Page 1

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF KENTUCKY

3                          CENTRAL DIVISION

4                             FRANKFORT

5               CIVIL ACTION NO. 3:19-cv-00049-GFVT

6                JUDGE GREGORY F. VAN TATENHOVE

7

8                          ZILLOW, INC.,

9                             Plaintiff

10

11                               V.

12

13      HON. THOMAS B. MILLER, IN HIS OFFICIAL CAPACITY AS

14     COMMISSIONER OF THE KENTUCKY DEPARTMENT OF REVENUE,

15                            ET AL.,

16                           Defendants

17

18

19

20

21

22

23    DEPONENT:  TOM CRAWFORD

24    DATE:      MARCH 11, 2021

25    REPORTER:  LINDSEY N. JOHNSON

Page 2

1        APPEARANCES
2
3 ON BEHALF OF THE PLAINTIFF, ZILLOW, INC.:
4 Darren W. Ford
5 Graydon Head & Ritchey, LLP
6 2400 Chamber Center Drive
7 Suite 300
8 Fort Mitchell, Kentucky 41017
9 Telephone No.: (859) 578-7263
10 E-mail: Dford@graydon.law
11 (Appeared via videoconference)
12
13 ON BEHALF OF THE DEFENDANTS, HON. THOMAS B. MILLER, IN
14 HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE KENTUCKY
15 DEPARTMENT OF REVENU, ET. AL.:
16 Richard W. Bertelson, III
17 Nicole Sergent
18 Office of Legal Services for Revenue
19 P.O. Box 423
20 Frankfort, Kentucky 40602
21 Telephone No.: (502) 564-9572
22 E-mail: Richard.bertelson@ky.gov
23     Nicole.sergent@ky.gov
24 (Appeared via videoconference)
25

Page 3

1              INDEX
2                      Page
3 PROCEEINGS                    5
4 DIRECT EXAMINATION BY MR. FORD          6
5 CROSS EXAMINATION BY MR. BERTELSON      46
6
7
8              EXHIBITS
9 Exhibit                  Page
10 Exhibit 2 - Notice of Deposition of the Office of    9
11    Commissioner of the Kentucky Department
12    of Revenue
13 Exhibit 3 - Complaint for Declaratory and Injunctive  17
14    Relief
15 Exhibit 6 - Defendants' Responses to Plaintiff's   29
16    First Set of Interrogatories
17 Exhibit 7 - PVA Budget              37
18
19
20
21
22
23
24
25

Page 4

1        STIPULATIONS
2
3 The 30(b)(6) deposition of TOM CRAWFORD was taken at the
4 office of Kentuckiana Court Reporters, located at 730
5 West Main Street, Suite 101, Louisville, Kentucky 40202,
6 via videoconference in which all participants attended
7 remotely, on Thursday, the 11th day of March 2021, at
8 10:55 a.m.; said deposition was taken pursuant to the
9 Federal Rules of Civil Procedure.  The oath in this
10 matter was sworn remotely pursuant to FRCP 30.
11
12 It is agreed that Lindsey N. Johnson, being a Notary
13 Public and Court Reporter for the State of Kentucky, may
14 swear the witness and that the reading and signing of
15 the completed transcript by the witness is not waived.
16
17
18
19
20
21
22
23
24
25

Page 5

1        PROCEEDINGS
2
3     COURT REPORTER:  We are now on the record.
4 Will all parties present please state your
5 appearance, how you are attending, and the location
6 you are attending from?
7     MR. FORD:  Darren Ford, via Zoom, from Fort
8 Mitchell, Kentucky for Plaintiff, Zillow, Inc.
9     MR. BERTELSON:  Rick Bertelson, on behalf of
10 all the defendants in the case including the
11 Department of Revenue.
12     I'm appearing with the witness at the State
13 Office Building, 501 High Street, Frankfort,
14 Kentucky, and we're on the tenth floor, and we're
15 appearing via Zoom.
16     MR. CRAWFORD:  I'm Tom Crawford.  I'm with the
17 Department of Revenue.  And as the witness said, I'm
18 at 501 High Street, the State Office Building.
19     MS. SERGENT:  And I'm Nicole Sergent, and I'm
20 appearing on behalf of the defendants.  I'm
21 appearing via Zoom based out of Lexington, Kentucky.
22     COURT REPORTER:  Thank you.  Mr. Crawford, will
23 you please hold your photo ID up to the camera and
24 wait until it is focused?
25     Do all parties present agree that the witness

2 (Pages 2 - 5)

Page 6

1  is, in fact, Tom Crawford?
2      MR. FORD:  Yes.
3      COURT REPORTER:  Mr. Bertelson?
4      MR. FORD:  She didn't hear you.
5      MR. BERTELSON:  Yes.
6      COURT REPORTER:  Thank you, sir.
7      Mr. Crawford, will you please raise your right
8  hand?
9      Do you swear or affirm that the testimony you
10  are about to give will be the truth, the whole
11  truth, and nothing but the truth?
12      THE WITNESS:  I do.
13      COURT REPORTER:  Thank you.
14      Mr. Ford?
15          DIRECT EXAMINATION
16  BY MR. FORD:
17      Q.   Good morning, Mr. Crawford.  My name is Darren
18  Ford.  I'm an attorney for Zillow, Inc., in a lawsuit
19  filed by it against various defendants in the United
20  States District Court for the Eastern District of
21  Kentucky including the commissioner for the Department
22  of Revenue, currently Thomas Miller.  If you could go
23  ahead and please introduce yourself?
24      A.   My name is Tom Crawford.  I'm the executive
25  director of the Office of Property Valuation within the

Page 7

1  Department of Revenue.
2      Q.   And what's your business address,
3  Mr. Crawford?
4      A.   501 High Street, Frankfort, Kentucky 40601.
5      Q.   And, Mr. Crawford, have you been deposed
6  before?
7      A.   Yes.  Some time ago though.
8      Q.   Okay.  Well, I'll give you a refresher course.
9  It won't take very long.  You understand that you are
10  here to give answers to the questions that I ask under
11  oath, correct?
12      A.   Correct.
13      Q.   And you understand the nature and consequences
14  of that oath, right?
15      A.   I do.
16      Q.   All right.  So the most important thing for us
17  to try to do today is to make a clear record to make
18  Ms. Johnson's job here as easy as possible.  A couple of
19  ways that we can do that is, one, try to avoid talking
20  over one another.  Obviously, in normal conversation,
21  that happens a lot.  When you are trying to write down
22  what people are saying, if they're talking at the same
23  time -- so both of us will need to -- I need to work on
24  that as well.  If you can keep that in back of your mind
25  when answering my questions, just give a little bit of a

Page 8

1  pause at the end of my question and then answer.  That
2  way, it makes Ms. Johnson's job that much easier, okay?
3      A.   Yes, sir.
4      Q.   Another thing that is -- makes it difficult
5  for Ms. Johnson are inaudible answers, head nods, head
6  shakes, that sort of thing.  So do your best, and I'll
7  try to remind you, if you give an "uh-huh" or something
8  like that, to give an audible answer.  That way, it's
9  clear what your answer is to the question, okay?
10      A.   Sounds good.
11      Q.   Another thing it's important to try to do
12  today is to make sure that we're both on the same page.
13  So if you don't understand one of my questions, which
14  will almost certainly happen this morning, please go
15  ahead and ask me for clarification. You are not under
16  any obligation to answer a question that you don't
17  understand.  I want to make sure that you do understand
18  my questions, okay?
19      A.   Yes, sir.
20      Q.   But if you go ahead and answer, I'm going to
21  assume that you understood it, okay?
22      A.   Got it.
23      Q.   All right.  And then finally, you are not a
24  hostage here this morning, so if you have any need to
25  take a break for any reason, please just let me know,

Page 9

1  and we'll do that.  My only request is if there's a
2  question pending, that you go ahead and answer that
3  question first, and then we'll take a break, okay?
4      A.   Sounds good.
5      Q.   Another thing that may happen throughout the
6  deposition this morning -- you may have heard in the
7  earlier one -- is Mr. Bertelson may interject some
8  objections to my question.
9      That's another good reason to give a little
10  bit of a pause, to give him an opportunity to do that.
11  If he does that, let him make his objection.  Unless he
12  instructs you not to answer the question though, you are
13  free to go ahead and answer the question when he's done
14  making the objection, okay?
15      A.   Okay.
16      Q.   All right.  Are on you any medications this
17  morning, Mr. Crawford, that you would affect your
18  ability to tell the truth?
19      A.   No.
20      Q.   How about medications that might affect your
21  ability to recall events or information?
22      A.   No -- no, sir.
23      Q.   All right.  If you would, Mr. Crawford,
24  hopefully you have some paper exhibits there in front of
25  you.  If you could pull out Exhibit 2 for me.

3 (Pages 6 - 9)

Page 10

1    (EXHIBIT 2 MARKED FOR IDENTIFICATION)
2    A.  2.  Yes, sir.  I've got it.
3    Q.  All right.  This document has a title of
4  "Notice of Deposition of the Office of Commissioner of
5  the Kentucky Department of Revenue."  Do you see that?
6    A.  Yes, sir.
7    Q.  On the second page of this document, there's a
8  list of topics numbered 1 through 6.
9    A.  Yes.  I see it.
10    Q.  All right.  And you understand that you are
11  here today to testify on behalf of the Office of the
12  Commissioner of the Kentucky Department of Revenue,
13  correct?
14    A.  Correct.
15    Q.  And my understanding is that your scope of
16  testimony will cover topic 1 -- except perhaps for the
17  mineral and GIS services, which Mr. Tackett testified to
18  -- number 2, number 5, and number 6; is that accurate?
19    A.  That's what I understand.  Yes, sir.
20    Q.  Okay.  And, Mr. Crawford, if you could just
21  briefly tell me what you did to prepare to testify on
22  topics 1, 2, 5, and 6 this morning.  And I don't want
23  you to reveal any communications with counsel.  I'm
24  looking for things like documents that you reviewed,
25  people that you may have interviewed, that sort of

Page 11

1  thing.
2    A.  Okay.  Yes.  I was provided with several
3  documents including the exhibits that I guess we're
4  going to go through this morning.  I did look through
5  them, and that's about all I did.
6    Q.  Okay.  So you didn't conduct any sort of
7  interviews with PVAs or anything like that?
8    A.  Oh, no, sir.  No.
9    Q.  Okay.  Did you review any internal documents
10  other than the exhibits that you were provided by
11  counsel?
12    A.  No, sir.
13    Q.  Did you have any conversation with any other
14  executive leadership -- Mr. Miller, anything like that -
15  - about your testimony this morning?
16    A.  No, sir.
17    Q.  Okay.  How long have you been with the
18  Department of Revenue, Mr. Crawford?
19    A.  Almost 36 years.
20    Q.  And how long have you been in your current
21  role as executive director of the office of property
22  valuation?
23    A.  Almost a year.  I was appointed April 1, 2020.
24    Q.  And were you appointed by Mr. Miller?
25    A.  Yes.

Page 12

1    Q.  What was your -- what was your title prior to
2  being appointed by Mr. Miller to your current position?
3    A.  I was the director of the division of local
4  support within the office.
5    Q.  All right.  And when you say, "within the
6  office," that's the Office of Property Valuation for the
7  DOR --
8    A.  Yes, sir.
9    Q.  -- Department of Revenue?
10    A.  Yes, sir.
11    Q.  Okay.  And then just since we're going to
12  almost surely do this here going forward, I just want to
13  make sure we're on the same page with acronyms:  So if I
14  use the acronym PVA, you understand I mean property
15  valuation administrator?
16    A.  Yes.
17    Q.  Okay.  If I use DOR, you understand I'm
18  referring to the Kentucky Department of Revenue?
19    A.  Yes.
20    Q.  What were your job responsibilities in your
21  capacity as director -- I'm sorry, is it director of
22  local services or local support?
23    A.  It's local support, yes.  And that was a
24  division that was responsible for compiling all PVA
25  assessment totals, and ultimately resulting in a tax --

Page 13

1  property tax roll certification for every county so that
2  they can go ahead and set the property tax rates each
3  year, and then you get your property tax bill in the
4  fall.
5    Q.  Okay.  How long were you in that role?
6    A.  I think I was appointed in 2014, and then I
7  served previous to that back in 2000 for about three
8  years.
9    Q.  And prior to your current -- I won't call it a
10  "term," but I guess maybe it sort of is since you were
11  appointed -- you were the director prior to your current
12  term?
13    A.  Well, we were a cabinet back then.  I was
14  appointed as acting commissioner.  That's not the same
15  as Tom Miller, but it's the same position when we were a
16  cabinet.  I was appointed acting commissioner in --
17  gosh, 2000 -- December of '01, I believe, and I went
18  through '03.  That may be -- I may be off a year.  I
19  served about 17 months as acting commissioner.
20    Q.  Okay.  And that -- is it the whole DOR, or is
21  it just property value?
22    A.  No.  That's what I'm -- I know it's a
23  different term, but we were a cabinet back then, so they
24  called us commissioners.  So it was just over the Office
25  of Property Valuation.

