Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF KENTUCKY

3                   CENTRAL DIVISION

4                      FRANKFORT

5          CIVIL ACTION NO. 3:19-CV-00049-GFVT

6            JUDGE GREGORY F. VAN TATENHOVE

7

8                    ZILLOW, INC.,

9                       Plaintiff

10

11                        V.

12

13   HON. THOMAS B. MILLER, IN HIS/HER OFFICIAL CAPACITY AS

14   COMMISSIONER OF THE KENTUCKY DEPARTMENT OF REVENUE, ET

15                        AL.

16                     Defendants

17

18

19

20

21

22

23   DEPONENT:   WILLIAM BRAD MCDOWELL

24   DATE:       MARCH 9, 2021

25   REPORTER:   LINDSEY N. JOHNSON

Page 2

APPEARANCES

1

2

3  ON BEHALF OF THE PLAINTIFF, ZILLOW, INC.:

4  Darren W. Ford, Esquire

5  Graydon Head & Ritchey, LLP

6  2400 Chamber Center Drive

7  Suite 300

8  Ft. Mitchell, Kentucky 41017

9  Telephone No.: (859) 578-7263

10  E-mail: Dford@graydon.com

11  (Appeared via videoconference)

12

13  ON BEHALF OF THE DEFENDANTS, HON. THOMAS B. MILLER, ET

14  AL.:

15  Richard W. Bertelson, III, Esquire

16  Nicole Sergent, Esquire

17  Office of Legal Services for Revenue

18  Post Office Box 423

19  Frankfort, Kentucky 40602

20  Telephone No.: (502) 564-9572

21  E-mail: Richard.berelson@ky.gov

22     Nicole.sergent@ky.gov

23  (Appeared via videoconference)

24

25

Page 3

INDEX

1

2                    Page

3  PROCEEDINGS                5

4  DIRECT EXAMINATION BY MR. FORD         6

5  CROSS EXAMINATION BY MR. BERTELSON       88

6  REDIRECT EXAMINATION BY MR. FORD       94

7

8

9         EXHIBITS

10  Exhibit              Page

11  1 - Notice of Deposition         10

12  3 - Complaint           16

13  6 - Answers to Interrogatories      84

14  24 - Invoices          62

15  25 - Office Budget           67

16  26 - E-mail          44

17  35 - E-mail          44

18

19  (All exhibits previously marked.)

20

21

22

23

24

25

Page 4

STIPULATION

1

2

3  The 30(b)(6) deposition of BRAD MCDOWELL was taken at

4  the office of Kentuckiana Court Reporters, located at

5  730 West Main Street, Suite 101, Louisville, Kentucky

6  40202, via videoconference in which all participants

7  attended remotely, on Tuesday, the 9th day of

8  March, 2021, at 8:58 a.m.; said 30(b)(6) deposition was

9  taken pursuant to the Federal Rules of Civil Procedure.

10  The oath in this matter was sworn remotely pursuant to

11  FRCP 30.

12

13  It is agreed that Lindsey N. Johnson, being a Notary

14  Public and Court Reporter for the State of Kentucky, may

15  swear the witness and that the reading and signing of

16  the completed transcript by the witness is not waived.

17

18

19

20

21

22

23

24

25

Page 5

PROCEEDINGS

1

2

3     COURT REPORTER:  We are now on the record.

4  Will all parties present please state your

5  appearance, how you are attending, and the location

6  you are attending from?

7     MR. FORD:  Darren Ford for Plaintiff, Zillow,

8  Inc.  I'm attending by Zoom meeting from Fort

9  Mitchell, Kentucky.

10     MR. BERTELSON:  And I'm Rick Bertelson.  I'm an

11  attorney for the Kentucky Department of Revenue's

12  Office of Legal Services, and I'm appearing on

13  behalf of all of the Defendants in this matter.  And

14  I'm currently at the office of the Shelby County

15  PVA, Brad McDowell.

16     COURT REPORTER:  Thank you.

17     Mr. McDowell, will you please state your full

18  name for the record?

19     THE WITNESS:  Full name is William Brad

20  McDowell.

21     COURT REPORTER:  Mr. McDowell, will you please

22  hold your driver's license up to the camera and wait

23  until it is focused?

24     Do all parties present agree that the witness

25  is, in fact, Brad McDowell?

2 (Pages 2 - 5)

Page 6

1   MR. FORD: Yes.
2   MR. BERTELSON: Yes.
3   COURT REPORTER: Thank you.
4   Mr. McDowell, will you please raise your right
5   hand? Do you swear or affirm that the testimony you
6   are about to give will be the truth, the whole
7   truth, and nothing but the truth?
8   THE WITNESS: I do.
9   COURT REPORTER: Thank you. Mr. Ford.
10   DIRECT EXAMINATION
11 BY MR. FORD:
12   Q.  Good morning, Mr. McDowell. My name is Darren
13 Ford. I'm an attorney for Zillow, Inc., in a lawsuit
14 --
15   A.  Good morning.
16   Q.  -- by them in the United States District Court
17 for the Eastern District of Kentucky against various
18 Defendants, including the Shelby County Property
19 Valuation Administrator.
20   If you could go ahead and please state your
21 name for the record.
22   A.  My name is Brad McDowell.
23   Q.  And what is your current business address,
24 Mr. McDowell?
25   A.  Current business address is 501 Washington

Page 7

1 Street, Shelbyville, Kentucky 40065.
2   Q.  And have you been deposed before,
3 Mr. McDowell?
4   A.  No, sir.
5   Q.  Okay. So just a few ground rules. I'm going
6 to ask you a series of questions, and you'll provide
7 answers to those questions under oath.
8   You understand the nature and consequences of
9 the oath that you've taken here this morning?
10   A.  Yes.
11   Q.  We have a court reporter here who will be
12 taking down everything that we say. So one of the
13 important things for us to try to do is to give audible
14 answers to my questions. So head nods, "uh-huhs," these
15 sorts of things, are hard for her to transcribe. So if
16 you would do your best to try to give a "yes," "no,"
17 some sort of audible answer, so that she can easily take
18 down what your answers to my questions are.
19   Also, since we're on Zoom, please do your best
20 to try to speak up so that way the microphone can pick
21 up what you're saying, okay?
22   A.  Yes, sir.
23   Q.  Another thing that's important for us to try
24 to do, and we've been reasonably good at this the last
25 couple of depositions, but try not to speak over one

Page 8

1 another.
2   So it will feel a little awkward, but if you
3 can wait until I finish my question before answering,
4 give a little bit of a pause, that'll ensure that
5 Ms. Johnson here can take down exactly what I'm saying
6 and what you're saying, and we don't have any muddying
7 of the record, okay?
8   A.  Yes, sir.
9   Q.  Another thing that you're free to do at any
10 time, Mr. McDowell is it's important for us to try to
11 get a clear transcript and a clear record here. I want
12 you to make sure that you understand my question. So if
13 you don't understand a question or there's a word I've
14 used or terminology that I've used that doesn't quite
15 make sense to you, just go ahead and let me know before
16 you answer. That way I can maybe try to rephrase the
17 question or clarify what I mean, okay?
18   A.  Okay.
19   Q.  And if you need a break at any time, just let
20 me know, and we'll take a break. My only request is
21 that you complete any pending question before we take
22 the break, all right?
23   A.  All right.
24   Q.  Are you on any medications this morning,
25 Mr. McDowell, that might affect your ability to tell the

Page 9

1 truth or to recall events --
2   MS. SERGENT: No.
3   Q.  -- two or three years ago?
4   MS. SERGENT: No.
5   A.  No, sir.
6   Q.  I think Ms. Sergent joined us there. Okay.
7   And one other thing that may happen during the
8 course of this deposition, Mr. McDowell is
9 Mr. Bertelson here, your attorney, he may interject with
10 some objections at times. That's one of the reasons to
11 try to give a little bit of a beat before answering my
12 questions.
13   If -- unless he instructs you specifically to
14 not answer my question, as soon as he's finished making
15 his objection on the record, you're free to answer. Of
16 course, if he does instruct you not to answer, you can
17 follow his instruction and consult with him, okay?
18   A.  Okay.
19   Q.  All right. Mr. McDowell, I don't know if
20 Mr. Bertelson is there with you today or not, but
21 hopefully you have copies of some exhibits there. I
22 don't know if you have a paper copy or a PDF copy.
23   What are you working with this morning?
24   A.  I have paper copies.
25   Q.  Perfect. Okay.

3 (Pages 6 - 9)

Page 10

1    A.  Mr. Bertelson is here with me.
2    Q.  All right.  Very good.
3        If you could, turn with me to, oh, I guess
4  what's going to be the 25th page here of this document.
5        And I wish they were numbered, but they're
6  not.  And that's going to be the Notice of Deposition,
7  Exhibit 1 for Shelby -- Property Valuation Administrator
8  for Shelby County.  It's definitely more than halfway
9  through.  Just let me know when you've gotten there.
10       (EXHIBIT 1 MARKED FOR IDENTIFICATION)
11   A.  Yes, sir.
12   Q.  You have it in front of you?
13   A.  Yes, sir.
14   Q.  All right.  If you could turn to the next page
15  of that notice, which is a list of topics one through
16  11?
17   A.  Yes.
18   Q.  And first question for you is:  Have you seen
19  this document before?
20   A.  Yes.
21   Q.  Okay.  And you notice there's a list of topics
22  that are described there.
23       Can you tell me, generally, and I don't want
24  you to disclose any communications that you may have had
25  with Mr. Bertelson, but documents that you looked at,

Page 11

1  anything like that, to prepare for testifying on the
2  topics identified in this notice of deposition that you
3  have in front of you?
4        THE WITNESS:  Is he just referring to the
5        things we have here, the documents that were sent to
6        us?
7    A.  Yeah, I've reviewed the documents that were
8  sent to us that were pending through the case at hand.
9  BY MR. FORD:
10   Q.  Okay.  So you reviewed the exhibits that you
11  have in front of you in preparation for your deposition
12  today?
13   A.  Yes.
14   Q.  Okay.  In terms of other preparation that
15  you've done, for instance, did you look at any budget
16  records or anything like that, that you maintain in your
17  office that aren't contained within the exhibits that
18  you received?
19   A.  Nothing that's not in the exhibits that we've
20  got.
21   Q.  Okay.  And you didn't interview any employees,
22  or anything like that, in preparation for today?
23   A.  No, I haven't -- haven't had time.  I've
24  barely had time to look at what we've got.
25   Q.  Okay.  And you presumably haven't spoken to

Page 12

1  any other PVAs about your deposition, then, today; is
2  that correct?
3    A.  No.
4    Q.  All right.  All right.  Mr. McDowell, how long
5  have you been -- let me actually strike that.  Let me
6  make sure I'm defining my terms here.
7        So I'm going to use the acronym "PVA" to refer
8  to property valuation administrator.
9    A.  Yes.
10   Q.  If I use that acronym and it's not clear to
11  you who I'm referring to, whether it's you or some other
12  PVA or PVAs in general, please ask for clarification on
13  that, and I'll try to make sure that I'm clear when I
14  use that term.  But just for shorthand purposes, if I
15  say "PVA," that's what I mean by that, okay?
16   A.  Okay.
17   Q.  The other acronym that I'll probably use here
18  at times is "DOR," and I'll use that for the department
19  of revenue; is that okay?
20   A.  Yes.
21   Q.  And you know what the department of revenue
22  is, right?
23   A.  Yes, sir.
24   Q.  Okay.  All right.  Mr. McDowell, how long have
25  you been PVA for Shelby County?

Page 13

1    A.  Since December of 1998.
2    Q.  And were you originally elected to that
3  office, or were you appointed?  What was your first
4  term?
5    A.  Elected.
6    Q.  And where did you go to high school,
7  Mr. McDowell?
8    A.  I went to high school at Shelby County High
9  School.
10   Q.  And what year did you graduate?
11   A.  I graduated in 1983.
12   Q.  And did you go to college?
13   A.  Yes, I did.
14   Q.  What college did you go to?
15   A.  I went to the University of Kentucky and the
16  University of Louisville.  Kind of odd.
17   Q.  Okay.  Did you do both for undergrad, or was
18  one undergrad and one grad school?
19   A.  No, both were undergrad.  I went to the
20  University of Kentucky my freshman year, and then
21  finished out at University of Louisville.
22   Q.  Okay.  What year did you graduate from the
23  University of Louisville?
24   A.  Graduated there in December of 1987.
25   Q.  And what degree did you receive from

4 (Pages 10 - 13)

Page 14

1 Louisville?
2    A.  Bachelor of Arts in business.  I'm sorry.
3       Business administration.
4    Q.  Business administration.  Okay.
5       So I don't want to go through your entire job
6 history here, but prior to your -- well, strike that.
7       Have you been Shelby County PVA continuously
8 since 1998?
9    A.  Yes.
10    Q.  Okay.  Prior to your being elected to the
11 position of Shelby County PVA, what were you doing for
12 work?
13    A.  Immediately prior, I was working with a
14 company called Steel Technologies in steel sales.  Prior
15 to that, I was a manager of what was Great Financial
16 Federal and is now U.S. Bank, here in Shelbyville,
17 Kentucky.
18    Q.  And then I assume, based on that answer, no
19 prior jobs with any sort of PVA, or anything like that,
20 prior to you being elected to that position?
21    A.  No.  I do hold a real estate license that's
22 now in escrow.
23    Q.  Okay.  Mr. McDowell, are you familiar with the
24 Kentucky Open Records Act, just generally, the existence
25 of that statute?

Page 15

1    A.  Yes, sir.
2    Q.  In connection with your being PVA for Shelby
3 County, do you recall receiving any training or
4 instruction on how to apply or comply with the Kentucky
5 Open Records Act?
6    A.  Yes.
7    Q.  Okay.  What kind of instruction or training
8 have you received during your time with Shelby County
9 PVA, instruction in the Open Records Act?
10    A.  There are general classes that we take as PVAs
11 and as PVA employees that teach you different functions
12 of the office.
13    Q.  And have you taken any classes, specifically
14 in the context of the Open Records Act, that have
15 instructed you on how to identify or classify a request
16 made for a commercial purpose under that act?
17    A.  There's not a class specific to that, but
18 within the classes that we've taken, there -- there are
19 things that tell us what we should look for, yes.
20    Q.  Okay.  And when you say "what we should look
21 for," is that characteristics of a request that should
22 be characterized as commercial purpose?  What do you
23 mean by "what you should look for"?  What sort of --
24 what sorts of things have you been trained to look for?
25    A.  Various things.  One's -- one very clear one

Page 16

1 is we have a form that needs to be filled out that --
2 that has a spot on it to notify whether it is a for
3 commercial use or noncommercial use.  Other things are
4 just the nature and the purpose of the request.
5    Q.  Okay.  Any other training outside of the
6 classes that you described that you received in
7 connection with the Kentucky Open Records Act?
8       Mr. McDowell?
9    A.  Yes.
10    Q.  Have you received any other training other
11 than classes that you described in how to apply the
12 Kentucky Open Records Act?
13    A.  I responded no.
14    Q.  Okay.  I'm sorry.  I didn't hear you.
15    A.  Okay.  That's fine.
16    Q.  All right.  If you could grab Exhibit 3 for
17 me, Mr. McDowell.
18       (EXHIBIT 3 MARKED FOR IDENTIFICATION)
19    A.  Okay.
20    Q.  And you see that is a document that has a
21 caption at the top, United States District Court,
22 Eastern District of Kentucky, Central Division, and it
23 has Zillow, Inc., and a number of PVAs.
24       You're listed there on the first page.
25       Do you see that?

Page 17

1    A.  Yes, sir.
2    Q.  Okay.  If you could turn to the third page of
3 this document.
4       And there's a title there, "Complaint for
5 Declaratory & Injunctive Relief."
6       Do you see that?
7    A.  Yes.
8    Q.  Have you seen this document prior to today?
9       Have you reviewed this document at some point?
10 Yes?
11    A.  Yes, sir.
12       MR. FORD:  I seem to have some sort of audio
13 issue.
14       Lindsey, are you picking him up, or is it just
15 me?
16       COURT REPORTER:  The two times that you didn't
17 pick him up I didn't hear either.
18       MR. FORD:  Okay.  So it's --
19       COURT REPORTER:  So it's -- yeah, it's not you.
20 It's -- it may -- it's probably just Mr. McDowell's
21 feed.
22       MR. FORD:  Okay.
23       COURT REPORTER:  So -- and don't worry.  If I
24 don't hear it, I'll speak up and say something, of
25 course, so --

5 (Pages 14 - 17)

Page 18

1      MR. FORD:  Okay.  All right.  Very good.
2  BY MR. FORD:
3      Q.  Mr. McDowell, if you could just generally
4  characterize your understanding of Zillow's complaint in
5  this action and the nature of the claims that it's
6  asserted against your office?
7      A.  My understanding is that Zillow is basically
8  saying that we should not have considered them a
9  commercial user in their request for our information.
10     Q.  Mr. McDowell, in preparation for today, did
11 you have an opportunity to review any statutes
12 specifically related to the Kentucky Open Records Act or
13 the PVA specifically?
14     A.  I -- I looked over all of the documents that
15 are included here, and I think there are some statutes
16 in that that we reviewed.
17     Q.  Okay.  But you didn't specifically go and pull
18 statutes and review those statutes.  It was whatever was
19 in -- within these documents; is that what you're
20 saying?
21     A.  That's correct.
22     Q.  If you look at paragraph 1 of the complaint,
23 you see introduction there, and there's three statutes
24 that are identified, KRS Section 61.874, 61.8745, and
25 133.047.

Page 19

1      Do you see that?
2      A.  Yes.
3      Q.  All right.  Are you familiar with those
4  statutes, Mr. McDowell?
5      A.  I am familiar with them.  I can't quote them
6  to you, but I am familiar with them.
7      Q.  Definitely wouldn't ask you to recite them
8  verbatim.
9      You understand that those are statutes that
10 relate to Kentucky public records law and fees that may
11 be charged under the Kentucky Open Records Act?  Do you
12 understand them generally that way?
13     A.  Yes.
14     Q.  All right.  If you can see there, they're --
15 those three statutes are defined as the commercial
16 purpose fee statutes.
17     Do you see that?
18     A.  Yes.
19     Q.  I will probably try to be specific as to which
20 statute that I'm referring to, but if I use the term
21 "commercial purpose fee statutes," those are the three
22 that I'm referring to, okay?
23     A.  Okay.
24     Q.  And, Mr. McDowell, are you familiar with the
25 Kentucky Open Records Act drawing a distinction in the

Page 20

1  act between a commercial purpose and a noncommercial
2  purpose?
3      A.  Yes.
4      Q.  And if you could turn with me to page 10 of
5  the complaint.
6      A.  Okay.
7      Q.  And you see at the top there, it has in quotes
8  -- actually, you may want to look at -- yeah, that's
9  fine.
10     Top page 10, you see the term "commercial
11 purposes" in quotes?  Do you see that?
12     A.  Yes, I do.
13     Q.  All right.  And then there's a subsection A
14 and a subsection B.
15     Do you recognize that, based upon your
16 familiarity with the Kentucky Open Records Act, as a
17 definition for commercial purpose that's provided for in
18 those statutes?
19     And take a moment to read it if you need.
20     A.  Yes, I'm looking over it.
21     Yes, I do.
22     Q.  Okay.  Let's take a look, if you would, with
23 me.  And on the top right-hand side of -- corner, top
24 right-hand corner of this document, there are page
25 numbers that say "Page ID."