4 (Pages 10 - 13)

Page 14

1    Q.  Got you.  Okay.  As Mr. Miller is the
2  commissioner of the entire Department of Revenue --
3    A.  Yes.
4    Q.  -- you were commissioner when it was the
5  cabinet of just the property valuation portion?
6    A.  Yes.
7    Q.  Got you.  And now they have changed titles,
8  and you are executive director instead of commissioner?
9    A.  Yes, sir.
10    Q.  Okay.  What are your general job
11  responsibilities as executive director of the Office of
12  Property Valuation?
13    A.  Well, they've expanded to being responsible
14  for not just the -- though these I had before as
15  director, but I now supervise the Division of State
16  Valuation, which covers motor vehicle taxation, tangible
17  property, and the assessment of public service
18  companies, and then I also supervise Mike Tackett's area
19  of the division of minerals and GIS services.
20    Q.  Okay.  With respect to PVAs in the
21  Commonwealth of Kentucky, can you generally describe
22  what your responsibilities are with respect to PVA
23  offices?
24    A.  Well, I'm still responsible for making sure
25  that they are meeting our fair cash value standards for

Page 15

1  all real property assessments, and we also provide
2  guidance in other areas like homestead exemptions,
3  agricultural exemptions, and things to that nature to
4  the PVAs.
5    Q.  You understand Mr. Miller in his capacity as
6  commissioner of the Department of Revenue has
7  supervisory authority over PVAs in the Commonwealth of
8  Kentucky?
9    A.  I do.
10    Q.  Do you know from -- in your capacity as
11  executive director for the Office of Property Valuation,
12  do you know if Mr. Miller has the power to issue a legal
13  director -- directive or order to property valuation
14  administrators in the Commonwealth of Kentucky?
15    A.  He does.
16    Q.  Okay.  And what types of directives is
17  Mr. Miller, in your understanding, authorized to provide
18  or give to PVAs in the Commonwealth of Kentucky?
19    A.  Well, if he sees a problem or if I advise him
20  of an issue that needs to be corrected immediately or as
21  soon as possible, then he can issue a directive to that
22  PVA that, you need to get such-and-such fixed by X date.
23    Q.  Okay.  And so if you in your capacity see a
24  problem and you want to, you know, get a PVA to fix that
25  problem, you would go through Mr. Miller who has the

Page 16

1  statutory authority to issue such directive; is that
2  correct?
3    A.  If I was unsuccessful myself in getting the
4  problem resolved, yes, that's what I would do.
5    Q.  Okay.  And do you have regular interactions
6  with PVAs in your capacity as executive director when
7  you speak to individual PVAs in the counties on a
8  regular basis?
9    A.  I do.
10    Q.  Okay.  And what kinds of -- well, strike that.
11      Listed in topic 1, there's a title of
12  "Executive director, Kentucky PVA association.  Do you
13  see that?
14    A.  Yes.  I do, yes.
15    Q.  Okay.  And that's one of the portion of topic
16  1, is the job responsibilities.  Now, my understanding
17  is Kentucky PVA Association is essentially a private
18  organization.  It doesn't have any sort of legal
19  authority; is that correct?
20    A.  I would think that's right, yes.
21    Q.  Okay.  So the executive director of the
22  Kentucky PVA Association is not somebody who has an
23  office in Frankfort paid for by public tax dollars
24  directly, correct?
25    A.  That is correct, yes.

Page 17

1    Q.  Presumably that association is funded by
2  offices out of their budget, right?
3    A.  That is correct.
4    Q.  And they have -- and the executive director of
5  the Kentucky PVA Association has no legal authority or
6  supervisory authority with respect to PVAs, correct?
7    A.  That is correct.
8    Q.  That's solely Mr. Miller, correct?
9    A.  Correct.
10    Q.  Are you familiar, Mr. Crawford -- let's just
11  go ahead and look at them.  If you could pull out
12  Exhibit 3 for me.
13      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
14    A.  Okay.  I'm with you.
15    Q.  And if you could turn -- if you notice, this
16  document has a caption on the first page, Zillow, Inc.
17  versus various individuals.  First in the list is
18  Honorable Pete Bork, who is the former commissioner of
19  the Kentucky Department of Revenue.
20      He's been substituted obviously with
21  Mr. Miller now.  And if you turn to the third page, it's
22  a complaint for declaratory and injunctive relief.  Do
23  you see that --
24    A.  Yes.
25    Q.  -- Mr. Crawford?

5 (Pages 14 - 17)

Page 18

1    A.  I do, yes.
2    Q.  Have you had a chance to review this complaint
3  at some point in the past?
4    A.  I have.  I'll be honest: It was a lot of
5  pages, so I didn't read it all of it.  I'll tell you
6  that right now.  I skimmed it though.
7    Q.  Okay.  You didn't -- but you didn't look at it
8  and study it in preparation for your testimony this
9  morning?
10    A.  Well, like I said, I made a cursory review of
11  it.
12    Q.  Okay.  What's your understanding of Zillow's
13  claims in this action?
14    A.  That -- well, my understanding is that they
15  object to the charges being levied against them by the
16  PVAs for getting access to their records, the PVA's
17  records.
18    Q.  Okay.  All right.  If you could turn with me -
19  - see there are some numbers at the top right-hand
20  corner next to the page ID number?  Do you see that?
21    A.  Yes. I do.
22    Q.  Okay.  If you could, Mr. Crawford, turn to
23  page ID number 34, and just let me know when you are
24  there.
25    A.  Okay.  I'm ready.

Page 19

1    Q.  All right.  Mr. Crawford, this document has a
2  header of "PVA Open Records Commercial Fee Guidelines."
3  Do you see that?
4    A.  I do.
5    Q.  Are you familiar with this document?
6    A.  I am.
7    Q.  And over the left-hand side there, there's a
8  date of 8-12.
9    A.  Yes, sir.
10    Q.  Is it accurate to say that this is the version
11  of the commercial -- strike that.
12      Is it accurate to say that this is the version
13  of the PVA open records commercial fee guidelines that
14  went into effect in August of 2012?
15    A.  That's correct.
16    Q.  And this is the current version that PVAs
17  utilize in the Commonwealth of Kentucky, correct?
18    A.  Yes.
19    Q.  And is it accurate to say that these
20  commercial fee guidelines are published by the
21  Department of Revenue?
22    A.  They are.
23    Q.  And is it also accurate to say that the
24  Department of Revenue has final authority over what the
25  amounts in this document ultimately are?

Page 20

1    A.  That is correct.
2    Q.  And is it correct to say that the Kentucky PVA
3  Association has no ability to veto or override any
4  determinations made by DOR with respect to these
5  amounts?
6    A.  Correct.
7    Q.  And is it the DOR's policy that PVAs in the
8  Commonwealth of Kentucky comply with and follow these
9  guidelines?
10    A.  Yes -- I mean, yes, we do, yes.
11    Q.  Okay.  Are those expectations communicated by
12  the DOR, that the all PVAs in the Commonwealth of
13  Kentucky should charge for their public records in
14  accordance with these fee guidelines for commercial --
15    A.  That is --
16    Q.  -- request?
17    A.  I'm sorry, you kind of cut out, but I
18  understood the question.  Yes.  It is our -- that is
19  correct, yes.
20    Q.  Okay.  And do you understand that if -- strike
21  that.
22      Do you PVAs generally operate on the view that
23  they have the ability to charge less than these
24  commercial fee guidelines prescribed, for instance, to
25  provide commercial purpose requesters for records for

Page 21

1  free?
2    A.  I'm sorry, I'm going to have to ask you repeat
3  that question for me.  I'm sorry.
4    Q.  It was a bad question.  Those are those the
5  types of questions that you should make me ask again
6  because they're not good.  All right.  Do you understand
7  that PVAs have discretion to charge less than the
8  amounts prescribed in these commercial fee guidelines?
9    A.  Well, it's my understanding that these are
10  recommended guidelines, and I -- yes, I am aware of PVAs
11  sometimes charging less.
12    Q.  But your general policy at the DOR is to
13  encourage PVAs to charge in accordance with these
14  guidelines, correct?
15    A.  Correct.
16    Q.  If you can turn a couple more pages into this
17  document to page ID 37.
18    A.  I'm with you.
19    Q.  And this document has a title, "Request For
20  Reproduction of PVA Public Records and Contract for
21  Commercial Users" --
22    A.  Yes.
23    Q.  -- "as Part of Revenue."  Do you see that?
24    A.  Yes, sir.
25    Q.  Is this a document that is created by DOR?

6 (Pages 18 - 21)

Page 22

1   A.   Yes.
2   Q.   Okay.  And is it DOR's policy that PVAs in the
3   Commonwealth of Kentucky utilize this document in
4   connection with requests for records that they may
5   maintain?
6   A.   Yes.
7   Q.   Does the DOR publish any sort of contract or
8   noncommercial requesters of PVA records?
9   A.   Not that I'm aware of.
10  Q.   And if you move forward in this document to
11  page ID 39 --
12  A.   Okay.
13  Q.   -- and this document has the title, "Contract
14  and Fee Schedule for Commercial Users of PVA Office
15  Records for Use When Non-Geographic System Records are
16  Requested"?
17  A.   Yes.  That's correct.
18  Q.   And is this another document that the DOR
19  creates?
20  A.   Yes.
21  Q.   And is it the DOR's policy and expectation
22  that property valuation administrators will utilize this
23  contract for requests made for the records for a
24  commercial purpose?
25  A.   Yes.

Page 23

1   Q.   All right.  You've been with the DOR for a
2   long time, Mr. Crawford.  Were you involved at all in
3   creating any of these documents personally?
4   A.   The contract, you mean?
5   Q.   Either the fee schedule, the request for
6   reproduction, or the contract, any of those three.  Were
7   you involved in any of those?
8   A.   I guess I was somewhat involved in the 2012,
9   not in any great detail that was the handled by the
10  previous executive director, but I was certainly aware
11  that he was working on it.
12       I'm sure he and I had conversations about it,
13  but not in any meaningful form I was involved.  And
14  likewise with the contracts: I certainly was aware that
15  they were being crafted and developed, but other
16  attorneys and the previous executive director had
17  primary responsibility for developing those.
18  Q.   Is it your understanding that if DOR wanted to
19  change the commercial fee guidelines that we looked at
20  in Exhibit 3 on page 34, that it has the ability to
21  change those to whatever it deems appropriate?
22  A.   Yes.
23  Q.   And is it accurate to say that if Mr. Miller,
24  as commissioner of the Department of Revenue, directed a
25  property valuation administrator to charge a certain

Page 24

1   amount for public records maintained by that PVA, that
2   he would have the power to issue such a directive?
3   A.   I would say yes.
4   Q.   Are you familiar with the Kentucky Open
5   Records Act, generally, Mr. Crawford?
6   A.   Yes, sir.  I am, generally.
7   Q.   Okay.  If you could turn with me in Exhibit 3
8   to page 10 of that document.
9   A.   Okay.
10  Q.   And you see at the top of page 10, there's a
11  definition for "commercial purpose."  Do you see that?
12  A.   I do.
13  Q.   And it's two subparagraphs, A and B.  The
14  first, A, is sort of the overall definition of
15  "commercial purpose," and then B is some exceptions to
16  that.  Would you agree with me?
17  A.   Yes, sir.
18  Q.   Were you familiar with that definition prior
19  to today?
20  A.   Yes, sir.
21  Q.   Does your office, DOR, your executive director
22  of your Office of Property Valuation, do you offer any
23  sort of training to PVAs in how to interpret or apply
24  that definition?
25  A.   No.  We've included it in various assessment