Page 21

1      Do you see those, Mr. McDowell?
2      A.  Yes.
3      Q.  All right.  So occasionally, if I get into
4  some of the exhibits in the back of a document here that
5  are not sequentially numbered, I'm going to refer to
6  those page numbers.
7      If you could refer -- if you could turn to
8  page 42 of that document, Exhibit 3.
9      A.  Okay.
10     Q.  All right.  And this document here, which is
11 attached to the complaint, has letterhead, Zillow Group,
12 at the top dated April 25, 2019, and it's addressed to
13 you and Shelby County Property Valuation Administrator.
14     Do you see that?
15     A.  Yes, sir.
16     Q.  And then this two-page document, turn to the
17 next page.  It is signed by Susan Noto, Source
18 Acquisition Strategist.
19     Do you see that?
20     A.  Yes.
21     Q.  Do you recall receiving this request on or
22 about April 25, 2019, Mr. McDowell?
23     A.  Yes.
24     Q.  And did you understand this to be a request
25 made to your office pursuant to the Kentucky Open

Veritext Legal Solutions

www.veritext.com                                    888-391-3376

Page 22

1  Records Act?
2     A.  Yes.
3     Q.  And did you treat it as such?
4     A.  Yes.
5     Q.  Did you make a determination that this request
6  that Ms. Noto made here to you on April 25, 2019, on
7  behalf of Zillow, did you understand this to be a
8  request made for a commercial purpose within the
9  definition that we just looked at in the complaint?
10    A.  Yes, I did.
11    Q.  What factors information did you rely upon in
12 determining that Ms. Noto's request was for a commercial
13 purpose?
14    A.  Zillow, to my knowledge, Zillow was not a
15 newspaper or a news article or a -- a television-type
16 news media, and Zillow is a large company that is very
17 profitable.  So it was taken that this was for a
18 commercial use because they were going to use the data,
19 obviously, to produce income.
20    Q.  Okay.  When you received this request from
21 Zillow, were you familiar with Zillow prior to that
22 point in time?  Had you heard of them before?
23    A.  Yes.
24    Q.  Okay.  Prior to you receiving this request,
25 what was your understanding of the nature of Zillow's

Page 23

1  business?
2     A.  I had seen advertisements for Zillow.  I knew
3  that they were in the real estate business, that they
4  buy and sell real estate, that they have a rental
5  division, and that they have a mortgage division.  And I
6  also, in having my license in escrow, I am still
7  associated with the real estate firm in some degree, and
8  I know that they used to pay fees to Zillow for leads
9  and for advertisements.
10    Q.  Had you ever gone on Zillow's website prior to
11 April 25, 2019?
12    A.  Yes.
13    Q.  All right.  What have you gone on to Zillow's
14 website to do prior to receiving this request?  What
15 types of activities did you do on there?
16    A.  For the most part, occasionally look at it
17 just to see what they think home values are in some
18 instances, and I also had looked at it just as a company
19 to see what all they did.
20    Q.  And that's prior to receiving this request,
21 you just went on there to see what they did?
22    A.  Yes.  With a real estate background and with
23 the business that I do here as PVA, yes.
24    Q.  Okay.  And I think your first part of your
25 answer was that you had occasionally gone onto

Page 24

1  Zillow.com to look at home values; is that correct?
2     A.  I had looked at them some, and occasionally
3  when we have what we call open -- or inspection period
4  and people come in to appeal their assessment with us,
5  they will bring in what they call the Zestimate, or
6  Zillow's estimate of what the property value is.
7     Q.  Okay.  So you're familiar, then, with the
8  Zestimate, and that's sort of an estimated value of a
9  home based upon comps and other information; is that
10 fair?  Is that your understanding of it?
11    A.  Yes.
12    Q.  Okay.  And I think you said that occasionally
13 when you have people that come in and want to maybe
14 question what the assessment of their house is that your
15 office has conducted, that they will bring in a
16 Zestimate as sort of proof, presumably, that it's worth
17 less than they're saying?  Is that usually the case?
18    A.  That's generally the case.  I -- I generally
19 don't have folks coming in thinking I should raise the
20 assessment, unless they're selling it, and that very
21 seldom happens.
22    Q.  Yeah, I figured that was the case.
23    A.  Yes.
24    Q.  But they'll bring that Zestimate in, and they
25 try to sort of show that to you as some proof of what it

Page 25

1  may be worth.  And then you might go on and sort of look
2  at whatever Zillow has if they do that.
3        Is that a fair characterization?
4     A.  Yes.
5     Q.  Yeah?
6     A.  I think I'm talking too fast.
7     Q.  That's okay.
8        And do you ever look at Zillow in your
9  capacity as PVA for Shelby County to sort of get a sense
10 of what is going on in the Shelby County real estate
11 market in terms of the number of houses for sale and,
12 you know, that sort of thing?
13    A.  No.
14    Q.  All right.  So when you received this request
15 from Ms. Noto and you made a determination that it was
16 for a commercial purpose, part of your determination,
17 then, if I'm accurately understanding you, was based
18 upon your prior knowledge of Zillow's business from
19 having, you know, been familiar with it in your capacity
20 as Shelby County PVA and having been on its website.
21        That's part one, correct?
22    A.  Yes, that's a part of it.
23    Q.  And then the other part was looking at the
24 nature of the request?  Or what other information did
25 you rely upon in determining that Zillow's request was

7 (Pages 22 - 25)

Page 26

1  for a commercial purpose?
2      A.  Basically, just the purpose of what they were
3  going to do with the data.  It was -- it was to -- on
4  their website and to -- to generate income from that.
5      Q.  Okay.  And when you say "generate income from
6  that," are you referring to the portion of Zillow's
7  letter where it states that it generates revenue from,
8  among other sources, the sale of advertising space on
9  Zillow.com?
10     A.  Yes.
11     Q.  Was there any other way in which you believed
12 or understood that Zillow would be making money from the
13 use of the records that it was requesting from your
14 office?
15     A.  Other than the fact that I know that they
16 charge real estate offices for leads for data, and maybe
17 not just real estate offices, but other firms.
18     Q.  When you say, "leads for data," what do you
19 mean by that?
20     A.  I don't know the specifics.  I do know that,
21 like I said, the real estate firm that I was associated
22 with did pay fees to Zillow, and it was -- it was for
23 leads and for -- and for information.  I -- I don't know
24 the specifics because I was not involved in that part of
25 it.

Page 27

1      Q.  Okay.  Do you know if those leads had
2  information sourced from PVAs in them, or were they
3  leads, you know, people who are interested in buying a
4  home, that sort of thing?
5      A.  I'm not -- I'm not positive on that.
6      Q.  Okay.  In classifying Zillow's request for a
7  commercial purpose, did you rely upon your belief that
8  the information that you would be providing would be
9  used by Zillow to sell leads to real estate companies?
10     A.  As part of it, but primarily the fact that
11 Zillow is a for-profit company.  They're not a -- news
12 media.
13     Q.  So the main reason, then, was because Zillow
14 is a for-profit company?  That's why you classified
15 their request is for a commercial purpose?
16     A.  Well, the purpose of what they were going to
17 do with the data.  It's almost every company that wants
18 that data uses it to repackage it and to use it to -- to
19 generate income.
20     Q.  Okay.  If you notice in Ms. Noto's letter to
21 you, on page 43, she writes that, "Zillow intends to
22 make some or all of the information contained in the
23 real property records sought by this request available
24 to users of its website, Zillow.com, free of charge."
25         Do you see that?

Page 28

1      A.  Which paragraph was that?  In the first or the
2  second paragraph there?
3      Q.  Yeah, first paragraph on page 43.  It's the
4  second sentence there that starts, "Zillow intends."
5         Do you see that?
6      A.  Yes, yes.
7      Q.  And then it ends with "free of charge"?
8      A.  Yes.
9      Q.  Okay.  Did the fact that Zillow.com intended
10 to publish the information in these records on its
11 website so that people could use it free of charge
12 factor into your determination as to whether or not its
13 request was for a commercial purpose?
14     A.  No.  Publishing it free of charge or putting
15 it out there free of charge doesn't mean that they're
16 not using it for income production.
17     Q.  Let's go back, if you would, Mr. McDowell, to
18 page 10 of this same document, which -- where that
19 definition of "commercial purpose" is contained.
20     A.  Yes.
21     Q.  And so paragraph A is "commercial purpose,"
22 and it has a definition there.  It says, "means the
23 direct or indirect use of any part of a public record or
24 records, in any form, for sale, resale, solicitation,
25 rent, or lease of a service, or any use by which the

Page 29

1  user expects a profit either through commission, salary,
2  or fee."
3         Do you see that?
4      A.  Yes.
5      Q.  Did you understand when you classified
6  Zillow's request as one for a commercial purpose, that
7  it would be selling the information to third parties?
8      A.  It was -- I understand it that way.
9      Q.  You understood that they would be selling the
10 information or selling the records to a third party?
11     A.  Well, no, not selling the records necessarily,
12 but they would be using it as a commercial use.
13     Q.  Okay.  But I'm trying to understand what --
14 that term, "sale," do you understand what the term
15 "sale" means?
16     A.  Yes.
17     Q.  What does the term "sale" mean to you?
18     A.  Sale means to offer a product for money.
19     Q.  Okay.  And what product was Zillow, in your
20 understanding, offering in exchange for money in
21 connection with the public records that it was
22 requesting from your office?
23     A.  They were using our data -- like I said, they
24 -- putting it on the website is just one facet of what I
25 assumed they were doing with it.

8 (Pages 26 - 29)

Page 30

1    Q.  What other things did you assume that they
2  were doing with the records they were requesting from
3  your office, other than putting it on the website?
4    A.  Like I said, Zillow has many different facets.
5       They buy and sell real estate, they do
6  rentals, and they do mortgages.  And I -- the data would
7  most likely be used for all of those purposes.  And --
8  and they're -- they're not a -- they're not a news media
9  that would be using it for those types of informational
10  purposes.
11    Q.  What information did you have when you
12  classified Zillow's request as one for a commercial
13  purpose that they would be using the records that they
14  were requesting from your office to buy or sell real
15  estate?
16    A.  Just general knowledge of Zillow.
17    Q.  Did you have any specific information about
18  how they might use these records that you would provide
19  to buy and sell real estate?
20    A.  Well, our records include property data and
21  like I said, I know that they have a service called
22  premier agents that they charge a fee for, for real
23  estate agents to get a lead and to sell property.
24    Q.  Okay.  And how do they use the records that
25  your office maintains?  How do they use that

Page 31

1  information?
2    A.  It's data on homes that are -- that are in
3  Shelby County.  There's a wealth of knowledge and a
4  wealth of data included there.
5    Q.  Is that information available through other
6  sources, like MLS?
7    A.  It's available through MLS if the property is
8  for sale, yes.
9    Q.  Okay.  So is there any specific activity that
10  you're aware of that Zillow engages in with those
11  records in connection with its buying and selling of
12  real estate?
13    A.  Not specific.
14    Q.  So you're just assuming they do that?  You
15  don't have any specific knowledge of what they might be
16  doing with those records in connection of buying and
17  selling real estate; is that correct, Mr. McDowell?
18    A.  Not specific.
19    Q.  And would you agree with me that there was
20  nothing in Ms. Noto's letter that said they would be
21  using those records to buy and sell real estate?
22    A.  Not to buy and sell real estate.
23    Q.  Okay.  I think you also mentioned they're from
24  your agent program has another activity that they --
25  that Zillow engages in that you're aware of; is that --

Page 32

1  did I hear you correctly?
2    A.  Yes.  I'm somewhat aware of that, yes.
3    Q.  Okay.  How does Zillow.com or how -- in your
4  understanding, would Zillow.com have used the records it
5  was requesting from your records in connection with its
6  premiere agent program?
7    A.  I have no specific knowledge.
8    Q.  If you go back to the definition of
9  "commercial purpose," on page 10 of the complaint there,
10  so is it fair to say at least that you don't have any
11  specific knowledge, sitting here today, that Zillow was
12  planning to sell this information to a third-party if
13  you had provided it to it?
14    A.  I don't know what other purpose they would be
15  using it for.  Like I said, they're -- they're not
16  considered a publication or a news media or a public
17  service.
18    Q.  What about resale?  Were they -- you
19  understand that Zillow planned to utilize these records
20  in connection with some sort of resale of information or
21  the records?
22    A.  That is generally what companies do with our
23  data.  Like I said, it's usually repackaged and used for
24  some sort of resale.
25    Q.  Okay.  Did Zillow tell you at any point in

Page 33

1  time that that's what it was planning to do with the
2  records, is to resell it?
3    A.  They did not make that specific, no.
4    Q.  Okay.  And when you refer to "other
5  companies," are you talking about companies like
6  CoreLogic, Black Knight, those sorts of companies?
7    A.  Correct.
8    Q.  Okay.  Do you know if CoreLogic and Black
9  Knight are engaged in the same sort of business that
10  Zillow is in terms of what they do with data?
11    A.  I don't know that for a fact.
12    Q.  Okay.  Have you ever been on a website of
13  CoreLogic and looked at, you know, estimates and
14  property values in Shelby County?
15    A.  No, sir.
16    Q.  Okay.  Do you know if even such a website
17  exists?
18    A.  I am not familiar with it.
19    Q.  Do you know if you wanted to, you could go and
20  access all of the data that CoreLogic has from Shelby
21  County, and other counties in Kentucky, and see how that
22  -- see what that information is for free if you wanted
23  to?  Do you know if you can do that?
24    A.  I am not familiar with that.
25    Q.  Okay.  Another word in here is "solicitation."

9 (Pages 30 - 33)

Page 34

1    Do you see that?
2    A.  We're still on page 10?
3    Q.  Yeah, we're still on page 10, definition of
4 "commercial purpose."
5    Do you see where it says "solicitation"?
6    A.  Yes.
7    Q.  Okay.  Did you believe when you classified
8 Zillow's request as one for a commercial purpose, that
9 it planned to use these records for solicitation
10 purposes?
11    A.  That's -- that's a possibility.
12    Q.  Well, I'm not asking you if it's a
13 possibility.  I'm asking you if you had any specific
14 information, based on what Zillow told you or other
15 information that you had, that it planned to use the
16 records that it was requesting from your office for
17 solicitation?
18    A.  Not based on their general letter that they
19 sent.
20    Q.  What about to rent property?  Did you
21 understand that Zillow was going to be using the records
22 that it was requesting from your office to rent
23 property?
24    A.  Not based on their letter.
25    Q.  How about a lease of a service?

Page 35

1    A.  Again, not based on their letter.
2    Q.  Okay.  So really, we're talking about the last
3 portion there, "or any use by which the user expects a
4 profit."
5    Your understanding that it was  Zillow planned
6 to use the records that it was requesting from your
7 office, and it expected a profit from that use, correct?
8    A.  Profit, commission, or fee -- or salary or
9 fee, yes.
10    Q.  Okay.  What -- how was Zillow going to earn a
11 commission off the use of those records?
12    A.  If -- if they provide a lead to a real estate
13 agent and that agent sells the property, they get a fee
14 from that.  They charge a fee for advertisements on
15 their website.
16    Q.  Okay.  So you understand what a commission is,
17 right, Mr. McDowell?  You're in real estate, right?
18    A.  Yes, sir.
19    Q.  Would you understand -- would you -- would you
20 understand a commission to be something that a
21 salesperson receives in connection with selling
22 property, for instance?
23    A.  Yes.
24    Q.  Okay.  Did you understand that Zillow was
25 going to be earning commissions off of the use of your

Page 36

1 records?
2    A.  I don't know that it would be considered a
3 commission.
4    Q.  Okay.  You understand what a salary is, right,
5 Mr. McDowell?
6    A.  Yes.
7    Q.  Salary is something that you presumably earn
8 as a PVA of Shelby County, right?
9    A.  Correct.
10    Q.  What your employees earn, right?
11    A.  Yes.
12    Q.  You understand that Zillow, as the public
13 records requester here, would be earning a salary from
14 the use of your records?
15    A.  No.
16    Q.  Okay.  So really, we're just talking about
17 fees.
18    Your interpretation or your understanding of
19 Zillow's use was that it would be earning fees from
20 putting the information on its website through
21 advertising; is that accurate?
22    A.  Yes.
23    Q.  Okay.  All right.  And you said a couple times
24 this morning, Mr. McDowell, that you did not believe
25 that Zillow's request fell within the subsection B

Page 37

1 there, which says, "Commercial purpose shall not
2 include publication or related use of a public record by
3 a newspaper or periodical," right?
4    A.  That's correct.
5    Q.  When you got Zillow's request in April of
6 2019, did you -- did you think about that?  I mean, was
7 it sort of -- I mean, you had seen the definition of
8 "commercial purpose" prior to receiving that request,
9 correct?
10    A.  Yes.
11    Q.  So you knew that that exception, or whatever
12 you want to call it, was in the statute for newspaper or
13 periodical use, right?
14    A.  The exception for newspaper or periodical, is
15 that your question?
16    Q.  Yeah.  You knew that was in the statute prior
17 to receiving Zillow's request, correct?
18    A.  Yes.
19    Q.  Okay.  And so when you received Zillow's
20 request, I think you testified earlier that in your
21 mind, prior to classifying them as a commercial
22 requester, you considered whether you should deem them
23 to be, or deem their use to be, publication or related
24 to use by a newspaper or periodical, and you made the
25 determination that that exception did not apply to

10 (Pages 34 - 37)

Page 38

1 Zillow, correct?

2    A.   Yes.

3    Q.   Okay.  What about Zillow, in your mind --

4 well, strike that.  Do you have a newspaper in Shelby

5 County, Mr. McDowell?

6    A.   We do.

7    Q.   What's that newspaper called?

8    A.   The Sentinel News.

9    Q.   How often do they publish?

10    A.   It comes out twice a week and then a -- a

11 Monday -- or excuse me, a Tuesday issue that is just

12 advertisements, basically.

13    Q.   All right.  So the Tuesday issue is, like,

14 classifieds and advertisements, coupons, that sort of

15 thing?

16    A.   Correct.

17    Q.   Have you ever received a request for any sort

18 of record from your office from the Sentinel News?

19    A.   No, not that I can recall.

20    Q.   Would you consider the Sentinel News, though,

21 to constitute a newspaper within the meaning of this

22 exception here in subparagraph B of the "commercial

23 purpose" definition?

24    A.   Yes.

25    Q.   Okay.  Why would you consider the -- well, let

Page 39

1 me ask you this:  Does the Sentinel News have a website?

2    A.   Yes.

3    Q.   Have you ever been on their website?

4    A.   No.

5    Q.   But it also publishes a paper, actual

6 newspaper paper?

7    A.   Correct.

8    Q.   What about the Sentinel News makes it, in your

9 view, a newspaper within the meaning of that exception

10 there, subparagraph B on page 10 of the complaint?

11    A.   It's a -- it's a publication that deals with

12 lots of different topics, local news, weather, sports,

13 classified ads, and -- and other topics that you would

14 expect a newspaper to cover.

15    Q.   What, in your view, distinguished -- let me

16 strike that.  Where were the factors that you considered

17 in distinguishing Zillow's intended use of the records

18 it was requesting from your office from how, say, a

19 newspaper might use those records?

20    A.   Zillow, to my knowledge, is strictly pretty

21 much real-estate based.  And I -- I don't know -- I

22 can't imagine my newspaper requesting the entire

23 database of the Shelby County PVA, because to publish

24 that would take a ridiculous amount of -- of newspaper.

25       And I don't know what the purpose would be.

Page 40

1    Q.   Okay.  Do you know if the Sentinel News

2 contains classifieds or advertisements for homes that

3 might be for sale in Shelby County?  Have you ever seen

4 anything like that in the paper?

5    A.   Yes, it does.

6    Q.   And have you ever placed a notice, or anything

7 like that, in your capacity as Shelby County PVA, in the

8 Sentinel News?

9    A.   Yes.

10    Q.   Okay.  And you pay for that?

11    A.   Yes.

12    Q.   Do you know if the Sentinel News charges to

13 place advertisements in its newspaper, generally?

14    A.   I would assume so, yes.

15    Q.   So in terms of how the Sentinel News operates

16 as a fee structure -- let me ask if you would agree with

17 this:  Sentinel News publishes information in its paper,

18 whether online or in the actual paper, correct?

19    A.   Yes.

20    Q.   And the paper contains advertisements,

21 correct?

22    A.   Yes.

23    Q.   And your assumption is that it charges for

24 those advertisements, such as the notice that you've

25 placed in the Sentinel News, right?

Page 41

1    A.   Yes.

2    Q.   And you would agree with me that the Sentinel

3 News is not obligated to publish your notices?  If it

4 wanted to refuse them, it could, right?

5    A.   I -- I suppose so, yes.

6    Q.   Actually, it never has, but you have no --

7    A.   Right.

8    Q.   There's a law that requires it to publish your

9 notices, right?

10    A.   Not that I'm aware of.  Mine are considered, I

11 guess, legal notices, but I'm not sure if they could --

12    Q.   Say no or --

13    A.   -- deny those or not, yeah.

14    Q.   Okay.  So like Zillow, the Sentinel News

15 contains advertisements and publishes information,

16 right?

17    A.   Yes.

18    Q.   Okay.  Is it, then, just the fact that the

19 Sentinel News contains information beyond the real

20 estate subject that, in your view, distinguishes what it

21 does from Zillow, or what other things distinguish what

22 the Sentinel News does with information, what Zillow

23 does with information?

24    A.   The Sentinel News contains many other topics

25 as part of it, but that is also the extent of the

11 (Pages 38 - 41)

Page 42

1 Sentinel News. Whereas Zillow is, like I said, a very
2 large company that makes lots of profit and basically,
3 from my knowledge, is only real-estate focused.
4     Q.  Okay.  If you received a request from the
5 Sentinel News for records from your office and they said
6 they were going to publish those records in its
7 newspaper and charge for advertisements that would
8 appear on its website or in its paper, would you charge
9 them as a commercial purpose requester with that
10 information?
11     A.  Can you clarify?  Are you talking about the
12 entire database, the same type of request that Zillow
13 requested?
14     Q.  Well, does it matter to you what they request
15 if they're -- if they tell you they're going to publish
16 it in their newspaper?
17     A.  To some degree.  If it's specifics about
18 something that's going on in the community or something
19 like that, I would probably look at it as news related.
20        If it was just general information, I would
21 probably charge them as a commercial user.
22     Q.  Okay.  And if it was general information, like
23 your database, why would you charge them as a commercial
24 user?  What would be the reason you would distinguish
25 that use from noncommercial use?

Page 43

1     A.  Again, if they're requesting the entire
2 database, I would have to assume that there's something
3 further going on than just -- I can't imagine them
4 publishing -- using that just for a publication purpose.
5     Q.  Okay.  What if they said they were going to
6 publish a special edition and publish all of the
7 information in your database?  You wouldn't -- you
8 wouldn't believe them; is that what you're telling me?
9     A.  I mean, if they specifically said that, then I
10 would probably have to take that into consideration.
11     Q.  Okay.  But there's nothing in the statute that
12 specifies the type of use that a newspaper is using the
13 records for; it just says, "publication or related use,"
14 right?
15     A.  Correct.
16     Q.  Okay.  So as long as it's publication or
17 related use, there's no exception for what the type of
18 records they're requesting from your office are, right?
19     A.  As long as they specify that, yes.
20     Q.  Okay.  And here, Zillow told you that it
21 planned to publish your information on its website,
22 right?
23     A.  Yes.
24     Q.  But you decided what it was doing was
25 different from what a newspaper or periodical would be

Page 44

1 doing when it publishes information, right?  Correct?
2     A.  Yes.
3     Q.  And that was, in part, because Zillow's focus
4 is on information relating solely to real estate and
5 doesn't have a broad base of information that it
6 publishes on its website, correct?
7     A.  That's a portion of it, yes.
8     Q.  All right.  If you could --
9        MR. FORD:  Actually, you know what?  Rick, if
10 we could take a -- let's go off the record for a
11 moment.
12        MR. BERTELSON:  Sure.
13        (OFF THE RECORD)
14 BY MR. FORD:
15     Q.  Mr. McDowell, we're back from a short break.
16        You understand you're still under oath, right?
17     A.  Yes, sir.
18     Q.  All right.  And I want you to pull -- I
19 believe you just printed a document that we're going to
20 mark as Exhibit 35, but also I would like you to pull
21 out Exhibit 26 for me, if you would, as well.
22        (EXHIBIT 35 MARKED FOR IDENTIFICATION)
23        (EXHIBIT 26 MARKED FOR IDENTIFICATION)
24     A.  Okay.
25     Q.  All right.  You have Exhibit 26 in front of

Page 45

1 you there?
2     A.  Yes, sir.
3     Q.  Okay.  At the bottom of Exhibit 26, you see
4 there's some numbers and a prefix of "DEF."
5        Do you see that?
6     A.  Yes.
7     Q.  All right.  Those are what we call Bates
8 numbers.  This document, Exhibit 26, has the Bates
9 numbers DEF 000153 through DEF 000156.
10        Do you see that?
11     A.  Yes.
12     Q.  All right.  And then the first e-mail in the
13 string at the bottom is from you -- I'm sorry, from
14 Ms. Noto to you dated April 25, 2019.
15        Do you see that?
16     A.  Yes.
17     Q.  Okay.  And the subject, "Zillow colon KRS
18 Request dash Shelby County," right?  Do you see that?
19     A.  Yes.
20     Q.  Okay.  And then there is an attachment
21 identified in your e-mail forwarding to Mr. Bertelson, I
22 assume, in connection with discovering this case, and
23 it's "Kentucky Shelby PVA Letter 04252019.PDF."
24        Do you see that?
25     A.  Yes.