Page 25

1   administration manuals, but it's only to show them the
2   definition that's in statute.
3   Q.   And so not to repeat myself, but there's not
4   any sort of course or training that DOR offers to PVAs
5   in trying to determine whether or not a request is for a
6   commercial purpose; correct?
7   A.   That's correct.  There's no training.
8   Q.   Is it DOR's expectation that PVAs will --
9   well, strike that.
10       Let me ask it this way: We looked at the
11  request for reproduction, if you recall, the DOR
12  publishes for use by PVAs.
13       That was on page ID 37.
14  A.   I'm with you.
15  Q.   And you know paragraph 3 of this request for
16  reproduction has a section where it basically asks a
17  requester to identify the use of the information,
18  whether it's for commercial or noncommercial?
19  A.   Yes, sir.
20  Q.   Is it DOR's policy that PVAs question a user's
21  classification of itself as a commercial or
22  noncommercial purpose used, based upon the information
23  that the requester provides?
24  A.   Yes, yes.
25  Q.   So I want to ask just a hypothetical.  If a

7 (Pages 22 - 25)

Page 26

1 requester were to make a request for the -- strike that.
2          Let me define some terms first. Are you
3 familiar with the types of records, generally, that PVAs
4 maintain?
5     A. In general, yes.
6     Q. And are you familiar with the term "property
7 tax roll file database"? Have you heard that thrown
8 around?
9     A. I have, yes.
10    Q. Okay. And if I were to generally describe
11 that as all of the information that the PVA collects
12 about properties within its jurisdiction and inputs into
13 its software, that that information is the database that
14 sometimes people request from it, correct?
15    A. Yes. I agree with that.
16    Q. All right. And so is it DOR's policy that if
17 the PVA gets a tax roll database from the requester and
18 it indicates that it intends to utilize that information
19 for some sort of business activity, but indicates
20 noncommercial as the use, would it be DOR's policy and
21 expectation that a PVA would question that
22 self-classification?
23    A. If I was a PVA, I would question that, yes, so
24 I would think that would be a wise thing to do. Whether
25 it's a policy or not, I don't know, but I think that a

Page 27

1 reasonable PVA would question that, yes.
2     Q. And so that's a fair -- that's a fair
3 clarification, I guess, is that a PVA who did that, who
4 said, I don't believe you, I think this is a commercial,
5 it wouldn't be inconsistent with any DOR policy for them
6 to question that self-classification; is that correct?
7     A. That is correct.
8     Q. Are you aware of -- and I don't want to get
9 into any sort of legal advice or memos that have been
10 drafted by lawyers advising DOR -- but are you aware of
11 any internal memos or other written guidance that DOR
12 maintains for itself that provide an analysis or
13 explanation of what a commercial purpose is for PVA
14 records specifically?
15    A. I'm not aware of any, no.
16    Q. If a PVA has a question about whether or not a
17 requester receives for its records for a commercial
18 purpose within the Open Records Act, does your office
19 provide any sort of resources like a person that a PVA
20 could call up and say, hey, you know, I'm not sure what
21 to do with this, then that person could provide some
22 guidance?
23    A. I would expect them to call Mr. Tackett on
24 that.
25    Q. Okay. And Mr. Tackett is the director of --

Page 28

1 is it mineral -- sorry.
2     A. Minerals taxation and GIS services.
3     Q. Minerals taxation and GIS services. Okay. So
4 you would expect him in his purview that he would
5 field the question about compliance with the Open
6 Records Act even if it wasn't specific to GIS services
7 or GIS records?
8     A. I would expect him to respond to a PVA, and
9 ask him if whether or not they are for -- is this for a
10 commercial purpose.
11         I would expect Mr. Tackett to give a qualified
12 opinion on that, yes.
13    Q. Okay. Mr. Tackett's not a lawyer though,
14 correct?
15    A. No.
16    Q. Does Mr. Tackett, to your knowledge, have any
17 specialized training in Open Records Act application;
18 anything like that?
19    A. Other than with his generally being familiar
20 with the statutes, that's it.
21    Q. Okay. Any other resources that your office
22 offers to a PVA who may have a question about whether or
23 not a request is for a commercial purpose or not?
24    A. No. None that I'm aware of.
25    Q. What about the DOR as a whole? Are there any

Page 29

1 -- is there anybody in DOR who is considered to be a
2 guru or expert in open records law that might give -- a
3 PVA might get referred to that section?
4     A. We do have an open records request area within
5 the Department of Revenue. Very rarely, maybe a PVA
6 would consult with that person.
7     Q. Okay. What's the -- what's the name of that
8 office or person, currently; if you know?
9     A. I just know it as the "open records request
10 area." It's in my global e-mail that way.
11    Q. That's fine.
12         MR. BERTELSON: Slightly outside the topics. I
13 didn't ask you to come in with that, so that's okay,
14 but there is some area in DOR that sort of deals
15 with open records.
16         MR. FORD: Yes. Absolutely.
17 BY MR. FORD:
18    Q. All right. Mr. Crawford, turn back to Exhibit
19 -- actually, not "turn back." I don't think we have
20 marked it yet for your deposition. Exhibit 6, if you
21 could pull that out for me.
22         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
23    A. I've got it.
24    Q. All right. And one of the topics in the list
25 of topics in which you were prepared to testify today is

8 (Pages 26 - 29)

Page 30

1  number 5, which is the commissioner's answer to
2  Interrogatory number 10, including whether and how each
3  of the interests identified in response to that
4  interrogatory is substantial and how each substantial
5  interest is advanced by the commercial purpose fee
6  statutes.
7          And you are prepared to testify on that topic,
8  correct, Mr. Crawford?
9      A.  Oh, I'm sorry, I didn't mean to talk over you.
10  I am.
11      Q.  Okay.  And so let's go ahead and turn to that
12  question and answer, which is on page 30 of Exhibit 6.
13      A.  I'm with you.
14      Q.  And the question in number 10 is, "State what
15  governmental interest you contend the commercial purpose
16  fee statutes as that term is defined in the complaint
17  advance and how the law advances each interest
18  identified," and then there's a lengthy answer there.
19  I'll give you a moment to go ahead and read that, and
20  let me know when you are done.
21      A.  I'm ready.
22      Q.  Okay.  So the first part of this answer states
23  that, "The PVA offices expend a considerable sum of
24  public funds to gather, process, create, catalog,
25  manage, and store the data requested by Zillow."  Do you

Page 31

1  see that?
2      A.  Yes, sir.
3      Q.  Do PVAs in the Commonwealth of Kentucky
4  collect information solely for the purpose of responding
5  to public records requests?
6      A.  No, sir.
7      Q.  So there's not a specific category or type of
8  information that PVAs collect that they do so only so
9  that they can respond to the public records requests,
10  correct?
11      A.  (No verbal response.)
12      Q.  Correct?
13      A.  Correct.  I'm sorry, yeah.
14      Q.  I didn't hear you, so I figured Lindsey
15  probably hadn't you, either.  And the second part of
16  that answer says, "The Kentucky legislature has created
17  a statutory right to access this information and data
18  through the Open Records Act, KRS 61.870 to 61.884, and
19  for the collection of fees that offset the cost of the
20  commonwealth of gathering, processing, creating,
21  cataloging, managing, or otherwise acquiring and storing
22  the data and information by person and business entities
23  such as the plaintiff, make it profitable use of the
24  data and information in their private business
25  ventures."  Is it your understanding that the Kentucky

Page 32

1  legislature commercial purpose provisions or commercial
2  purpose fee statutes are for the purpose of offsetting
3  the cost to PVAs to run their office?
4      A.  It's to offset parts of their cost to run
5  their office.  Yes, sir.
6      Q.  And those offices though are not created to
7  satisfy public records requests, correct?
8      A.  Well, maybe.
9          MR. BERTELSON:  I object to the form of the
10  question.
11          That is rather confusing.
12          MR. FORD:  Okay.  I can re-ask the question.
13  BY MR. FORD:
14      Q.  The cost that the PVAs incur are costs that
15  they're going to incur irrespective of whether they ever
16  receive a public records request, correct?
17      A.  That is correct.
18      Q.  And so the income that comes in from public
19  records requesters who pay for their records, if that
20  income were to cease, PVAs wouldn't be able to stop
21  doing what they do with respect to collecting
22  information, correct?
23      A.  It would be a hardship, but no, they would not
24  be allowed to stop what they're doing.
25      Q.  Are you familiar with Zillow as a business,

Page 33

1  generally?
2      A.  Generally, yes.
3      Q.  Okay.  What's your understanding of what
4  Zillow does?
5      A.  They have a large website that has lots of
6  properties listed for sale.  They have -- they could
7  provide -- I think you call them "Zestimates" of
8  properties' values.  And I know you are expanding into
9  various other businesses related to that but, you know,
10  just my primary use is just look for properties listed
11  for sale.
12      Q.  So you have used Zillow personally to look for
13  properties listed for sale?
14      A.  Yes.
15      Q.  And you don't pay anything to go on Zillow,
16  correct?
17      A.  I do not.
18      Q.  Do you find the information that Zillow has on
19  its website useful?
20      A.  Yes.  It's interesting.
21      Q.  You understand that the commercial -- or the
22  Open Records Act and the definition of "commercial
23  purpose" excepts from the definition of "commercial
24  purpose," requests made for the purpose of publishing or
25  related use in a newspaper or periodical.  Are you

9 (Pages 30 - 33)

Page 34

1 familiar with that exception?

2     A.  I am.

3     Q.  Okay.  What purpose does that exception to the
4 definition of "commercial purpose" advance; in your
5 view?

6     A.  Well, I believe that was designed to assist
7 newspapers or other reporters to make sure there's
8 transparency in government so that, you know, we're not
9 doing anything wrong or trying to hide anything from the
10 taxpayer.  They are holding us accountable for taxpayer
11 dollars, so the legislature deemed other newspapers or
12 other related entities except from those fees.

13     Q.  Is there something that makes Zillow
14 publishing the information on its website to users like
15 yourself, free of charge so they can go on and look at
16 that information, different than if a newspaper were to
17 do the identical thing on its website?

18     A.  Okay.  I didn't understand quite the last part
19 of your question there.

20     Q.  Sure.  So the statute allows a PVA to not
21 charge -- well, strike that.  Let me rephrase that:

22     The statute precludes a PVA from charging a
23 newspaper for its public records if the newspaper
24 indicates it's going to publish, correct?

25     A.  Yes.

Page 35

1     Q.  But the position that some certain PVAs in
2 this litigation have taken is that they can charge
3 Zillow, which intends to publish the information on its
4 website, as a commercial purpose requester, correct?

5     A.  Correct.

6     Q.  So what is the interest that in newspaper
7 publication of this information differently than how
8 Zillow intends to use it?

9     A.  Well, my understanding is Zillow is a
10 for-profit company using this information to, you know,
11 provide accurate information for users for free -- like
12 me -- but you are also getting various treaties from
13 advertisers and other agencies to sponsor those
14 websites, and that's your revenue stream, but you're
15 also not promoting the public goods.  You're not holding
16 me accountable as state official, making sure I'm doing
17 my job.

18     You're not publishing stories of governmental
19 interest to expose or maybe commend, I hope, a
20 governmental official for doing something good or bad.
21 To my knowledge, Zillow does not do that.  It's just a
22 straight presentation of the data that is used -- for
23 users to access, and it's part of a business model.  You
24 have other advertisers or whatever that provides income
25 towards Zillow.

Page 36

1     Q.  I think early on in your answer, you used the
2 term "for-profit."  Is it your understanding that if a
3 newspaper indicated that it made a profit publishing
4 information, that that would change whether it was a
5 newspaper or not?

6     A.  No, sir -- no, sir.  Because they have a
7 specific exception in the statute.

8     Q.  So the fact that the newspaper earns a profit
9 from selling advertising in its paper, that's not a
10 factor that could be considered for purposes of whether
11 its exempt as a commercial purpose?

12     A.  That's what the general assembly has deemed
13 it.  Yes, sir.

14     Q.  So for-profit really doesn't come into play,
15 does it?

16     A.  Yeah.  You're right.

17     Q.  But generally -- I don't want to the
18 mischaracterize what you said -- but generally, the
19 issue, in your understanding, is that Zillow, from your
20 office's perspective, is more narrow in focus.,  It
21 doesn't publish stories like a newspaper, and that
22 distinguishes it in terms of how to use the information?