12 (Pages 42 - 45)

1    Q.  And the attachment to this e-mail, which
2  starts on DEF 000155, is the same letter that we looked
3  at in the Zillow complaint starting on page ID -- let's
4  see, page ID 42, right?  Would you agree with me?
5    A.  Yes, it's the same letter.
6    Q.  Same letter, right?
7       And the top e-mail here is from you to
8  Mr. Bertelson, so that's, obviously -- that's a
9  contemporary e-mail.
10      That was not communicated to Ms. Noto,
11 correct?
12   A.  Correct.
13   Q.  Okay.  And if you could pull out the new
14 exhibit that I had you print there.  I appreciate you
15 doing that for me.  Exhibit 35.
16   A.  Yes.
17   Q.  All right.  And Exhibit 35 is multipage
18 document, and the top document is an e-mail from you to
19 Ms. Noto dated May 1, 2019, at 7:53 a.m.
20      Do you see that?
21   A.  Yes, I do.
22   Q.  And it says, "Susan, I received your request
23 dated April 25 in today's mail."
24      I assume you meant that you got a paper copy
25 of the e-mail request?

1    A.  I -- I believe so.
2    Q.  Okay.  Because I know you -- the e-mail that
3  we looked at in Exhibit 26 from her to you on April 25,
4  you don't deny that you received that, obviously,
5  because you produced that in discovery, right?
6    A.  Correct.
7    Q.  But you may have also received a paper copy of
8  it as well, right?
9    A.  That's correct.
10   Q.  All right.  And then you e-mailed her on
11 May 1, 2019, subject, "Shelby County, Kentucky Tax
12 Files," responding to that request, right?
13   A.  Yes, from the -- from the mail request, yes.
14   Q.  Yeah.  And my first question, you know, we
15 received some documents in discovery, like Exhibit 26
16 from you.  I don't believe we received this particular
17 e-mail and the attachments that were included with it.
18      Do you still have a copy of that e-mail; do
19 you know, Mr. McDowell?
20   A.  Of which e-mail?
21   Q.  Of the one that we're looking at in Exhibit 35
22 from you to Ms. Noto?
23   A.  I don't believe that I still have that
24 e-mail.
25      I had -- this is where I have trouble with

1  e-mails I've lost.  I had lost some e-mails in switching
2  computers and -- and have not been able to regain them.
3    Q.  Okay.
4    A.  I can't recall if this is in that group or
5  not.  I would have to look.
6    Q.  That's no problem.  I guess all I would ask is
7  that if you still -- you have a copy of it, if you could
8  have your counsel produce that with some Bates numbers,
9  just so we have -- because this is obviously from my
10 end.  I would just like to make sure that I have a copy
11 of whatever you have on your end, okay?
12   A.  Yes.
13      MR. BERTELSON:  I'll just say that his
14 recounting of his memory that he did -- he lost some
15 e-mails and may not have all of the ones that would
16 have been turned over in discovery in this matter is
17 consistent with what he told me.
18      MR. FORD:  Yeah, I'm not questioning
19 that.  I'm just -- I'm just asking if he still has
20 it in his outbox somewhere, I would like to just get
21 a copy of whatever he's got going out the door with
22 Bates numbers, just so, you know, there's no
23 question that what we have is the same as what he's
24 got, if he has it.  If he doesn't have it, obviously
25 you can't produce something you don't have, which --

1  BY MR. FORD:
2    Q.  All right.  But do you recognize this e-mail,
3  Mr. McDowell?
4    A.  Yes.
5    Q.  Okay.  And so you don't have any reason to
6  doubt that you sent this e-mail to Ms. Noto on or about
7  May 1, 2019, at 7:53 a.m.?
8    A.  No, I do not.
9    Q.  Okay.  And your e-mail to her just says,
10 "Susan, I received your request dated April 25 in
11 today's mail."  And then you go on to say, "I have
12 attached the required forms to be completed and signed
13 for the purchase of the Shelby County assessment files.
14      I have also included an invoice for the cost
15 of the files.  Your letter requested the current 2018
16 assessment files.  However, we are currently working on
17 our 2019 assessment file.  Please confirm which year's
18 records you are requesting.  I have attached an invoice
19 for each year."
20      And then there are a number of documents that
21 you sent to Ms. Noto that were attached to this e-mail;
22 is that correct?
23   A.  That is correct.
24   Q.  All right.  And the first one --
25      MR. FORD:  And I just want to make clear,

Page 50

1 Rick, too, I'm not representing this is the -- these are
2 the order necessarily that they appear in his original
3 e-mail, but these are the documents that it appears to
4 have been the order that he attached them in.  But,
5 obviously, this is -- this is coming from my client's
6 file, so I just want to make that clear.
7 BY MR. FORD:
8   Q.   But in terms of the contract and fee schedule,
9 you see it has "Shelby" filled in there, right?
10   A.   Yes.
11   Q.   And this is the standard contract and fee
12 schedule that you use with commercial purpose
13 requesters, correct?
14   A.   Correct.
15   Q.   All right.  And then the next document is the
16 request for reproduction of PVA public records.  Also
17 has "Shelby County" filled in.
18       Do you see that?
19   A.   Yes.
20   Q.   And this is the standard request that you
21 require commercial purpose requesters to fill out; is
22 that correct?
23   A.   It's a standard for any request on this.
24   Q.   Let me ask you about that, because the title
25 of this document is "Request for Reproduction of PVA

Page 51

1 Public Records and Contract for Commercial Users."
2       So if I understand your clarification, is that
3 anyone requesting records from your office would have to
4 fill this out, but if they identify themselves as
5 noncommercial in this document, then they don't have to
6 sign the contract portion; is that accurate?
7   A.   They would still need to fill out the form and
8 just indicate commercial or noncommercial.
9   Q.   But is it your understanding that if you're a
10 noncommercial purpose requester, that you don't need to
11 -- or that your office can't compel them to enter into a
12 contract with your office?  Is that -- is that your
13 understanding?
14   A.   It's if they're noncommercial, the contract
15 for the fees would not be in place.
16   Q.   Right.  And the document says, "Contract for
17 Commercial Users," right?  So if they're a noncommercial
18 user, the contract is not something that they need to be
19 bound by, correct?
20   A.   That's correct, but there is a spot on there
21 to mark for noncommercial.
22   Q.   I see that, right.  And that's --
23   A.   Yes.
24   Q.   -- that's paragraph 3 where it says, the use
25 of the information is commercial or noncommercial,

Page 52

1 right?
2   A.   Right.
3   Q.   Now, when you sent this to Ms. Noto, you had
4 already determined that she was making a request for a
5 commercial purpose on Zillow's behalf, correct?
6   A.   Pretty much, yes.
7   Q.   Okay.  So if she had marked "noncommercial" on
8 this, would you have accepted her self-classification as
9 noncommercial?
10   A.   I would probably have requested additional
11 information.
12   Q.   Okay.  And what additional information would
13 you have requested from Ms. Noto?
14   A.   The scope and purpose of what they were going
15 to use the data for.
16   Q.   Okay.  What additional information not
17 included in her letter to you of April 25, 2019, would
18 you have needed to be able to know whether or not the
19 purpose was for a commercial or noncommercial request?
20   A.   I would have needed that letter to be a little
21 more specific.  I'm not sure that they were being
22 completely upfront in the letter, whether it was just
23 for use as -- to put on their website, as they said, or
24 if that would be used in Zillow sales, Zillow rental,
25 Zillow Premier, or any of their other functions.

Page 53

1   Q.   So if the information contained in their
2 letter that they just intended to use these records to
3 publish them on Zillow.com for users free of charge and
4 Ms. Noto had designated this as a request for a
5 noncommercial purpose, would you have accepted that
6 designation, then, if that was the only use?
7   A.   If they had specified that, I probably would
8 have asked for a legal ruling.  But, again, in my
9 knowledge, Zillow is a large company, and -- and they've
10 got so many facets of what they do.  And to need this
11 type of information, it's generally not something that
12 you're just getting just for publication purposes.
13   Q.   So I think you said that if under that
14 scenario, you would have asked for a legal ruling; is
15 that correct?
16   A.   Most likely, yes.
17   Q.   Okay.
18   A.   Because I still would have considered it a
19 commercial use myself.
20   Q.   Okay.  But you're not sure whether it is or
21 not?
22   A.   In my mind, I am sure, but I would ask for a
23 legal ruling, or legal opinion.  I'm not sure how that
24 would be worded, but --
25   Q.   And I just want to make clear here that -- and

14 (Pages 50 - 53)

Page 54

1  I don't want to get into any attorney-client
2  communications, but I don't believe we received a
3  privilege log suggesting that you contacted any attorney
4  to get a legal ruling on whether their request should be
5  classified as commercial or not, correct?
6      A.  No, I did not get to that point.
7      Q.  Okay.  But you did classify the request as a
8  commercial purpose because you instructed her to fill
9  out the commercial user contract, which only applies to
10 commercial purpose requests, right?
11     A.  I considered it to be, and this form we use,
12 as I said, for all requests.  It does say "commercial
13 users" on it, but there is a place to mark
14 noncommercial, and I use it for all requests.
15     Q.  Yeah, and that's not the document I'm
16 referring to.
17     A.  Oh.
18     Q.  If you look at the prior document, the
19 "Contract and Fee Schedule for Commercial Users" --
20     A.  Yes.
21     Q.  -- is "of PVA Office Records," you sent that
22 to Ms. Noto as well and told her to fill that out, too,
23 correct?
24     A.  Yes.
25     Q.  And that contract and fee schedule has no

Page 55

1  application to noncommercial purpose requests, correct?
2      A.  Correct.
3      Q.  And there's nowhere on that document where a
4  noncommercial user would indicate that they're a
5  noncommercial user, correct?
6      A.  Not on that form.
7      Q.  Okay.  And the reason you sent that form to
8  Ms. Noto is that you had already determined that her
9  request was for a commercial purpose, correct?
10     A.  Yes.
11     Q.  And you did not seek out any sort of legal
12 ruling on that, correct?
13     A.  Correct, but then none of the documents were
14 returned, and so there was no need to move forward.
15     Q.  Okay.  If you look at the next document
16 attachment, it's sort of just a paragraph there that
17 says, "You have requested a copy of the Shelby County
18 tax roll."
19        Do you see that?
20     A.  Yes.
21     Q.  Okay.  And is that something that your office
22 prepared?  I haven't seen that elsewhere, and I'm not
23 saying it's not.  But is that something that your -- you
24 use sort of for your office but is not a DOR form?
25     A.  It was originally part of that same form, and

Page 56

1  that's where I -- that's where I got it from.  I can't
2  say when or where, but it's been a part of what I've
3  done for years.
4      Q.  Okay.  Do you understand, though, that at
5  least in terms of how you transmitted that to Ms. Noto,
6  that you transferred that as a separate attachment, that
7  that's not part of the prior contract that we looked at,
8  the request for reproduction of PVA public records?
9      A.  Right.  It's a separate document, but it's a
10 part of the package that we used for the requests.
11     Q.  Got you.  Okay.  So just -- that was something
12 that was not -- I don't want -- I just want to make sure
13 it's clear that that's not a part of the same PDF as the
14 commercial purpose request form that you also sent her,
15 right?
16     A.  Correct.
17     Q.  Okay.  And that paragraph says, "You have
18 requested a copy of the Shelby County tax roll.  Please
19 be aware the use of the information provided is
20 restricted to the use that your company has indicated
21 and that the information, original or repackaged, shall
22 not be resold, given, assigned, etcetera, without a 14
23 day prior notice given to the undersigned, and the
24 undersigned's consent."
25        Right?  Did I read that correctly?

Page 57

1      A.  Yes.
2      Q.  Okay.  Where in the Kentucky Open Records Act
3  does it give a publication agency the right to restrict
4  resale of public records?
5          MR. BERTELSON:  Objection.  Calls for a legal
6  conclusion.
7      Q.  You can answer.
8      A.  I have no idea.
9      Q.  Okay.
10     A.  I'm not an attorney.
11     Q.  All right.  Next document is Shelby County PVA
12 invoice.
13        Do you see that one is to Zillow Group, and
14 it's dated January 3, 2019?
15     A.  Yes.
16     Q.  And the rep says, "Christine Ito."
17        Do you see that?
18     A.  Yes.
19     Q.  So this is a prior year's invoice that you
20 sent to Zillow, correct?
21     A.  Yes.  I would assume so, yes.
22     Q.  And I assume you were sending this just to
23 give an idea of what it would cost in a previous year?
24        You weren't going to charge her for the same
25 records twice, I assume, right?

15 (Pages 54 - 57)

Page 58

1   A.  No.  If you -- if you look at the original
2  e-mail, I said that she was requesting the 2018
3  assessment file, but we were working on 2019.  And in
4  there, I state that I attached an invoice for each year
5  depending on which one they were requesting.
6   Q.  I got you.  Okay.  So -- but I notice the rep
7  is different, and that one says, "Christine Ito."
8       Do you know why Christine Ito is identified
9  there?
10   A.  I'm not sure if that's who I had been dealing
11  with.  They -- they had -- the previous time.  I'm not
12  sure.
13   Q.  Okay.  But the next one is May 1, 2019.
14       That's the date of your e-mail, and that one
15  says, "Rep
16  Susan Noto," right?
17       The next invoice, Mr. McDowell, right?
18   A.  Yes.
19   Q.  Okay.  So -- but you weren't sure which year
20  she was requesting, so you sent two invoices, one for
21  '18 and one for '19, correct?
22   A.  That is correct.
23   Q.  And '19 is a little bit more than '18, right,
24  not -- but pretty much the same?
25   A.  They're pretty much the same, but if you'll

Page 59

1  see, the, -- the number of parcels is a little higher in
2  2019, which makes the total fee a little higher.
3   Q.  Got you.  Okay.  And I'm glad you brought that
4  up, because I did want to ask you -- I don't think I had
5  and -- I haven't asked you this yet.
6       If you could turn with me back to Exhibit 3
7  for a minute, Mr. McDowell, and look at page ID 34.
8   A.  Yes.
9   Q.  And page ID 34 has the header, "PVA Open
10  Records Commercial Fee Guidelines."
11       Do you see that?
12   A.  Yes, I do.
13   Q.  You're familiar with this document, I assume,
14  Mr. McDowell?
15   A.  Yes, I am.
16   Q.  And I note in the sort of top left-hand corner
17  there, it has some numbers.  One of them looks like a
18  date, "08-12."
19       Do you see that?
20   A.  Yes.
21   Q.  And you recognize that as indicating that this
22  is the August 2012 version of the commercial fee
23  guidelines?
24   A.  Correct.
25   Q.  And is this the version that has been in use,

Page 60

1  by your office at least, since that time?
2   A.  Yes.
3   Q.  And hasn't been updated since then,
4  officially, to your knowledge, correct?
5   A.  Not officially to my knowledge.
6   Q.  Okay.  And when you prepared those invoices to
7  Zillow that we just looked at in Exhibit 35, you based
8  those charges on these commercial fee guidelines; is
9  that correct?
10   A.  That is correct.
11   Q.  And in your understanding of these commercial
12  fee guidelines, is it mandatory for you to charge at
13  least the amount specified in this, but that you can
14  charge more if your office incurs more in responding to
15  a request?
16   A.  The only thing we can charge more for is if
17  the actual cost to reproduce them is -- is higher.
18   Q.  Okay.  So if you have, like, copy charges or
19  there's a media, like a thumb drive or a hard drive or
20  something, you can charge on top -- you can charge that
21  on top of these costs, correct?
22   A.  Correct.
23   Q.  Now, do you have discretion, Mr. McDowell, to
24  charge less than the amount specified in here?  In other
25  words, can you say, "I like Zillow.  I'm going to charge

Page 61

1  them $0.50 a parcel instead of $2"?
2   A.  Not to my knowledge.  I follow the fee
3  schedule.
4   Q.  And if the DOR were to change this fee
5  schedule and say, "Actually, you're not going to be
6  allowed to charge for your records anymore," would you
7  understand that that fee schedule, then, would be
8  binding upon you and that you would have to follow that?
9       MR. BERTELSON:  Objection.  Calls for
10  speculation.  But you can respond if he -- if he has
11  an answer.
12   A.  I would consider that, I guess, binding, but
13  that would be detrimental to my office.
14   Q.  Understood.  But you wouldn't -- you
15  understand the DOR has supervisory role over PVAs in the
16  Commonwealth of Kentucky; is that correct?
17   A.  Yes.
18   Q.  Yes?
19   A.  Yes.
20   Q.  All right.  I understand that you occasionally
21  will have DOR auditors that come into your office and
22  look through your stuff; is that accurate?
23   A.  Yes.
24   Q.  Okay.  And do you provide, you know, monthly
25  reports, or anything like that, or quarterly reports to

16 (Pages 58 - 61)

Page 62

1 DOR about operations that your office is engaging in,
2 anything like that?
3   A.  No.  We have -- we -- our budgets and our
4 reassessment plans are sent into DOR, but not on a
5 monthly or quarterly or --
6   Q.  I'm sorry.  So is that an -- are those both
7 annual things that you do, then?
8   A.  Yes.  The budget is annual, and the -- the
9 other is pretty much a -- or every four years.  We give
10 them a plan for our next four years of what we would be
11 reassessing.
12   Q.  So you have the budget annually that you
13 submit, and then every four years, you submit an
14 assessment plan?
15   A.  Yes.
16   Q.  And does DOR have to approve those things
17 before you move forward?
18   A.  Yes.
19   Q.  All right.  Take a look, if you would,
20 Mr. McDowell, at Exhibit 24 for me.
21     (EXHIBIT 24 MARKED FOR IDENTIFICATION)
22   A.  Yes, sir.  24?
23   Q.  24.  And 24 is a few invoices, and the bottom
24 Bates number is DEF 000147 through DEF 000151, right?
25   A.  Yes.

Page 63

1   Q.  And there's a couple of different -- one is --
2 the first page is CoreLogic invoice.  Second page, I
3 believe, is the same invoice that we looked at in that
4 Exhibit 35.
5     It's Christine Ito, right?
6   A.  Yes.
7   Q.  And then you've got one for Black Knight,
8 another one for CoreLogic, and another one for Zillow
9 Group, which is the same invoice that was also attached
10 to that e-mail, right?
11   A.  That is correct.
12   Q.  All right.  So in terms of regular requests
13 that you get from public records requesters, how would
14 you describe the information that Zillow requested in
15 its April 25, 2019, record?  How would you describe the
16 records that they requested?  I want to use your
17 terminology here.
18   A.  I'm not sure I understand your question.
19   Q.  Let me -- and that's fair because that's a --
20 that's a vague question.
21   A.  Pretty vague.
22   Q.  Yeah.  So I've heard other PVAs use the
23 terminology "property tax roll database" to describe
24 what Zillow, in its April 25, 2019, request, was asking
25 for from your office.

Page 64

1   A.  Yes.
2   Q.  Is that how you would describe what they had
3 requested as well?  Is that terminology that you use?
4   A.  Yes.  They are basically -- in their request,
5 they are basically asking for what I would call the
6 entire Shelby County PVA database.
7   Q.  Okay.  And you don't -- you do receive
8 requests from other requesters that are less broad in
9 terms of what they're asking for.
10     So, for instance, I know I ran into where
11 someone -- I said property tax roll file is a subset of
12 that database.  It wouldn't necessarily include, for
13 instance, property characteristics or things like that.
14     So that would be not the entire database if
15 someone were to say "property tax roll file," in your
16 understanding, correct?
17   A.  Correct.
18   Q.  Okay.  But here, in terms of what Zillow
19 requested, they requested the entire Shelby County PVA
20 property tax roll database; is that fair?
21   A.  Yes.
22   Q.  Okay.  And it looks like you do receive
23 requests from CoreLogic and Black Knight for a similar
24 scope.  I mean, the CoreLogic invoice in October 2018
25 was about the same price as the quote to Zillow,

Page 65

1 presumably for the same type of information.
2     Is that -- or are they -- are they even asking
3 for more here?
4   A.  If it's -- they're all pretty much the same
5 types of requests for the entire database.
6   Q.  Okay.  Other than CoreLogic, Black Knight, and
7 Zillow here, do you receive any other what I would say
8 regular annual requests for either your property tax
9 roll database or some portion of that?
10   A.  There's a pretty standard -- a lot of times
11 they'll request the tax billing file that they use, I
12 guess, for other purposes.
13   Q.  So you get a request from, like, a Wells Fargo
14 or a mortgage company that says, you know, "We want a
15 copy of all of the property tax bills."
16     Is that something that you get?
17   A.  That is a request we get.  I have not received
18 one from Wells Fargo myself in particular, but
19 occasionally they will want the tax bill file.
20   Q.  Okay.  And do you have any banks or mortgage
21 companies that do regularly, on an annual basis, request
22 your tax bill file?
23   A.  CoreLogic is pretty standard on that coming in
24 most every year, but not every year.
25   Q.  Okay.  It's your understanding that CoreLogic

17 (Pages 62 - 65)

Page 66

1 resells that information to banks that may want that for
2 their mortgages?
3    A. Yes.
4    Q. Okay. And what about Black Knight? Is that a
5 request that you get on an annual basis or semiannual
6 basis? How frequent is the Black Knight request?
7    A. Black Knight was a little bit random. They
8 came in -- I believe the first year was 2018, and
9 requested the entire database, which they purchased.
10    And, surprisingly, they came back in 2019, and
11 I guess they have a expense account and said they had
12 money to purchase it again and wanted the 2019. I
13 believe those are the correct years, 2018 and '19. But
14 other than that, I have not dealt with them since.
15    Q. Okay. Is it fair, though, to say that you've
16 provided to either CoreLogic and/or Black Knight a copy
17 of the same records that Zillow had requested from you
18 in April of 2019?
19    A. Yes.
20    Q. And the reason I ask that is I just want to
21 make sure you've been through the process of having to
22 copy that information from your database to provide to
23 those requesters.
24    You're familiar with how you would have to do
25 that, correct?