23     A.  Yes, sir.

24     Q.  Are you familiar with the budgeting process
25 that PVAs engage in on an annual year?

Page 37

1     A.  In a general sense, yes, I am.

2     Q.  Okay.  And if you would pull out Exhibit 7 for
3 me, Mr. Crawford.

4         (EXHIBIT 7 MARKED FOR IDENTIFICATION)

5     A.  Yes.  I have it, yes.

6     Q.  And is this a document that you have seen
7 before?

8     A.  It is, yes.

9     Q.  And my perception of this document -- and tell
10 me if I'm wrong -- is that this is sort of a compilation
11 of all of the PVA budgets in the Commonwealth of
12 Kentucky for fiscal year 2020-2021?

13     A.  Oh, thank you.  Yes.  It is.

14     Q.  Okay.  And this is something that I --
15 presumably your office or somebody in your office would
16 have prepared?

17     A.  Somebody in my office did, yes.

18     Q.  Okay.  Do you personally take any sort of
19 active role in reviewing PVA budgets for approval?

20     A.  No.

21     Q.  Okay.  Does the DOR, your office, have any
22 sort of expectation or policy that a PVA should budget
23 for what it will cost to reproduce public records in
24 response to public records requests on an annual basis?

25     A.  Are you talking about budgeting and expense to

10 (Pages 34 - 37)

Page 38

1  respond to those open records?  I don't -- I know of no
2  policy, no.
3      Q.   Have you ever received any complaints from a
4  PVA saying that the amount of time and cost that they
5  were incurring to respond to public records requests for
6  their property tax roll database were to owners and that
7  they needed more money to be able to do that?
8      A.   Well, I've received complaints, but probably
9  not in the area that you are describing in your
10  question.
11      Q.   Well, that's why I was being very specific
12  because if I were to ask you if you ever received
13  complaints from PVAs about their budget, we could
14  probably be here for about four days and then probably
15  still wouldn't cover it.  So I want to be very, very
16  specific in the type of complaint is that: Have you ever
17  received a complaint from a PVA saying, hey, copy my
18  property tax roll database and providing public records
19  requesters, that takes a lot of time, I need to hire
20  somebody, or I need more money to be able to do that.
21  Have you ever received a complaint or request like that
22  from a PVA?
23      A.   No.
24      Q.   And is it your understanding that PVAs
25  generally include an estimation of income that they

Page 39

1  expect to earn from selling their records to public
2  records requesters?
3      A.   Their budget process, you mean?  Yes.  They
4  do.
5      Q.   Okay.  And you understand at least -- well,
6  strike that.
7          Do you understand that they put that line item
8  under their miscellaneous income in anticipated
9  receipts?
10      A.   Yes.
11      Q.   Okay.  Has -- have you ever had a discussion
12  or received a complaint from a PVA where they've said, I
13  did not receive what I expected to receive this year
14  from public records requests and income, and, therefore,
15  I'm not able to meet my anticipated receipts for this
16  year?
17      A.   No.  I have not.
18      Q.   Have you ever had a conversation with a PVA in
19  your capacity as executive director where a PVA has
20  indicated that it needs to lay off an employee because
21  it did not receive enough in fee income from selling its
22  records to public records requesters?
23      A.   No.
24      Q.   Are you aware of that ever having happened
25  during your time with the Office of Property Valuation?

Page 40

1      A.   No.
2      Q.   If PVAs were to compel to provide their
3  property tax roll database to Zillow as a noncommercial
4  requester, what adverse effects that would have on the
5  PVAs office or your office's ability to perform its
6  statutory duties, if any?
7      A.   Well, it would have an impact on their budget
8  receipts, obviously.  And they might be able to get,
9  substantially, all their work done, but I'm sure there
10  would be some shortfalls, and maybe they couldn't get
11  all of their assessments done quite as timely as they
12  normally would have.  Sometimes it makes a difference in
13  an employee getting paid mileage to go out into the
14  field to do the work or go into a class to learn more
15  about his or her job.  So it would have an impact, but
16  overall, it would maybe delay getting the work done.
17  But it would not prevent totally getting the work done.
18      Q.   Let me rephrase this because I think you
19  answered a different question --
20      A.   Okay.
21      Q.   -- which was: What if they couldn't charge for
22  any records, and my question is specific as to Zillow,
23  individually.
24      A.   Oh, my apologies.  Well, I don't know what the
25  extent is of the charges are for Zillow, so I don't

Page 41

1  know.
2      Q.   Well, do you know if PVAs currently depend
3  upon getting money from Zillow every year to run their
4  offices?
5      A.   I'm not aware of that.
6      Q.   Okay.  Are you -- do you know if Zillow ever
7  paid any of the PVAs or defendants in this case for the
8  records that they requested?
9      A.   I do not know.
10      Q.   And so at least from your position as
11  executive director of the Office of Property Valuation,
12  whether or not Zillow pays money to a PVA on an annual
13  basis, is that something that you factored into your
14  overall running of the office of property valuation?
15      A.   No.
16      Q.   And so going back to my specific question:
17  Can you identify any adverse effects that would flow
18  from PVAs not being able to charge Zillow for a copy of
19  their property tax roll database?
20      A.   Well, I will reiterate my earlier concerns
21  about what I said before about possibly -- it could have
22  some adverse impact on getting some work done, but
23  depending on the extent -- but, again, you're right:
24  With Zillow, I don't know for certain.
25          I don't know.

11 (Pages 38 - 41)

Page 42

1    Q.   Okay.  When you say, "getting work done," what
2  work would not be able to get done if --
3    A.   Well, again --
4    Q.   -- property tax roll database --
5    A.   Right.
6    Q.   -- without the charge?
7    A.   They would have some delays in getting a field
8  rep or field representative of their staff to go out and
9  do some fieldwork, perhaps, or not being able to pay
10 them mileage or whatever.  Sometimes that happens.  In
11 these smaller offices, you know, $400 or 500 is a big
12 deal to them, so that they have to keep the employees in
13 the office, so they don't allow them to go to
14 educational courses or benefit them, that type of thing.
15   Q.   Sure.  And I just I want to make sure though
16 that we're talking about the same thing --
17   A.   Yeah.
18   Q.   -- because at this point, if the -- if they're
19 not getting money from Zillow --
20   A.   Right.
21   Q.   -- then they don't depend on that income,
22 correct?
23   A.   That's true.
24   Q.   And do you know what types of costs a PVA
25 would incur to copy the property tax roll database and

Page 43

1  send that to Zillow?
2        Do you know what that cost is?
3    A.   Well, the actual cost of copying is probably
4  very small, but the actual data that is provided is what
5  we're trying to offset.
6    Q.   And I understand that there's costs involved
7  in collecting that, but you do that regardless of
8  whether Zillow asks for it or not, right?
9    A.   Correct.
10   Q.   So the actual act of copying, your
11 understanding is that that cost to the PVA is relatively
12 small, correct?
13   A.   Correct.
14   Q.   Okay.  And so in terms of adverse effects to
15 an office, is there anything beyond the time it would
16 take them to copy that information and provide it to
17 Zillow, which might involve some employee time?  Is
18 there anything beyond that that you would consider to be
19 an adverse effect if they were compelled to provide
20 those records to Zillow free of charge?
21   A.   None beyond what you identified.
22   MR. FORD:  Mr. Crawford, why don't you give me
23 about five -- let's say, ten minutes?  I don't want
24 to bring you back twice.  Give me about ten minutes
25 here, and I'm going to organize my thoughts here,

Page 44

1    and I might be done with you here today.
2        COURT REPORTER:  Off the record.
3         (OFF THE RECORD)
4        COURT REPORTER:  Back on the record.
5  BY MR. FORD:
6    Q.   Mr. Crawford, you understand that you're still
7  under oath, correct?
8    A.   Yes, sir.
9    Q.   Okay.  Does the PVA have any sort of -- strike
10 that.
11       Does your office have any sort of directive or
12 policy about PVAs creating websites through which the
13 public can access the information in its property tax
14 roll file database?
15   A.   No.  We don't.
16   Q.   Okay.  But you understand that some PVAs has
17 some such websites and have subscription fees?
18   A.   Yes, sir.
19   Q.   Do you think it's important for the public to
20 be able to have access to information about how the
21 state is taxing property?
22   A.   How the state -- yes.  I do.
23   Q.   And is there a policy PVA of facilitating
24 public getting access to the entirety of the tax roll
25 property databases that PVAs maintained and --

Page 45

1        MR. BERTELSON:  I'm going to object to the form
2    of the question.  That's too confusing.
3        MR. FORD:  Okay.  Let me see if I can rephrase
4    that.
5  BY MR. FORD:
6    Q.   Does DOR, your office, have any sort of
7  policy, or directive initiative, or anything like that,
8  that encourages PVAs to publish their entire property
9  tax roll database for free so that residents of the
10 county can see what types of assessments and revenue are
11 being generated?
12   A.   There's a statute that says they have to have
13 a tax roll data available for public inspection.
14   Q.   But that's actually paper inspection, right?
15   A.   Not necessarily.  I mean, a lot of times, in
16 my long career, as you pointed out to me, yes, there
17 have been -- there used to be a paper tax roll, and
18 there still may be in some counties, but now they have
19 electronic access to that tax roll.
20   Q.   Okay.  And so your understanding is that PVAs
21 have to make the electronic version of that available in
22 its totality to the public?
23   A.   Yes, sir.
24   Q.   And that's something maybe a terminal or
25 something that each PVA office where someone could come

12 (Pages 42 - 45)

Page 46

1  in and access it?
2      A.  That's correct.
3      Q.  Okay.  All right.  Mr. Crawford, I always give
4  witnesses an opportunity to amend or correct any
5  testimony that they have given during the course of the
6  deposition.  Is there anything that you've testified to
7  here today that you would like to amend or correct
8  before I pass you to Mr. Bertelson?
9      A.  No, sir.
10      MR. FORD:  Okay.  Well, subject to any
11  potential re-cross, I will go ahead and pass the
12  witness.
13          CROSS EXAMINATION
14  BY MR. BERTELSON:
15      Q.  Tom, thanks for being here today.  I
16  appreciate your time.  I know this is a very busy period
17  of time for both PVAs and for your office, so we
18  appreciate you being here to answer questions for us
19  with regards to this case. I think I've just got one
20  quick follow-up.  Mr. Ford asked you about whether or
21  not -- not being able to collect fees for commercial
22  purpose users for open records would result in any
23  adverse effects on a PVA's -- in general, a PVA's
24  offices.  Is it correct that, could not having the
25  ability to supplement their office budgets with the

Page 47

1  miscellaneous income that includes open records fees,
2  commercial purpose fees could result in adverse effects
3  on their ability to properly assess all of the
4  properties in their county over a period of time?
5      MR. FORD:  Objection.  Calls for speculation.
6      Go ahead.
7      A.  In my opinion, that could be the case.  If
8  they don't have sufficient funds to pay for timely
9  fieldwork, or things of that nature, or get software
10  that helps them with their fieldwork, then the
11  assessments could suffer, or at least -- at the very --
12  at the very least, they'll be very much -- it could be
13  delayed in getting to the Department of Revenue which
14  could lead to delays in property tax bills, which would
15  adversely affect the county taxing districts.
16      Q.  Could there be a cumulative adverse effect
17  over a period of years with regard to the accuracy of
18  the tax roll?
19      MR. FORD:  Same objection.
20      A.  That's certainly possible.  Yes, sir.
21      COURT REPORTER:  I'm sorry, Mr. Ford, did you
22  say something?
23      MR. FORD:  I said, "Same objection."
24      MR. BERTELSON:  Then I have no further
25  questions.