Page 67

1    A. Yes, I have provided it to those companies.
2    Q. Okay. How many employees does your office
3 have currently, Mr. McDowell?
4    A. I have myself and four employees.
5    Q. And has that been the case since 2019, since
6 you received this request from Zillow?
7    A. That's been the case since December of 1998.
8    Q. Okay. And so you are the PVA.
9    You have a deputy PVA?
10    A. I have a chief deputy, and I have three others
11 that are -- they're all called deputies. They have
12 different titles of things they do.
13    Q. Okay. Are they all full-time employees?
14    A. Yes, they are.
15    Q. Are they all salaried or any of them hourly?
16    A. Salary.
17    Q. All right. If you could, Mr. McDowell, turn
18 to Exhibit 25 with me for a second.
19    (EXHIBIT 25 MARKED FOR IDENTIFICATION)
20    A. Okay.
21    Q. And this document here has at the top, "Annual
22 PVA Office Budget FY 2020 through 2021."
23    Do you see that?
24    A. Yes, I do.
25    Q. And I understand the fiscal year for PVAs runs

Page 68

1 from July 1 through June 30; is that correct?
2    A. That is correct.
3    Q. So this current -- or this budget that we're
4 looking at is the budget that you are currently in in
5 this -- in this moment, right?
6    A. Yes.
7    Q. Yeah. And budget has two categories here --
8 well, let me -- strike that. I understand that these
9 are budgets that are prepared actually by the DOR based
10 on information that you provide, but also some
11 information the DOR itself supplies.
12    Is that an accurate characterization?
13    A. That is correct. It's got two components to
14 it.
15    Q. Okay. But you've seen this -- you've seen a
16 copy of this before, correct?
17    A. Yes.
18    Q. And this is something that your office
19 maintains?
20    A. Yes.
21    Q. Okay. And just for the record, Exhibit 25 has
22 the Bates number DEF 000152 at the bottom there.
23    Did I read that correctly?
24    A. Yes.
25    Q. Okay. So there's two basic categories in

Page 69

1 here, this budget, which is -- are anticipated expenses
2 and anticipated receipts, right?
3    A. Yes.
4    Q. And one is money coming -- one is money going
5 out and one is money coming in, to use the most simple
6 way of describing this.
7    Would you agree with that, Mr. McDowell?
8    A. Yes.
9    Q. And money going out is the anticipated
10 expenses, money going in -- money coming in is
11 anticipated receipts, right?
12    A. Yes.
13    Q. And I understand that state law requires that
14 this budget balance so that the amount of money going
15 out has to equal the amount of money coming in; is that
16 correct?
17    A. That's correct.
18    Q. All right. Is there -- on -- in the
19 anticipated expenses, is there a line item in here or an
20 account where you budget or estimate the amount that
21 your office will spend in responding to anticipated
22 requests for your property tax roll database from public
23 records requesters?
24    A. No, there's nothing specific.
25    Q. Okay. And as to anticipated receipts, my

Page 70

1 understanding is that money that you intend to receive
2 from public records requesters is indicated in the
3 miscellaneous income section; is that correct?
4    A.   Correct.
5    Q.   And for this current fiscal year, you've
6 indicated $23,650, right?
7    A.   Yes.
8       MR. BERTELSON:  Darren, I think you're frozen.
9       COURT REPORTER:  Sometimes he'll come right
10 back.  So maybe wait a second, but --
11      MR. FORD:  I think I lost you.
12      COURT REPORTER:  Boom.
13      MR. BERTELSON:  You froze up for a minute.
14      MR. FORD:  Yeah, that happens here with our
15 Internet for some reason.
16      What was the last thing you heard, Lindsey?
17      COURT REPORTER:  And for this current fiscal
18 year, you've indicated $23,650, right?  Answer: Yes.
19      MR. FORD:  Okay.  Not so bad.  Well, you didn't
20 miss much.  I didn't do a soliloquy or anything.
21 BY MR. FORD:
22   Q.   Okay.  Mr. McDowell, is that amount less than
23 prior years, about the same, or more?  And I recognize
24 you don't have those previous year budgets in front of
25 you, but based on your recollection, is that amount

Page 71

1 consistent with those prior years or less or more?
2    A.   I would assume it's pretty consistent with
3 recent years.  Probably more than some previous years.
4    Q.   Okay.  And --
5    A.   I don't have those numbers in front of me to
6 be exact.
7    Q.   I understand.  And I may ask you to break just
8 to look, because I -- it is one of the topics in your
9 notice of deposition.
10      But I guess for our purposes right now,
11 though, is, the amount of income that you budgeted for
12 this year isn't drastically less than it has been in
13 prior years; is that correct?
14   A.   Correct.
15   Q.   Okay.
16   A.   Correct.
17   Q.   And in terms of the amount of money that you
18 budgeted here, break that down for me in terms of where
19 that income is coming from.  My understanding is, it's
20 not necessarily all income from selling your database to
21 public records requesters.  There's other components to
22 that.
23      So what goes into that miscellaneous income
24 budget line there in the office budget that we're
25 looking at here for fiscal year 2020-2021?

Page 72

1    A.   The primary component of that is our website
2 fees that we charge.  We don't generally throw in
3 anything for our database sale because they are so --
4 the -- the sale of our database is so limited and
5 random, so to speak.
6    Q.   Okay.  So --
7    A.   We don't know from year to year that's coming.
8    Q.   I understand.
9       So you can't count on that income, so you
10 don't budget for it; is that fair to say?
11   A.   Correct, correct.
12   Q.   If you do get some money from selling that's a
13 windfall, but it's not something that you're telling the
14 DOR, "Hey, we expect to get this much.  That should be
15 part of what we are allowed to spend," right?
16   A.   It's a windfall for us, and we do have to do
17 an amended budget.  And the bulk of our money that we
18 bring in goes back to the state to pay for employee
19 salaries, so we would need to amend the budget to show
20 that.
21   Q.   Okay.  So when you say your "website fees," is
22 that a subscription fee that somebody pays to be able to
23 access records that you maintain?  Is that a fair
24 description?
25   A.   Yes.

Page 73

1    Q.   Okay.  And so they get a login, an account,
2 and --
3    A.   Yes.
4    Q.   -- they go on?
5       What types of information can someone pull by
6 getting a subscription to your website?
7    A.   They can basically look at most any of our
8 information, any -- any parcels, all the characteristics
9 with those parcels, and so on.
10   Q.   And are they allowed to download that
11 information, or is it just looking at it?
12   A.   No.  They can't download the entire database
13 or anything.  They -- they can look at specific parcels,
14 and I guess if they wanted to go through them one by
15 one, I guess that could be done.  I'm -- I'm not a
16 website guy, so I don't know the specifics of that.
17   Q.   Right.  But there's not any -- I mean, if
18 someone wanted to print out a screenshot of something,
19 there's nothing that would stop them, to your knowledge,
20 from doing that, right?
21   A.   No.
22   Q.   What do you charge --
23   A.   And the -- same -- the same token is true
24 as well if someone wanted to come to our office.  We
25 have public computers.  They can be used for the

19 (Pages 70 - 73)

Page 74

1 information as well.
2    Q.  Okay.  What do you charge?  Is it a monthly
3 subscription?  Annual?  What do you charge for that
4 subscription?
5    A.  I just use an annual fee, and there's -- I
6 have three different variations on that.
7    Q.  Okay.  And is -- and are the variations based
8 on whether the use is commercial or noncommercial?  What
9 are the -- what are the fees based on?
10    A.  It's just a subscription base.  If they want
11 it, it's -- the -- they're based on how many what we
12 call records or hits they can use.  And there's three
13 levels of that, and one of those being an unlimited
14 package.
15    Q.  Got you.  Okay.
16       So it's basically how many properties you want
17 to look up annually, and you get up to a certain amount
18 of one fee, between X-amount and X-amount for the next
19 level, and then if you want unlimited, that's the top
20 fee.
21       Is that a fair description?
22    A.  Correct.
23    Q.  And for the top unlimited, what's the annual
24 subscription or monthly subscription for that?
25    A.  It's a $250 fee.

Page 75

1    Q.  And is it -- in terms of the information
2 that's available through that, is it your database, or
3 is it only certain information in your database?
4    A.  It's -- it's specific information.  I don't
5 believe that the entire database is available.
6    Q.  Okay.  So in terms of what Zillow requested
7 from your office on April 25, 2019, what information did
8 Zillow request that would not be available through your
9 website?
10    A.   It was -- it was basically the same
11 information, sales records, characteristics, building
12 characteristics.
13    Q.  So -- and I want to make sure I'm clear.  So
14 if -- and I recognize it's not a -- it's not a bulk data
15 format on your website, but in terms of the type of
16 information that you -- one can access with this
17 subscription service, is it all the same information
18 that you would have provided to Zillow from your
19 database ultimately on a parcel-by-parcel basis?
20       So, you know, let's just say parcel X, if I
21 wanted to go through your subscription service and look
22 at parcel X, would the information that Zillow would
23 have gotten for parcel X be different from what I could
24 go then and look at through your subscription service?
25    A.  I believe it would be the same.

Page 76

1    Q.  And do you -- I just want to make sure.  I
2 think you've answered this, but just for clarity
3 purposes of the record, you don't charge subscription
4 fees based upon whether or not you use this for a
5 commercial use or noncommercial use, right?  It's just
6 on -- just based on the number of hits that somebody
7 wants per year, right?
8    A.  Correct.
9    Q.  All right.  I want to turn now to the process
10 to actually provide a copy of your property tax roll
11 database.  So you get a request from somebody like a
12 CoreLogic or a Zillow.  You respond to them.  You send
13 them an invoice, say, "Here's what it costs."  They do
14 whatever you require of them.  And then now it's time
15 for you to actually deliver that information to the
16 requester.
17       What's the first step in the process of
18 actually delivering the records to the requester?
19    A.  We would have to put the records on some sort
20 of media to get it to them.
21    Q.  Okay.  And let me back up from there, because
22 "delivery" is a bad word.
23       So what's the first step in the process of
24 actually preparing the data for transfer to a requester?
25       And what I mean by that is, you know, do you

Page 77

1 have to go on and convert the database to a Excel or a
2 data file?
3       What's the first step in that process?
4    A.  And this is after the records are created.
5 I'm guessing you're asking that once we have the data
6 and you want to know what's the process to deliver it --
7    Q.  Let's --
8    A.  -- to the requester.
9    Q.  Let's do step by step here, because I think
10 that'll be more helpful to you in terms of where --
11    A.  Yeah.
12    Q.  -- I want you to start in describing that
13 process.
14       So your office, on an annual basis, goes out
15 and collects a wealth of information about properties in
16 Shelby County for purposes of determining what to assess
17 for property taxes, correct?
18    A.  Yes.
19    Q.  And at some point in time, you complete that
20 process for all of the properties in Shelby County,
21 right?
22    A.  Yes.
23    Q.  Okay.  And then you input that information.  I
24 assume you do it on a continuous basis.  You don't all
25 do it at once.  Maybe you, I don't know.  But I assume

20 (Pages 74 - 77)

Page 78

1  when you do one property, you input it, and you don't
2  wait until everything is done and then input it, right?
3      A.  Right.  It's a day-by-day basis.
4      Q.  Okay.  So -- but at some point in time, you
5  know, you're done doing all of the properties for the
6  prior year, right?
7      A.  That's correct.
8      Q.  And now all of that information is in your
9  database for, let's say, 2018, right?
10     A.  Yes.
11     Q.  And then you get a request from, let's say, a
12 CoreLogic that says, "I want your property tax roll file
13 database."
14         And you understand that is all of the
15 information that you've collected from these properties
16 for whatever year they're requesting, right?
17     A.  Yes.
18     Q.  And so now you send them an invoice, you say,
19 "I consider your request to be for a commercial purpose.
20         Here's what you have to pay."  They send you
21 the money, sign the contract if you require a contract,
22 and now you're at the step where it's okay.  They've
23 complied with what you required them to do.  Now you
24 need to get them those records.
25         What's the first step in you getting those

Page 79

1  records to them at that point in time?
2      A.  At that point, it's a matter of just locating
3  the file that they're looking for and preparing it for
4  delivery in whichever media form they request.
5      Q.  When you say "locating the file that they're
6  looking for," so if they're looking for the entire
7  property tax roll database, that's the whole database,
8  right?
9      A.  Yes.  Yes.
10     Q.  And is that in a -- is that a single file for
11 a year?  Like, for instance, it's one file for 2019 or
12 2018?
13     A.  Yes.
14     Q.  Okay.  And is -- what kind of file format is
15 that in?  And I know that -- have you seen the acronym
16 "MDB."  Is -- that is an MDB file?
17     A.  I believe MDB is correct, I believe.
18     Q.  Okay.  And so do you provide the MDB file to a
19 requester, or do you convert that to a text file or
20 Excel file format?
21     A.  We provide the MDB file.
22     Q.  So all you're doing, then, is copying the MDB
23 file and transmitting that to the requester.
24         You're not converting it or doing anything
25 like that, right?

Page 80

1      A.  No.  As far as delivery no.
2      Q.  Do you do any sort of validation or
3  verification of the data?  I mean, do you go through and
4  check for errors or anything like that?
5      A.  Not at that time.  All that should have
6  already been taken care of.
7      Q.  Okay.  And in terms of the media that you put
8  the information on, that could be a thumb drive, it
9  could be a CD, DVD, ROM, it could be an e-mail, right?
10     A.  Correct, depending on the size.
11     Q.  And I would assume those MDB files are
12 probably fairly large in size, or what -- how -- do you
13 know how big they are, roughly?
14     A.  They are fairly large.  I don't know the
15 numbers right off the top of my head.  A lot of times
16 they're -- lot of times it's not something I could
17 e-mail.
18     Q.  Okay.  And so in that case, will you typically
19 put it onto a thumb drive or an external hard drive?
20         How do you usually handle getting that
21 information to a requester?
22     A.  I've done it with thumb drives before, and
23 I've also gone through a -- and, again, I'm -- I'm not a
24 computer guy, but some sort of site that they have to
25 where I can go and kind of download that site.

Page 81

1      Q.  So upload the information --
2      A.  Upload, yeah.
3      Q.  -- to a third-party site?  Like they send you
4  a link and say, "Hey, upload them here," and you go hit
5  click, and it'll upload that file; is that fair?
6      A.  That's correct.
7      Q.  Okay.  And then once either that upload is
8  done or you've copied it to a thumb drive and sent it,
9  that's it, right?  There's nothing more for you to do?
10     A.  That's correct.  I think it's called an FTP
11 site, but I'm not positive with that.  I -- I think
12 that's correct.
13     Q.  That would be -- that would be one type of
14 site.  I'm not sure there's any other.  But I know what
15 you mean when you say, "FTP site."
16         It's the third-party Cloud storage that you
17 can upload, and then they can download it from there,
18 right?
19     A.  Yes.
20     Q.  Approximately how long does it take for you to
21 transfer that information from the point at which you
22 are going to your desktop to do that to the point where
23 you're uploading to an FTP or you, you know, put it on a
24 thumb drive and drop it in the mail?  What's the average
25 amount of time it takes you to do that?

21 (Pages 78 - 81)

Page 82

1    A.   Once everything is completed, just the
2  transfer of it, I would say 15 minutes or so, but that's
3  just the transfer alone.
4    Q.   Okay.  Well, when you say, "just the
5  transfer," what other time are you factoring in there?
6    A.   Well, I mean, you know, the -- the time it
7  took to create the data and have the database prepared
8  is, obviously, much more significant because the
9  transfer of it is 10, 15 minutes.
10    Q.   Okay.  And when you say "the time to create
11  the data," you're talking about the time spent by your
12  assessment clerks going out and collecting data on
13  properties, inputting that into the system.
14         Is that the type of time you're talking about?
15    A.   Right, throughout the year.  Like I said, the
16  database creation is an everyday event pretty much.
17    Q.   Is there any information that your staff
18  collects in the process of doing the assessment on an
19  annual basis that is solely for the purpose of providing
20  it to anticipated public records requesters?
21    A.   No.
22    Q.   Okay.  And my understanding is you prepare the
23  property tax roll file by law, right?  That's required
24  that your office do that every year, right?
25    A.   Yes.

Page 83

1    Q.   You don't prepare the property tax roll file
2  or the database because you get public records requests
3  for it, right?
4    A.   No.
5    Q.   And so you're going to do all that database
6  input and collection of information regardless of
7  whether you ever get a public records request, correct?
8    A.   Yes.
9    Q.   And because you said that public records
10  requests are relatively infrequent, or not steady
11  enough, that you don't actually even include anticipated
12  income from such requests in your budget on an annual
13  basis because it's not sufficiently reliable, correct?
14    A.   That's correct.  I mean, I -- I do this every
15  year because it's required, but -- but I don't do it for
16  Zillow.  I do it for the --
17    Q.   But you don't do it for -- well --
18    A.   No, I don't do it for Zillow, CoreLogic, Black
19  Knight.  We do it for the state and anybody that's going
20  to use it for their purposes instead of getting it free
21  when we spent the money and time to do it, they should
22  have to pay their share of it.
23    Q.   Yeah.  The current version of the commercial
24  purpose -- strike that.  The current version of the
25  commercial guidelines that you utilize for your office

Page 84

1  that we looked at in Exhibit 3 on page 34, I think you
2  testified that your recollection was that the
3  October 2012 data is the date that these went into
4  effect, correct?
5    A.   Yes, I believe so.
6    Q.   Were you involved in any way in setting these
7  fees?  I mean, were you part of any sort of committee,
8  or anything like that, where you were asked to weigh in
9  on what you should charge, anything like that?
10    A.   No, I was not.
11    Q.   All right.  If you could, Mr. McDowell, pull
12  Exhibit 6 for me.
13         (EXHIBIT 6 MARKED FOR IDENTIFICATION)
14    A.   Okay.
15    Q.   And this document has at the top the caption
16  of the case and the title of Defendants' Responses to
17  Plaintiff's First Set of Interrogatories.
18         Do you see that?
19    A.   Yes.
20    Q.   All right.  And have you seen this document
21  before, Mr. McDowell?
22    A.   Yes.
23    Q.   And is this something that you reviewed to
24  determine that it was accurate to the best of your
25  knowledge and belief?

Page 85

1    A.   Yes.
2    Q.   And if you could turn with me to -- well,
3  strike that.  First thing I want to ask you is:  Have
4  you ever looked at a Zillow SEC filing before?
5    A.   A Zillow what again?
6    Q.   Well, do you know what the Securities and
7  Exchange Commission is?
8    A.   Yes.
9    Q.   Do you understand that companies file
10  information with the Securities and Exchange Commission?
11    A.   Yes.
12    Q.   Do you know if Zillow is a public company?  Do
13  you know if it files information with the Securities and
14  Exchange Commission?
15    A.   I have never reviewed it, but I would assume
16  they do.
17    Q.   But you've never gone on it and looked at any
18  filings that Zillow's made with the SEC, correct?
19    A.   Not their particular filings.
20    Q.   And none of -- any filing that Zillow may or
21  may not have made with the SEC, that wasn't something
22  that you considered when you determined that Zillow was
23  a -- or Zillow was making a request for a commercial
24  purpose, correct?
25    A.   I don't believe so, you know, just my

22 (Pages 82 - 85)

Page 86

1 knowledge of knowing that Zillow is a -- very large,
2 very profitable company.
3   Q.  Right.  But I'm -- what I'm asking is:  When
4 you were making the determination that Sue Noto's
5 April 25, 2019, request was for a commercial purpose,
6 you didn't go on the SEC's website and look at a Zillow
7 filing to make that assessment, correct?
8   A.  No, I did not.
9   Q.  If you could turn with me to Interrogatory
10 number 13, which is on page 26 of Exhibit 6.
11   A.  Okay.
12   Q.  And the question at the top there says, "State
13 what governmental interests you contend the Commercial
14 Purpose Fee Statutes (as that term is defined in the
15 Complaint) advance, and how the law advances each
16 interest identified."
17       Do you see that?
18   A.  Yes.
19   Q.  And then below that, there is a response of
20 Blake Robertson, PVA, Owen County, right?
21   A.  Yes.
22   Q.  And do you know Mr. Robertson?
23   A.  Yes, I do.
24   Q.  You met him before?
25   A.  Yes.

Page 87

1   Q.  Okay.  Did you discuss this answer with him at
2 any point in time; do you recall?
3   A.  Not to my knowledge.
4   Q.  Okay.  I want to give you a moment to read his
5 answer here, and I'm going to ask you a question about
6 it.  But just take a moment, read it, and let me know
7 when you've had a chance to look at it.
8   A.  Okay.  Okay.
9   Q.  All right.  Is there any governmental interest
10 that you, Brad McDowell, as PVA for Shelby County, would
11 contend that the commercial purpose fee statutes, as
12 that term is defined in the complaint, advanced that's
13 not included in Mr. Robertson's response here?
14   A.  No.
15       MR. FORD:  All right.  Hey, Rick, why don't you
16   give me about ten minutes here.  I might be wrapped
17   up, and then I'll pass the witness to you, okay?
18       MR. BERTELSON:  Okay.
19       MR. FORD:  All right.
20       (OFF THE RECORD)
21 BY MR. FORD:
22   Q.  Mr. McDowell, we're back from a brief break.
23       You understand you're still under oath?
24   A.  Yes.
25   Q.  So I don't have any further questions for you,

Page 88

1 but I always like to ask -- or give my witnesses an
2 opportunity to amend or correct any testimony that
3 they've given during the course of the deposition.
4       Is there anything that you've said during the
5 course of today's deposition that you would like to
6 amend or correct before I pass you to Mr. Bertelson?
7   A.  No, sir.
8       MR. FORD:  All right.  On that, subject
9 to any recross-examination based on Mr. Bertelson's
10 questions, I will pass the witness.
11              CROSS EXAMINATION
12 BY MR. BERTELSON:
13   Q.  All right.  Brad, thank you very much for
14 being available here today for this deposition.  I know
15 this is a very busy time of the year for your office.
16       We appreciate you giving us a couple of hours
17 of your time to answer these questions.
18   A.  Thank you.
19   Q.  Let's go back to Exhibit 3, page 43.  That's
20 the correct one.
21   A.  Yes, sir.
22   Q.  Okay.  And that's the letter that Susan Noto
23 wrote to you on April 25th of 2019, right?
24   A.  Yes.
25   Q.  On the second page, could you read that

Page 89

1 paragraph at the top of the page there?  Go ahead and
2 read it straight off into the record.
3   A.  Paragraph is "As you" -- "As you may know"?
4   Q.  Yes.
5   A.  "As you may know, Zillow is an online real
6 estate and rental marketplace that provides free access
7 to online property listings, among other services.
8       Zillow intends to make some or all of the
9 information contained in the real property records
10 sought by this request available to users of its
11 website, Zillow.com, free of charge.  Zillow generates
12 revenue from, among other sources, the sale of
13 advertising space on
14 Zillow.com, where the information contained in these
15 records will appear.  More information about Zillow can
16 be found at," and it's got the Zillow site.
17   Q.  All right.  Okay.  So with -- in that
18 paragraph, did Susan Noto fully disclose all of the uses
19 Zillow was going to make of the data that she was
20 requesting from your office?
21   A.  I don't believe so.
22   Q.  All right.  On the first page of that letter -
23 -
24   A.  Yes.
25   Q.  -- is a list of the records that she was

23 (Pages 86 - 89)

Page 90

1 requesting; is that correct?
2        COURT REPORTER:  I'm sorry.  Mr. Bertelson?
3        MR. BERTELSON:  Okay.
4        COURT REPORTER:  I only heard the -- parts of
5    that question because there was document movement.
6        Could you re-ask that question?
7        MR. BERTELSON:  Sure.
8 BY MR. BERTELSON:
9    Q.  On the first page, there's a list of the data
10 or records that Susan Noto is requesting from your
11 office; is that correct?
12    A.  Yes.
13    Q.  Can you read that list for us here?
14    A.  Yes.  Parcel number, account number, owner
15 name or names, mailing address, city, state, and zip,
16 property 911 address, property use or class code, legal
17 description, acreage lot size, breakdown of assessed
18 values land and building, breakdown of market values
19 land and building, tax amount, sales information, date,
20 price, D book, D page, property characteristics, number
21 of bedrooms, number of bathrooms, building area, number
22 of stories, heating, AC, etcetera.
23    Q.  Okay.  Now, if I was going to try to buy a
24 piece of property, would it be helpful to have
25 information without the breakdown of the assessed

Page 91

1 values, the breakdown of the market values, sales
2 information, and property characteristics, like what --
3 how many bedrooms and bathrooms a particular piece of
4 property had?
5        MR. FORD:  Objection.  Lack of foundation,
6    speculation.  Go ahead.
7        COURT REPORTER:  Hold on.  I didn't hear
8 Mr. McDowell's response.
9        THE WITNESS:  Yes.
10        COURT REPORTER:  Thank you.
11 BY MR. BERTELSON:
12    Q.  And you've indicated that you're aware of that
13 Zillow.com is in the business of buying and selling real
14 estate; is that correct?
15    A.  Yes.
16    Q.  So if they buy and sell real estate, wouldn't
17 they be interested in having some of this information in
18 order to determine what a fair -- a proper fair cash
19 value for each piece of property might be?
20    A.  Yes.
21        MR. FORD:  Objection.  Foundation.  Calls for
22    speculation.  Go ahead.
23 BY MR. BERTELSON:
24    Q.  All right.  He asked you with regard to the
25 response to number -- Interrogatory number 13, number 6.