Page 48

1      Thank you.
2      MR. FORD:  No follow-up from me.  Mr. Crawford,
3  you have the opportunity to read and sign.  Mr.
4  Bertelson has taken advantage to that in the prior
5  depositions, so I assume he will do that here as
6  well.
7      MR. BERTELSON:  Correct.
8      COURT REPORTER:  Off the record.
9      (DEPOSITION CONCLUDED AT 11:57 A.M.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 49

1      CERTIFICATE OF REPORTER
2      COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability. I certify that I am not a
13  relative or employee of either counsel and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  LINDSEY JOHNSON,
23  COURT REPORTER/NOTARY
24  MY COMMISSION EXPIRES: 05/24/2023
25  SUBMITTED ON: 03/29/2021

13 (Pages 46 - 49)

Page 50

```
 1            Veritext Legal Solutions
                1100 Superior Ave
 2                  Suite 1820
               Cleveland, Ohio 44114
 3             Phone: 216-523-1313
 4   March 29, 2021
 5
     To: Mr. Bertelson
 6
     Case Name: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
 7
     Veritext Reference Number: 4458309
 8
     Witness: Tom Crawford      Deposition Date: 3/11/2021
 9
10   Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 51

```
 1            DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 4458309
 3     CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/11/2021
 4     WITNESS' NAME: Tom Crawford
 5       In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7       I have made no changes to the testimony
       as transcribed by the court reporter.
 8
          _____
 9   Date            Tom Crawford
10       Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11   the referenced witness did personally appear
       and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
            Statement; and
14       Their execution of this Statement is of
            their free act and deed.
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
          _____
18       Notary Public
19
          _____
20       Commission Expiration Date
21
22
23
24
25
```

Page 52

```
 1            DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
       ASSIGNMENT REFERENCE NO: 4458309
 3     CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/11/2021
 4     WITNESS' NAME: Tom Crawford
 5       In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
     my testimony or it has been read to me.
 7       I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9       I request that these changes be entered
       as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
       that both be appended to the transcript of my
12   testimony and be incorporated therein.
13       _____
     Date            Tom Crawford
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
       the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18          in the appended Errata Sheet;
         They signed the foregoing Sworn
19          Statement; and
         Their execution of this Statement is of
20          their free act and deed.
21       I have affixed my name and official seal
22   this _____ day of_____, 20____.
23
          _____
24       Notary Public
25
          _____
         Commission Expiration Date
```

Page 53