Page 92

1 Mr. Ford asked you to look over the response to number
2 13.
3        And with regard to that -- and then asked you
4 if there were any additional governmental interests that
5 are advanced by the commercial purpose fee statutes.  If
6 the Mayor of Shelbyville had a $1 million mansion -- and
7 it's clearly a mansion that's fair cash value.  It's $1
8 million or more.  We know this because he bought it last
9 year -- but you have it assessed at $50,000, would the
10 public be interested in knowing that information?
11    A.  Yes, absolutely.
12    Q.  Why?
13    A.  It's a -- it's a news story at that point.
14        We've had some examples of that, if you want
15 to get into the news stories, a few years back with
16 Governor Bevin's home in Jefferson County that was
17 questioned and became quite a news story, what the fair
18 market value of it should be.
19        We've also had a situation where we had one in
20 the legislature with an -- I think it was a 300- 350,000
21 houseboat that was not being taxed at all because it was
22 a documented water craft, so to speak, and that became a
23 news story.
24    Q.  Got you.  Why is it a news story when a public
25 official's property is not assessed properly or assessed

Page 93

1 at a value that's lower than its fair cash value?
2    A.  Obviously, because things are not being done
3 right, and there's favoritism shown in throwing a tax
4 burden onto other taxpayers versus the locally elected
5 official in that case.
6    Q.  So if the open records statutes or the
7 commercial purpose fee statutes, as described in this
8 Interrogatory number 13, serve the purpose in some way,
9 shape, or form facilitating the publication of
10 information concerning property assessments for public
11 officials, would that be a governmental interest that
12 the law advances?
13        MR. FORD:  Objection.  Leading.  Calls for a
14    legal conclusion.  Go ahead.
15    A.  Yes, I would think so.
16 BY MR. BERTELSON:
17    Q.  All right, then.  Do you have a county
18 attorney in Shelby County?
19    A.  Yes.
20    Q.  What's his name?
21    A.  Hart Megibben.
22    Q.  Okay.  Do you consult him on legal advice?
23    A.  Yes, I do.
24    Q.  Now, if the Department of Revenue all of a
25 sudden said stop using the commercial purpose fee

24 (Pages 90 - 93)

Page 94

1 guidelines. You can't collect commercial purpose fees
2 anymore, would you -- what would you do?
3     MR. FORD: Objection. Calls for speculation.
4 Go ahead.
5     A. Okay. I would probably consult with him to
6 see if there was anything I could do to potentially
7 maintain some fees?
8     Q. Okay. One second.
9        All right. That concludes my questions.
10         REDIRECT EXAMINATION
11 BY MR. FORD:
12     Q. All right. I just have a couple of
13 follow-ups, Mr. McDowell.
14        If you could turn with me back to Exhibit 6
15 for a moment.
16     MR. BERTELSON: No, no. Answers to the
17     interrogatories.
18     THE WITNESS: I've got numbers everywhere.
19     MR. BERTELSON: The second biggest.
20     THE WITNESS: Bear with me. I'm trying to get
21 all of my papers straight.
22 BY MR. FORD:
23     Q. Okay.
24     A. Yeah, I'm looking for numbers up here.
25        Okay. I've got it. Sorry.

Page 95

1     Q. Okay. And number 13 on page 26, you recall
2 Mr. Bertelson asked you to look at that and then asked
3 you a series of questions about newspapers publishing
4 stories about public corruption.
5        Do you recall that?
6     A. Yes.
7     Q. So I just want to --
8     A. Yes.
9     Q. -- make clear, you're not asserting that the
10 answer that you signed onto in Interrogatory number 13
11 is incomplete in any way, correct?
12     A. I'm not sure I understand what you're asking
13 me.
14     Q. Well, I asked you earlier whether there were
15 any governmental interests identified -- or not
16 identified in Mr. Robertson's response, and you said no,
17 correct?
18     A. Yes. I said -- that was my response at that
19 time, yes.
20     Q. And is your answer still no, or are you going
21 to supplement your answer to this interrogatory and
22 state that there are additional governmental interests
23 that you contend the commercial purpose fee statutes
24 advance?
25     A. Yes. I didn't take those things into

Page 96

1 consideration. Yes, I do amend that.
2     Q. So your contention is that what governmental
3 interest not identified in Mr. Robertson's response here
4 is advanced by the commercial purpose fee statutes, in
5 your own words?
6     A. And in these cases, it would be undervaluing
7 property that's owned by any sort of government
8 official, or anyone to that -- for that matter, but
9 primarily government officials, because there's been
10 examples of that.
11     Q. How did the commercial purpose fee statutes
12 advance the interest that you just identified?
13     A. It -- it allows the newspapers or publications
14 to get that data for free and not as a commercial user.
15     Q. Is there a difference between Zillow
16 publishing the value of a tax assessment on its website
17 and the difference between a newspaper publishing that
18 information?
19     A. In my opinion, yes, they're -- they're two
20 different entities with two different purposes.
21     Q. What's the difference?
22     A. Just the process of publishing it is not a
23 difference, but Zillow is not just in the business of
24 publishing.
25     Q. So --

Page 97

1     A. Or putting it on their website.
2     Q. Would it be fair to say that your contention
3 is that the governmental interest advanced by the
4 commercial purpose fee statutes is that it allows your
5 office to discriminate between a newspaper and an online
6 company, like Zillow, that publishes information that's
7 more narrow in scope?
8     MR. BERTELSON: Objection. Argumentative.
9     Q. You can answer.
10     A. Yes.
11     MR. FORD: Okay. I think that does it for me,
12 Mr. McDowell. I don't know if Mr. Bertelson has any
13 further questions. But if he does, I'll preserve
14 the right to cross. If not, we'll conclude for
15 today.
16     MR. BERTELSON: Okay. That's all for me.
17 Thank you.
18     MR. FORD: All right.
19     THE WITNESS: Thank you.
20     MR. FORD: Mr. McDowell --
21     MR. BERTELSON: We would like to read and sign.
22     MR. FORD: Okay.
23     (DEPOSITION CONCLUDED AT 11:24 A.M.)
24
25

25 (Pages 94 - 97)

Page 98

1      CERTIFICATE OF REPORTER
2      COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10 typewritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skill and ability. I certify that I am not a
13 relative or employee of either counsel and that I am in
14 no way interested financially, directly or indirectly,
15 in this action.
16
17
18
19
20
21
22 LINDSEY JOHNSON,
23 COURT REPORTER/NOTARY
24 MY COMMISSION EXPIRES:05/24/2023
25 SUBMITTED ON: 03/26/2021

Page 100

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4458304
3      CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/9/2021
4      WITNESS' NAME: William Brad  McDowell
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have made no changes to the testimony
       as transcribed by the court reporter.
8
       _____
9  Date          William Brad  McDowell
10     Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11 the referenced witness did personally appear
       and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
          Statement; and
14     Their execution of this Statement is of
          their free act and deed.
15
       I have affixed my name and official seal
16
       this _____ day of_____, 20____.
17
       _____
18     Notary Public
19
       _____
20     Commission Expiration Date
21
22
23
24
25

Page 99

1         Veritext Legal Solutions
             1100 Superior Ave
2               Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   March 26, 2021
5
   To: MR. BERTELSON
6
   Case Name: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
7
   Veritext Reference Number: 4458304
8
   Witness:  William Brad  McDowell      Deposition Date:  3/9/2021
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 101

1      DEPOSITION REVIEW
       CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4458304
3      CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/9/2021
4      WITNESS' NAME: William Brad  McDowell
5      In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7      I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s).
9      I request that these changes be entered
       as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
       that both be appended to the transcript of my
12 testimony and be incorporated therein.
13     _____
       Date          William Brad  McDowell
14
       Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
       the referenced witness did personally appear
16 and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18        in the appended Errata Sheet;
       They signed the foregoing Sworn
19        Statement; and
       Their execution of this Statement is of
20     their free act and deed.
       I have affixed my name and official seal
21 this _____ day of_____, 20____.
22
       _____
23     Notary Public
24
       _____
25     Commission Expiration Date

26 (Pages 98 - 101)

Page 102

```
1          ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 4458304
3  PAGE/LINE(S) /     CHANGE     /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
   _____   _____
20 Date         William Brad  McDowell
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20_____ .
23 _____
       Notary Public
24
   _____
25    Commission Expiration Date
```

**[& - acronym]**                                                                                     Page 1

| & | | | |
|---|---|---|---|

**&**   2:5 17:5

**0**

**0.50**   61:1
**000147**   62:24
**000151**   62:24
**000152**   68:22
**000153**   45:9
**000155**   46:2
**000156**   45:9
**00049**   1:5
**03/26/2021**   98:25
**04252019.pdf.**
   45:23
**05/24/2023**   98:24
**08-12**   59:18

**1**

**1**   3:11 10:7,10
   18:22 46:19 47:11
   49:7 58:13 68:1
   92:6,7
**10**   3:11 20:4,10
   28:18 32:9 34:2,3
   39:10 82:9
**101**   4:5
**11**   10:16
**1100**   99:1
**11:24**   97:23
**13**   86:10 91:25
   92:2 93:8 95:1,10
**133.047.**   18:25
**14**   56:22
**15**   82:2,9
**16**   3:12
**18**   58:21,23
**1820**   99:2
**19**   58:21,23 66:13
**1983**   13:11
**1987**   13:24

**1998**   13:1 14:8
   67:7

**2**

**2**   61:1
**20**   100:16 101:22
   102:22
**2012**   59:22 84:3
**2018**   49:15 58:2
   64:24 66:8,13
   78:9 79:12
**2019**   21:12,22 22:6
   23:11 37:6 45:14
   46:19 47:11 49:7
   49:17 52:17 57:14
   58:3,13 59:2
   63:15,24 66:10,12
   66:18 67:5 75:7
   79:11 86:5 88:23
**2020**   67:22
**2020-2021**   71:25
**2021**   1:24 4:8
   67:22 99:4
**216-523-1313**   99:3
**23,650**   70:6,18
**24**   3:14 62:20,21
   62:22,23,23
**2400**   2:6
**25**   3:15 21:12,22
   22:6 23:11 45:14
   46:23 47:3 49:10
   52:17 63:15,24
   67:18,19 68:21
   75:7 86:5
**250**   74:25
**25th**   10:4 88:23
**26**   3:16 44:21,23
   44:25 45:3,8 47:3
   47:15 86:10 95:1
   99:4

**3**

**3**   3:12 16:16,18
   21:8 51:24 57:14
   59:6 84:1 88:19
**3/9/2021**   99:8
   100:3 101:3
**30**   4:3,8,11 68:1
**300**   2:7 92:20
**34**   59:7,9 84:1
**35**   3:17 44:20,22
   46:15,17 47:21
   60:7 63:4
**350,000**   92:20
**3:19**   1:5

**4**

**40065**   7:1
**40202**   4:6
**40602**   2:19
**41017**   2:8
**42**   21:8 46:4
**423**   2:18
**43**   27:21 28:3
   88:19
**44**   3:16,17
**44114**   99:2
**4458304**   99:7
   100:2 101:2 102:2

**5**

**5**   3:3
**50,000**   92:9
**501**   6:25
**502**   2:20
**564-9572**   2:20
**578-7263**   2:9

**6**

**6**   3:4,13 4:3,8
   84:12,13 86:10
   91:25 94:14
**61.874**   18:24

**61.8745**   18:24
**62**   3:14
**67**   3:15

**7**

**730**   4:5
**7:53**   46:19 49:7

**8**

**84**   3:13
**859**   2:9
**88**   3:5
**8:58**   4:8

**9**

**9**   1:24
**911**   90:16
**94**   3:6
**9th**   4:7

**a**

**a.m.**   4:8 46:19
   49:7 97:23
**ability**   8:25 98:12
**able**   48:2 52:18
   72:22
**absolutely**   92:11
**ac**   90:22
**accepted**   52:8 53:5
**access**   33:20 72:23
   75:16 89:6
**account**   66:11
   69:20 73:1 90:14
**accurate**   36:21
   51:6 61:22 68:12
   84:24
**accurately**   25:17
**acknowledge**
   100:11 101:16
**acquisition**   21:18
**acreage**   90:17
**acronym**   12:7,10
   12:17 79:15

**act** 14:24 15:5,9 15:14,16 16:7,12 18:12 19:11,25 20:1,16 22:1 57:2 100:14 101:20
**action** 1:5 18:5 98:15
**activities** 23:15
**activity** 31:9,24
**actual** 39:5 40:18 60:17
**additional** 52:10 52:12,16 92:4 95:22
**address** 6:23,25 90:15,16 99:15
**addressed** 21:12
**administration** 14:3,4
**administrator** 6:19 10:7 12:8 21:13
**ads** 39:13
**advance** 86:15 95:24 96:12
**advanced** 87:12 92:5 96:4 97:3
**advances** 86:15 93:12
**advertisements** 23:2,9 35:14 38:12,14 40:2,13 40:20,24 41:15 42:7
**advertising** 26:8 36:21 89:13
**advice** 93:22
**affect** 8:25
**affirm** 6:5
**affixed** 100:15 101:21

**agency** 57:3
**agent** 31:24 32:6 35:13,13
**agents** 30:22,23
**ago** 9:3
**agree** 5:24 31:19 40:16 41:2 46:4 69:7
**agreed** 4:13
**ahead** 6:20 8:15 89:1 91:6,22 93:14 94:4
**al** 1:15 2:14 99:6 100:3 101:3
**allowed** 61:6 72:15 73:10
**allows** 96:13 97:4
**amend** 72:19 88:2 88:6 96:1
**amended** 72:17
**amount** 39:24 60:13,24 69:14,15 69:20 70:22,25 71:11,17 74:17,18 74:18 81:25 90:19
**annual** 62:7,8 65:8 65:21 66:5 67:21 74:3,5,23 77:14 82:19 83:12
**annually** 62:12 74:17
**answer** 7:17 8:16 9:14,15,16 14:18 23:25 57:7 61:11 70:18 87:1,5 88:17 95:10,20,21 97:9
**answered** 76:2
**answering** 8:3 9:11

**answers** 3:13 7:7 7:14,18 94:16
**anticipated** 69:1,2 69:9,11,19,21,25 82:20 83:11
**anybody** 83:19
**anymore** 61:6 94:2
**appeal** 24:4
**appear** 42:8 50:2 89:15 100:11 101:15
**appearance** 5:5
**appearances** 2:1
**appeared** 2:11,23
**appearing** 5:12
**appears** 50:3
**appended** 101:11 101:18
**application** 55:1
**applies** 54:9
**apply** 15:4 16:11 37:25
**appointed** 13:3
**appreciate** 46:14 88:16
**approve** 62:16
**approximately** 81:20
**april** 21:12,22 22:6 23:11 37:5 45:14 46:23 47:3 49:10 52:17 63:15 63:24 66:18 75:7 86:5 88:23
**area** 90:21
**argumentative** 97:8
**article** 22:15
**arts** 14:2

**asked** 53:8,14 59:5 84:8 91:24 92:1,3 95:2,2,14
**asking** 34:12,13 48:19 63:24 64:5 64:9 65:2 77:5 86:3 95:12
**asserted** 18:6
**asserting** 95:9
**assess** 77:16
**assessed** 90:17,25 92:9,25,25
**assessment** 24:4 24:14,20 49:13,16 49:17 58:3 62:14 82:12,18 86:7 96:16
**assessments** 93:10
**assigned** 56:22
**assignment** 100:2 101:2 102:2
**associated** 23:7 26:21
**assume** 14:18 30:1 40:14 43:2 45:22 46:24 57:21,22,25 59:13 71:2 77:24 77:25 80:11 85:15
**assumed** 29:25
**assuming** 31:14
**assumption** 40:23
**attached** 21:11 49:12,18,21 50:4 58:4 63:9 101:7
**attachment** 45:20 46:1 55:16 56:6
**attachments** 47:17
**attended** 4:7
**attending** 5:5,6,8
**attorney** 5:11 6:13 9:9 54:1,3 57:10

[attorney - central]

Page 3

93:18
**audible** 7:13,17
**audio** 17:12
**auditors** 61:21
**august** 59:22
**authorize** 101:11
**available** 27:23
  31:5,7 75:2,5,8
  88:14 89:10
**ave** 99:1
**average** 81:24
**aware** 31:10,25
  32:2 41:10 56:19
  91:12
**awkward** 8:2

**b**

**b** 1:13 2:13 4:3,8
  20:14 36:25 38:22
  39:10 99:6 100:3
  101:3
**bachelor** 14:2
**back** 21:4 28:17
  32:8 44:15 59:6
  66:10 70:10 72:18
  76:21 87:22 88:19
  92:15 94:14 99:15
**background** 23:22
**bad** 70:19 76:22
**balance** 69:14
**bank** 14:16
**banks** 65:20 66:1
**barely** 11:24
**base** 44:5 74:10
**based** 14:18 20:15
  24:9 25:17 34:14
  34:18,24 35:1
  39:21 60:7 68:9
  70:25 74:7,9,11
  76:4,6 88:9
**basic** 68:25

**basically** 18:7 26:2
  38:12 42:2 64:4,5
  73:7 74:16 75:10
**basis** 65:21 66:5,6
  75:19 77:14,24
  78:3 82:19 83:13
**bates** 45:7,8 48:8
  48:22 62:24 68:22
**bathrooms** 90:21
  91:3
**bear** 94:20
**beat** 9:11
**bedrooms** 90:21
  91:3
**behalf** 2:3,13 5:13
  22:7 52:5
**belief** 27:7 84:25
**believe** 34:7 36:24
  43:8 44:19 47:1
  47:16,23 54:2
  63:3 66:8,13 75:5
  75:25 79:17,17
  84:5 85:25 89:21
**believed** 26:11
**bertelson** 2:15 3:5
  5:10,10 6:2 9:9,20
  10:1,25 44:12
  45:21 46:8 48:13
  57:5 61:9 70:8,13
  87:18 88:6,12
  90:2,3,7,8 91:11
  91:23 93:16 94:16
  94:19 95:2 97:8
  97:12,16,21 99:5
**bertelson's** 88:9
**best** 7:16,19 84:24
  98:11
**bevin's** 92:16
**beyond** 41:19
**big** 80:13

**biggest** 94:19
**bill** 65:19,22
**billing** 65:11
**bills** 65:15
**binding** 61:8,12
**bit** 8:4 9:11 58:23
  66:7
**black** 33:6,8 63:7
  64:23 65:6 66:4,6
  66:7,16 83:18
**blake** 86:20
**book** 90:20
**boom** 70:12
**bottom** 45:3,13
  62:23 68:22
**bought** 92:8
**bound** 51:19
**box** 2:18
**brad** 1:23 4:3 5:15
  5:19,25 6:22
  87:10 88:13 99:8
  100:4,9 101:4,13
  102:20
**break** 8:19,20,22
  44:15 71:7,18
  87:22
**breakdown** 90:17
  90:18,25 91:1
**brief** 87:22
**bring** 24:5,15,24
  72:18
**broad** 44:5 64:8
**brought** 59:3
**budget** 3:15 11:15
  62:8,12 67:22
  68:3,4,7 69:1,14
  69:20 71:24,24
  72:10,17,19 83:12
**budgeted** 71:11,18
**budgets** 62:3 68:9
  70:24

**building** 75:11
  90:18,19,21
**bulk** 72:17 75:14
**burden** 93:4
**business** 6:23,25
  14:2,3,4 23:1,3,23
  25:18 33:9 91:13
  96:23
**busy** 88:15
**buy** 23:4 30:5,14
  30:19 31:21,22
  90:23 91:16
**buying** 27:3 31:11
  31:16 91:13

**c**

**ca** 99:25
**call** 24:3,5 37:12
  45:7 64:5 74:12
**called** 14:14 30:21
  38:7 67:11 81:10
**calls** 57:5 61:9
  91:21 93:13 94:3
**camera** 5:22
**capacity** 1:13 25:9
  25:19 40:7
**caption** 16:21
  84:15
**care** 80:6
**case** 11:8 24:17,18
  24:22 45:22 67:5
  67:7 80:18 84:16
  93:5 99:6 100:3
  101:3
**cases** 96:6
**cash** 91:18 92:7
  93:1
**categories** 68:7,25
**cd** 80:9
**center** 2:6
**central** 1:3 16:22