```
 1       ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 4458309
 3   PAGE/LINE(S) /      CHANGE      /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
        _____      _____
20   Date            Tom Crawford
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23       _____
         Notary Public
24
         _____
25       Commission Expiration Date
```

14 (Pages 50 - 53)

**CERTIFICATE OF REPORTER**

**COMMONWEALTH OF KENTUCKY AT LARGE**


I do hereby certify that the witness in the foregoing transcript was taken on the date, and at the time and place set out on the Title page hereof, by me after first being duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the said matter was recorded by me and then reduced to typewritten form under my direction, and constitutes a true record of the transcript as taken, all to the best of my skill and ability. I certify that I am not a relative or employee of either counsel and that I am in no way interested financially, directly or indirectly, in this action.


LINDSEY JOHNSON

COURT REPORTER / NOTARY

MY COMMISSION EXPIRES:  05/29/2022

SUBMITTED ON: 03/29/2021

[& - al]                                                                 Page 1

| & |
|---|
| **&**   2:5 |

| 0 |
|---|
| **00049**   1:5 |
| **01**   13:17 |
| **03**   13:18 |
| **03/29/2021**   49:25 |
| **05/24/2023**   49:24 |

| 1 |
|---|
| **1**   10:8,16,22 11:23 16:11,16 |
| **10**   24:8,10 30:2,14 |
| **101**   4:5 |
| **10:55**   4:8 |
| **11**   1:24 |
| **1100**   50:1 |
| **11:57**   48:9 |
| **11th**   4:7 |
| **17**   3:13 13:19 |
| **1820**   50:2 |

| 2 |
|---|
| **2**   3:10 9:25 10:1,2 10:18,22 |
| **20**   51:16 52:22 53:22 |
| **2000**   13:7,17 |
| **2012**   19:14 23:8 |
| **2014**   13:6 |
| **2020**   11:23 |
| **2020-2021**   37:12 |
| **2021**   1:24 4:7 50:4 |
| **216-523-1313**   50:3 |
| **2400**   2:6 |
| **29**   3:15 50:4 |

| 3 |
|---|
| **3**   3:13 17:12,13 23:20 24:7 25:15 |
| **3/11/2021**   50:8 51:3 52:3 |

| 30 |
|---|
| **30**   4:3,10 30:12 |
| **300**   2:7 |
| **34**   18:23 23:20 |
| **36**   11:19 |
| **37**   3:17 21:17 25:13 |
| **39**   22:11 |
| **3:19**   1:5 |

| 4 |
|---|
| **400**   42:11 |
| **40202**   4:5 |
| **40601**   7:4 |
| **40602**   2:20 |
| **41017**   2:8 |
| **423**   2:19 |
| **44114**   50:2 |
| **4458309**   50:7 51:2 52:2 53:2 |
| **46**   3:5 |

| 5 |
|---|
| **5**   3:3 10:18,22 30:1 |
| **500**   42:11 |
| **501**   5:13,18 7:4 |
| **502**   2:21 |
| **564-9572**   2:21 |
| **578-7263**   2:9 |

| 6 |
|---|
| **6**   3:4,15 4:3 10:8 10:18,22 29:20,22 30:12 |
| **61.870**   31:18 |
| **61.884**   31:18 |

| 7 |
|---|
| **7**   3:17 37:2,4 |
| **730**   4:4 |

| 8 |
|---|
| **8-12**   19:8 |
| **859**   2:9 |

| 9 |
|---|
| **9**   3:10 |

| a |
|---|
| **a.m.**   4:8 48:9 |
| **ability**   9:18,21 20:3,23 23:20 40:5 46:25 47:3 49:12 |
| **able**   32:20 38:7,20 39:15 40:8 41:18 42:2,9 44:20 46:21 |
| **absolutely**   29:16 |
| **access**   18:16 31:17 35:23 44:13,20,24 45:19 46:1 |
| **accountable**   34:10 35:16 |
| **accuracy**   47:17 |
| **accurate**   10:18 19:10,12,19,23 23:23 35:11 |
| **acknowledge**   51:11 52:16 |
| **acquiring**   31:21 |
| **acronym**   12:14 |
| **acronyms**   12:13 |
| **act**   24:5 27:18 28:6,17 31:18 33:22 43:10 51:14 52:20 |
| **acting**   13:14,16,19 |
| **action**   1:5 18:13 49:15 |
| **active**   37:19 |
| **activity**   26:19 |

| actual |
|---|
| **actual**   43:3,4,10 |
| **address**   7:2 50:15 |
| **administration**   25:1 |
| **administrator**   12:15 23:25 |
| **administrators**   15:14 22:22 |
| **advance**   30:17 34:4 |
| **advanced**   30:5 |
| **advances**   30:17 |
| **advantage**   48:4 |
| **adverse**   40:4 41:17,22 43:14,19 46:23 47:2,16 |
| **adversely**   47:15 |
| **advertisers**   35:13 35:24 |
| **advertising**   36:9 |
| **advice**   27:9 |
| **advise**   15:19 |
| **advising**   27:10 |
| **affect**   9:17,20 47:15 |
| **affirm**   6:9 |
| **affixed**   51:15 52:21 |
| **agencies**   35:13 |
| **ago**   7:7 |
| **agree**   5:25 24:16 26:15 |
| **agreed**   4:12 |
| **agricultural**   15:3 |
| **ahead**   6:23 8:15 8:20 9:2,13 13:2 17:11 30:11,19 46:11 47:6 |
| **al**   1:15 2:15 50:6 51:3 52:3 |

**allow**  42:13
**allowed**  32:24
**allows**  34:20
**amend**  46:4,7
**amount**  24:1 38:4
**amounts**  19:25
  20:5 21:8
**analysis**  27:12
**annual**  36:25
  37:24 41:12
**answer**  8:1,8,9,16
  8:20 9:2,12,13
  30:1,12,18,22
  31:16 36:1 46:18
**answered**  40:19
**answering**  7:25
**answers**  7:10 8:5
**anticipated**  39:8
  39:15
**anybody**  29:1
**apologies**  40:24
**appear**  51:11
  52:15
**appearance**  5:5
**appearances**  2:1
**appeared**  2:11,24
**appearing**  5:12,15
  5:20,21
**appended**  52:11
  52:18
**application**  28:17
**apply**  24:23
**appointed**  11:23
  11:24 12:2 13:6
  13:11,14,16
**appreciate**  46:16
  46:18
**appropriate**  23:21
**approval**  37:19
**april**  11:23

**area**  14:18 29:4,10
  29:14 38:9
**areas**  15:2
**asked**  46:20
**asks**  25:16 43:8
**assembly**  36:12
**assess**  47:3
**assessment**  12:25
  14:17 24:25
**assessments**  15:1
  40:11 45:10 47:11
**assignment**  51:2
  52:2 53:2
**assist**  34:6
**association**  16:12
  16:17,22 17:1,5
  20:3
**assume**  8:21 48:5
**attached**  52:7
**attended**  4:6
**attending**  5:5,6
**attorney**  6:18
**attorneys**  23:16
**audible**  8:8
**august**  19:14
**authority**  15:7
  16:1,19 17:5,6
  19:24
**authorize**  52:11
**authorized**  15:17
**available**  45:13,21
**ave**  50:1
**avoid**  7:19
**aware**  21:10 22:9
  23:10,14 27:8,10
  27:15 28:24 39:24
  41:5

**b**

**b**  1:13 2:13 4:3
  24:13,15 50:6
  51:3 52:3

**back**  7:24 13:7,13
  13:23 29:18,19
  41:16 43:24 44:4
  50:15
**bad**  21:4 35:20
**based**  5:21 25:22
**basically**  25:16
**basis**  16:8 37:24
  41:13
**behalf**  2:3,13 5:9
  5:20 10:11
**believe**  13:17 27:4
  34:6
**benefit**  42:14
**bertelson**  2:16 3:5
  5:9,9 6:3,5 9:7
  29:12 32:9 45:1
  46:8,14 47:24
  48:4,7 50:5
**best**  8:6 49:11
**beyond**  43:15,18
  43:21
**big**  42:11
**bill**  13:3
**bills**  47:14
**bit**  7:25 9:10
**bork**  17:18
**box**  2:19
**break**  8:25 9:3
**briefly**  10:21
**bring**  43:24
**budget**  3:17 17:2
  37:22 38:13 39:3
  40:7
**budgeting**  36:24
  37:25
**budgets**  37:11,19
  46:25
**building**  5:13,18
**business**  7:2 26:19
  31:22,24 32:25

  35:23
**businesses**  33:9
**busy**  46:16

**c**

**ca**  50:25
**cabinet**  13:13,16
  13:23 14:5
**call**  13:9 27:20,23
  33:7
**called**  13:24
**calls**  47:5
**camera**  5:23
**capacity**  1:13 2:14
  12:21 15:5,10,23
  16:6 39:19
**caption**  17:16
**career**  45:16
**case**  5:10 41:7
  46:19 47:7 50:6
  51:3 52:3
**cash**  14:25
**catalog**  30:24
**cataloging**  31:21
**category**  31:7
**cease**  32:20
**center**  2:6
**central**  1:3
**certain**  23:25 35:1
  41:24
**certainly**  8:14
  23:10,14 47:20
**certificate**  49:1
  52:11
**certification**  13:1
  51:1 52:1
**certify**  49:4,12
**chamber**  2:6
**chance**  18:2
**change**  23:19,21
  36:4 50:13,14
  52:8 53:3

changed  14:7
changes  50:12
  51:7 52:7,9
charge  20:13,23
  21:7,13 23:25
  34:15,21 35:2
  40:21 41:18 42:6
  43:20
charges  18:15
  40:25
charging  21:11
  34:22
civil  1:5 4:9 51:5
  52:5
claims  18:13
clarification  8:15
  27:3
class  40:14
classification
  25:21 26:22 27:6
clear  7:17 8:9
cleveland  50:2
collect  31:4,8
  46:21
collecting  32:21
  43:7
collection  31:19
collects  26:11
come  29:13 36:14
  45:25
comes  32:18
commend  35:19
commercial  19:2
  19:11,13,20 20:14
  20:24,25 21:8,21
  22:14,24 23:19
  24:11,15 25:6,18
  25:21 27:4,13,17
  28:10,23 30:5,15
  32:1,1 33:21,22,23
  34:4 35:4 36:11

46:21 47:2
commission  49:24
  51:19 52:25 53:25
commissioner
  1:14 2:14 3:11
  6:21 10:4,12
  13:14,16,19 14:2,4
  14:8 15:6 17:18
  23:24
commissioner's
  30:1
commissioners
  13:24
commonwealth
  14:21 15:7,14,18
  19:17 20:8,12
  22:3 31:3,20
  37:11 49:2
communicated
  20:11
communications
  10:23
companies  14:18
company  35:10
compel  40:2
compelled  43:19
compilation  37:10
compiling  12:24
complaint  3:13
  17:22 18:2 30:16
  38:16,17,21 39:12
complaints  38:3,8
  38:13
completed  4:15
  50:15
compliance  28:5
comply  20:8
concerns  41:20
concluded  48:9
conduct  11:6

confusing  32:11
  45:2
connection  22:4
consequences  7:13
consider  43:18
considerable
  30:23
considered  29:1
  36:10
constitutes  49:10
consult  29:6
contend  30:15
contract  21:20
  22:7,13,23 23:4,6
contracts  23:14
conversation  7:20
  11:13 39:18
conversations
  23:12
copy  38:17 41:18
  42:25 43:16
copying  43:3,10
corner  18:20
correct  7:11,12
  10:13,14 16:2,19
  16:24,25 17:3,6,7
  17:8,9 19:15,17
  20:1,2,6,19 21:14
  21:15 22:17 25:6
  25:7 26:14 27:6,7
  28:14 30:8 31:10
  31:12,13 32:7,16
  32:17,22 33:16
  34:24 35:4,5
  42:22 43:9,12,13
  44:7 46:2,4,7,24
  48:7
corrected  15:20
corrections  50:12
  52:17

cost  31:19 32:3,4
  32:14 37:23 38:4
  43:2,3,11
costs  32:14 42:24
  43:6
counsel  10:23
  11:11 49:13
counties  16:7
  45:18
county  13:1 45:10
  47:4,15 51:10
  52:15
couple  7:18 21:16
course  7:8 25:4
  46:5
courses  42:14
court  1:1 4:4,13
  5:3,22 6:3,6,13,20
  44:2,4 47:21 48:8
  49:23 51:7
cover  10:16 38:15
covers  14:16
crafted  23:15
crawford  1:23 4:3
  5:16,16,22 6:1,7
  6:17,24 7:3,5 9:17
  9:23 10:20 11:18
  17:10,25 18:22
  19:1 23:2 24:5
  29:18 30:8 37:3
  43:22 44:6 46:3
  48:2 50:8 51:4,9
  52:4,13 53:20
create  30:24
created  21:25
  31:16 32:6
creates  22:19
creating  23:3
  31:20 44:12
cross  3:5 46:11,13

cumulative  47:16
current  11:20 12:2
  13:9,11 19:16
currently  6:22
  29:8 41:2
cursory  18:10
cut  20:17
cv  1:5

**d**

darren  2:4 5:7
  6:17
data  30:25 31:17
  31:22,24 35:22
  43:4 45:13
database  26:7,13
  26:17 38:6,18
  40:3 41:19 42:4
  42:25 44:14 45:9
databases  44:25
date  1:24 15:22
  19:8 49:5 50:8
  51:3,9,19 52:3,13
  52:25 53:20,25
day  4:7 51:16
  52:22 53:22
days  38:14 50:18
deal  42:12
deals  29:14
dear  50:10
december  13:17
declaratory  3:13
  17:22
deed  51:14 52:20
deemed  34:11
  36:12 50:19
deems  23:21
defendants  1:16
  2:13 3:15 5:10,20
  6:19 41:7
define  26:2

defined  30:16
definition  24:11
  24:14,18,24 25:2
  33:22,23 34:4
delay  40:16
delayed  47:13
delays  42:7 47:14
department  1:14
  2:15 3:11 5:11,17
  6:21 7:1 10:5,12
  11:18 12:9,18
  14:2 15:6 17:19
  19:21,24 23:24
  29:5 47:13 50:22
depend  41:2 42:21
depending  41:23
deponent  1:23
deposed  7:5
deposition  3:10
  4:3,8 9:6 10:4
  29:20 46:6 48:9
  50:8,11 51:1,3
  52:1,3
depositions  48:5
describe  14:21
  26:10
describing  38:9
designed  34:6
detail  23:9
determinations
  20:4
determine  25:5
developed  23:15
developing  23:17
dford  2:10
difference  40:12
different  13:23
  34:16 40:19
differently  35:7
difficult  8:4

direct  3:4 6:15
directed  23:24
direction  49:10
directive  15:13,21
  16:1 24:2 44:11
  45:7
directives  15:16
directly  16:24
  49:14
director  6:25
  11:21 12:3,21,21
  13:11 14:8,11,15
  15:11,13 16:6,12
  16:21 17:4 23:10
  23:16 24:21 27:25
  39:19 41:11
discretion  21:7
discussion  39:11
distinguishes
  36:22
district  1:1,2 6:20
  6:20
districts  47:15
division  1:3 12:3
  12:24 14:15,19
document  10:3,7
  17:16 19:1,5,25
  21:17,19,25 22:3
  22:10,13,18 24:8
  37:6,9
documents  10:24