**certain** 74:17 75:3
**certificate** 98:1
101:11
**certification** 100:1
101:1
**certify** 98:4,12
**chamber** 2:6
**chance** 87:7
**change** 61:4 99:13
99:14 101:8 102:3
**changes** 99:12
100:7 101:7,9
**characteristics**
15:21 64:13 73:8
75:11,12 90:20
91:2
**characterization**
25:3 68:12
**characterize** 18:4
**characterized**
15:22
**charge** 26:16
27:24 28:7,11,14
28:15 30:22 35:14
42:7,8,21,23 53:3
57:24 60:12,14,16
60:20,20,24,25
61:6 72:2 73:22
74:2,3 76:3 84:9
89:11
**charged** 19:11
**charges** 40:12,23
60:8,18
**check** 80:4
**chief** 67:10
**christine** 57:16
58:7,8 63:5
**city** 90:15
**civil** 1:5 4:9 100:5
101:5

**claims** 18:5
**clarification** 12:12
51:2
**clarify** 8:17 42:11
**clarity** 76:2
**class** 15:17 90:16
**classes** 15:10,13
15:18 16:6,11
**classification** 52:8
**classified** 27:14
29:5 30:12 34:7
39:13 54:5
**classifieds** 38:14
40:2
**classify** 15:15 54:7
**classifying** 27:6
37:21
**clear** 8:11,11
12:10,13 15:25
49:25 50:6 53:25
56:13 75:13 95:9
**clearly** 92:7
**clerks** 82:12
**cleveland** 99:2
**click** 81:5
**client** 54:1
**client's** 50:5
**cloud** 81:16
**code** 90:16
**collect** 94:1
**collected** 78:15
**collecting** 82:12
**collection** 83:6
**collects** 77:15
82:18
**college** 13:12,14
**colon** 45:17
**come** 24:4,13
61:21 70:9 73:24
**comes** 38:10

**coming** 24:19 50:5
65:23 69:4,5,10,15
71:19 72:7
**commercial** 15:16
15:22 16:3 18:9
19:15,21 20:1,10
20:17 22:8,12,18
25:16 26:1 27:7
27:15 28:13,19,21
29:6,12 30:12
32:9 34:4,8 37:1,8
37:21 38:22 42:9
42:21,23 50:12,21
51:1,8,17,25 52:5
52:19 53:19 54:5
54:8,9,10,12,19
55:9 56:14 59:10
59:22 60:8,11
74:8 76:5 78:19
83:23,25 85:23
86:5,13 87:11
92:5 93:7,25 94:1
95:23 96:4,11,14
97:4
**commission** 29:1
35:8,11,16,20 36:3
85:7,10,14 98:24
100:19 101:25
102:25
**commissioner**
1:14
**commissions**
35:25
**committee** 84:7
**commonwealth**
61:16 98:2
**communicated**
46:10
**communications**
10:24 54:2

**community** 42:18
**companies** 27:9
32:22 33:5,5,6
65:21 67:1 85:9
**company** 14:14
22:16 23:18 27:11
27:14,17 42:2
53:9 56:20 65:14
85:12 86:2 97:6
**compel** 51:11
**complaint** 3:12
17:4 18:4,22 20:5
21:11 22:9 32:9
39:10 46:3 86:15
87:12
**complete** 8:21
77:19
**completed** 4:16
49:12 82:1 99:15
**completely** 52:22
**complied** 78:23
**comply** 15:4
**component** 72:1
**components** 68:13
71:21
**comps** 24:9
**computer** 80:24
**computers** 48:2
73:25
**concerning** 93:10
**conclude** 97:14
**concluded** 97:23
**concludes** 94:9
**conclusion** 57:6
93:14
**conducted** 24:15
**confirm** 49:17
**connection** 15:2
16:7 29:21 31:11
31:16 32:5,20
35:21 45:22

[consent - day]

**consent** 56:24
**consequences** 7:8
**consider** 38:20,25
 61:12 78:19
**consideration**
 43:10 96:1
**considered** 18:8
 32:16 36:2 37:22
 39:16 41:10 53:18
 54:11 85:22
**consistent** 48:17
 71:1,2
**constitute** 38:21
**constitutes** 98:10
**consult** 9:17 93:22
 94:5
**contacted** 54:3
**contained** 11:17
 27:22 28:19 53:1
 89:9,14
**contains** 40:2,20
 41:15,19,24
**contemporary**
 46:9
**contend** 86:13
 87:11 95:23
**contention** 96:2
 97:2
**context** 15:14
**continuous** 77:24
**continuously** 14:7
**contract** 50:8,11
 51:1,6,12,14,16,18
 54:9,19,25 56:7
 78:21,21
**convert** 77:1 79:19
**converting** 79:24
**copied** 81:8
**copies** 9:21,24
**copy** 9:22,22
 46:24 47:7,18

48:7,10,21 55:17
 56:18 60:18 65:15
 66:16,22 68:16
 76:10
**copying** 79:22
**corelogic** 33:6,8
 33:13,20 63:2,8
 64:23,24 65:6,23
 65:25 66:16 76:12
 78:12 83:18
**corner** 20:23,24
 59:16
**correct** 12:2 18:21
 24:1 25:21 31:17
 33:7 35:7 36:9
 37:4,9,17 38:1,16
 39:7 40:18,21
 43:15 44:1,6
 46:11,12 47:6,9
 49:22,23 50:13,14
 50:22 51:19,20
 52:5 53:15 54:5
 54:23 55:1,2,5,9
 55:12,13 56:16
 57:20 58:21,22
 59:24 60:4,9,10,21
 60:22 61:16 63:11
 64:16,17 66:13,25
 68:1,2,13,16 69:16
 69:17 70:3,4
 71:13,14,16 72:11
 72:11 74:22 76:8
 77:17 78:7 79:17
 80:10 81:6,10,12
 83:7,13,14 84:4
 85:18,24 86:7
 88:2,6,20 90:1,11
 91:14 95:11,17
**corrections** 99:12
 101:17

**correctly** 32:1
 56:25 68:23
**corruption** 95:4
**cost** 49:14 57:23
 60:17
**costs** 60:21 76:13
**counsel** 48:8 98:13
**count** 72:9
**counties** 33:21
**county** 5:14 6:18
 10:8 12:25 13:8
 14:7,11 15:3,8
 21:13 25:9,10,20
 31:3 33:14,21
 36:8 38:5 39:23
 40:3,7 45:18
 47:11 49:13 50:17
 55:17 56:18 57:11
 64:6,19 77:16,20
 86:20 87:10 92:16
 93:17,18 100:10
 101:15
**couple** 7:25 36:23
 63:1 88:16 94:12
**coupons** 38:14
**course** 9:8,16
 17:25 88:3,5
**court** 1:1 4:4,14
 5:3,16,21 6:3,9,16
 7:11 16:21 17:16
 17:19,23 70:9,12
 70:17 90:2,4 91:7
 91:10 98:23 100:7
**cover** 39:14
**craft** 92:22
**create** 82:7,10
**created** 77:4
**creation** 82:16
**cross** 3:5 88:11
 97:14

**current** 6:23,25
 49:15 68:3 70:5
 70:17 83:23,24
**currently** 5:14
 49:16 67:3 68:4
**cv** 1:5

**d**

**d** 90:20,20
**darren** 2:4 5:7
 6:12 70:8
**dash** 45:18
**data** 22:18 26:3,16
 26:18 27:17,18
 29:23 30:6,20
 31:2,4 32:23
 33:10,20 52:15
 75:14 76:24 77:2
 77:5 80:3 82:7,11
 82:12 84:3 89:19
 90:9 96:14
**database** 39:23
 42:12,23 43:2,7
 63:23 64:6,12,14
 64:20 65:5,9 66:9
 66:22 69:22 71:20
 72:3,4 73:12 75:2
 75:3,5,19 76:11
 77:1 78:9,13 79:7
 79:7 82:7,16 83:2
 83:5
**date** 1:24 58:14
 59:18 84:3 90:19
 98:5 99:8 100:3,9
 100:19 101:3,13
 101:25 102:20,25
**dated** 21:12 45:14
 46:19,23 49:10
 57:14
**day** 4:7 56:23 78:3
 78:3 100:16
 101:22 102:22

**days**  99:18
**dealing**  58:10
**deals**  39:11
**dealt**  66:14
**dear**  99:10
**december**  13:1,24
  67:7
**decided**  43:24
**declaratory**  17:5
**deed**  100:14
  101:20
**deem**  37:22,23
**deemed**  99:19
**def**  45:4,9,9 46:2
  62:24,24 68:22
**defendants**  1:16
  2:13 5:13 6:18
  84:16
**defined**  19:15
  86:14 87:12
**defining**  12:6
**definitely**  10:8
  19:7
**definition**  20:17
  22:9 28:19,22
  32:8 34:3 37:7
  38:23
**degree**  13:25 23:7
  42:17
**deliver**  76:15 77:6
**delivering**  76:18
**delivery**  76:22
  79:4 80:1
**deny**  41:13 47:4
**department**  1:14
  5:11 12:18,21
  93:24 99:22
**depending**  58:5
  80:10
**deponent**  1:23

**deposed**  7:2
**deposition**  3:11
  4:3,8 9:8 10:6
  11:2,11 12:1 71:9
  88:3,5,14 97:23
  99:8,11 100:1,3
  101:1,3
**depositions**  7:25
**deputies**  67:11
**deputy**  67:9,10
**describe**  63:14,15
  63:23 64:2
**described**  10:22
  16:6,11 93:7
**describing**  69:6
  77:12
**description**  72:24
  74:21 90:17
**designated**  53:4
**designation**  53:6
**desktop**  81:22
**determination**
  22:5 25:15,16
  28:12 37:25 86:4
**determine**  84:24
  91:18
**determined**  52:4
  55:8 85:22
**determining**  22:12
  25:25 77:16
**detrimental**  61:13
**dford**  2:10
**difference**  96:15
  96:17,21,23
**different**  15:11
  30:4 39:12 43:25
  58:7 63:1 67:12
  74:6 75:23 96:20
  96:20
**direct**  3:4 6:10
  28:23

**direction**  98:10
**directly**  98:14
**disclose**  10:24
  89:18
**discovering**  45:22
**discovery**  47:5,15
  48:16
**discretion**  60:23
**discriminate**  97:5
**discuss**  87:1
**distinction**  19:25
**distinguish**  41:21
  42:24
**distinguished**
  39:15
**distinguishes**
  41:20
**distinguishing**
  39:17
**district**  1:1,2 6:16
  6:17 16:21,22
**division**  1:3 16:22
  23:5,5
**document**  10:4,19
  16:20 17:3,8,9
  20:24 21:4,8,10,16
  28:18 44:19 45:8
  46:18,18 50:15,25
  51:5,16 54:15,18
  55:3,15 56:9
  57:11 59:13 67:21
  84:15,20 90:5
**documented**  92:22
**documents**  10:25
  11:5,7 18:14,19
  47:15 49:20 50:3
  55:13
**doing**  14:11 29:25
  30:2 31:16 43:24
  44:1 46:15 73:20
  78:5 79:22,24

82:18
**door**  48:21
**dor**  12:18 55:24
  61:4,15,21 62:1,4
  62:16 68:9,11
  72:14
**doubt**  49:6
**download**  73:10
  73:12 80:25 81:17
**drastically**  71:12
**drawing**  19:25
**drive**  2:6 60:19,19
  80:8,19,19 81:8,24
**driver's**  5:22
**drives**  80:22
**drop**  81:24
**duly**  98:7
**dvd**  80:9

**e**

**e**  2:10,21 3:16,17
  45:12,21 46:1,7,9
  46:18,25 47:2,10
  47:17,18,20,24
  48:1,1,15 49:2,6,9
  49:21 50:3 58:2
  58:14 63:10 80:9
  80:17
**earlier**  37:20
  95:14
**earn**  35:10 36:7,10
**earning**  35:25
  36:13,19
**easily**  7:17
**eastern**  1:2 6:17
  16:22
**edition**  43:6
**effect**  84:4
**either**  17:17 29:1
  65:8 66:16 81:7
  98:13

**[elected - firm]**

elected 13:2,5
  14:10,20 93:4
email 99:17
employee 72:18
  98:13
employees 11:21
  15:11 36:10 67:2
  67:4,13
enclosed 99:11
ends 28:7
engaged 33:9
engages 31:10,25
engaging 62:1
ensure 8:4
enter 51:11
entered 101:9
entire 14:5 39:22
  42:12 43:1 64:6
  64:14,19 65:5
  66:9 73:12 75:5
  79:6 100:5 101:5
entities 96:20
equal 69:15
errata 99:13,18
  101:7,10,18 102:1
errors 80:4
escrow 14:22 23:6
esquire 2:4,15,16
estate 14:21 23:3,4
  23:7,22 25:10
  26:16,17,21 27:9
  30:5,15,19,23
  31:12,17,21,22
  35:12,17 39:21
  41:20 42:3 44:4
  89:6 91:14,16
estimate 24:6
  69:20
estimated 24:8
estimates 33:13

et 1:14 2:13 99:6
  100:3 101:3
etcetera 56:22
  90:22
event 82:16
events 9:1
everyday 82:16
exact 71:6
exactly 8:5
examination 3:4,5
  3:6 6:10 88:9,11
  94:10
examples 92:14
  96:10
excel 77:1 79:20
exception 37:11
  37:14,25 38:22
  39:9 43:17
exchange 29:20
  85:7,10,14
excuse 38:11
executed 101:10
execution 100:14
  101:19
exhibit 3:10 10:7
  10:10 16:16,18
  21:8 44:20,21,22
  44:23,25 45:3,8
  46:14,15,17 47:3
  47:15,21 59:6
  60:7 62:20,21
  63:4 67:18,19
  68:21 84:1,12,13
  86:10 88:19 94:14
exhibits 3:9,19
  9:21 11:10,17,19
  21:4
existence 14:24
exists 33:17
expect 39:14 72:14

expected 35:7
expects 29:1 35:3
expense 66:11
expenses 69:1,10
  69:19
expiration 100:19
  101:25 102:25
expires 98:24
extent 41:25
external 80:19

**f**

f 1:6
facet 29:24
facets 30:4 53:10
facilitating 93:9
fact 5:25 26:15
  27:10 28:9 33:11
  41:18
factor 28:12
factoring 82:5
factors 22:11
  39:16
fair 24:10 25:3
  32:10 63:19 64:20
  66:15 72:10,23
  74:21 81:5 91:18
  91:18 92:7,17
  93:1 97:2
fairly 80:12,14
familiar 14:23
  19:3,5,6,24 22:21
  24:7 25:19 33:18
  33:24 59:13 66:24
familiarity 20:16
far 80:1
fargo 65:13,18
fast 25:6
favoritism 93:3
federal 4:9 14:16
fee 19:16,21 29:2
  30:22 35:8,9,13,14

40:16 50:8,11
  54:19,25 59:2,10
  59:22 60:8,12
  61:2,4,7 72:22
  74:5,18,20,25
  86:14 87:11 92:5
  93:7,25 95:23
  96:4,11 97:4
feed 17:21
feel 8:2
fees 19:10 23:8
  26:22 36:17,19
  51:15 72:2,21
  74:9 76:4 84:7
  94:1,7
fell 36:25
figured 24:22
file 49:17 50:6
  58:3 64:11,15
  65:11,19,22 77:2
  78:12 79:3,5,10,11
  79:14,16,18,19,20
  79:21,23 81:5
  82:23 83:1 85:9
files 47:12 49:13
  49:15,16 80:11
  85:13
filing 85:4,20 86:7
filings 85:18,19
fill 50:21 51:4,7
  54:8,22
filled 16:1 50:9,17
financial 14:15
financially 98:14
find 99:11
fine 16:15 20:9
finish 8:3
finished 9:14
  13:21
firm 23:7 26:21

**firms**  26:17
**first**  10:18 13:3
  16:24 23:24 28:1
  28:3 45:12 47:14
  49:24 63:2 66:8
  76:17,23 77:3
  78:25 84:17 85:3
  89:22 90:9 98:7
**fiscal**  67:25 70:5
  70:17 71:25
**focus**  44:3
**focused**  5:23 42:3
**folks**  24:19
**follow**  9:17 61:2,8
  94:13
**ford**  2:4 3:4,6 5:7
  5:7 6:1,9,11,13
  11:9 17:12,18,22
  18:1,2 44:9,14
  48:18 49:1,25
  50:7 70:11,14,19
  70:21 87:15,19,21
  88:8 91:5,21 92:1
  93:13 94:3,11,22
  97:11,18,20,22
**foregoing**  98:4
  100:13 101:18
**form**  16:1 28:24
  51:7 54:11 55:6,7
  55:24,25 56:14
  79:4 93:9 98:10
**format**  75:15
  79:14,20
**forms**  49:12
**fort**  5:8
**forward**  55:14
  62:17 99:15
**forwarding**  45:21
**found**  89:16
**foundation**  91:5
  91:21

**four**  62:9,10,13
  67:4
**frankfort**  1:4 2:19
**frcp**  4:11
**free**  8:9 9:15 27:24
  28:7,11,14,15
  33:22 53:3 83:20
  89:6,11 96:14
  100:14 101:20
**frequent**  66:6
**freshman**  13:20
**front**  10:12 11:3
  11:11 44:25 70:24
  71:5
**froze**  70:13
**frozen**  70:8
**ft**  2:8
**ftp**  81:10,15,23
**full**  5:17,19 67:13
**fully**  89:18
**functions**  15:11
  52:25
**further**  43:3 87:25
  97:13
**fy**  67:22

**g**

**general**  12:12
  15:10 30:16 34:18
  42:20,22
**generally**  10:23
  14:24 18:3 19:12
  24:18,18 32:22
  40:13 53:11 72:2
**generate**  26:4,5
  27:19
**generates**  26:7
  89:11
**getting**  53:12 73:6
  78:25 80:20 83:20
**gfvt**  1:5

**give**  6:6 7:13,16
  8:4 9:11 57:3,23
  62:9 87:4,16 88:1
**given**  56:22,23
  88:3
**giving**  88:16
**glad**  59:3
**go**  6:20 8:15 13:6
  13:12,14 14:5
  18:17 25:1 28:17
  32:8 33:19 44:10
  49:11 73:4,14
  75:21,24 77:1
  80:3,25 81:4 86:6
  88:19 89:1 91:6
  91:22 93:14 94:4
**goes**  71:23 72:18
  77:14
**going**  7:5 10:4,6
  12:7 21:5 22:18
  25:10 26:3 27:16
  34:21 35:10,25
  42:6,15,18 43:3,5
  44:19 48:21 52:14
  57:24 60:25 61:5
  69:4,9,10,14 81:22
  82:12 83:5,19
  87:5 89:19 90:23
  95:20
**good**  6:12,15 7:24
  10:2 18:1
**gotten**  10:9 75:23
**government**  96:7
  96:9
**governmental**
  86:13 87:9 92:4
  93:11 95:15,22
  96:2 97:3
**governor**  92:16
**grab**  16:16

**grad**  13:18
**graduate**  13:10,22
**graduated**  13:11
  13:24
**graydon**  2:5
**graydon.com**  2:10
**great**  14:15
**gregory**  1:6
**ground**  7:5
**group**  21:11 48:4
  57:13 63:9
**guess**  10:3 41:11
  48:6 61:12 65:12
  66:11 71:10 73:14
  73:15
**guessing**  77:5
**guidelines**  59:10
  59:23 60:8,12
  83:25 94:1
**guy**  73:16 80:24

**h**

**halfway**  10:8
**hand**  6:5 11:8
  20:23,24 59:16
**handle**  80:20
**happen**  9:7
**happens**  24:21
  70:14
**hard**  7:15 60:19
  80:19
**hart**  93:21
**he'll**  70:9
**head**  2:5 7:14
  80:15
**header**  59:9
**hear**  16:14 17:17
  17:24 32:1 91:7
**heard**  22:22 63:22
  70:16 90:4
**heating**  90:22

**helpful** 77:10
  90:24
**hereof** 98:6
**hey** 72:14 81:4
  87:15
**high** 13:6,8,8
**higher** 59:1,2
  60:17
**history** 14:6
**hit** 81:4
**hits** 74:12 76:6
**hold** 5:22 14:21
  91:7
**home** 23:17 24:1,9
  27:4 92:16
**homes** 31:2 40:2
**hon** 1:13 2:13 99:6
  100:3 101:3
**hopefully** 9:21
**hourly** 67:15
**hours** 88:16
**house** 24:14
**houseboat** 92:21
**houses** 25:11
**huhs** 7:14

**i**

**idea** 57:8,23
**identification**
  10:10 16:18 44:22
  44:23 62:21 67:19
  84:13
**identified** 11:2
  18:24 45:21 58:8
  86:16 95:15,16
  96:3,12
**identify** 15:15
  51:4
**iii** 2:15
**imagine** 39:22
  43:3

**immediately** 14:13
**important** 7:13,23
  8:10
**include** 30:20 37:2
  64:12 83:11
**included** 18:15
  31:4 47:17 49:14
  52:17 87:13 99:13
**including** 6:18
**income** 22:19 26:4
  26:5 27:19 28:16
  70:3 71:11,19,20
  71:23 72:9 83:12
**incomplete** 95:11
**incorporated**
  101:12
**incurs** 60:14
**index** 3:1
**indicate** 51:8 55:4
**indicated** 56:20
  70:2,6,18 91:12
**indicating** 59:21
  99:13
**indirect** 28:23
**indirectly** 98:14
**information** 18:9
  22:11 24:9 25:24
  26:23 27:2,8,22
  28:10 29:7,10
  30:11,17 31:1,5
  32:12,20 33:22
  34:14,15 36:20
  40:17 41:15,19,22
  41:23 42:10,20,22
  43:7,21 44:1,4,5
  51:25 52:11,12,16
  53:1,11 56:19,21
  63:14 65:1 66:1
  66:22 68:10,11
  73:5,8,11 74:1
  75:1,3,4,7,11,16