  11:3,9 23:3
doing  32:21,24
  34:9 35:16,20
dollars  16:23
  34:11
dor  12:7,17 13:20
  20:4,12 21:12,25
  22:7,18 23:1,18
  24:21 25:4,11
  27:5,10,11 28:25

29:1,14 37:21
  45:6
dor's  20:7 22:2,21
  25:8,20 26:16,20
drafted  27:10
drive  2:6
duly  49:7
duties  40:6

**e**

e  2:10,22 29:10
earlier  9:7 41:20
early  36:1
earn  39:1
earns  36:8
easier  8:2
eastern  1:2 6:20
easy  7:18
educational  42:14
effect  19:14 43:19
  47:16
effects  40:4 41:17
  43:14 46:23 47:2
either  23:5 31:15
  49:13
electronic  45:19
  45:21
email  50:17
employee  39:20
  40:13 43:17 49:13
employees  42:12
enclosed  50:11
encourage  21:13
encourages  45:8
engage  36:25
entered  52:9
entire  14:2 45:8
  51:5 52:5
entirety  44:24
entities  31:22
  34:12

errata 50:13,18 52:7,10,18 53:1
essentially 16:17
estimation 38:25
et 1:15 2:15 50:6 51:3 52:3
events 9:21
examination 3:4,5 6:15 46:13
exception 34:1,3 36:7
exceptions 24:15
excepts 33:23
executed 52:10
execution 51:14 52:19
executive 6:24 11:14,21 14:8,11 15:11 16:6,12,21 17:4 23:10,16 24:21 39:19 41:11
exempt 36:11
exemptions 15:2,3
exhibit 3:9,10,13 3:15,17 9:25 10:1 17:12,13 23:20 24:7 29:18,20,22 30:12 37:2,4
exhibits 3:8 9:24 11:3,10
expanded 14:13
expanding 33:8
expect 27:23 28:4 28:8,11 39:1
expectation 22:21 25:8 26:21 37:22
expectations 20:11
expected 39:13
expend 30:23

expense 37:25
expert 29:2
expiration 51:19 52:25 53:25
expires 49:24
explanation 27:13
expose 35:19
extent 40:25 41:23

**f**

f 1:6
facilitating 44:23
fact 6:1 36:8
factor 36:10
factored 41:13
fair 14:25 27:2,2
fall 13:4
familiar 17:10 19:5 24:4,18 26:3 26:6 28:19 32:25 34:1 36:24
federal 4:9
fee 19:2,13,20 20:14,24 21:8 22:14 23:5,19 30:5,16 32:2 39:21
fees 31:19 34:12 44:17 46:21 47:1 47:2
field 28:5 40:14 42:7,8
fieldwork 42:9 47:9,10
figured 31:14
file 26:7 44:14
filed 6:19
final 19:24
finally 8:23
financially 49:14
find 33:18 50:11

fine 29:11
first 3:16 9:3 17:16,17 24:14 26:2 30:22 49:7
fiscal 37:12
five 43:23
fix 15:24
fixed 15:22
floor 5:14
flow 41:17
focus 36:20
focused 5:24
follow 20:8 46:20 48:2
ford 2:4 3:4 5:7,7 6:2,4,14,16,18 29:16,17 32:12,13 43:22 44:5 45:3,5 46:10,20 47:5,19 47:21,23 48:2
foregoing 49:4 51:13 52:18
form 23:13 32:9 45:1 49:10
former 17:18
fort 2:8 5:7
forward 12:12 22:10 50:15
four 38:14
frankfort 1:4 2:20 5:13 7:4 16:23
frcp 4:10
free 9:13 21:1 34:15 35:11 43:20 45:9 51:14 52:20
front 9:24
funded 17:1
funds 30:24 47:8
further 47:24

**g**

gather 30:24
gathering 31:20
general 14:10 21:12 26:5 36:12 37:1 46:23
generally 14:21 20:22 24:5,6 26:3 26:10 28:19 33:1 33:2 36:17,18 38:25
generated 45:11
geographic 22:15
getting 16:3 18:16 35:12 40:13,16,17 41:3,22 42:1,7,19 44:24 47:13
gfvt 1:5
gis 10:17 14:19 28:2,3,6,7
give 6:10 7:8,10,25 8:7,8 9:9,10 15:18 28:11 29:2 30:19 43:22,24 46:3
given 46:5
global 29:10
go 6:22 8:14,20 9:2,13 11:4 13:2 15:25 17:11 30:11 30:19 33:15 34:15 40:13,14 42:8,13 46:11 47:6
going 8:20 11:4 12:11,12 21:2 32:15 34:24 41:16 43:25 45:1
good 6:17 8:10 9:4 9:9 21:6 35:20
goods 35:15
gosh 13:17

**government** 34:8
**governmental**
  30:15 35:18,20
**graydon** 2:5
**graydon.law** 2:10
**great** 23:9
**gregory** 1:6
**guess** 11:3 13:10
  23:8 27:3
**guidance** 15:2
  27:11,22
**guidelines** 19:2,13
  19:20 20:9,14,24
  21:8,10,14 23:19
**guru** 29:2

**h**

**hand** 6:8 18:19
  19:7
**handled** 23:9
**happen** 8:14 9:5
**happened** 39:24
**happens** 7:21
  42:10
**hardship** 32:23
**head** 2:5 8:5,5
**header** 19:2
**hear** 6:4 31:14
**heard** 9:6 26:7
**helps** 47:10
**hereof** 49:6
**hey** 27:20 38:17
**hide** 34:9
**high** 5:13,18 7:4
**hire** 38:19
**hold** 5:23
**holding** 34:10
  35:15
**homestead** 15:2
**hon** 1:13 2:13 50:6
  51:3 52:3

**honest** 18:4
**honorable** 17:18
**hope** 35:19
**hopefully** 9:24
**hostage** 8:24
**huh** 8:7
**hypothetical**
  25:25

**i**

**identical** 34:17
**identification** 10:1
  17:13 29:22 37:4
**identified** 30:3,18
  43:21
**identify** 25:17
  41:17
**iii** 2:16
**immediately** 15:20
**impact** 40:7,15
  41:22
**important** 7:16
  8:11 44:19
**inaudible** 8:5
**include** 38:25
**included** 24:25
  50:13
**includes** 47:1
**including** 5:10
  6:21 11:3 30:2
**income** 32:18,20
  35:24 38:25 39:8
  39:14,21 42:21
  47:1
**inconsistent** 27:5
**incorporated**
  52:12
**incur** 32:14,15
  42:25
**incurring** 38:5
**index** 3:1

**indicated** 36:3
  39:20
**indicates** 26:18,19
  34:24
**indicating** 50:13
**indirectly** 49:14
**individual** 16:7
**individually** 40:23
**individuals** 17:17
**information** 9:21
  25:17,22 26:11,13
  26:18 31:4,8,17,22
  31:24 32:22 33:18
  34:14,16 35:3,7,10
  35:11 36:4,22
  43:16 44:13,20
**initiative** 45:7
**injunctive** 3:13
  17:22
**inputs** 26:12
**inspection** 45:13
  45:14
**instance** 20:24
**instructs** 9:12
**intends** 26:18 35:3
  35:8
**interactions** 16:5
**interest** 30:5,15,17
  35:6,19
**interested** 49:14
**interesting** 33:20
**interests** 30:3
**interject** 9:7
**internal** 11:9
  27:11
**interpret** 24:23
**interrogatories**
  3:16
**interrogatory**
  30:2,4

**interviewed** 10:25
**interviews** 11:7
**introduce** 6:23
**involve** 43:17
**involved** 23:2,7,8
  23:13 43:6
**irrespective** 32:15
**issue** 15:12,20,21
  16:1 24:2 36:19
**item** 39:7

**j**

**job** 7:18 8:2 12:20
  14:10 16:16 35:17
  40:15
**johnson** 1:25 4:12
  8:5 49:22
**johnson's** 7:18 8:2
**judge** 1:6
**jurisdiction** 26:12

**k**

**keep** 7:24 42:12
**kentuckiana** 4:4
**kentucky** 1:2,14
  2:8,14,20 3:11 4:5
  4:13 5:8,14,21
  6:21 7:4 10:5,12
  12:18 14:21 15:8
  15:14,18 16:12,17
  16:22 17:5,19
  19:17 20:2,8,13
  22:3 24:4 31:3,16
  31:25 37:12 49:2
**kind** 20:17
**kinds** 16:10
**know** 8:25 13:22
  15:10,12,24 18:23
  25:15 26:25 27:20
  29:8,9 30:20 33:8
  33:9 34:8 35:10
  38:1 40:24 41:1,2

41:6,9,24,25 42:11
42:24 43:2 46:16
**knowledge**  28:16
35:21
**krs**  31:18
**ky.gov**  2:22,23

**l**

**large**  33:5 49:2
**law**  29:2 30:17
**lawsuit**  6:18
**lawyer**  28:13
**lawyers**  27:10
**lay**  39:20
**lead**  47:14
**leadership**  11:14
**learn**  40:14
**left**  19:7
**legal**  2:18 15:12
16:18 17:5 27:9
50:1 53:1
**legislature**  31:16
32:1 34:11
**lengthy**  30:18
**letter**  50:19
**levied**  18:15
**lexington**  5:21
**likewise**  23:14
**lindsey**  1:25 4:12
31:14 49:22
**line**  39:7 50:13
52:7 53:3
**list**  10:8 17:17
29:24
**listed**  16:11 33:6
33:10,13 52:7,17
**listing**  52:7
**litigation**  35:2
**little**  7:25 9:9
**llp**  2:5
**local**  12:3,22,22,23

**located**  4:4
**location**  5:5
**long**  7:9 11:17,20
13:5 23:2 45:16
**look**  11:4 17:11
18:7 33:10,12
34:15
**looked**  23:19
25:10
**looking**  10:24
**lot**  7:21 18:4 38:19
45:15
**lots**  33:5
**louisville**  4:5

**m**

**madam**  50:10
**mail**  2:10,22 29:10
**main**  4:5
**maintain**  22:5
26:4
**maintained**  24:1
44:25
**maintains**  27:12
**making**  9:14 14:24
35:16
**manage**  30:25
**managing**  31:21
**manuals**  25:1
**march**  1:24 4:7
50:4
**marked**  10:1
17:13 29:20,22
37:4
**matter**  4:10 49:9
**mean**  12:14 20:10
23:4 30:9 39:3
45:15
**meaningful**  23:13
**medications**  9:16
9:20

**meet**  39:15
**meeting**  14:25
**memos**  27:9,11
**midwest**  50:17
53:1
**mike**  14:18
**mileage**  40:13
42:10
**miller**  1:13 2:13
6:22 11:14,24
12:2 13:15 14:1
15:5,12,17,25 17:8
17:21 23:23 50:6
51:3 52:3
**mind**  7:24
**mineral**  10:17
28:1
**minerals**  14:19
28:2,3
**minutes**  43:23,24
**miscellaneous**
39:8 47:1
**mischaracterize**
36:18
**mitchell**  2:8 5:8
**model**  35:23
**moment**  30:19
**money**  38:7,20
41:3,12 42:19
**months**  13:19
**morning**  6:17 8:14
8:24 9:6,17 10:22
11:4,15 18:9
**motor**  14:16
**move**  22:10

**n**

**n**  1:25 4:12
**name**  6:17,24 29:7
50:6 51:3,4,15
52:3,4,21

**narrow**  36:20
**nature**  7:13 15:3
47:9
**necessarily**  45:15
**need**  7:23,23 8:24
15:22 38:19,20
**needed**  38:7
**needs**  15:20 39:20
**newspaper**  33:25
34:16,23,23 35:6
36:3,5,8,21
**newspapers**  34:7
34:11
**nicole**  2:17 5:19
**nicole.sergent**
2:23
**nods**  8:5
**non**  22:15
**noncommercial**
22:8 25:18,22
26:20 40:3
**normal**  7:20
**normally**  40:12
**notarized**  50:14
**notary**  4:12 49:23
50:25 51:10,18
52:15,23 53:23
**note**  50:12
**notice**  3:10 10:4
17:15
**number**  10:18,18
10:18 18:20,23
30:1,2,14 50:7,13
**numbered**  10:8
**numbers**  18:19
52:7

**o**

**oath**  4:9 7:11,14
44:7
**object**  18:15 32:9
45:1

**objection**  9:11,14
  47:5,19,23
**objections**  9:8
**obligation**  8:16
**obviously**  7:20
  17:20 40:8
**offer**  24:22
**offers**  25:4 28:22
**office**  2:18 3:10
  4:4 5:13,18 6:25
  10:4,11 11:21
  12:4,6,6 13:24
  14:11 15:11 16:23
  22:14 24:21,22
  27:18 28:21 29:8
  32:3,5 37:15,15,17
  37:21 39:25 40:5
  41:11,14 42:13
  43:15 44:11 45:6
  45:25 46:17,25
**office's**  36:20 40:5
**offices**  14:23 17:2
  30:23 32:6 41:4
  42:11 46:24
**official**  1:13 2:14
  35:16,20 51:15
  52:21
**offset**  31:19 32:4
  43:5
**offsetting**  32:2
**oh**  11:8 30:9 37:13
  40:24
**ohio**  50:2
**okay**  7:8 8:2,9,18
  8:21 9:3,14,15
  10:20 11:2,6,9,17
  12:11,17 13:5,20
  14:1,10,20 15:16
  15:23 16:5,10,15
  16:21 17:14 18:7
  18:12,18,22,25

20:11,20 22:2,12
  24:7,9 26:10
  27:25 28:3,13,21
  29:7,13 30:11,22
  32:12 33:3 34:3
  34:18 37:2,14,18
  37:21 39:5,11
  40:20 41:6 42:1
  43:14 44:9,16
  45:3,20 46:3,10
**open**  19:2,13 24:4
  27:18 28:5,17
  29:2,4,9,15 31:18
  33:22 38:1 46:22
  47:1
**operate**  20:22
**opinion**  28:12 47:7
**opportunity**  9:10
  46:4 48:3
**order**  15:13
**organization**
  16:18
**organize**  43:25
**outside**  29:12
**overall**  24:14
  40:16 41:14
**override**  20:3
**owners**  38:6

**p**

**p.o.**  2:19
**page**  3:2,9 8:12
  10:7 12:13 17:16
  17:21 18:20,23
  21:17 22:11 23:20
  24:8,10 25:13
  30:12 49:6 50:13
  50:15 52:7 53:3
**pages**  18:5 21:16
**paid**  16:23 40:13
  41:7

**paper**  9:24 36:9
  45:14,17
**paragraph**  25:15
**part**  21:23 30:22
  31:15 34:18 35:23
  52:9
**participants**  4:6
**parties**  5:4,25
**parts**  32:4
**pass**  46:8,11
**pause**  8:1 9:10
**pay**  32:19 33:15
  42:9 47:8
**pays**  41:12
**pending**  9:2
**people**  7:22 10:25
  26:14
**perception**  37:9
**perform**  40:5
**period**  46:16 47:4
  47:17
**periodical**  33:25
**person**  27:19,21
  29:6,8 31:22
**personally**  23:3
  33:12 37:18 51:11
  52:15
**perspective**  36:20
**pete**  17:18
**phone**  50:3
**photo**  5:23
**place**  49:6
**plaintiff**  1:9 2:3
  5:8 31:23
**plaintiff's**  3:15
**play**  36:14
**please**  5:4,23 6:7
  6:23 8:14,25
  50:11,11
**point**  18:3 42:18

**pointed**  45:16
**policy**  20:7 21:12
  22:2,21 25:20
  26:16,20,25 27:5
  37:22 38:2 44:12
  44:23 45:7
**portion**  14:5 16:15
**position**  12:2
  13:15 35:1 41:10
**possible**  7:18
  15:21 47:20
**possibly**  41:21
**potential**  46:11
**power**  15:12 24:2
**precludes**  34:22
**preparation**  18:8
**prepare**  10:21
**prepared**  29:25
  30:7 37:16
**prescribed**  20:24
  21:8
**present**  5:4,25
**presentation**
  35:22
**presumably**  17:1
  37:15
**prevent**  40:17
**previous**  13:7
  23:10,16
**primary**  23:17
  33:10
**prior**  12:1 13:9,11
  24:18 48:4
**private**  16:17
  31:24
**probably**  31:15
  38:8,14,14 43:3
**problem**  15:19,24
  15:25 16:4
**procedure**  4:9
  51:5 52:5

**proceedings** 5:1
**proceeings** 3:3
**process** 30:24
   36:24 39:3