75:17,22 76:15
  77:15,23 78:8,15
  80:8,21 81:1,21
  82:17 83:6 85:10
  85:13 89:9,14,15
  90:19,25 91:2,17
  92:10 93:10 96:18
  97:6
**informational**
  30:9
**infrequent** 83:10
**injunctive** 17:5
**input** 77:23 78:1,2
  83:6
**inputting** 82:13
**inspection** 24:3
**instance** 11:15
  35:22 64:10,13
  79:11
**instances** 23:18
**instruct** 9:16
**instructed** 15:15
  54:8
**instruction** 9:17
  15:4,7,9
**instructs** 9:13
**intend** 70:1
**intended** 28:9
  39:17 53:2
**intends** 27:21 28:4
  89:8
**interest** 86:16 87:9
  93:11 96:3,12
  97:3
**interested** 27:3
  91:17 92:10 98:14
**interests** 86:13
  92:4 95:15,22
**interject** 9:9
**internet** 70:15

**interpretation**
  36:18
**interrogatories**
  3:13 84:17 94:17
**interrogatory**
  86:9 91:25 93:8
  95:10,21
**interview** 11:21
**introduction**
  18:23
**invoice** 49:14,18
  57:12,19 58:4,17
  63:2,3,9 64:24
  76:13 78:18
**invoices** 3:14
  58:20 60:6 62:23
**involved** 26:24
  84:6
**issue** 17:13 38:11
  38:13
**it'll** 81:5
**item** 69:19
**ito** 57:16 58:7,8
  63:5

**j**

**january** 57:14
**jefferson** 92:16
**job** 14:5
**jobs** 14:19
**johnson** 1:25 4:13
  8:5 98:22
**joined** 9:6
**judge** 1:6
**july** 68:1
**june** 68:1

**k**

**kentuckiana** 4:4
**kentucky** 1:2,14
  2:8,19 4:5,14 5:9
  5:11 6:17 7:1

13:15,20 14:17,24
15:4 16:7,12,22
18:12 19:10,11,25
20:16 21:25 33:21
45:23 47:11 57:2
61:16 98:2
**kind** 13:16 15:7
79:14 80:25
**knew** 23:2 37:11
37:16
**knight** 33:6,9 63:7
64:23 65:6 66:4,6
66:7,16 83:19
**know** 8:15,20 9:19
9:22 10:9 12:21
23:8 25:12,19
26:15,20,20,23
27:1,3 30:21
32:14 33:8,11,13
33:16,19,23 36:2
39:21,25 40:1,12
44:9 47:2,14,19
48:22 52:18 58:8
61:24 64:10 65:14
72:7 73:16 75:20
76:25 77:6,25
78:5 79:15 80:13
80:14 81:14,23
82:6 85:6,12,13,25
86:22 87:6 88:14
89:3,5 92:8 97:12
**knowing** 86:1
92:10
**knowledge** 22:14
25:18 30:16 31:3
31:15 32:7,11
39:20 42:3 53:9
60:4,5 61:2 73:19
84:25 86:1 87:3
**krs** 18:24 45:17

**ky.gov** 2:21,22

**l**

**lack** 91:5
**land** 90:18,19
**large** 22:16 42:2
53:9 80:12,14
86:1 98:2
**law** 19:10 41:8
69:13 82:23 86:15
93:12
**lawsuit** 6:13
**lead** 30:23 35:12
**leading** 93:13
**leads** 23:8 26:16
26:18,23 27:1,3,9
**lease** 28:25 34:25
**left** 59:16
**legal** 2:17 5:12
41:11 53:8,14,23
53:23 54:4 55:11
57:5 90:16 93:14
93:22 99:1 102:1
**legislature** 92:20
**letter** 26:7 27:20
31:20 34:18,24
35:1 45:23 46:2,5
46:6 49:15 52:17
52:20,22 53:2
88:22 89:22 99:19
**letterhead** 21:11
**level** 74:19
**levels** 74:13
**license** 5:22 14:21
23:6
**limited** 72:4
**lindsey** 1:25 4:13
17:14 70:16 98:22
**line** 69:19 71:24
99:13 101:7 102:3
**link** 81:4

**list** 10:15,21 89:25
90:9,13
**listed** 16:24 101:7
101:17
**listing** 101:7
**listings** 89:7
**little** 8:2,4 9:11
52:20 58:23 59:1
59:2 66:7
**llp** 2:5
**local** 39:12
**locally** 93:4
**located** 4:4
**locating** 79:2,5
**location** 5:5
**log** 54:3
**login** 73:1
**long** 12:4,24 43:16
43:19 81:20
**look** 11:15,24
15:19,20,23,24
18:22 20:8,22
23:16 24:1 25:1,8
42:19 48:5 54:18
55:15 58:1 59:7
61:22 62:19 71:8
73:7,13 74:17
75:21,24 86:6
87:7 92:1 95:2
**looked** 10:25
18:14 22:9 23:18
24:2 33:13 46:2
47:3 56:7 60:7
63:3 84:1 85:4,17
**looking** 20:20
25:23 47:21 68:4
71:25 73:11 79:3
79:6,6 94:24
**looks** 59:17 64:22
**lost** 48:1,1,14
70:11

**lot** 65:10 80:15,16
90:17
**lots** 39:12 42:2
**louisville** 4:5
13:16,21,23 14:1
**lower** 93:1

**m**

**madam** 99:10
**mail** 2:10,21 3:16
3:17 45:12,21
46:1,7,9,18,23,25
47:2,13,17,18,20
47:24 49:2,6,9,11
49:21 50:3 58:2
58:14 63:10 80:9
80:17 81:24
**mailed** 47:10
**mailing** 90:15
**mails** 48:1,1,15
**main** 4:5 27:13
**maintain** 11:16
72:23 94:7
**maintains** 30:25
68:19
**making** 9:14 26:12
52:4 85:23 86:4
**manager** 14:15
**mandatory** 60:12
**mansion** 92:6,7
**march** 1:24 4:8
99:4
**mark** 44:20 51:21
54:13
**marked** 3:19
10:10 16:18 44:22
44:23 52:7 62:21
67:19 84:13
**market** 25:11
90:18 91:1 92:18
**marketplace** 89:6

**matter** 4:10 5:13
42:14 48:16 79:2
96:8 98:9
**mayor** 92:6
**mcdowell** 1:23 4:3
5:15,17,20,21,25
6:4,12,22,24 7:3
8:10,25 9:8,19
12:4,24 13:7
14:23 16:8,17
18:3,10 19:4,24
21:1,22 28:17
31:17 35:17 36:5
36:24 38:5 44:15
47:19 49:3 58:17
59:7,14 60:23
62:20 67:3,17
69:7 70:22 84:11
84:21 87:10,22
94:13 97:12,20
99:8 100:4,9
101:4,13 102:20
**mcdowell's** 17:20
91:8
**mdb** 79:16,16,17
79:18,21,22 80:11
**mean** 8:17 12:15
15:23 26:19 28:15
29:17 37:6,7 43:9
64:24 73:17 76:25
80:3 81:15 82:6
83:14 84:7
**meaning** 38:21
39:9
**means** 28:22 29:15
29:18
**meant** 46:24
**media** 22:16 27:12
30:8 32:16 60:19
76:20 79:4 80:7

**medications** 8:24
**meeting** 5:8
**megibben** 93:21
**memory** 48:14
**mentioned** 31:23
**met** 86:24
**microphone** 7:20
**midwest** 99:17
102:1
**miller** 1:13 2:13
99:6 100:3 101:3
**million** 92:6,8
**mind** 37:21 38:3
53:22
**mine** 41:10
**minute** 59:7 70:13
**minutes** 82:2,9
87:16
**miscellaneous**
70:3 71:23
**mitchell** 2:8 5:9
**mls** 31:6,7
**moment** 20:19
44:11 68:5 87:4,6
94:15
**monday** 38:11
**money** 26:12
29:18,20 66:12
69:4,4,5,9,10,10
69:14,15 70:1
71:17 72:12,17
78:21 83:21
**monthly** 61:24
62:5 74:2,24
**morning** 6:12,15
7:9 8:24 9:23
36:24
**mortgage** 23:5
65:14,20
**mortgages** 30:6
66:2

**move** 55:14 62:17
**movement** 90:5
**muddying** 8:6
**multipage** 46:17

# n

**n** 1:25 4:13
**name** 5:18,19 6:12
6:21,22 90:15
93:20 99:6 100:3
100:4,15 101:3,4
101:21
**names** 90:15
**narrow** 97:7
**nature** 7:8 16:4
18:5 22:25 25:24
**necessarily** 29:11
50:2 64:12 71:20
**need** 8:19 20:19
51:7,10,18 53:10
55:14 72:19 78:24
**needed** 52:18,20
**needs** 16:1
**never** 41:6 85:15
85:17
**new** 46:13
**news** 22:15,16
27:11 30:8 32:16
38:8,18,20 39:1,8
39:12 40:1,8,12,15
40:17,25 41:3,14
41:19,22,24 42:1,5
42:19 92:13,15,17
92:23,24
**newspaper** 22:15
37:3,12,14,24 38:4
38:7,21 39:6,9,14
39:19,22,24 40:13
42:7,16 43:12,25
96:17 97:5
**newspapers** 95:3
96:13

**nicole** 2:16
**nicole.sergent**
2:22
**nods** 7:14
**noncommercial**
16:3 20:1 42:25
51:5,8,10,14,17,21
51:25 52:7,9,19
53:5 54:14 55:1,4
55:5 74:8 76:5
**notarized** 99:14
**notary** 4:13 98:23
99:25 100:10,18
101:15,23 102:23
**note** 59:16 99:12
**notice** 3:11 10:6
10:15,21 11:2
27:20 40:6,24
56:23 58:6 71:9
**notices** 41:3,9,11
**notify** 16:2
**noto** 21:17 22:6
25:15 45:14 46:10
46:19 47:22 49:6
49:21 52:3,13
53:4 54:22 55:8
56:5 58:16 88:22
89:18 90:10
**noto's** 22:12 27:20
31:20 86:4
**number** 16:23
25:11 49:20 59:1
62:24 68:22 76:6
86:10 90:14,14,20
90:21,21 91:25,25
91:25 92:1 93:8
95:1,10 99:7,13
**numbered** 10:5
21:5
**numbers** 20:25
21:6 45:4,8,9 48:8

48:22 59:17 71:5
80:15 94:18,24
101:7

**o**

**oath**  4:10 7:7,9
  44:16 87:23
**objection**  9:15
  57:5 61:9 91:5,21
  93:13 94:3 97:8
**objections**  9:10
**obligated**  41:3
**obviously**  22:19
  46:8 47:4 48:9,24
  50:5 82:8 93:2
**occasionally**  21:3
  23:16,25 24:2,12
  61:20 65:19
**october**  64:24 84:3
**odd**  13:16
**offer**  29:18
**offering**  29:20
**office**  2:17,18 3:15
  4:4 5:12,14 11:17
  13:3 15:12 18:6
  21:25 24:15 26:14
  29:22 30:3,14,25
  34:16,22 35:7
  38:18 39:18 42:5
  43:18 51:3,11,12
  54:21 55:21,24
  60:1,14 61:13,21
  62:1 63:25 67:2
  67:22 68:18 69:21
  71:24 73:24 75:7
  77:14 82:24 83:25
  88:15 89:20 90:11
  97:5
**offices**  26:16,17
**official**  1:13 93:5
  96:8 100:15
  101:21

**official's**  92:25
**officially**  60:4,5
**officials**  93:11
  96:9
**oh**  10:3 54:17
**ohio**  99:2
**okay**  7:5,21 8:7,17
  8:18 9:6,17,18,25
  10:21 11:10,14,21
  11:25 12:15,16,19
  12:24 13:17,22
  14:4,10,23 15:7,20
  16:5,14,15,19 17:2
  17:18,22 18:1,17
  19:22,23 20:6,22
  21:9 22:20,24
  23:24 24:7,12
  25:7 26:5 27:1,6
  27:20 28:9 29:13
  29:19 30:24 31:9
  31:23 32:3,25
  33:4,8,12,16,25
  34:7 35:2,10,16,24
  36:4,16,23 37:19
  38:3,25 40:1,10
  41:14,18 42:4,22
  43:5,11,16,20
  44:24 45:3,17,20
  46:13 47:2 48:3
  48:11,18 49:5,9
  52:7,12,16 53:17
  53:20 54:7 55:7
  55:15,21 56:4,11
  56:17 57:2,9 58:6
  58:13,19 59:3
  60:6,18 61:24
  64:7,18,22 65:6,20
  65:25 66:4,15
  67:2,8,13,20 68:15
  68:21,25 69:25
  70:19,22 71:4,15

72:6,21 73:1 74:2
  74:7,15 75:6
  76:21 77:23 78:4
  78:22 79:14,18
  80:7,18 81:7 82:4
  82:10,22 84:14
  86:11 87:1,4,8,8
  87:17,18 88:22
  89:17 90:3,23
  93:22 94:5,8,23,25
  95:1 97:11,16,22
**once**  77:5,25 81:7
  82:1
**one's**  15:25
**ones**  48:15
**online**  40:18 89:5
  89:7 97:5
**open**  14:24 15:5,9
  15:14 16:7,12
  18:12 19:11,25
  20:16 21:25 24:3
  57:2 59:9 93:6
**operates**  40:15
**operations**  62:1
**opinion**  53:23
  96:19
**opportunity**  18:11
  88:2
**order**  50:2,4 91:18
**original**  50:2
  56:21 58:1
**originally**  13:2
  55:25
**outbox**  48:20
**outside**  16:5
**owen**  86:20
**owned**  96:7
**owner**  90:14

**p**

**package**  56:10
  74:14
**page**  3:2,10 10:4
  10:14 16:24 17:2
  20:4,10,24,25 21:6
  21:8,16,17 27:21
  28:3,18 32:9 34:2
  34:3 39:10 46:3,4
  59:7,9 63:2,2 84:1
  86:10 88:19,25
  89:1,22 90:9,20
  95:1 98:6 99:13
  99:15 101:7 102:3
**paper**  9:22,24 39:5
  39:6 40:4,17,18,20
  42:8 46:24 47:7
**papers**  94:21
**paragraph**  18:22
  28:1,2,3,21 51:24
  55:16 56:17 89:1
  89:3,18
**parcel**  61:1 75:19
  75:19,20,22,23
  90:14
**parcels**  59:1 73:8
  73:9,13
**part**  23:16,24
  25:16,21,22,23
  26:24 27:10 28:23
  41:25 44:3 55:25
  56:2,7,10,13 72:15
  84:7 101:9
**participants**  4:6
**particular**  47:16
  65:18 85:19 91:3
**parties**  5:4,24 29:7
**parts**  90:4
**party**  29:10 32:12
  81:3,16

**pass** 87:17 88:6,10
**pause** 8:4
**pay** 23:8 26:22
  40:10 72:18 78:20
  83:22
**pays** 72:22
**pdf** 9:22 56:13
**pending** 8:21 11:8
**people** 24:4,13
  27:3 28:11
**perfect** 9:25
**period** 24:3
**periodical** 37:3,13
  37:14,24 43:25
**personally** 100:11
  101:15
**phone** 99:3
**pick** 7:20 17:17
**picking** 17:14
**piece** 90:24 91:3
  91:19
**place** 40:13 51:15
  54:13 98:6
**placed** 40:6,25
**plaintiff** 1:9 2:3
  5:7
**plaintiff's** 84:17
**plan** 62:10,14
**planned** 32:19
  34:9,15 35:5
  43:21
**planning** 32:12
  33:1
**plans** 62:4
**please** 5:4,17,21
  6:4,20 7:19 12:12
  49:17 56:18 99:11
  99:11
**point** 17:9 22:22
  32:25 54:6 77:19
  78:4 79:1,2 81:21

81:22 87:2 92:13
**portion** 26:6 35:3
  44:7 51:6 65:9
**position** 14:11,20
**positive** 27:5
  81:11
**possibility** 34:11
  34:13
**post** 2:18
**potentially** 94:6
**prefix** 45:4
**premier** 30:22
  52:25
**premiere** 32:6
**preparation** 11:11
  11:14,22 18:10
**prepare** 11:1
  82:22 83:1
**prepared** 55:22
  60:6 68:9 82:7
**preparing** 76:24
  79:3
**present** 5:4,24
**preserve** 97:13
**presumably** 11:25
  24:16 36:7 65:1
**pretty** 39:20 52:6
  58:24,25 62:9
  63:21 65:4,10,23
  71:2 82:16
**previous** 57:23
  58:11 70:24 71:3
**previously** 3:19
**price** 64:25 90:20
**primarily** 27:10
  96:9
**primary** 72:1
**print** 46:14 73:18
**printed** 44:19
**prior** 14:6,10,13
  14:14,19,20 17:8

22:21,24 23:10,14
  23:20 25:18 37:8
  37:16,21 54:18
  56:7,23 57:19
  70:23 71:1,13
  78:6
**privilege** 54:3
**probably** 12:17
  17:20 19:19 42:19
  42:21 43:10 52:10
  53:7 71:3 80:12
  94:5
**problem** 48:6
**procedure** 4:9
  100:5 101:5
**proceedings** 3:3
  5:1
**process** 66:21 76:9
  76:17,23 77:3,6,13
  77:20 82:18 96:22
**produce** 22:19
  48:8,25
**produced** 47:5
**product** 29:18,19
**production** 28:16
  99:15,17,22
**profit** 27:11,14
  29:1 35:4,7,8 42:2
**profitable** 22:17
  86:2
**program** 31:24
  32:6
**proof** 24:16,25
**proper** 91:18
**properly** 92:25
**properties** 74:16
  77:15,20 78:5,15
  82:13
**property** 6:18
  10:7 12:8 21:13
  24:6 27:23 30:20

30:23 31:7 33:14
  34:20,23 35:13,22
  63:23 64:11,13,15
  64:20 65:8,15
  69:22 76:10 77:17
  78:1,12 79:7
  82:23 83:1 89:7,9
  90:16,16,20,24
  91:2,4,19 92:25
  93:10 96:7
**provide** 7:6 30:18
  35:12 61:24 66:22
  68:10 76:10 79:18
  79:21
**provided** 20:17
  32:13 56:19 66:16
  67:1 75:18
**provides** 89:6
**providing** 27:8
  82:19
**public** 4:14 19:10
  28:23 29:21 32:16
  36:12 37:2 50:16
  51:1 56:8 57:4
  63:13 69:22 70:2
  71:21 73:25 82:20
  83:2,7,9 85:12
  92:10,24 93:10
  95:4 100:10,18
  101:15,23 102:23
**publication** 32:16
  37:2,23 39:11
  43:4,13,16 53:12
  57:3 93:9
**publications** 96:13
**publish** 28:10 38:9
  39:23 41:3,8 42:6
  42:15 43:6,6,21
  53:3
**publishes** 39:5
  40:17 41:15 44:1

[publishes - reference]                                                                Page 14

44:6 97:6
**publishing** 28:14
  43:4 95:3 96:16
  96:17,22,24
**pull** 18:17 44:18
  44:20 46:13 73:5
  84:11
**purchase** 49:13
  66:12
**purchased** 66:9
**purpose** 15:16,22
  16:4 19:16,21
  20:1,2,17 22:8,13
  25:16 26:1,2 27:7
  27:15,16 28:13,19
  28:21 29:6 30:13
  32:9,14 34:4,8
  37:1,8 38:23
  39:25 42:9 43:4
  50:12,21 51:10
  52:5,14,19 53:5
  54:8,10 55:1,9
  56:14 78:19 82:19
  83:24 85:24 86:5
  86:14 87:11 92:5
  93:7,8,25 94:1
  95:23 96:4,11
  97:4
**purposes** 12:14
  20:11 30:7,10
  34:10 53:12 65:12
  71:10 76:3 77:16
  83:20 96:20
**pursuant** 4:9,10
  21:25
**put** 52:23 76:19
  80:7,19 81:23
**putting** 28:14
  29:24 30:3 36:20
  97:1

**pva** 5:15 12:7,12
  12:15,25 14:7,11
  14:19 15:2,9,11
  18:13 23:23 25:9
  25:20 36:8 39:23
  40:7 45:23 50:16
  50:25 54:21 56:8
  57:11 59:9 64:6
  64:19 67:8,9,22
  86:20 87:10
**pvas** 12:1,12 15:10
  16:23 27:2 61:15
  63:22 67:25

**q**

**quarterly** 61:25
  62:5
**question** 8:3,12,13
  8:17,21 9:14
  10:18 24:14 37:15
  47:14 48:23 63:18
  63:20 86:12 87:5
  90:5,6
**questioned** 92:17
**questioning** 48:18
**questions** 7:6,7,14
  7:18 9:12 87:25
  88:10,17 94:9
  95:3 97:13
**quite** 8:14 92:17
**quote** 19:5 64:25
**quotes** 20:7,11

**r**

**raise** 6:4 24:19
**ran** 64:10
**random** 66:7 72:5
**read** 20:19 56:25
  68:23 87:4,6
  88:25 89:2 90:13
  97:21 100:5,6,12
  101:5,6,17

**reading** 4:15
  99:19
**real** 14:21 23:3,4,7
  23:22 25:10 26:16
  26:17,21 27:9,23
  30:5,14,19,22
  31:12,17,21,22
  35:12,17 39:21
  41:19 42:3 44:4
  89:5,9 91:13,16
**really** 35:2 36:16
**reason** 27:13
  42:24 49:5 55:7
  66:20 70:15 99:14
  101:8 102:3
**reasonably** 7:24
**reasons** 9:10
**reassessing** 62:11
**reassessment** 62:4
**recall** 9:1 15:3
  21:21 38:19 48:4
  87:2 95:1,5
**receipt** 99:18
**receipts** 69:2,11
  69:25
**receive** 13:25 64:7
  64:22 65:7 70:1
**received** 11:18
  15:8 16:6,10
  22:20 25:14 37:19
  38:17 42:4 46:22
  47:4,7,15,16 49:10
  54:2 65:17 67:6
**receives** 35:21
**receiving** 15:3
  21:21 22:24 23:14
  23:20 37:8,17
**recite** 19:7
**recognize** 20:15
  49:2 59:21 70:23
  75:14