**processing** 31:20
**production** 50:15
   50:17,22
**profit** 35:10 36:2,3
   36:8,14
**profitable** 31:23
**promoting** 35:15
**properly** 47:3
**properties** 26:12
   33:6,8,10,13 47:4
**property** 6:25
   11:21 12:6,14
   13:1,2,3,21,25
   14:5,12,17 15:1,11
   15:13 22:22 23:25
   24:22 26:6 38:6
   38:18 39:25 40:3
   41:11,14,19 42:4
   42:25 44:13,21,25
   45:8 47:14
**provide** 15:1,17
   20:25 27:12,19,21
   33:7 35:11 40:2
   43:16,19
**provided** 11:2,10
   43:4
**provides** 25:23
   35:24
**providing** 38:18
**provisions** 32:1
**public** 4:13 14:17
   16:23 20:13 21:20
   24:1 30:24 31:5,9
   32:7,16,18 34:23
   35:15 37:23,24
   38:5,18 39:1,14,22
   44:13,19,24 45:13

45:22 51:10,18
   52:15,23 53:23
**publication** 35:7
**publish** 22:7 34:24
   35:3 36:21 45:8
**published** 19:20
**publishes** 25:12
**publishing** 33:24
   34:14 35:18 36:3
**pull** 9:25 17:11
   29:21 37:2
**purpose** 20:25
   22:24 24:11,15
   25:6,22 27:13,18
   28:10,23 30:5,15
   31:4 32:1,2,2
   33:23,24,24 34:3,4
   35:4 36:11 46:22
   47:2
**purposes** 36:10
**pursuant** 4:8,10
**purview** 28:4
**put** 39:7
**pva** 3:17 12:14,24
   14:22 15:22,24
   16:12,17,22 17:5
   19:2,13 20:2
   21:20 22:8,14
   24:1 26:11,17,21
   26:23 27:1,3,13,16
   27:19 28:8,22
   29:3,5 30:23
   34:20,22 37:11,19
   37:22 38:4,17,22
   39:12,18,19 41:12
   42:24 43:11 44:9
   44:23 45:25
**pva's** 18:16 46:23
   46:23
**pvas** 11:7 14:20
   15:4,7,18 16:6,7

17:6 18:16 19:16
   20:7,12,22 21:7,10
   21:13 22:2 24:23
   25:4,8,12,20 26:3
   31:3,8 32:3,14,20
   35:1 36:25 38:13
   38:24 40:2,5 41:2
   41:7,18 44:12,16
   44:25 45:8,20
   46:17

### q

**qualified** 28:11
**question** 8:1,9,16
   9:2,3,8,12,13
   20:18 21:3,4
   25:20 26:21,23
   27:1,6,16 28:5,22
   30:12,14 32:10,12
   34:19 38:10 40:19
   40:22 41:16 45:2
**questions** 7:10,25
   8:13,18 21:5
   46:18 47:25
**quick** 46:20
**quite** 34:18 40:11

### r

**raise** 6:7
**rarely** 29:5
**rates** 13:2
**read** 18:5 30:19
   48:3 51:5,6,12
   52:5,6,17
**reading** 4:14
   50:19
**ready** 18:25 30:21
**real** 15:1
**really** 36:14
**reason** 8:25 9:9
   50:14 52:8 53:3

**reasonable** 27:1
**recall** 9:21 25:11
**receipt** 50:18
**receipts** 39:9,15
   40:8
**receive** 32:16
   39:13,13,21
**received** 38:3,8,12
   38:17,21 39:12
**receives** 27:17
**recommended**
   21:10
**record** 5:3 7:17
   44:2,3,4 48:8
   49:11 52:9
**recorded** 49:9
**records** 18:16,17
   19:2,13 20:13,25
   21:20 22:4,8,15,15
   22:23 24:1,5 26:3
   27:14,17,18 28:6,7
   28:17 29:2,4,9,15
   31:5,9,18 32:7,16
   32:19,19 33:22
   34:23 37:23,24
   38:1,5,18 39:1,2
   39:14,22,22 40:22
   41:8 43:20 46:22
   47:1
**reduced** 49:9
**reference** 50:7
   51:2 52:2
**referenced** 51:11
   52:15
**referred** 29:3
**referring** 12:18
**refresher** 7:8
**regard** 47:17
**regardless** 43:7
**regards** 46:19

**regular**  16:5,8
**reiterate**  41:20
**related**  33:9,25
  34:12
**relative**  49:13
**relatively**  43:11
**relief**  3:14 17:22
**remind**  8:7
**remotely**  4:7,10
**rep**  42:8
**repeat**  21:2 25:3
**rephrase**  34:21
  40:18 45:3
**reporter**  1:25 4:13
  5:3,22 6:3,6,13
  44:2,4 47:21 48:8
  49:1,23 51:7
**reporters**  4:4 34:7
**representative**
  42:8
**reproduce**  37:23
**reproduction**
  21:20 23:6 25:11
  25:16
**request**  9:1 20:16
  21:19 23:5 25:5
  25:11,15 26:1,14
  28:23 29:4,9
  32:16 38:21 52:9
  52:11
**requested**  22:16
  30:25 41:8
**requester**  25:17
  25:23 26:1,17
  27:17 35:4 40:4
**requesters**  20:25
  22:8 32:19 38:19
  39:2,22
**requests**  22:4,23
  31:5,9 32:7 33:24
  37:24 38:5 39:14

**required**  50:25
**residents**  45:9
**resolved**  16:4
**resources**  27:19
  28:21
**respect**  14:20,22
  17:6 20:4 32:21
**respond**  28:8 31:9
  38:1,5
**responding**  31:4
**response**  30:3
  31:11 37:24
**responses**  3:15
**responsibilities**
  12:20 14:11,22
  16:16
**responsibility**
  23:17
**responsible**  12:24
  14:13,24
**result**  46:22 47:2
**resulting**  12:25
**returned**  50:18
**reveal**  10:23
**revenu**  2:15
**revenue**  1:14 2:18
  3:12 5:11,17 6:22
  7:1 10:5,12 11:18
  12:9,18 14:2 15:6
  17:19 19:21,24
  21:23 23:24 29:5
  35:14 45:10 47:13
**review**  11:9 18:2
  18:10 50:12 51:1
  52:1
**reviewed**  10:24
**reviewing**  37:19
**richard**  2:16
**richard.bertelson**
  2:22

**rick**  5:9
**right**  6:7 7:14,16
  8:23 9:16,23 10:3
  10:10 12:5 16:20
  17:2 18:6,18,19
  19:1 21:6 23:1
  26:16 29:18,24
  31:17 36:16 41:23
  42:5,20 43:8
  45:14 46:3
**ritchey**  2:5
**role**  11:21 13:5
  37:19
**roll**  13:1 26:7,17
  38:6,18 40:3
  41:19 42:4,25
  44:14,24 45:9,13
  45:17,19 47:18
**rules**  4:9 51:5 52:5
**run**  32:3,4 41:3
**running**  41:14

### s

**s**  50:15 52:8,8 53:3
**sale**  33:6,11,13
**satisfy**  32:7
**saying**  7:22 38:4
  38:17
**says**  31:16 45:12
**schedule**  22:14
  23:5
**scope**  10:15
**seal**  51:15 52:21
**second**  10:7 31:15
**section**  25:16 29:3
**see**  10:5,9 15:23
  16:13 17:23 18:19
  18:20 19:3 21:23
  24:10,11 31:1
  45:3,10
**seen**  37:6

**sees**  15:19
**self**  26:22 27:6
**selling**  36:9 39:1
  39:21
**send**  43:1
**sense**  37:1
**sergent**  2:17 5:19
  5:19
**served**  13:7,19
**service**  14:17
**services**  2:18
  10:17 12:22 14:19
  28:2,3,6
**set**  3:16 13:2 49:6
**shakes**  8:6
**sheet**  50:13 52:7
  52:10,18 53:1
**shortfalls**  40:10
**show**  25:1
**shown**  50:16
**side**  19:7
**sign**  48:3
**signature**  50:14
**signed**  51:13 52:18
**signing**  4:14 50:19
**sincerely**  50:21
**sir**  6:6 8:3,19 9:22
  10:2,6,19 11:8,12
  11:16 12:8,10
  14:9 19:9 21:24
  24:6,17,20 25:19
  31:2,6 32:5 36:6,6
  36:13,23 44:8,18
  45:23 46:9 47:20
  50:10
**skill**  49:12
**skimmed**  18:6
**slightly**  29:12
**small**  43:4,12
**smaller**  42:11

**software** 26:13
47:9
**solely** 17:8 31:4
**solutions** 50:1
53:1
**somebody** 16:22
37:15,17 38:20
**somewhat** 23:8
**soon** 15:21
**sorry** 12:21 20:17
21:2,3 28:1 30:9
31:13 47:21
**sort** 8:6 10:25 11:6
13:10 16:18 22:7
24:14,23 25:4
26:19 27:9,19
29:14 37:10,18,22
44:9,11 45:6
**sounds** 8:10 9:4
**speak** 16:7
**specialized** 28:17
**specific** 28:6 31:7
36:7 38:11,16
40:22 41:16
**specifically** 27:14
**speculation** 47:5
**sponsor** 35:13
**staff** 42:8
**standards** 14:25
**state** 4:13 5:4,12
5:18 14:15 30:14
35:16 44:21,22
51:10 52:15
**statement** 51:13
51:14 52:19,19
**states** 1:1 6:20
30:22
**statute** 25:2 34:20
34:22 36:7 45:12
**statutes** 28:20
30:6,16 32:2

**statutory** 16:1
31:17 40:6
**stipulations** 4:1
**stop** 32:20,24
**store** 30:25
**stories** 35:18
36:21
**storing** 31:21
**straight** 35:22
**stream** 35:14
**street** 4:5 5:13,18
7:4
**strike** 16:10 19:11
20:20 25:9 26:1
34:21 39:6 44:9
**study** 18:8
**subject** 46:10
**submitted** 49:25
**subparagraphs**
24:13
**subscribed** 51:10
52:14 53:21
**subscription** 44:17
**substantial** 30:4,4
**substantially** 40:9
**substituted** 17:20
**suffer** 47:11
**sufficient** 47:8
**suite** 2:7 4:5 50:2
**sum** 30:23
**superior** 50:1
**supervise** 14:15,18
**supervisory** 15:7
17:6
**supplement** 46:25
**support** 12:4,22
12:23
**sure** 8:12,17 12:13
14:24 23:12 27:20
34:7,20 35:16
40:9 42:15,15

**surely** 12:12
**swear** 4:14 6:9
**sworn** 4:10 49:7
51:10,13 52:14,18
53:21
**system** 22:15

**t**

**tackett** 10:17
27:23,25 28:11,16
**tackett's** 14:18
28:13
**take** 7:9 8:25 9:3
37:18 43:16
**taken** 4:3,8 35:2
48:4 49:5,11
**takes** 38:19
**talk** 30:9
**talking** 7:19,22
37:25 42:16
**tangible** 14:16
**tatenhove** 1:6
**tax** 12:25 13:1,2,3
16:23 26:7,17
38:6,18 40:3
41:19 42:4,25
44:13,24 45:9,13
45:17,19 47:14,18
**taxation** 14:16
28:2,3
**taxing** 44:21 47:15
**taxpayer** 34:10,10
**telephone** 2:9,21
**tell** 9:18 10:21
18:5 37:9
**ten** 43:23,24
**tenth** 5:14
**term** 13:10,12,23
26:6 30:16 36:2
**terminal** 45:24
**terms** 26:2 36:22
43:14

**testified** 10:17
46:6
**testify** 10:11,21
29:25 30:7 49:7
**testimony** 6:9
10:16 11:15 18:8
46:5 51:6,7 52:6,9
52:12
**thank** 5:22 6:6,13
37:13 48:1
**thanks** 46:15
**thing** 7:16 8:4,6,11
9:5 11:1 26:24
34:17 42:14,16
**things** 10:24 15:3
47:9
**think** 13:6 16:20
26:24,25 27:4
29:19 33:7 36:1
40:18 44:19 46:19
**third** 17:21
**thirty** 50:18
**thomas** 1:13 2:13
6:22 50:6 51:3
52:3
**thoughts** 43:25
**three** 13:7 23:6
**thrown** 26:7
**thursday** 4:7
**time** 7:7,23 23:2
38:4,19 39:25
43:15,17 46:16,17
47:4 49:5
**timely** 40:11 47:8
**times** 45:15
**title** 10:3 12:1
16:11 21:19 22:13
49:6
**titles** 14:7
**today** 7:17 8:12
10:11 24:19 29:25

44:1 46:7,15
**tom**   1:23 4:3 5:16
  6:1,24 13:15
  46:15 50:8 51:4,9
  52:4,13 53:20
**top**   18:19 24:10
**topic**   10:16 16:11
  16:15 30:7
**topics**   10:8,22
  29:12,24,25
**totality**   45:22
**totally**   40:17
**totals**   12:25
**training**   24:23
  25:4,7 28:17
**transcribed**   51:7
**transcript**   4:15
  49:5,11 50:11,12
  51:5,12 52:5,11,17
**transparency**   34:8
**treaties**   35:12
**true**   42:23 49:11
**truth**   6:10,11,11
  9:18 49:7,8,8
**try**   7:17,19 8:7,11
**trying**   7:21 25:5
  34:9 43:5
**turn**   17:15,21
  18:18,22 21:16
  24:7 29:18,19
  30:11
**twice**   43:24
**two**   24:13
**type**   31:7 38:16
  42:14
**types**   15:16 21:5
  26:3 42:24 45:10
**typewritten**   49:10

**u**

**uh**   8:7
**ultimately**   12:25
  19:25
**understand**   7:9,13
  8:13,17,17 10:10
  10:19 12:14,17
  15:5 20:20 21:6
  33:21 34:18 39:5
  39:7 43:6 44:6,16
**understanding**
  10:15 15:17 16:16
  18:12,14 21:9
  23:18 31:25 33:3
  35:9 36:2,19
  38:24 43:11 45:20
**understood**   8:21
  20:18
**united**   1:1 6:19
**unsuccessful**   16:3
**use**   12:14,17 22:15
  25:12,17 26:20
  31:23 33:10,25
  35:8 36:22
**useful**   33:19
**user's**   25:20
**users**   21:21 22:14
  34:14 35:11,23
  46:22
**utilize**   19:17 22:3
  22:22 26:18

**v**

**v**   1:11 50:6 51:3
  52:3
**valuation**   6:25
  11:22 12:6,15
  13:25 14:5,12,16
  15:11,13 22:22
  23:25 24:22 39:25
  41:11,14

**value**   13:21 14:25
**values**   33:8
**van**   1:6
**various**   6:19 17:17
  24:25 33:9 35:12
**vehicle**   14:16
**ventures**   31:25
**verbal**   31:11
**veritext**   50:1,7
  53:1
**veritext.com.**
  50:17
**version**   19:10,12
  19:16 45:21
**versus**   17:17
**veto**   20:3
**videoconference**
  2:11,24 4:6
**view**   20:22 34:5

**w**

**w**   2:4,16
**wait**   5:24
**waived**   4:15 50:19
**want**   8:17 10:22
  12:12 15:24 25:25
  27:8 36:17 38:15
  42:15 43:23
**wanted**   23:18
**way**   8:2,8 25:10
  29:10 49:14
**ways**   7:19
**we've**   24:25
**website**   33:5,19
  34:14,17 35:4
**websites**   35:14
  44:12,17
**went**   13:17 19:14
**west**   4:5
**wise**   26:24
**witness**   4:14,15
  5:12,17,25 6:12

46:12 49:4 50:8
  50:11 51:1,4,11
  52:1,4,15
**witnesses**   46:4
**witness'**   50:14
**work**   7:23 40:9,14
  40:16,17 41:22
  42:1,2
**working**   23:11
**write**   7:21
**written**   27:11
**wrong**   34:9 37:10

**x**

**x**   15:22

**y**

**yeah**   31:13 36:16
  42:17
**year**   11:23 13:3,18
  36:25 37:12 39:13
  39:16 41:3
**years**   11:19 13:8
  47:17

**z**

**zestimates**   33:7
**zillow**   1:8 2:3 5:8
  6:18 17:16 30:25
  32:25 33:4,12,15
  33:18 34:13 35:3
  35:8,9,21,25 36:19
  40:3,22,25 41:3,6
  41:12,18,24 42:19
  43:1,8,17,20 50:6
  51:3 52:3
**zillow's**   18:12
**zoom**   5:7,15,21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.