**recollection** 70:25
  84:2
**record** 5:3,18 6:21
  8:7,11 9:15 28:23
  37:2 38:18 44:10
  44:13 63:15 68:21
  76:3 87:20 89:2
  98:11 101:9
**recorded** 98:9
**records** 11:16
  14:24 15:5,9,14
  16:7,12 18:12
  19:10,11,25 20:16
  22:1 26:13 27:23
  28:10,24 29:10,11
  29:21 30:2,13,18
  30:20,24 31:11,16
  31:21 32:4,5,19,21
  33:2 34:9,16,21
  35:6,11 36:1,13,14
  39:17,19 42:5,6
  43:13,18 49:18
  50:16 51:1,3 53:2
  54:21 56:8 57:2,4
  57:25 59:10 61:6
  63:13,16 66:17
  69:23 70:2 71:21
  72:23 74:12 75:11
  76:18,19 77:4
  78:24 79:1 82:20
  83:2,7,9 89:9,15
  89:25 90:10 93:6
**recounting** 48:14
**recross** 88:9
**redirect** 3:6 94:10
**reduced** 98:9
**refer** 12:7 21:5,7
  33:4
**reference** 99:7
  100:2 101:2

**referenced** 100:11
101:15
**referring** 11:4
12:11 19:20,22
26:6 54:16
**refuse** 41:4
**regain** 48:2
**regard** 91:24 92:3
**regardless** 83:6
**regular** 63:12 65:8
**regularly** 65:21
**relate** 19:10
**related** 18:12 37:2
37:23 42:19 43:13
43:17
**relating** 44:4
**relative** 98:13
**relatively** 83:10
**reliable** 83:13
**relief** 17:5
**rely** 22:11 25:25
27:7
**remotely** 4:7,10
**rent** 28:25 34:20
34:22
**rental** 23:4 52:24
89:6
**rentals** 30:6
**rep** 57:16 58:6,15
**repackage** 27:18
**repackaged** 32:23
56:21
**rephrase** 8:16
**reporter** 1:25 4:14
5:3,16,21 6:3,9
7:11 17:16,19,23
70:9,12,17 90:2,4
91:7,10 98:1,23
100:7
**reporters** 4:4

**reports** 61:25,25
**representing** 50:1
**reproduce** 60:17
**reproduction**
50:16,25 56:8
**request** 8:20 15:15
15:21 16:4 18:9
21:21,24 22:5,8,12
22:20,24 23:14,20
25:14,24,25 27:6
27:15,23 28:13
29:6 30:12 34:8
36:25 37:5,8,17,20
38:17 42:4,12,14
45:18 46:22,25
47:12,13 49:10
50:16,20,23,25
52:4,19 53:4 54:4
54:7 55:9 56:8,14
60:15 63:24 64:4
65:11,13,17,21
66:5,6 67:6 75:8
76:11 78:11,19
79:4 83:7 85:23
86:5 89:10 101:9
101:11
**requested** 42:13
49:15 52:10,13
55:17 56:18 63:14
63:16 64:3,19,19
66:9,17 75:6
**requester** 36:13
37:22 42:9 51:10
76:16,18,24 77:8
79:19,23 80:21
**requesters** 50:13
50:21 63:13 64:8
66:23 69:23 70:2
71:21 82:20
**requesting** 26:13
29:22 30:2,14

32:5 34:16,22
35:6 39:18,22
43:1,18 49:18
51:3 58:2,5,20
78:16 89:20 90:1
90:10
**requests** 54:10,12
54:14 55:1 56:10
63:12 64:8,23
65:5,8 69:22 83:2
83:10,12
**require** 50:21
76:14 78:21
**required** 49:12
78:23 82:23 83:15
99:25
**requires** 41:8
69:13
**resale** 28:24 32:18
32:20,24 57:4
**resell** 33:2
**resells** 66:1
**resold** 56:22
**respond** 61:10
76:12
**responded** 16:13
**responding** 47:12
60:14 69:21
**response** 86:19
87:13 91:8,25
92:1 95:16,18
96:3
**responses** 84:16
**restrict** 57:3
**restricted** 56:20
**returned** 55:14
99:18
**revenue** 1:14 2:17
12:19,21 26:7
89:12 93:24

**revenue's** 5:11
**review** 18:11,18
99:12 100:1 101:1
**reviewed** 11:7,10
17:9 18:16 84:23
85:15
**richard** 2:15
**richard.berelson**
2:21
**rick** 5:10 44:9 50:1
87:15
**ridiculous** 39:24
**right** 6:4 8:22,23
9:19 10:2,14 12:4
12:4,22,24 16:16
18:1 19:3,14
20:13,23,24 21:3
21:10 23:13 25:14
35:17,17 36:4,8,10
36:23 37:3,13
38:13 40:25 41:4
41:7,9,16 43:14,18
43:22 44:1,8,16,18
44:25 45:7,12,18
46:4,6,17 47:5,8
47:10,12 49:2,24
50:9,15 51:16,17
51:22 52:1,2
54:10 56:9,15,25
57:3,11,25 58:16
58:17,23 61:20
62:19,24 63:5,10
63:12 67:17 68:5
69:2,11,18 70:6,9
70:18 71:10 72:15
73:17,20 76:5,7,9
77:21 78:2,3,6,9
78:16 79:8,25
80:9,15 81:9,18
82:15,23,24 83:3
84:11,20 86:3,20

87:9,15,19 88:8,13
88:23 89:17,22
91:24 93:3,17
94:9,12 97:14,18
**ritchey** 2:5
**robertson** 86:20
86:22
**robertson's** 87:13
95:16 96:3
**role** 61:15
**roll** 55:18 56:18
63:23 64:11,15,20
65:9 69:22 76:10
78:12 79:7 82:23
83:1
**rom** 80:9
**roughly** 80:13
**rules** 4:9 7:5 100:5
101:5
**ruling** 53:8,14,23
54:4 55:12
**runs** 67:25

**s**

**s** 99:15 101:8,8
102:3
**salaried** 67:15
**salaries** 72:19
**salary** 29:1 35:8
36:4,7,13 67:16
**sale** 25:11 26:8
28:24 29:14,15,17
29:18 31:8 40:3
72:3,4 89:12
**sales** 14:14 52:24
75:11 90:19 91:1
**salesperson** 35:21
**saying** 7:21 8:5,6
18:8,20 24:17
55:23
**says** 28:22 34:5
37:1 43:13 46:22

49:9 51:16,24
55:17 56:17 57:16
58:7,15 65:14
78:12 86:12
**scenario** 53:14
**schedule** 50:8,12
54:19,25 61:3,5,7
**school** 13:6,8,9,18
**scope** 52:14 64:24
97:7
**screenshot** 73:18
**seal** 100:15 101:21
**sec** 85:4,18,21
**sec's** 86:6
**second** 28:2,4 63:2
67:18 70:10 88:25
94:8,19
**section** 18:24 70:3
**securities** 85:6,10
85:13
**see** 16:20,25 17:6
18:23 19:1,14,17
20:7,10,11 21:1,14
21:19 23:17,19,21
27:25 28:5 29:3
33:21,22 34:1,5
45:3,5,10,15,18,24
46:4,20 50:9,18
51:22 55:19 57:13
57:17 59:1,11,19
67:23 84:18 86:17
94:6
**seek** 55:11
**seen** 10:18 17:8
23:2 37:7 40:3
55:22 68:15,15
79:15 84:20
**seldom** 24:21
**self** 52:8
**sell** 23:4 27:9 30:5
30:14,19,23 31:21

31:22 32:12 91:16
**selling** 24:20 29:7
29:9,10,11 31:11
31:17 35:21 71:20
72:12 91:13
**sells** 35:13
**semiannual** 66:5
**send** 76:12 78:18
78:20 81:3
**sending** 57:22
**sense** 8:15 25:9
**sent** 11:5,8 34:19
49:6,21 52:3
54:21 55:7 56:14
57:20 58:20 62:4
81:8
**sentence** 28:4
**sentinel** 38:8,18,20
39:1,8 40:1,8,12
40:15,17,25 41:2
41:14,19,22,24
42:1,5
**separate** 56:6,9
**sequentially** 21:5
**sergent** 2:16 9:2,4
9:6
**series** 7:6 95:3
**serve** 93:8
**service** 28:25
30:21 32:17 34:25
75:17,21,24
**services** 2:17 5:12
89:7
**set** 84:17 98:6
**setting** 84:6
**shape** 93:9
**share** 83:22
**sheet** 99:13 101:7
101:10,18 102:1
**shelby** 5:14 6:18
10:7,8 12:25 13:8

14:7,11 15:2,8
21:13 25:9,10,20
31:3 33:14,20
36:8 38:4 39:23
40:3,7 45:18,23
47:11 49:13 50:9
50:17 55:17 56:18
57:11 64:6,19
77:16,20 87:10
93:18
**shelbyville** 7:1
14:16 92:6
**short** 44:15
**shorthand** 12:14
**show** 24:25 72:19
**shown** 93:3 99:16
**side** 20:23
**sign** 51:6 78:21
97:21
**signature** 99:14
**signed** 21:17 49:12
95:10 100:13
101:18
**significant** 82:8
**signing** 4:15 99:19
**similar** 64:23
**simple** 69:5
**sincerely** 99:21
**single** 79:10
**sir** 7:4,22 8:8 9:5
10:11,13 12:23
15:1 17:1,11
21:15 33:15 35:18
44:17 45:2 62:22
88:7,21 99:10
**site** 80:24,25 81:3
81:11,14,15 89:16
**sitting** 32:11
**situation** 92:19
**size** 80:10,12
90:17

skill  98:12
solely  44:4 82:19
solicitation  28:24
  33:25 34:5,9,17
soliloquy  70:20
solutions  99:1
  102:1
somebody  72:22
  76:6,11
somewhat  32:2
soon  9:14
sorry  14:2 16:14
  45:13 62:6 90:2
  94:25
sort  7:17 14:19
  15:23 17:12 24:8
  24:16,25 25:1,9,12
  27:4 32:20,24
  33:9 37:7 38:14
  38:17 55:11,16,24
  59:16 76:19 80:2
  80:24 84:7 96:7
sorts  7:15 15:24
  33:6
sought  27:23
  89:10
source  21:17
sourced  27:2
sources  26:8 31:6
  89:12
space  26:8 89:13
speak  7:20,25
  17:24 72:5 92:22
special  43:6
specific  15:17
  19:19 30:17 31:9
  31:13,15,18 32:7
  32:11 33:3 34:13
  52:21 69:24 73:13
  75:4

specifically  9:13
  15:13 18:12,13,17
  43:9
specifics  26:20,24
  42:17 73:16
specified  53:7
  60:13,24
specifies  43:12
specify  43:19
speculation  61:10
  91:6,22 94:3
spend  69:21 72:15
spent  82:11 83:21
spoken  11:25
sports  39:12
spot  16:2 51:20
staff  82:17
standard  50:11,20
  50:23 65:10,23
start  77:12
starting  46:3
starts  28:4 46:2
state  4:14 5:4,17
  6:20 58:4 69:13
  72:18 83:19 86:12
  90:15 95:22
  100:10 101:15
statement  100:13
  100:14 101:19,19
states  1:1 6:16
  16:21 26:7
statute  14:25
  19:20 37:12,16
  43:11
statutes  18:11,15
  18:18,18,23 19:4,9
  19:15,16,21 20:18
  86:14 87:11 92:5
  93:6,7 95:23 96:4
  96:11 97:4

steady  83:10
steel  14:14,14
step  76:17,23 77:3
  77:9,9 78:22,25
stipulation  4:1
stop  73:19 93:25
storage  81:16
stories  90:22
  92:15 95:4
story  92:13,17,23
  92:24
straight  89:2
  94:21
strategist  21:18
street  4:5 7:1
strictly  39:20
strike  12:5 14:6
  38:4 39:16 68:8
  83:24 85:3
string  45:13
structure  40:16
stuff  61:22
subject  41:20
  45:17 47:11 88:8
submit  62:13,13
submitted  98:25
subparagraph
  38:22 39:10
subscribed  100:10
  101:14 102:21
subscription  72:22
  73:6 74:3,4,10,24
  74:24 75:17,21,24
  76:3
subsection  20:13
  20:14 36:25
subset  64:11
sudden  93:25
sue  86:4
sufficiently  83:13

suggesting  54:3
suite  2:7 4:5 99:2
superior  99:1
supervisory  61:15
supplement  95:21
supplies  68:11
suppose  41:5
sure  8:12 12:6,13
  41:11 44:12 48:10
  52:21 53:20,22,23
  56:12 58:10,12,19
  63:18 66:21 75:13
  76:1 81:14 90:7
  95:12
surprisingly  66:10
susan  21:17 46:22
  49:10 58:16 88:22
  89:18 90:10
swear  4:15 6:5
switching  48:1
sworn  4:10 98:7
  100:10,13 101:14
  101:18 102:21
system  82:13

t

take  7:17 8:5,20
  8:21 15:10 20:19
  20:22 39:24 43:10
  44:10 62:19 81:20
  87:6 95:25
taken  4:3,9 7:9
  15:13,18 22:17
  80:6 98:5,11
takes  81:25
talking  25:6 33:5
  35:2 36:16 42:11
  82:11,14
tatenhove  1:6
tax  47:11 55:18
  56:18 63:23 64:11
  64:15,20 65:8,11

65:15,19,22 69:22
76:10 78:12 79:7
82:23 83:1 90:19
93:3 96:16
**taxed**  92:21
**taxes**  77:17
**taxpayers**  93:4
**teach**  15:11
**technologies**  14:14
**telephone**  2:9,20
**television**  22:15
**tell**  8:25 10:23
15:19 32:25 42:15
**telling**  43:8 72:13
**ten**  87:16
**term**  12:14 13:4
19:20 20:10 29:14
29:14,17 86:14
87:12
**terminology**  8:14
63:17,23 64:3
**terms**  11:14 12:6
25:11 33:10 40:15
50:8 56:5 63:12
64:9,18 71:17,18
75:1,6,15 77:10
80:7
**testified**  37:20
84:2
**testify**  98:7
**testifying**  11:1
**testimony**  6:5 88:2
100:6,7 101:6,9,12
**text**  79:19
**thank**  5:16 6:3,9
88:13,18 91:10
97:17,19
**thing**  7:23 8:9 9:7
25:12 27:4 38:15
60:16 70:16 85:3

**things**  7:13,15
11:5 15:19,24,25
16:3 30:1 41:21
62:7,16 64:13
67:12 93:2 95:25
**think**  9:6 18:15
23:17,24 24:12
25:6 31:23 37:6
37:20 53:13 59:4
70:8,11 76:2 77:9
81:10,11 84:1
92:20 93:15 97:11
**thinking**  24:19
**third**  17:2 29:7,10
32:12 81:3,16
**thirty**  99:18
**thomas**  1:13 2:13
99:6 100:3 101:3
**three**  9:3 18:23
19:15,21 67:10
74:6,12
**throw**  72:2
**throwing**  93:3
**thumb**  60:19 80:8
80:19,22 81:8,24
**time**  8:10,19 11:23
11:24 15:8 22:22
33:1 58:11 60:1
67:13 76:14 77:19
78:4 79:1 80:5
81:25 82:5,6,10,11
82:14 83:21 87:2
88:15,17 95:19
98:5
**times**  9:10 12:18
17:16 36:23 65:10
80:15,16
**title**  17:4 50:24
84:16 98:6
**titles**  67:12

**today**  9:20 11:12
11:22 12:1 17:8
18:10 32:11 88:14
97:15
**today's**  46:23
49:11 88:5
**token**  73:23
**told**  34:14 43:20
48:17 54:22
**top**  16:21 20:7,10
20:23,23 21:12
46:7,18 59:16
60:20,21 67:21
74:19,23 80:15
84:15 86:12 89:1
**topics**  10:15,21
11:2 39:12,13
41:24 71:8
**total**  59:2
**trained**  15:24
**training**  15:3,7
16:5,10
**transcribe**  7:15
**transcribed**  100:7
**transcript**  4:16
8:11 98:5,11
99:11,12 100:5,12
101:5,11,17
**transfer**  76:24
81:21 82:2,3,5,9
**transferred**  56:6
**transmitted**  56:5
**transmitting**
79:23
**treat**  22:3
**trouble**  47:25
**true**  73:23 98:11
**truth**  6:6,7,7 9:1
98:7,8,8
**try**  7:13,16,20,23
7:25 8:10,16 9:11

12:13 19:19 24:25
90:23
**trying**  29:13 94:20
**tuesday**  4:7 38:11
38:13
**turn**  10:3,14 17:2
20:4 21:7,16 59:6
67:17 76:9 85:2
86:9 94:14
**turned**  48:16
**twice**  38:10 57:25
**two**  9:3 17:16
21:16 58:20 68:7
68:13,25 96:19,20
**type**  22:15 42:12
43:12,17 53:11
65:1 75:15 81:13
82:14
**types**  23:15 30:9
65:5 73:5
**typewritten**  98:10
**typically**  80:18

**u**

**u.s.**  14:16
**uh**  7:14
**ultimately**  75:19
**undergrad**  13:17
13:18,19
**undersigned**  56:23
**undersigned's**
56:24
**understand**  7:8
8:12,13 19:9,12
21:24 22:7 29:5,8
29:13,14 32:19
34:21 35:16,19,20
35:24 36:4,12
44:16 51:2 56:4
61:7,15,20 63:18
67:25 68:8 69:13
71:7 72:8 78:14

85:9 87:23 95:12
**understanding**
18:4,7 22:25
24:10 25:17 29:20
32:4 35:5 36:18
51:9,13 60:11
64:16 65:25 70:1
71:19 82:22
**understood** 26:12
29:9 61:14
**undervaluing** 96:6
**united** 1:1 6:16
16:21
**university** 13:15
13:16,20,21,23
**unlimited** 74:13
74:19,23
**updated** 60:3
**upfront** 52:22
**upload** 81:1,2,4,5
81:7,17
**uploading** 81:23
**ups** 94:13
**use** 12:7,10,14,17
12:18 16:3,3
19:20 22:18,18
26:13 27:18 28:11
28:23,25 29:12
30:18,24,25 34:9
34:15 35:3,6,7,11
35:25 36:14,19
37:2,13,23,24
39:17,19 42:25,25
43:12,13,17 50:12
51:24 52:15,23
53:2,6,19 54:11,14
55:24 56:19,20
59:25 63:16,22
64:3 65:11 69:5
74:5,8,12 76:4,5,5
83:20 90:16

**user** 18:9 29:1
35:3 42:21,24
51:18 54:9 55:4,5
96:14
**users** 27:24 51:1
51:17 53:3 54:13
54:19 89:10
**uses** 27:18 89:18
**usually** 24:17
32:23 80:20
**utilize** 32:19 83:25

**v**

**v** 1:11 99:6 100:3
101:3
**vague** 63:20,21
**validation** 80:2
**valuation** 6:19
10:7 12:8 21:13
**value** 24:6,8 91:19
92:7,18 93:1,1
96:16
**values** 23:17 24:1
33:14 90:18,18
91:1,1
**van** 1:6
**variations** 74:6,7
**various** 6:17 15:25
**verbatim** 19:8
**verification** 80:3
**veritext** 99:1,7
102:1
**veritext.com.**
99:17
**version** 59:22,25
83:23,24
**versus** 93:4
**videoconference**
2:11,23 4:6
**view** 39:9,15 41:20

**w**

**w** 2:4,15
**wait** 5:22 8:3
70:10 78:2
**waived** 4:16 99:19
**want** 8:11 10:23
14:5 20:8 24:13
37:12 44:18 49:25
50:6 53:25 54:1
56:12,12 59:4
63:16 65:14,19
66:1,20 74:10,16
74:19 75:13 76:1
76:9 77:6,12
78:12 85:3 87:4
92:14 95:7
**wanted** 33:19,22
41:4 66:12 73:14
73:18,24 75:21
**wants** 27:17 76:7
**washington** 6:25
**water** 92:22
**way** 7:20 8:16
19:12 26:11 29:8
69:6 84:6 93:8
95:11 98:14
**we've** 7:24 11:19
11:24 15:18 92:14
92:19
**wealth** 31:3,4
77:15
**weather** 39:12
**website** 23:10,14
25:20 26:4 27:24
28:11 29:24 30:3
33:12,16 35:15
36:20 39:1,3 42:8
43:21 44:6 52:23
72:1,21 73:6,16
75:9,15 86:6
89:11 96:16 97:1

**week** 38:10
**weigh** 84:8
**wells** 65:13,18
**went** 13:8,15,19
23:21 84:3
**west** 4:5
**whichever** 79:4
**william** 1:23 5:19
99:8 100:4,9
101:4,13 102:20
**windfall** 72:13,16
**wish** 10:5
**witness** 4:15,16
5:19,24 6:8 11:4
87:17 88:10 91:9
94:18,20 97:19
98:4 99:8,11
100:1,4,11 101:1,4
101:15
**witnesses** 88:1
**witness'** 99:14
**word** 8:13 33:25
76:22
**worded** 53:24
**words** 60:25 96:5
**work** 14:12
**working** 9:23
14:13 49:16 58:3
**worry** 17:23
**worth** 24:16 25:1
**wrapped** 87:16
**writes** 27:21
**wrote** 88:23

**x**

**x** 74:18,18 75:20
75:22,23

**y**

**yeah** 11:7 17:19
20:8 24:22 25:5
28:3 34:3 37:16

[yeah - zoom]

41:13 47:14 48:18
54:15 63:22 68:7
70:14 77:11 81:2
83:23 94:24
**year**   13:10,20,22
49:19 57:23 58:4
58:19 65:24,24
66:8 67:25 70:5
70:18,24 71:12,25
72:7,7 76:7 78:6
78:16 79:11 82:15
82:24 83:15 88:15
92:9
**year's**   49:17 57:19
**years**   9:3 56:3
62:9,10,13 66:13
70:23 71:1,3,3,13
92:15

**z**

**zestimate**   24:5,8
24:16,24
**zillow**   1:8 2:3 5:7
6:13 16:23 18:7
21:11 22:7,14,14
22:16,21,21 23:2,8
25:2,8 26:12,22
27:9,11,13,21 28:4
29:19 30:4,16
31:10,25 32:11,19
32:25 33:10 34:14
34:21 35:5,10,24
36:12 38:1,3
39:20 41:14,21,22
42:1,12 43:20
45:17 46:3 52:24
52:24,25 53:9
57:13,20 60:7,25
63:8,14,24 64:18
64:25 65:7 66:17
67:6 75:6,8,18,22
76:12 83:16,18

85:4,5,12,20,22,23
86:1,6 89:5,8,11
89:15,16,19 96:15
96:23 97:6 99:6
100:3 101:3
**zillow's**   18:4 22:25
23:10,13 24:6
25:18,25 26:6
27:6 29:6 30:12
34:8 36:19,25
37:5,17,19 39:17
44:3 52:5 85:18
**zillow.com**   24:1
26:9 27:24 28:9
32:3,4 53:3 89:11
89:14 91:13
**zip**   90:15
**zoom**   5:8 7:19

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.