Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF KENTUCKY

3                    CENTRAL DIVISION

4                       FRANKFORT

5         CIVIL ACTION NO. 3:19-CV-00049-GFVT

6           JUDGE GREGORY F. VAN TATENHOVE

7

8                     ZILLOW, INC.,

9                        Plaintiff

10

11                         V.

12

13   HON. THOMAS B. MILLER, IN HIS/HER OFFICIAL CAPACITY AS

14   COMMISSIONER OF THE KENTUCKY DEPARTMENT OF REVENUE, ET

15                        AL.,

16                     Defendants

17

18

19

20

21

22

23   DEPONENT:   JASON NEELY

24   DATE:       MARCH 9, 2021

25   REPORTER:   LINDSEY N. JOHNSON

Page 2

1          APPEARANCES

2

3 ON BEHALF OF THE PLAINTIFF, ZILLOW, INC.:

4 Darren W. Ford, Esquire

5 Graydon Head & Ritchey, LLP

6 2400 Chamber Center Drive

7 Suite 300

8 Ft. Mitchell, Kentucky 41017

9 Telephone No.: (859) 578-7263

10 E-mail: Dford@graydon.com

11 (Appeared via videoconference)

12

13 ON BEHALF OF THE DEFENDANTS, HON. THOMAS B. MILLER:

14 Richard W. Bertelson, III, Esquire

15 Nicole Sergent, Esquire

16 Office of Legal Services for Revenue

17 Post Office Box 423

18 Frankfort, Kentucky 40602

19 Telephone No.: (502) 564-9572

20 E-mail: Richard.berelson@ky.gov

21      Nicole.sergent@ky.gov

22 (Appeared via videoconference)

23

24

25

Page 3

1              INDEX

2                          Page

3 PROCEEDINGS                    5

4 DIRECT EXAMINATION BY MR. FORD        6

5

6

7            EXHIBITS

8 Exhibit                    Page

9 1 - Notice of Deposition          9

10 3 - Complaint                16

11 6 - Answers to Interrogatories        62

12 27 - Office Records            48

13 28 - Office Budget            52

14 29 - E-mail              25

15 30 - Assessment Administration Manual      65

16

17 (All exhibits previously marked.)

18

19

20

21

22

23

24

25

Page 4

1          STIPULATION

2

3 The 30(b)(6) deposition of JASON NEELY was taken at the

4 office of Kentuckiana Court Reporters, located at 730

5 West Main Street, Suite 101, Louisville, Kentucky

6 40202, via videoconference in which all participants

7 attended remotely, on Tuesday, the 9th day of March,

8 2021, at 1:32 p.m.; said 30(b)(6) deposition was taken

9 pursuant to the Federal Rules of Civil Procedure.  The

10 oath in this matter was sworn remotely pursuant to FRCP

11 30.

12

13

14 It is agreed that Lindsey N. Johnson, being a Notary

15 Public and Court Reporter for the State of Kentucky, may

16 swear the witness and that the reading and signing of

17 the completed transcript by the witness is not waived.

18

19

20

21

22

23

24

25

Page 5

1          PROCEEDINGS

2

3      COURT REPORTER:  We are now on the record.

4      Will all parties present please state your

5 appearance, how you are attending, and the location

6 you are attending from?

7      MR. FORD:  Darren Ford for Plaintiff, Zillow,

8 Inc.  I am attending via Zoom from Fort Mitchell,

9 Kentucky.

10      MR. BERTELSON:  I'm Rick Bertelson.  I'm

11 attorney for the Kentucky Department of Revenue's

12 Office of Legal Services.  I'm serving as counsel

13 for all defendants in this matter, and I'm appearing

14 at the Clark County PVA's office in Winchester,

15 Kentucky.

16      MS. SERGENT:  My name is Nicole Sergent. I'm

17 severing as an attorney for the Defendants.  I am

18 appearing via Zoom from Lexington, Kentucky.

19      COURT REPORTER:  Mr. Neely, will you please

20 state your full name for the record?

21      THE WITNESS:  Jason Neely.

22      COURT REPORTER:  Mr. Neely, will you please

23 hold your driver's license up to the camera and wait

24 until it is focused?  A little closer, please.

25 Almost there.

2 (Pages 2 - 5)

Page 6

1    Do all parties present agree that the witness
2  is, in fact, Jason Neely?
3    MR. FORD:  Yes.
4    MR. BERTELSON:  I do.
5    COURT REPORTER:  Mr. Neely, will you please
6  raise your right hand?  Do you swear or affirm that
7  the testimony you are about to give will be the
8  truth, the whole truth, and nothing but the truth?
9    THE WITNESS:  Yes, I do.
10   COURT REPORTER:  Thank you.  Mr. Ford.
11         DIRECT EXAMINATION
12 BY MR. FORD:
13   Q.  Good afternoon, Mr. Neely.  My name is Darren
14 Ford.  I'm an attorney for Zillow, Inc., in a lawsuit
15 filed by it in the United States District Court for the
16 Eastern District of Kentucky against various property
17 valuation administrators in Kentucky and the commission
18 for the Department of
19 Revenue.
20    Go ahead and please introduce yourself.
21   A.  Jason Neely.  I'm the Clark County PVA in
22 Winchester, Kentucky.
23   Q.  And, Mr. Neely, what is your current business
24 address?
25   A.  34 South Main Street, Winchester, Kentucky

Page 7

1  40391.
2    Q.  All right.  Mr. Neely, have you been deposed
3  before?
4    A.  I have not.
5    Q.  Just a few ground rules, then.  You're here to
6  answer questions -- excuse me.  Yeah, you're here to
7  answer questions that I ask under oath.
8    You understand the nature and consequences of
9  the oath that you've given today?
10   A.  Yes, sir.
11   Q.  All right.  So the way this is going to work
12 is, I'll ask questions.  You'll give answers.
13   Ms. Johnson here is our court reporter.  She
14 will be taking down what we say.  So it's very important
15 here that we try to make a clear record.
16    And one of the ways that we do that is by
17 giving clear audible answers to questions.  So head
18 nods, head shakes, "uh-huhs," those sort of things, are
19 difficult to transcribe.  So hopefully if you keep that
20 in mind when you're answering my questions, think about
21 giving audible answers, like "yes" and "no," and avoid
22 sort of the natural tendency to answer in other ways,
23 okay?
24   A.  Yes, sir.
25   Q.  The next thing is that it's important that we

Page 8

1  are on the same page with respect to my questions.  So
2  if there's something about my question that you don't
3  understand, a term or it's just a poorly worded
4  question, which will almost certainly happen today, I
5  encourage you to ask me for clarification before you try
6  to answer it.
7    I don't want you to answer any questions that
8  you don't understand, or if I use any sort of
9  terminology that isn't terminology you would use or you
10 don't understand, okay?
11   A.  Okay.
12   Q.  And the final piece of this that's important
13 to remember is that you're not a hostage.  So if you
14 need to take a break at any point in time, that's no
15 problem.  Just let me know that you want to take a
16 break.  The only thing I'll ask is if there's a question
17 pending, that you go ahead and finish answering that
18 question, and then we'll go ahead and take a break,
19 okay?
20   A.  Okay.
21   Q.  One other thing that you may hear throughout
22 this deposition is Mr. Bertelson here, who's your
23 attorney, he may interject in between my question and an
24 answer that you're giving with an objection to my
25 question.

Page 9

1    Unless he specifically asks -- instructs you
2  to not answer my question, you can wait until he's
3  finished with his objection and go ahead and answer.  Of
4  course, if he instructs you not to answer the question,
5  you're free to follow his instruction and consult with
6  him about that, okay?
7    A.  Okay.
8    Q.  Mr. Neely, are you on any medications today
9  that would prevent you from giving full and complete
10 truthful answers to my questions?
11   A.  No, sir.
12   Q.  Any medications or any other incidents that I
13 should know about that affects your ability to recall
14 events from the 2019 period?
15   A.  No, sir.
16   Q.  Okay.  All right.  Mr. Neely, you understand
17 you're here today to testify on behalf of the Office of
18 Property Valuation Administrator for Clark County; is
19 that right?
20   A.  That is correct.
21   Q.  Okay.  And if you could remove Exhibit 1,
22 hopefully you have some paper copies of those exhibits
23 in front of you?
24        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
25   A.  Yes.

3 (Pages 6 - 9)

Page 10

1    Q.   And if you could turn with me to what is going
2  to be -- let's see, actually the last notice, which is
3  going to be the 30th page of this document, but if you
4  start from the back, it's about five pages from the end,
5  and it says, "Notice of Deposition of the Office of
6  Property Valuation Administrator for Clark County."
7         Do you see that?
8    A.   Yes, sir.
9    Q.   All right.  And then if you turn to the next
10 page of that document, there's a list of topics numbered
11 1 through 11.
12        Do you see that?
13   A.   Yes, sir.
14   Q.   All right.  And, Mr. Neely, have you seen this
15 document before?
16   A.   Yes, sir.
17   Q.   All right.  And you understand that the list
18 of topics there, 1 through 11, are the subject matters
19 on which you're here to testify about today, correct?
20   A.   Yes, sir.
21   Q.   And, Mr. Neely, what did you do to prepare to
22 testify on those topics today?  And I just want to make
23 clear, I'm not asking you for any communications that
24 you may have had with your counsel.  I'm looking for any
25 documents that you may have reviewed, any employees that

Page 11

1  you may have spoken to, or other PVAs.  Give me an
2  overview of what you did, generally, to prepare for
3  today.
4    A.   I didn't do much of anything.  I looked over
5  this document and some other documents that counsel had
6  provided me.  And I looked over some past budgets.
7    Q.   Okay.  Now, in terms of the topics that are
8  listed here, are these all topics, then, that you would
9  consider to be within your personal knowledge,
10 obviously, you know, with the additional consulting with
11 old budgets and that sort of thing?
12   A.   Yes, sir.
13   Q.   Okay.  So these are all topics where you feel
14 that you can answer within your personal knowledge of
15 the subject matter of these topics; is that correct?
16   A.   Yes, sir.
17   Q.   Okay.  Mr. Neely, how long have you been
18 property valuation administrator for Clark County?
19   A.   I came to office December 3, 2018.
20   Q.   So a little over two years, then; is that
21 correct?
22   A.   Yes, sir.
23   Q.   And where did you go to high school,
24 Mr. Neely?
25   A.   George Rogers Clark High School here in

Page 12

1  Winchester, Kentucky.
2    Q.   And what year did you graduate?
3    A.   2000.
4    Q.   And did you go to college?
5    A.   I did.  The University of Mississippi.
6    Q.   And what year did you graduate?
7    A.   2007.
8    Q.   And what degree did you receive?
9    A.   Bachelor's in arts.
10   Q.   What was your major?
11   A.   Major in political science.
12   Q.   I'm sorry.  Did you say political science?
13   A.   Yes, sir.
14   Q.   And so you started as Clark County Property
15 Valuation Administrator on December 3, 2018.
16        What were you doing for work immediately prior
17 to your taking over that position?
18   A.   I worked at the Fayette County PVA office for
19 nine years.
20   Q.   And one of the things -- you're doing it, and
21 I'll do it throughout this deposition, but just for
22 purposes of the record here, I'll use the term "PVA" as
23 you've been using.
24        When I use "PVA," you'll understand that means
25 property valuation administrator, right?

Page 13

1    A.   Yes, sir.
2    Q.   Okay.  Another acronym that I may use today is
3  "DOR."  If I use "DOR," I'll be referring to the
4  Department of Revenue, okay?
5    A.   Okay.
6    Q.   And you know what the Department of Revenue
7  is, right?
8    A.   Yes, sir.
9    Q.   Okay.  So you said you worked at Fayette
10 County PVA for nine years prior to becoming Clark County
11 PVA?
12   A.   Correct.
13   Q.   What was your position with the Fayette County
14 PVA?
15   A.   My last position was chief deputy.
16   Q.   Okay.  And how long were you in the chief
17 deputy position with the Fayette County PVA?
18   A.   Four -- four to five years.
19   Q.   And what was your position prior to becoming
20 chief deputy?
21   A.   Residential supervisor.
22   Q.   Okay.  And how long were you a residential
23 supervisor?
24   A.   Roughly three years.
25   Q.   And did you have a position before residential

4 (Pages 10 - 13)

Page 14

1  supervisor with the Fayette PVA?
2      A. I was the farm field representative.
3      Q. Okay. And I assume, based upon those numbers,
4  that was about one or two years in that position?
5      A. It was about a year, year and a half.
6      Q. Okay. And was that your first position with
7  the Fayette County PVA?
8      A. No. My first position was in motor vehicle
9  taxes.
10     Q. Okay. And was that immediately before the
11 farm field rep position?
12     A. Yes, sir.
13     Q. And what year did you start with the Fayette
14 County PVA? Would that have been 2012, roughly?
15     A. September of 2009.
16     Q. I'm sorry. 2009. I'm thinking today.
17         So nine years prior to Clark County, so 2009
18 you said?
19     A. Yes, sir.
20     Q. And prior to Fayette County PVA, where were
21 you working?
22     A. A.P. Suggins Bar and Grill. It's a restaurant
23 in Lexington, Kentucky.
24     Q. So no – was Fayette County PVA your first job
25 in government?

Page 15

1      A. Yes, sir.
2      Q. All right. Mr. Neely, during the course of
3  your time both as the Clark County PVA and working at
4  the Fayette County PVA, have you received training in
5  the Kentucky Open Records Act?
6      A. Yes, sir.
7      Q. Okay. And you're familiar then with what the
8  Kentucky Open Records Act is?
9      A. Roughly, yes, sir.
10     Q. Yeah. What's your layperson's understanding
11 of what the Kentucky Records Act is, Open Records Act
12 is?
13     A. That if, you know, something is requested from
14 this office, that it is something that is -- that I do
15 not have to put together, that is data that I have
16 available, I have to respond back within -- I believe
17 it's three days, three business days, from receiving
18 their request, and -- and then let them know if the data
19 is available or not.
20     Q. Okay. What kind of training have you received
21 -- and let me segregate two time periods. So let me ask
22 first: What kind of training have you received in the
23 Kentucky Open Records Act since you became Clark County
24 PVA in December of '18?
25     A. We take orientation when we first become PVA,

Page 16

1  and that was discussed during that orientation. We also
2  have books that we can refer to.
3      Q. Okay. Have you had any sort of independent
4  classes on the Kentucky Open Records Act where you've,
5  you know, spent a half day just focused on the Kentucky
6  Open Records Act?
7      A. I have not.
8      Q. Prior to becoming Clark County PVA, did you --
9  had you received any training in the Kentucky Open
10 Records Act while you were employed by the Fayette
11 County PVA?
12     A. I believe it came up in some of the Kentucky
13 courses that I've took.
14     Q. And were these courses that were mandated by
15 your employment that you had to take just as training
16 and that sort of thing?
17     A. It's not necessarily mandated. It's offered
18 as incentive.
19     Q. Do you recall taking some courses that covered
20 the Kentucky Open Records Act?
21     A. Yes.
22     Q. All right. Mr. Neely, if you could turn to
23 Exhibit 3 with me.
24         (EXHIBIT 3 MARKED FOR IDENTIFICATION)
25     A. Okay.

Page 17

1      Q. Oh, and one question I wanted to ask: So when
2  you started your term -- are you -- how long are PVA
3  terms in Kentucky? Six years?
4      A. Four years.
5      Q. Four years.
6         Were you elected to the term that you're
7  currently serving?
8      A. Yes, I was.
9      Q. So if you look at Exhibit 3, the first page
10 has a caption, court name, Zillow, Inc., and then it's,
11 again, various defendants. And if you turn to the
12 second page, your name is listed there.
13         Do you see that?
14     A. Yes, sir.
15     Q. And then if you turn to the third page, it has
16 the title, "Complaint for Declaratory & Injunctive
17 Relief."
18         Do you see that?
19     A. Yes, sir.
20     Q. Prior to today, have you seen a copy of this
21 document?
22     A. Yes, I have.
23     Q. Did you review it at any point in time prior
24 to today?
25     A. Yes.

Veritext Legal Solutions
www.veritext.com                                                    888-391-3376

Page 18

1    Q.  Did you review it in preparation for your
2  deposition today?
3    A.  Your -- you broke up a little bit.  I couldn't
4  hear you.  Could you repeat?
5    Q.  Did you review this in preparation for your
6  deposition today?
7    A.  Yes, sir.  I glanced over it, yes, sir.
8    Q.  Okay.  In your general understanding, what is
9  your understanding of the nature of the claims that
10  Zillow has asserted against your office's -- excuse me,
11  against your office in this litigation?
12    A.  That we have violated their First and
13  Fourteenth Amendment.
14    Q.  Do you have an understanding of what Zillow
15  alleges was the nature of that violation?
16    A.  Not really, no.
17    Q.  If you look in the first paragraph, underneath
18  the title there, "Introduction," it has some statutes
19  listed.
20        Do you see that, KRS Section 61.874, 61.8745,
21  and 133.047?  Do you see those?
22    A.  Yes, sir.
23    Q.  Do you recognize those statutes as statutes
24  that pertain to the property valuation administrator in
25  relation to the Kentucky Open Records Act?

Page 19

1    A.  I know they do, but, I mean, I do not -- just
2  reading those numbers does not click in my head that --
3  what that goes to.
4    Q.  So the numbers don't -- the numbers don't
5  necessarily refresh your recollection.
6        Did you review any statutes in preparation for
7  today?  Did you look over any statutes at all?
8    A.  No, sir.
9    Q.  You understand, generally, that the Kentucky
10  Open Records Act uses a term called "commercial
11  purpose"?
12    A.  Yes, sir.
13    Q.  And if you could turn with me to page 10 of
14  the complaint?
15    A.  Okay.
16    Q.  And you see there's a -- says,
17  "Commercial purpose," and then gives a definition, and
18  then subparagraph B says, "'Commercial purpose' shall
19  not include."
20        Do you see that?
21    A.  Yes, sir.
22    Q.  Does this definition of "commercial purpose"
23  look familiar to you?  Have you seen this before?
24    A.  Yes, I have.
25    Q.  And is this a definition that you have

Page 20

1  previously applied or utilized in connection with your
2  role as Clark County PVA?
3    A.  Yes, sir.
4    Q.  All right.  Mr. Neely, there's some numbers up
5  in the top right-hand corner of this document next to
6  the description.  It's called page ID number.
7        Do you see that?
8    A.  Yes, sir.
9    Q.  So for some of these pages, because they're
10  not numbered sequentially, I'm going to refer to that
11  page ID number.  And I'm going to do so in this case and
12  ask you to turn to page ID number 52, if you would.
13    A.  Okay.  Okay.
14    Q.  And you see there's a document with a
15  Zillow Group letterhead dated April 25, 2019, to
16  yourself as property valuation administrator for Clark
17  County?
18    A.  Yes.
19    Q.  And then if you look at the second page of
20  this document, it appears to be from a Susan Noto?
21    A.  Yes.
22    Q.  Do you recall receiving this request back in
23  April of 2019?
24    A.  Yes.
25    Q.  And did you understand this to be a request

Page 21

1  that was made to you pursuant to the Kentucky Open
2  Records Act?
3    A.  Yes.
4    Q.  And did you treat it as such in responding to
5  it?
6    A.  Yes.
7    Q.  Prior to April 25, 2019, had you ever heard of
8  Zillow before?
9    A.  Yes.
10    Q.  And what was your -- what was your prior
11  experience with Zillow?  How did you come across Zillow
12  as a -- as a company?
13    A.  Well, actually started when I was in the
14  Fayette County PVA office, and property owners would
15  call in with their Zestimates.
16    Q.  Okay.
17    A.  And I had no idea what a Zestimate was, so
18  then I got on and looked at Zillow.
19    Q.  So when you were Fayette PVA, property owners
20  would call up and tell you that they had a Zestimate
21  number and, presumably, that was to complain that the
22  assessment that your office had made of their property
23  was too high?
24    A.  Correct.
25    Q.  Okay.  And so first time anyone told you -- or

6 (Pages 18 - 21)

Page 22

1 used the term "Zestimate," you said you had no idea what
2 that was, so you had to go onto Zillow and see what that
3 was?
4 A. Correct.
5 Q. Okay. How long ago -- I think you said you
6 started with the Fayette County PVA in 2009. And I know
7 -- I'm not going to hold you to an exact date, but
8 roughly how many years ago did you first sort of come
9 across Zillow and the Zestimate, you know, that was
10 being used by property owners in Fayette County?
11 A. 2012, roughly.
12 Q. And so would you go online then to
13 Zillow.com and look at the Zestimate of the particular
14 property to see what they were talking about?
15 A. If somebody was trying to use that number, I
16 would.
17 Q. Okay. And what was your purpose in going and
18 visiting Zillow.com's website for purposes of verifying
19 the Zestimate? Did you just -- curiosity or was your --
20 was the office using those to sort of assess whether
21 they may have overvalued the property? What was the
22 purpose in checking the Zestimate, so to speak?
23 A. Curiosity. Really just seeing if the property
24 owner was telling the truth.
25 Q. Any other ways in which, prior to

Page 23

1 April 25, 2019, that you utilized Zillow?
2 A. No.
3 Q. Can you recall, any time while you were at the
4 Fayette PVA, where a property owner had called in with a
5 Zestimate that was lower than your office's assessment
6 and the fact that there was a difference prompted your
7 office to investigate whether its assessment was too
8 high that you can recall?
9 A. I mean, any time a property owner would call
10 in to discuss their value, we would then look at that
11 and talk to them about that.
12 Q. Okay. Have you ever used Zillow, in your
13 personal capacity, to look for property or see what your
14 own home was worth, anything like that?
15 A. My wife has. I have not.
16 Q. And so in your capacity as Clark County PVA,
17 you've never gone on Zillow to kind of see what the real
18 estate market looked like in terms of home for -- homes
19 for sale, that sort of thing?
20 A. No. I have gone on and looked if a house was
21 sold and it's not on LBAR, I have gone on Zillow to see
22 if it was listed on Zillow by the homeowner.
23 Q. Okay. So you've used it on occasion to see
24 whether or not a house was listed for sale?
25 A. Correct.

Page 24

1 Q. And you understand that owners can list their
2 houses for sale on Zillow, and that may be the only
3 place that they may be listed? They may not be on MLS
4 or other services?
5 A. Correct. That -- when it's not on MLS is when
6 I normally look at Zillow. That's not my first place to
7 look.
8 Q. You might look at MLS first. If it's not
9 there, then you might look at Zillow to see if the
10 property owner maybe has only identified that the house
11 is for sale on that website, correct?
12 A. Correct.
13 Q. And you don't pay anything to do that through
14 Zillow, right? You can do that for free?
15 A. Correct.
16 Q. And is that information useful to you, as
17 Clark County PVA, to know whether a house is listed for
18 sale at times?
19 A. If it has sold. I'm not looking if it is
20 listed. I'm looking after it has sold.
21 Q. So is that information that -- a house sold,
22 is that information of use to you as Clark County PVA at
23 times?
24 A. It can be, yes.
25 Q. All right. So when you received -- well,

Page 25

1 let's look, actually, at Exhibit 29, if you would,
2 Mr. Neely.
3 A. Okay.
4 Q. And this document has some numbers down at the
5 bottom there. Well, actually if you look at it in the
6 landscape format, it has some Bates -- some numbers
7 there with a prefix of "DEF."
8 Do you see that?
9 A. Yes.
10 Q. We call that a Bates number in the biz. So if
11 I say, "Bates number," that's what I'm talking about.
12 This Bates number is DEF 000051, and this
13 document goes through sequentially to DEF 000056.
14 Do you see that?
15 A. Yes, sir.
16 Q. And it appears to be a -- well, strike that.
17 Let me ask you this: So at the top of the
18 first page, it's got Jason Neely there.
19 It looks like it was printed out from your
20 Outlook, or whatever, e-mail software you use, right?
21 A. Yes, sir.
22 Q. And do these look like e-mails that you
23 collected and provided to your counsel for production in
24 this litigation?
25 A. Yes, sir.

7 (Pages 22 - 25)

Page 26

1    Q.   And so the first e-mail in this packet here is
2 from Ms. Noto to you dated April 25, 2019, correct?
3    A.   Correct.
4    Q.   And it has the subject line, "Zillow KRS
5 Request dash Clark, Kentucky," right?
6    A.   That's correct.
7    Q.   And then it has a line that indicates that it
8 had an attachment.
9        Do you see that?
10   A.   Yes.
11   Q.   But I don't think -- the attachment was not
12 included in here, but do you recognize that attachment
13 as the letter that we looked at in Exhibit 3 on page ID
14 52 to you dated the same date, April 25?
15   A.   Yes.
16   Q.   She writes, "Dear Mr. Neely, please see
17 attached KRS request for current tax assessment data."
18       If you turn to the next page, there is a
19 response from you dated April 26, 2019.
20       Do you see that?
21   A.   Yes, sir.
22   Q.   And it also indicates an attachment, which is
23 not included in this e-mail, but the attachment is
24 "Request for Reproduction of Public Records for Zillow."
25       Do you see that?

Page 27

1    A.   Yes, sir.
2    Q.   And if you turn back to Exhibit 3 for a
3 moment.
4    A.   Okay.
5    Q.   And go to page ID 37.
6    A.   Okay.
7    Q.   And you see there's a document there?  It
8 says, "Request for Reproduction of PVA Public Records"?
9    A.   Yes, sir.
10   Q.   And you recognize that as a standard
11 department of revenue form, right?
12   A.   Yes, sir.
13   Q.   Is that the form that you use in Clark County
14 for people that want to make a request for reproduction
15 of your records?
16   A.   Yes, I'm pretty sure it is.
17   Q.   Okay.  And I may at a break, I may try to pull
18 the attachment here.  I think I have it somewhere.
19       But you recognize that form as something that
20 your office uses?
21   A.   Correct.
22   Q.   Okay.  And you note in the middle there, it
23 has, the use of this information, commercial,
24 noncommercial.
25       Do you see that?

Page 28

1    A.   Yes, sir.
2    Q.   All right.  So you're sending this form, or
3 something like that, and we'll get a copy of the actual
4 form here to you, but you're sending Ms. Noto this form
5 and then saying the cost for the records is $31,055.50.
6        Do you see that?
7    A.   Yes, sir.
8    Q.   And if you turn with me in Exhibit 3 to page
9 ID 34, which is a few pages before that?
10   A.   Yes, sir.
11   Q.   And there's a document there with the title,
12 "PVA Open Records Commercial Fee Guidelines."
13       Do you see that?
14   A.   Yes.
15   Q.   And over in the left-hand corner, there are
16 some numbers, and one of them is "08 slash 12."
17       Do you see that?
18   A.   Yes.
19   Q.   And do you recognize that as a date indicator
20 of August 2012?
21   A.   Yes.
22   Q.   All right.  Is it your understanding that
23 these are the current commercial fee guidelines being
24 used by your office to -- in regard to commercial
25 purpose requests that are made?

Page 29

1    A.   Yes.
2    Q.   And these are published by the Department of
3 Revenue, correct?
4    A.   Along with the PVA Association.
5    Q.   Okay.  And you follow these guidelines when
6 you determine what a charge should be for reproduction
7 of public records for a commercial purpose requester?
8    A.   Yes, sir.
9    Q.   And the charge that you quoted Ms. Noto in
10 your e-mail to her of April 26 of '19 of $31,055.50,
11 that is based upon the commercial fee guidelines,
12 correct?
13   A.   Yes, sir.
14   Q.   That would not be a charge that you would
15 charge to a noncommercial requester; is that correct?
16   A.   Correct.
17   Q.   So when you sent Ms. Noto this e-mail on
18 April 26, you had determined that her request was made
19 for a commercial purpose within the meaning of the
20 Kentucky Open Records Act, correct?
21   A.   Correct.
22   Q.   What information had you relied upon in making
23 the assessment that Ms. Noto's request on behalf of
24 Zillow was for a commercial purpose?
25   A.   Well, Zillow is a huge company.  People have

8 (Pages 26 - 29)

Page 30

1  to pay to put their houses for sale on their website.
2          Those are the two biggest things that come to
3  mind.
4      Q.  Okay.  If you want, turn back to the letter
5  that Ms. Noto sent with the request, which is on
6  page ID 52.
7      A.  Okay.
8      Q.  And was there any information within this
9  letter that you relied upon in assessing that Zillow's
10  request was for a commercial purpose?
11     A.  They were going to use the information
12  contained in the property records on the website
13  available to its users.
14     Q.  Okay.  And why, in your view, did Zillow's
15  intention to publish the information on its website for
16  its users make this a commercial purpose request?
17     A.  In my opinion, they're essentially making
18  money off the data.
19     Q.  All right.  If you look back, page 10 of the
20  complaint, we looked at the definition of "commercial
21  purpose."
22          Go to page 10 for me for a minute.  Let me
23  know when you're there.
24     A.  Under definitions?
25     Q.  Yeah.  If you look at page 10, the top there,

Page 31

1  "commercial purpose" definition?
2      A.  Okay.
3      Q.  You recognize that as the definition of what a
4  commercial purpose is, right?
5      A.  Hold on.  I'm not on the right page.
6      Q.  Page 10 of the complaint, page ID 10.
7      A.  Yes.
8      Q.  Okay.  You recognize that as the definition of
9  "commercial purpose," right?
10     A.  Yes, sir.
11     Q.  All right.  And what -- so I think you said
12  that you understood that Zillow was going to be making
13  money off of data that it was requesting from your
14  office.
15          Is that a fair summary of your understanding?
16     A.  Yes, sir.
17     Q.  You didn't understand that Zillow intended to
18  sell the data, though, did you?
19     A.  No.
20     Q.  Or solicit based on the information, correct?
21     A.  I -- I did not think that they would be
22  selling the data, no.  Solicit, I -- I don't know.
23     Q.  Okay.  No one -- no reason to believe one way
24  or the other on solicitation, right?
25     A.  Correct.

Page 32

1      Q.  And you had no reason to believe that Zillow
2  intended to rent out the information or use the records
3  for renting, correct?
4      A.  No, I guess not.
5      Q.  Or leasing of a service, correct?
6      A.  Correct.
7      Q.  And then the last part is, "or any use by
8  which the user expects a profit."
9          So in terms of what you were relying upon with
10  this statute, would it be fair to say that it was the --
11  you believe it was the use by which you thought that
12  Zillow would expect a profit, correct?
13     A.  Correct.
14     Q.  And then the last part of the definition is,
15  "either through commission, salary, or fee."
16          You understand what a commission is, right,
17  Mr. Neely?
18     A.  Yes, sir.
19     Q.  Did you have any reason to believe that Zillow
20  would be making a commission off of its use of this data
21  on its website?
22     A.  To be honest, I'm not for sure how Zillow
23  collects money from their use of their website.
24     Q.  Okay.  Well, if you look back at the letter
25  that Ms. Noto sent to you on April 25, 2019.

Page 33

1      A.  Uh-huh.
2      Q.  You -- she states that, "Zillow generates
3  revenue from, among other sources, the sale of
4  advertising space on Zillow.com, where the information
5  contained in these records will appear."
6          Do you see that?
7      A.  Yes.
8      Q.  Okay.  And so did you consider that piece when
9  you determined that Zillow's request was for a
10  commercial purpose?  What I mean is, is -- was that
11  something that you factored in, or were you more relying
12  upon your general knowledge of Zillow's business from
13  familiarity through Zestimates and other, you know,
14  interactions with the website?
15     A.  Yeah, I was -- really didn't.  I mean, I read
16  that, and I saw that.  I did not take that into
17  consideration for them to be noncommercial.
18     Q.  Okay.  And then the second part, going back --
19  sorry to make you bounce around again here, but if you
20  go back to page 10 and the "commercial purpose"
21  definition, the second part of that definition says,
22  "'Commercial purpose' shall not include," and then it
23  says, "Publication or related use of a public record by
24  a newspaper or periodical."
25          Do you see that?

9 (Pages 30 - 33)

Page 34

1    A.  Yes.
2    Q.  In terms of assessing whether Zillow's request
3  was for a commercial purpose, did you consider whether
4  or not its intended use was publication or related use
5  by a newspaper or periodical?
6    A.  I -- I mean, yes, I did not consider Zillow to
7  be a newspaper or a periodical.
8    Q.  What about Zillow, in your view, made them not
9  a newspaper?  We'll take one at a time.
10   A.  They print no news.
11   Q.  So there's lack of a physical actual
12  newspaper?
13   A.  Oh, not even that.  They give no insight
14  behind anything, if that makes sense.
15   Q.  When you say, "insight behind anything," what
16  do you mean by that?
17   A.  So you go on their website, and you're looking
18  at a house.  You get no other insight behind it.  There
19  is no publication.  There's no story.  There's no --
20   Q.  Well, let me ask you this:  I mean, the
21       Zestimate that you're familiar with from your
22  time at the PVA, and let me ask you about this:  Do you
23  get calls from anybody in Clark County nowadays with a
24  Zestimate saying, "Hey, the Zestimate says it's lower
25  than your assessment"?  Do you still get those types of

Page 35

1  calls?
2    A.  No, sir.
3    Q.  Okay.  Going back, then, to your time at the
4  Fayette PVA, Zestimate is something that Zillow creates,
5  correct?
6    A.  As far as I know, yes.
7    Q.  I mean, it's not something that if they
8  request data from your office, you don't create the
9  Zestimate for them, right?
10   A.  I do not create a Zestimate.  I give them an
11  estimate of their property value, an assessment.
12   Q.  Right.  And so the Zestimate is something, at
13  least to your knowledge, is something that Zillow
14  formulates based on information that it obtains from
15  offices like yourself, correct?
16   A.  Correct.
17   Q.  And so you say there's no insight.
18       Would you not consider the Zestimate as being
19  an insight into what a particular piece of property may
20  be worth based upon various pieces of information?
21   A.  Without knowing exactly how they come up with
22  the Zestimate, it's not anything I've ever relied upon
23  or --
24   Q.  Okay.
25   A.  -- to know is very accurate.

Page 36

1    Q.  Okay.  It's relied upon by folks that called
2  you, when you were the Fayette PVA, to suggest that
3  maybe their assessment was too high, right?
4    A.  Yes, but I never took the Zestimate as the
5  value.
6    Q.  Sure.  But the property owners that you talked
7  to, they certainly thought it was at least noteworthy
8  enough to get them to question whether the assessment
9  was correct, right?
10   A.  Correct.
11   Q.  So other than lack of insights or stories on
12  Zillow, anything else that distinguishes Zillow and/or
13  or distinguishes Zillow in your mind from what you think
14  of as a newspaper?
15   A.  I mean, yeah, when I think of a newspaper, I
16  think of the Lexington Herald-Leader, the Winchester
17  Sun.  I don't think of Zillow.
18   Q.  When you say, "the Winchester Sun," is that
19  the Clark County local newspaper?
20   A.  It is.
21   Q.  Okay.  And is that -- how often is that
22  published?
23   A.  Twice a week.
24   Q.  And is it published physical paper copies, I
25  assume?

Page 37

1    A.  Yes.
2    Q.  Do they also have a website?
3    A.  They do.
4    Q.  Have you ever visited their website?
5    A.  From time to time.
6    Q.  Okay.  If the Winchester Sun decided to stop
7  printing a physical newspaper and only publish news on
8  its website, would you consider them to stop being a
9  newspaper within the meaning of this statute?
10   A.  No.
11   Q.  So the fact that Zillow is only an online
12  entity, to your knowledge, that didn't disqualify them
13  from being a newspaper within your understanding of what
14  a newspaper is, correct?
15   A.  Correct.
16   Q.  Does the Winchester Sun contain ads?
17   A.  Yes.
18   Q.  Have you ever had to place a notice in the
19  Winchester Sun, like a legal notice, anything like that?
20   A.  Yes, every year.
21   Q.  And do they charge you for that?
22   A.  Yes.
23   Q.  Do you know if Winchester Sun charges for
24  other advertisements that businesses put in the
25  newspaper?

10 (Pages 34 - 37)

Page 38

1    A.  Yes, I'm pretty sure they do.

2    Q.  Does it contain classifieds?

3    A.  Yes.

4    Q.  And do you know if people have to pay money to

5  put a classified in the Winchester Sun?

6    A.  I'm not a 100 percent for sure, but I believe

7  that they do.

8    Q.  What about the way in which the Winchester Sun

9  generates revenue through ad sales is different, in your

10  understanding, from the way that Zillow generates

11  revenue from advertising sales?

12    A.  I don't know if there is anything different.

13    Q.  All right.  And the same part of that

14  exception definition is periodical, right?  What's your

15  understanding of what a periodical is?

16    A.  A magazine or monthly subscription of some --

17  of some type.

18    Q.  And in terms of why you would not consider

19  Zillow to be a periodical is the fact that Zillow is

20  only online?  Is that something that would disqualify

21  them from being a periodical, in your view?

22    A.  No, sir.

23    Q.  Is it -- and I don't want to make you go

24  through the same explanation we've already given, but is

25  it fair to say, then, that periodicals, in your view,

Page 39

1  have stories that offer insight on news and information

2  in contrast -- in your opinion, does not?  Is that a

3  fair characterization?

4    A.  Yes, sir.

5    Q.  If you received a request from a real estate

6  magazine -- and you're familiar there are magazines out

7  there that are real estate oriented, correct?

8    A.  Yes.

9    Q.  Okay.  If you received a public record request

10  from a real estate magazine, would you consider that to

11  be a request from a periodical?

12    A.  I would probably have to see the request.  I

13  couldn't answer that.

14    Q.  Okay.

15    A.  Without seeing the actual request that they

16  are looking for.

17    Q.  Okay.  So --

18    A.  I can say that -- I can say that no newspaper

19  or periodical has ever requested the entire tax roll

20  with property characteristics.

21    Q.  Well, let's -- that's a good place to probably

22  define what we're talking about here in terms of data.

23       So Zillow's request on April 25, 2019, asks

24  for a lot of information from your office, correct?

25    A.  Correct.

Page 40

1    Q.  And I've heard other PVAs use the term

2  "property tax database" to describe what they were

3  asking for.

4       Is that a term, or is that terminology that

5  you would also use to describe what they were after?

6    A.  Yes, sir.

7    Q.  And that's distinguished from, say, the tax --

8  property tax bills, which is a subset maybe of that

9  information?  It's not the whole database, right?

10    A.  Correct.

11    Q.  So what Zillow was requesting was all of the

12  information that you input into your computer system

13  software about the properties that you go out and

14  collect information about every year.

15       Is that a fair summary?

16    A.  Yes, sir.

17    Q.  And I think you said that you've never

18  received any request from the Winchester Sun or

19  Lexington Herald-Leader or Louisville Courier for your

20  entire property tax roll database, correct?

21    A.  Correct.

22    Q.  If you got a request from the Winchester Sun

23  for your entire property tax roll database and it told

24  you in that request that it intended to publish all of

25  that information in a special edition of the Winchester

Page 41

1  Sun, would that change your assessment of whether or not

2  the request was by a newspaper?

3    A.  Can you repeat that now?

4    Q.  Well, let me clarify what I mean.

5    A.  Okay.

6    Q.  Does the nature of the record being requested

7  or the number of records being requested, does that

8  affect whether or not a request is for a commercial

9  purpose or not?

10    A.  I mean, no.

11    Q.  So if the Winchester Sun said, "We want your

12  entire property tax roll database every year.  We just

13  want to have it.  We plan to publish some of -- some or

14  all of it depending on what we decide editorially we

15  want to," the fact that they were requesting all of it

16  wouldn't change the fact that you were getting a request

17  from a newspaper from how you understand that term; is

18  that fair?

19    A.  Correct.

20    Q.  And if the Winchester Sun were to publish your

21  property tax roll database on its website as information

22  for the residents of Clark County, how would that be

23  different, in your view, than Zillow.com doing it?  What

24  would be the difference between the Winchester Sun doing

25  that and Zillow.com doing that?

11 (Pages 38 - 41)

Page 42

1      MR. BERTELSON:  Objection.  Calls for
2  speculation, but he can answer if he has an opinion,
3  I suppose.
4      You can answer the question.
5      A.  The Winchester Sun is not in the business of
6  real estate, selling houses, getting realtors to sign up
7  with them.
8  BY MR. FORD:
9      Q.  Any other differences that you see?
10     A.  Those are the main ones that stick out.
11     Q.  Do you think it's useful for the residents of
12 Clark County to know what's happening in the real estate
13 market in Clark County?
14     A.  Yes.
15     Q.  Do you think that that sort of information
16 helps people decide what they should price their home at
17 or, you know, whether it's a good time to put a house on
18 the market, those sorts of things?
19     A.  I -- I can't speculate what the people of
20 Clark County look at or what they --
21     Q.  Okay.  Well, do you -- do you have a website
22 for your office, Mr. Neely?
23     A.  I do.
24     Q.  Do you publish any information there?
25     A.  Yes, under subscription login.

Page 43

1      Q.  Okay.  What kind of information do you make
2  available through your website?
3      A.  The -- the data that's kept in the office for
4  each property.
5      Q.  All right.  So is your website then somewhere
6  where I could go and find the same type of information
7  that Zillow was requesting for individual properties if
8  I had a -- if I subscribed to your service?
9      A.  There is no Zestimate on there, no.
10     Q.  That's fair.  I -- that was a bad question.
11     So I guess what I'm asking is:  If Zillow made
12 a request for your property tax roll database, right?
13 And within that database, it has information about
14 individual parcels, right?
15     A.  Correct.
16     Q.  And so, obviously, I could go into Zillow, and
17 if they had -- if they had your records, they might
18 include, you know, last sale date or some property
19 characteristics in that information for that -- for a
20 particular parcel.
21     Is that the same type of information, you
22 know, last sale date, you know, number of bedrooms,
23 number of bathrooms, is that the same type of
24 information that if I had a subscription to your
25 service, that I could go on, look up a parcel, and get

Page 44

1  that same information?
2      A.  Yes, sir.
3      Q.  And is your entire database available through
4  that subscription?  I mean, is it all the properties
5  that you collect information on?
6      A.  Yes, sir.
7      Q.  And what do you charge for that subscription?
8      A.  It's a different level of -- it depends on how
9  many I'll call them hits.  So for $10, you get 5 hits.
10 And I don't have that in front of me, but there's a
11 range up to, I think, 600 hits for $1,200.  I can't
12 remember off the top of my head.  But there's -- there's
13 a range where you can get 5 hits, 20 hits, 100 hits, 300
14 hits.  So there's a range for -- depending on what type
15 of user is looking for it.
16     Q.  And by "hits," you mean if I want to look up a
17 particular parcel, right?  So if I put in the address,
18 that's a hit, and I get back that parcel information?
19     A.  Correct.
20     Q.  Do you have an unlimited option for your
21 subscription, where you can do as many hits as you want
22 on an annual basis?
23     A.  No, sir.
24     Q.  So I think you said your best guess was, and I
25 won't hold you to it, but your best guess was around 600

Page 45

1  hits per year was approximately $1,200?
2      A.  I believe so.
3      Q.  Is that $1,200 annual, or is that monthly?
4      A.  The -- the subscription is set up for a
5  one-year and expires after one year from date of
6  purchase.
7      Q.  Okay.  So roughly, then, 1,200 bucks to get
8  600 hits over the course of 12 months, right, roughly?
9      A.  Correct, yes, sir.
10     Q.  And is there any information available through
11 your subscription that it would not -- well, strike
12 that.  Let me re-ask that.
13     If you go back to Ms. Noto's request on page
14 ID 52 in Exhibit 3.  Let me know when you're there.
15     A.  Okay.
16     Q.  And you see she's got a bullet point list
17 there in the first page of the information she's looking
18 for?
19     A.  Yes.
20     Q.  Is there any bullet point on here that is
21 information that wouldn't be available through your
22 subscription service?
23     A.  No.
24     Q.  And is there any restriction on somebody who
25 pays for your subscription service on them printing that

12 (Pages 42 - 45)

Page 46

1 information or sort of copying it for their own
2 purposes? Do you put a restriction and say, "Hey, you
3 can't copy this information," anything like that?
4    A. No.
5    Q. How many parcels do you -- do you know how
6 many parcels you have in Clark County?
7    A. 17,251.
8    Q. That's very precise. All right. 17,000 --
9 you said 251?
10    A. Yes, sir.
11    Q. Okay. And I imagine you deal with that number
12 frequently. So that's probably why it was top of mind.
13       I assume that only changes if you have, you
14 know, splits and that kind of thing, right? So it
15 probably doesn't change --
16    A. Well, it's combinations. It changes a little
17 bit. New subdivisions come up. So I think it is up
18 this year over that, but I believe that was the number
19 when Ms. Noto contacted me.
20    Q. Okay. So really there would be no way through
21 your subscription service to get the parcel information
22 for every parcel in Clark County, right?
23    A. Correct.
24    Q. Let's talk a little about your -- well,
25 actually strike that. Let's go back to your back and

Page 47

1 forth with Ms. Noto in --
2    A. Okay.
3    Q. -- Exhibit 29.
4       (EXHIBIT 29 MARKED FOR IDENTIFICATION)
5 If you turn to the page that's -- has the Bates number
6 down there, DEF 000055.
7    A. Okay.
8    Q. The second page of that, or the next page,
9 DEF 56, is the beginning of that e-mail string, and that
10 starts with her letter to you with the request and then
11 the previous e-mail that we looked at. And then she's
12 got a response to you on May 1 of 2019, and she asks you
13 if you determined whether Zillow's intended use is for a
14 commercial purpose.
15       And then you respond, "Your intended use is
16 considered a commercial purpose pursuant to
17 KRS 61.870(4)(a)," and then you say, "The fee is based
18 on the PVA's Open Records Commercial Fee Guidelines."
19       Do you see that?
20    A. Yes.
21    Q. We've already discussed at length your
22 assessment of why you deemed Zillow's request to be for
23 a commercial purpose. Looking at that e-mail, is there
24 anything that you haven't mentioned to me so far that
25 you would add in terms of factors that you considered in

Page 48

1 making your assessment on May 2, 2019?
2    A. No, sir.
3    Q. All right. Mr. Neely, if you could -- let's
4 see, turn with me to Exhibit 27.
5       (EXHIBIT 27 MARKED FOR IDENTIFICATION)
6    A. Okay.
7    Q. All right. Mr. Neely, this document marked as
8 Exhibit 27 has a Bates number in the bottom right-hand
9 corner of DEF 000001.
10       Do you see that?
11    A. Yes, sir.
12    Q. And this one goes all the way through 49.
13       Do you see that?
14    A. Yes, sir.
15    Q. All right. And I believe, correct me if I'm
16 wrong, but I believe these are all records that you
17 maintain with your office; is that correct?
18    A. Yes, sir.
19    Q. Okay. And these are records relating to other
20 public records requests that you've gotten for property
21 tax roll database information?
22    A. Yes, sir.
23    Q. And these are records that you maintain in
24 your office during regular course of your duties as the
25 Clark County PVA, correct?

Page 49

1    A. Yes, sir.
2    Q. Now, the first page of this document looks
3 like it's from a Hazen -- or has an e-mail on there from
4 a Hazen Buckley at First American.
5       Do you see that?
6    A. Yes.
7    Q. And First American Data Company asks you for
8 your tax roll data; is that right?
9    A. Correct.
10    Q. Is that a request that you get on an annual
11 basis from First American, or is that sort of random or
12 you can't predict --
13    A. That was the first time I was ever -- they
14 ever contacted me.
15    Q. Okay. And I know you've only been at Clark
16 County PVA really starting in December of '19, right?
17 I'm sorry, January of '19?
18    A. '19.
19    Q. So really '19 and '20.
20       You have two years' worth of fielding public
21 records requests for Clark County; is that fair?
22    A. Yes, sir.
23    Q. All right. So First American, you don't --
24 did they make a request -- this request was in '19. Did
25 they make a request in '20; do you recall?

13 (Pages 46 - 49)

Page 50

1    A.  They did not.
2    Q.  Okay.  And then there's another -- and if you
3  look at GEF -- I'm sorry, DEF 4?
4    A.  Okay.
5    Q.  And there's a request in there from looks like
6  a Geenex Solar.
7        Do you see that?
8    A.  Yes.
9    Q.  Okay.  Is that a request that you get
10  annually, or that's just sort of a one-off there?
11    A.  As far as I know, that was a one-off.
12    Q.  Okay.  So that request was -- looks like it
13  was in October of '18?
14    A.  Correct.
15    Q.  Slightly before you got there.  So probably
16  your predecessor would have handled that one, not you.
17    A.  That's correct.
18    Q.  All right.  And is that Ms. Bushart?  Was she
19  your predecessor?
20    A.  Yes, sir.
21    Q.  All right.  And then the next one here, looks
22  like DEF 6, is a CoreLogic request to Ms. Bushart.
23        Do you see that?
24    A.  Yes.
25    Q.  Have you gotten requests from CoreLogic since

Page 51

1  you've started as PVA of Clark County?
2    A.  Yes.
3    Q.  Is that a request that you've gotten over the
4  last couple of years, '19 and '20, for your property tax
5  roll database?
6    A.  Yes, sir.
7    Q.  Okay.  And then if you turn to -- I'm going to
8  skip some of these that are Ms. Bushart.
9        There's a request from Kentucky American Water
10  on DEF 15?
11    A.  Yes.
12    Q.  And from a Brent O'Neill, right?
13    A.  Correct.
14    Q.  Is that something that was a one-off?  Did you
15  get another one from them in '20 or --
16    A.  That was a one-off.
17    Q.  Okay.  So of the requests that you get on a
18  regular basis, and when I say "regular," I mean at least
19  annually.  I see CoreLogic, you said is one that you can
20  sort of predict is going to come in at some point during
21  the year.  And then there's another request later on in
22  October of '19, from Black Knight Real Estate Data
23  Solutions, on DEF 22.
24        Do you see that?
25    A.  Yes, sir.

Page 52

1    Q.  Is Black Knight another requester where you
2  get sort of annual requests from them, or is it --
3    A.  Yes, sir.
4    Q.  -- more sporadic?
5        Yes, you do get annual requests?
6    A.  Correct, yes, sir.
7    Q.  Okay.  All right.  So we've got CoreLogic,
8  Black Knight.  I saw there was a Wells Fargo asking for
9  property tax bills.
10        Is that something you get annually as well
11  from Wells Fargo?
12    A.  I did not in '20.
13    Q.  Okay.
14    A.  And I don't think I did in '19 either.
15    Q.  Okay.  So that's more sporadic, then? That's
16  not like a CoreLogic or a Black Knight in terms of sort
17  of every year?
18    A.  Correct.
19    Q.  If you could turn with me to Exhibit 28?
20        (EXHIBIT 28 MARKED FOR IDENTIFICATION)
21    A.  Okay.
22    Q.  And my understanding of this document -- and
23  you're very fortune, Mr. Neely, because I know a lot
24  more now than I did last week.  So I pretty much know
25  what this document is.

Page 53

1        This is a document that the Department of
2  Revenue creates based upon some information that you
3  provide to it for estimated budget and receipts, but
4  also includes some numbers that the DOR throws in there
5  itself, and then it spits this document out and this is
6  your budget for the fiscal year, right?
7    A.  Correct.
8    Q.  All right.  My understanding is your fiscal
9  year runs from July 1 through June 30, right?
10    A.  Yes, sir.
11    Q.  And so in Exhibit 28, which has the Bates
12  number DEF 000050, this budget is for the fiscal year we
13  are currently in, correct?
14    A.  Correct.
15    Q.  And budget has two basic categories.  One is
16  money going out, which is the anticipated expenses, and
17  money coming in, which is anticipated receipts, right?
18    A.  Yes, sir.
19    Q.  And by state law, that budget needs to balance
20  at zero, right?  So has to be -- your estimate, at
21  least, has to be same amount of money going out as
22  coming in, right?
23    A.  Correct.
24    Q.  All right.  Let's talk a little bit about your
25  process for fulfilling a request for your property tax

14 (Pages 50 - 53)

Page 54

1 roll database.
2      That's something that you have done before in
3 response to CoreLogic or Black Knight requests; is that
4 fair to say?
5   A.  Yes, sir.
6   Q.  And so here's what I want to -- I want to
7 know:  First step in that process is you -- your office
8 goes out and collects all of the information about
9 property in Clark County and inputs that into your
10 database, right?
11   A.  That's an everyday thing.
12   Q.  Right.  And so you do it on a -- you do it on
13 an every -- every day you're putting new property
14 information in there?  It's not, like, all at once,
15 right?
16   A.  Correct.
17   Q.  And is it fair to say, Mr. Neely, that you
18 perform that function of going out and collecting
19 information about properties in Clark County, pursuant
20 to Kentucky law and that it's not done pursuant to any
21 desire to fulfill public records requests, right?
22   A.  Correct.
23   Q.  So if you never got a public records request,
24 you would still go out and do all of that collection,
25 right?

Page 55

1   A.  Yes, sir.
2   Q.  And at some point in time during the year you
3 complete your -- what you call an assessment, basically?
4   A.  Yes, sir.
5   Q.  So all of the properties have been done for
6 that year, and all of the information has been inputted,
7 and then you would consider at that point in time, after
8 validation, checking things, that that would be your
9 database for that year, right?
10   A.  Yes, sir.
11   Q.  Okay.  And so if you get a request for your
12 property tax roll database for, let's say, 2019, then
13 you -- if it's for a commercial purpose, you would ask
14 the requester to pay whatever the fee was.  And then
15 they would make that payment, sign the contract, if that
16 was required, and then now we're at the point where the
17 requester has fulfilled whatever requirements you have
18 asked them to satisfy, and we're at the point now where
19 you want to get the records to the requester.
20      What's the first step in that process to get
21 the records to the requester?
22   A.  I have to go to the database and pull the data
23 that they have requested.  So what tax year that we're
24 talking about, get into an Excel spreadsheet, and then I
25 e-mail it to them.

Page 56

1   Q.  Okay.  Do you maintain your database in an MDB
2 file?  I know some other PVAs use that.  Is that the
3 format in which you maintain your database; do you know?
4   A.  No.
5   Q.  Okay.  But you convert the information, you
6 said, to an Excel file to provide to a CoreLogic or
7 Black Knight; is that correct?
8   A.  Yes, sir.
9   Q.  All right.  So first step in that process,
10 then, is it fair to say, you go to a desktop in your
11 office and access the database, and software gives you
12 the ability to hit convert, or something like that, and
13 it'll convert the data to an Excel; is that accurate?
14   A.  Yes, sir.
15   Q.  And the desktop computer that you use for
16 that, that's not a desktop that's dedicated just to
17 fulfilling public records requests, right?
18   A.  It's my work computer.
19   Q.  Okay.  Who in your office does that
20 conversion?  Is it you, or do you have another employee
21 that does that?
22   A.  Myself.  I do it.
23   Q.  How many employees does your office have?
24   A.  Five and myself.  Six.
25   Q.  Okay.  Are any of those employees tasked to

Page 57

1 fulfilling public records requests from a CoreLogic or a
2 Black Knight?  Like is that their only job, or at least
3 sort of an expected percentage of their job performance
4 or job responsibilities, is fulfilling public records
5 requests?
6   A.  No, sir.  I -- I deal with all of that.
7   Q.  All right.  So the only person in your office
8 who responds to public records requests is yourself; is
9 that accurate?
10   A.  Yes, sir.
11   Q.  And you receive a salary; is that correct?
12   A.  Correct.
13   Q.  And you don't receive any sort of overtime,
14 correct?
15   A.  Correct.
16   Q.  So in terms of that process that we started
17 describing, you go on to your desktop, you convert the
18 appropriate database file for whatever year is being
19 requested to an Excel file, and then, presumably, you
20 can potentially e-mail that to a requester or upload
21 that to an FTP site if that's what they want, correct?
22   A.  Yes, sir.
23   Q.  Or you could put it on a thumb drive or
24 something like that, correct?
25   A.  Yes, sir.

15 (Pages 54 - 57)

Page 58

1   Q.  How long does it take to convert the database
2 to an Excel file?  In terms of computer time, how long
3 does that usually take?
4   A.  A minute, two minutes.
5   Q.  Okay.  And then similar amount of time to copy
6 it to a thumb drive or put it into an FTP site, roughly?
7   A.  Yes, sir.  I have to do some organizing in the
8 Excel spreadsheet.
9   Q.  Okay.  What kind of organizing do you need to
10 do in the Excel spreadsheet?
11   A.  They -- like a CoreLogic likes to have it in
12 the same order they received it from the year before.
13      And I got a new tax roll system when I got in
14 the office, so the columns were in different orders, so
15 I have to go in and move columns around so it's in the
16 same order for them.
17   Q.  Okay.  Approximately how long does it take you
18 for a CoreLogic to do that?
19   A.  Five to ten minutes.
20   Q.  With respect to Zillow's request, the one that
21 you got in April 25, 2019, was there anything that
22 required you to do the same thing for Zillow in terms of
23 moving columns around or doing anything like that?
24   A.  No, probably not.
25   Q.  And then -- so assuming, you know, you have to

Page 59

1 do some reorganizing of columns in the Excel
2 spreadsheet, that kind of thing, is the next step, then,
3 to transmit it however the requester has asked in terms
4 of whether they want it to be an e-mail or FTP site or
5 thumb drive?
6   A.  Yes, sir.
7   Q.  And then that's the last step in the process,
8 right?
9   A.  Yes, sir.
10   Q.  Nothing else after that that you need to do to
11 fulfill the request.
12      Once the records are gone, you've done your
13 part, right?
14   A.  Correct.
15   Q.  Let's turn back to Exhibit 28 again, which is
16 your budget.
17   A.  Okay.
18   Q.  So the process that I just described -- I'm
19 sorry.  I didn't describe it.  The process that we just
20 discussed in which you go and convert the data and then,
21 you know, either move some columns around for a request
22 or to satisfy their parameters and then send it to them,
23 is there a line item under "anticipated expenses" where
24 you have budgeted a certain amount of money for your
25 office to be able to satisfy those types of requests?

Page 60

1   A.  No, there's not a line item that says "tax
2 roll sales expenses," or anything like that, no, sir.
3   Q.  Okay.  What about under "anticipated
4 receipts"?  Is there a line item where you have budgeted
5 an expected amount of revenue coming in the door from
6 selling your records to public records requesters?
7   A.  The only thing we have is miscellaneous
8 income, which is what a tax roll sale or any data sold
9 would be filed under.
10   Q.  Okay.  And this number that you have in this
11 budget is $30,020.
12      Do you see that?
13   A.  Yes, sir.
14   Q.  And is this number similar to previous year
15 budgets?  I mean, does that number fluctuate a lot, or
16 is it pretty consistent year to year?
17   A.  I looked at my predecessor's previous, and
18 that's kind of what I carried over with.
19   Q.  Yeah.  So there's nothing in your mind with
20 this 30,000 number that stands out to you that says,
21 "Wow, that was a lot less than usual," or "a lot more
22 than usual"?  It's in line with what it typically is in
23 a given year?
24   A.  Yes, sir.
25   Q.  Okay.  And you said that this is where you

Page 61

1 would include any anticipated fee income from selling
2 your records to public records requesters, right?
3   A.  Correct.
4   Q.  And does this also include fees that you
5 receive from your subscription service?
6   A.  Yes, sir.
7   Q.  Okay.  Do you know how much of this $30,000
8 number is anticipated income from your subscription
9 service versus income from public records requesters?
10   A.  No.  I -- I believe last year I got roughly
11 nine to $10,000 from tax roll sales.
12   Q.  Okay.
13   A.  So the -- the remainder would be roughly from
14 the website.
15   Q.  Yeah.
16   A.  Normally in a year, copies that we sell, paper
17 copies, people come in, realtors come in, will get a
18 property record or -- that will go in there as well.
19   Q.  Okay.
20   A.  But with COVID, nobody really came in the
21 office, so --
22   Q.  So is this number lower than for this fiscal
23 year than prior years because of not having the in-
24 person sales?
25   A.  No, I wouldn't say so.

16 (Pages 58 - 61)

Page 62

1   Q.  Okay.  If you were to lose the anticipated
2 income from sales of your data to a CoreLogic or Black
3 Knight, is there any function of your office that you
4 would not -- no longer perform without that revenue
5 coming in that you could think of?
6   A.  That would be hard to state because myself,
7 just like every other PVA office, needs every dollar
8 that they can generate.  We're underfunded, and have
9 been underfunded, for roughly 20 years now.
10   Q.  Okay.  But you would still collect all of the
11 data that you collect if you weren't getting money from
12 public records sales, correct?
13   A.  To the best of our ability.
14   Q.  Okay.  Turn with me, if you would, to
15 Exhibit 6.  Let me know when you got that in front of
16 you.
17       (EXHIBIT 6 MARKED FOR IDENTIFICATION)
18   A.  Okay.
19   Q.  All right.  And Exhibit 6 has as its title,
20 "Defendants' Responses to Plaintiff's First Set of
21 Interrogatories."
22       Do you see that?
23   A.  Yes, sir.
24   Q.  Have you seen this document before, Mr. Neely?
25   A.  Yes, sir.

Page 63

1   Q.  And you understand there's some responses in
2 here that you gave?  They're not all yours, but there
3 are some responses in here that you gave to our
4 questions?
5   A.  Yes, sir.
6   Q.  And did you review those responses before you
7 authorized this to be sent?
8   A.  Yes, sir.
9   Q.  Okay.  If you could turn with me to page 26 of
10 this document, which is Interrogatory number 13.
11   A.  Okay.
12   Q.  And you see the question at the top there,
13 "State what governmental interests you contend the
14 Commercial Purpose Fee Statutes (as that term is defined
15 in the Complaint) advance, and how the law advances each
16 interest identified."
17       And then you are letter C in the response
18 below.  It says, "Response of Jason Neely, PVA, Clark
19 County."  It says, "My response is the same as
20 Mr. Robertson's response at 13.A above."
21       Do you see that?
22   A.  Yes, sir.
23   Q.  All right.  I want you to take a moment and
24 read Mr. Robertson's response, because you probably
25 haven't looked at it in a while, and then I'm just going

Page 64

1 to ask you a question about it, okay?
2       Just let me know when you finish reading it.
3   A.  Okay.
4   Q.  All right.  So my question to you, Mr.
5       Neely, is:  Are there any governmental
6 interests that you, as
7 PVA for Clark County, contend that the commercial
8 purpose fee statutes, as that term is defined in the
9 complaint, advance that are not identified in
10 Mr. Robertson's response?
11   A.  Can you repeat that?  You broke up.
12   Q.  Oh, sorry about that.  Okay.  I'll try this
13 again.
14       Are there any governmental interests that you,
15 Jason Neely, as PVA for Clark County, contend that the
16 commercial purpose fee statutes advance that are not
17 identified in Mr. Robertson's response?
18   A.  No.
19       MR. BERTELSON:  Hey, Darren, I don't want to
20 interfere with your flow, but I was going to ask if
21 you got a whole lot more, maybe we could take a
22 quick bathroom break.
23       MR. FORD:  You know, I'll probably go ahead and
24 take a break now anyway just to sort of organize my
25 thoughts.  So why don't we take -- why don't we just

Page 65

1 go to 3:10.
2       Does that work for you?
3       MR. BERTELSON:  Sure.
4       THE WITNESS:  Okay.
5       (OFF THE RECORD)
6 BY MR. FORD:
7   Q.  Mr. Neely, we're back from a short break.
8       You understand you're still under oath?
9   A.  Yes, sir.
10   Q.  You understand the last edition of the
11 commercial fee guidelines for the PVA were made official
12 in 2012; is that -- do you understand that?
13   A.  Yes, sir.
14   Q.  And at that time, you were working at the
15 Fayette PVA, correct?
16   A.  Correct.
17   Q.  Did you have any involvement in helping to
18 decide what those fees should be on those guidelines?
19   A.  I -- I did not.
20   Q.  Last thing that I just want to ask you quickly
21 about is Exhibit 30.
22       (EXHIBIT 30 MARKED FOR IDENTIFICATION)
23   A.  Okay.
24   Q.  And this document has the Bates number
25 DEF 000369.

17 (Pages 62 - 65)

Page 66

1 Do you see that at the bottom there?
2 A. Yes, sir.
3 Q. And it goes all the way through DEF 000386?
4 A. Yes, sir.
5 Q. And it has the title, "2019 Assessment
6 Administration Manual, Office of the PVA."
7 Do you see that?
8 A. Yes, sir.
9 Q. Is this a document that you have in your
10 office somewhere that you use in the course of
11 performing your duties as PVA of Clark County?
12 A. Yes, sir.
13 Q. And so this is information that the
14 government, DOR, publishes that you rely upon in
15 performing your duties, or who puts this out?
16 A. Yes, I believe the Department of Revenue.
17 Q. Okay. What's your understanding of the
18 relationship between your office and the Department of
19 Revenue?
20 A. In my interpretation, is that they basically
21 oversee and make sure that I'm doing my job correctly.
22 Q. And you get auditors sometimes from DOR that
23 come in and look in -- look into your records and make
24 sure everything looks okay?
25 A. I believe so. I have not been audited since

Page 67

1 I've been in office.
2 Q. Okay. That's not an annual thing, then?
3 That's something that happens -- is it a every
4 four years sort of thing, or how often do you --
5 A. I do not know.
6 Q. And my understanding is that you submit your
7 proposed -- some of your proposed budget numbers to DOR
8 every year, and they have to approve that before you can
9 start operating on that budget; is that correct?
10 A. Yes, sir.
11 Q. And then I also understand that every four
12 years, you have to submit an assessment plan to DOR and
13 says, "Here's how we're going to assess properties this
14 year," and they have to approve that as well?
15 A. Correct, yes, sir.
16 Q. Are there any other sorts of activities that
17 your office performs that the DOR has to approve?
18 A. New hires. We have to go through the state's
19 HR department for hiring, firing, promotions within.
20 Q. So employment personnel issues are handled
21 through -- at the DOR state level?
22 A. Correct.
23 Q. So you can't fire someone without getting DOR
24 approval; is that correct?
25 A. No. I can fire somebody. I just have to

Page 68

1 notify the -- I have to notify DOR that -- when somebody
2 has been fired or let go.
3 Q. But you have to -- to hire somebody, do you
4 have to -- do they have to approve -- sign off on a new
5 hire?
6 A. They have to make sure that it's in my budget,
7 that I have a spot available, and that they meet the
8 requirements for that position.
9 Q. Okay. And the DOR puts out the commercial fee
10 guidelines, correct?
11 A. Along with the PVA association.
12 Q. If the DOR changed those fee guidelines, would
13 you view yourself as being able to not utilize those and
14 utilize your own fee schedule?
15 A. What do you mean by "change" them?
16 Q. Well, if they were to change the amounts, if
17 it -- if they decided to lower the amounts in the fee
18 schedule to, you know, whatever they decided was
19 appropriate, would you feel that you had discretion to
20 depart from those fee guidelines and charge a different
21 amount?
22 A. No. I think the PVA Association would
23 probably be involved, and it would be something that
24 everyone would maybe not agree on, but the majority
25 would conclude --

Page 69

1 MR. BERTELSON: Objection.
2 Q. Is the PVA Association, is that a governmental
3 entity, or is that more of a sort of association of
4 government officials?
5 A. Association of the PVAs statewide.
6 Q. It has no -- it has no governmental authority;
7 is that correct?
8 A. Correct.
9 Q. The PVA Association would have no ability to
10 tell the DOR, "Hey, we don't like your fee schedule,"
11 and override that to your knowledge, correct?
12 A. As far as I know, that -- correct.
13 Q. How often -- do you have annual meetings or
14 quarterly meetings of the PVA Association?
15 A. We do have annual. Sometimes we have more
16 than just -- I guess we -- we have to have two every
17 year, summer conference and fall conference. And
18 there's been times where we've had --
19 MR. FORD: Oh.
20 COURT REPORTER: Yeah, I don't see him either,
21 Mr. Ford, so we'll just wait a second. Hopefully, he'll
22 kick back.
23 MR. FORD: One reason I do not love Zoom.
24 COURT REPORTER: Wow, this is taking a long
25 time. And we lost them both. Okay.

18 (Pages 66 - 69)

Page 70

1      THE WITNESS:  Wi-Fi went down.  Sorry, guys.
2      MR. FORD:  No worries.
3      (OFF THE RECORD)
4  BY MR. FORD:
5      Q.  All right.  Mr. Neely, we're back on the
6  record after a short technical glitch there.
7      You understand you're still under oath, right?
8      A.  Yes, sir.
9      Q.  And I was asking you about annual meetings or
10  how often your -- the PVA Association met, and you had
11  said that you had two annual meetings, but then you went
12  on to say something before you were cut off.
13     So I'll give you an opportunity to finish what
14  you were -- what you were saying there.
15     A.  We had more, but it's not, I guess, an annual-
16  type thing.  Like if there's something going on that we
17  need to discuss, then a meeting will be called.
18     And most of the time, we meet in Frankfort.
19  Or if there's something going on, we'll try to meet at a
20  certain conference.  But the two annuals that we always
21  do have is summer conference and fall conference.
22     Q.  Okay.  Do you -- did you have two meetings
23  this last year, 2020; do you recall?
24     A.  On Zoom.
25     Q.  Do you recall discussing this lawsuit at all

Page 71

1  during those meetings?
2      A.  Not at great length.  I think it was brought
3  up that the lawsuit was still ongoing, but I don't -- it
4  was not a --
5      Q.  No --
6      A.  -- talking point.
7      Q.  No substantive discussions, then, about the
8  lawsuit during your last year of meetings with the PVA
9  Association?
10     A.  No, sir.
11     Q.  All right.  Mr. Neely, I think I'm going to
12  wrap up with you.  I always give witnesses an
13  opportunity to correct or amend the testimony that
14  they've given during the course of the deposition.
15     Is there any testimony that you've given here
16  this afternoon that you would like to amend or correct
17  before I pass you to Mr. Bertelson?
18     A.  No, sir.
19     Q.  All right.  Well, I'll go ahead and pass you
20  to Mr. Bertelson and reserve my right to recross after
21  he's done with his questions.
22     MR. BERTELSON:  I have zero follow-up.
23     MR. FORD:  Okay.  There you go.  All right.
24  Mr. Neely, you're done.
25     Mr. Bertelson has taken advantage of reading

Page 72

1  and signing.
2      I assume same here, Rick?
3      MR. BERTELSON:  Yes, please, we'd like to read
4  and sign.
5      MR. FORD:  Thank you for your time this
6  afternoon and have a good rest of your day.
7      (DEPOSITION CONCLUDED AT 3:21 P.M.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 73

1          CERTIFICATE OF REPORTER
2      COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10  typewritten form under my direction, and constitutes a
11  true record of the transcript as taken, all to the best
12  of my skill and ability. I certify that I am not a
13  relative or employee of either counsel and that I am in
14  no way interested financially, directly or indirectly,
15  in this action.
16
17
18
19
20
21
22  LINDSEY JOHNSON,
23  COURT REPORTER/NOTARY
24  MY COMMISSION EXPIRES:05/24/2023
25  SUBMITTED ON: 03/26/2021

19 (Pages 70 - 73)

Page 74

1        Veritext Legal Solutions
           1100 Superior Ave
2           Suite 1820
          Cleveland, Ohio 44114
3        Phone: 216-523-1313

4  March 26, 2021

5

6  To: MR. BERTELSON

   Case Name: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.

7  Veritext Reference Number: 4458304

8

   Witness: Jason Neely    Deposition Date:  3/9/2021

9

10  Dear Sir/Madam:

11  Enclosed please find a deposition transcript.  Please have the witness

12  review the transcript and note any changes or corrections on the

13  included errata sheet, indicating the page, line number, change, and

14  the reason for the change.  Have the witness' signature notarized and

15  forward the completed page(s) back to us at the Production address

16  shown

17  above, or email to production-midwest@veritext.com.

18

19  If the errata is not returned within thirty days of your receipt of

    this letter, the reading and signing will be deemed waived.

20

21  Sincerely,

22  Production Department

23

24

25  NO NOTARY REQUIRED IN CA

---

Page 75

1       DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2

3   ASSIGNMENT REFERENCE NO: 4458304
   CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
   DATE OF DEPOSITION: 3/9/2021
4   WITNESS' NAME: Jason Neely
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
   as transcribed by the court reporter.
8

   _____
9  Date       Jason Neely
10    Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
    They have read the transcript;
13   They signed the foregoing Sworn
     Statement; and
14   Their execution of this Statement is of
     their free act and deed.
15
    I have affixed my name and official seal
16  this _____ day of_____, 20_____.
17
18   _____
     Notary Public
19
    Commission Expiration Date
20
21
22
23
24
25

---

Page 76

1      DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2

3   ASSIGNMENT REFERENCE NO: 4458304
   CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
   DATE OF DEPOSITION: 3/9/2021
4   WITNESS' NAME: Jason Neely
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
     I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
   that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
   Date       Jason Neely
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
   the referenced witness did personally appear
16  and acknowledge that:
17    They have read the transcript;
    They have listed all of their corrections
18    in the appended Errata Sheet;
    They signed the foregoing Sworn
19    Statement; and
    Their execution of this Statement is of
20    their free act and deed.
21  I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23   _____
     Notary Public
24
   _____
25    Commission Expiration Date

---

Page 77

1      ERRATA SHEET
   VERITEXT LEGAL SOLUTIONS MIDWEST
2    ASSIGNMENT NO: 4458304
3  PAGE/LINE(S) /     CHANGE    /REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____

   _____   _____
20  Date       Jason Neely
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23   _____
     Notary Public
24
   _____
25   Commission Expiration Date

20 (Pages 74 - 77)

**[& - administration]**                                                                                              Page 1

| **&** |
| --- |
| **&**   2:5 17:16 |

| **0** |
| --- |
| **000001**   48:9 |
| **000050**   53:12 |
| **000051**   25:12 |
| **000055**   47:6 |
| **000056**   25:13 |
| **000369**   65:25 |
| **000386**   66:3 |
| **00049**   1:5 |
| **03/26/2021**   73:25 |
| **05/24/2023**   73:24 |
| **08**   28:16 |

| **1** |
| --- |
| **1**   3:9 9:21,24 10:11,18 47:12 53:9 |
| **1,200**   44:11 45:1,3 45:7 |
| **10**   19:13 30:19,22 30:25 31:6,6 33:20 44:9 |
| **10,000**   61:11 |
| **100**   38:6 44:13 |
| **101**   4:5 |
| **11**   10:11,18 |
| **1100**   74:1 |
| **12**   28:16 45:8 |
| **13**   63:10 |
| **13.a**   63:20 |
| **133.047**   18:21 |
| **15**   51:10 |
| **16**   3:10 |
| **17,000**   46:8 |
| **17,251**   46:7 |
| **18**   15:24 50:13 |
| **1820**   74:2 |
| **19**   29:10 49:16,17 49:18,19,24 51:4 |

| 51:22 52:14 |
| --- |
| **1:32**   4:8 |

| **2** |
| --- |
| **2**   48:1 |
| **20**   44:13 49:19,25 51:4,15 52:12 62:9 75:16 76:22 77:22 |
| **2000**   12:3 |
| **2007**   12:7 |
| **2009**   14:15,16,17 22:6 |
| **2012**   14:14 22:11 28:20 65:12 |
| **2018**   11:19 12:15 |
| **2019**   9:14 20:15,23 21:7 23:1 26:2,19 32:25 39:23 47:12 48:1 55:12 58:21 66:5 |
| **2020**   70:23 |
| **2021**   1:24 4:8 74:4 |
| **216-523-1313**   74:3 |
| **22**   51:23 |
| **2400**   2:6 |
| **25**   3:14 20:15 21:7 23:1 26:2,14 32:25 39:23 58:21 |
| **251**   46:9 |
| **26**   26:19 29:10,18 63:9 74:4 |
| **27**   3:12 48:4,5,8 |
| **28**   3:13 52:19,20 53:11 59:15 |
| **29**   3:14 25:1 47:3 47:4 |

| **3** |
| --- |
| **3**   3:10 11:19 12:15 16:23,24 17:9 26:13 27:2 28:8 |

| 45:14 |
| --- |
| **3/9/2021**   74:8 75:3 76:3 |
| **30**   3:15 4:3,8,11 53:9 65:21,22 |
| **30,000**   60:20 61:7 |
| **30,020**   60:11 |
| **300**   2:7 44:13 |
| **30th**   10:3 |
| **31,055.50**   29:10 |
| **31,055.50.**   28:5 |
| **34**   6:25 28:9 |
| **37**   27:5 |
| **3:10**   65:1 |
| **3:19**   1:5 |
| **3:21**   72:7 |

| **4** |
| --- |
| **4**   47:17 50:3 |
| **40202**   4:6 |
| **40391**   7:1 |
| **40602**   2:18 |
| **41017**   2:8 |
| **423**   2:17 |
| **44114**   74:2 |
| **4458304**   74:7 75:2 76:2 77:2 |
| **48**   3:12 |
| **49**   48:12 |

| **5** |
| --- |
| **5**   3:3 44:9,13 |
| **502**   2:19 |
| **52**   3:13 20:12 26:14 30:6 45:14 |
| **56**   47:9 |
| **564-9572**   2:19 |
| **578-7263**   2:9 |

| **6** |
| --- |
| **6**   3:4,11 4:3,8 50:22 62:15,17,19 |

| **600**   44:11,25 45:8 |
| --- |
| **61.870**   47:17 |
| **61.874**   18:20 |
| **61.8745**   18:20 |
| **62**   3:11 |
| **65**   3:15 |

| **7** |
| --- |
| **730**   4:4 |

| **8** |
| --- |
| **859**   2:9 |

| **9** |
| --- |
| **9**   1:24 3:9 |
| **9th**   4:7 |

| **a** |
| --- |
| **a.p.**   14:22 |
| **ability**   9:13 56:12 62:13 69:9 73:12 |
| **able**   59:25 68:13 |
| **access**   56:11 |
| **accurate**   35:25 56:13 57:9 |
| **acknowledge** 75:11 76:16 |
| **acronym**   13:2 |
| **act**   15:5,8,11,11,23 16:4,6,10,20 18:25 19:10 21:2 29:20 75:14 76:20 |
| **action**   1:5 73:15 |
| **activities**   67:16 |
| **actual**   28:3 34:11 39:15 |
| **ad**   38:9 |
| **add**   47:25 |
| **additional**   11:10 |
| **address**   6:24 44:17 74:15 |
| **administration** 3:15 66:6 |

**administrator**
9:18 10:6 11:18
12:15,25 18:24
20:16
**administrators**
6:17
**ads** 37:16
**advance** 63:15
64:9,16
**advances** 63:15
**advantage** 71:25
**advertisements**
37:24
**advertising** 33:4
38:11
**affect** 41:8
**affirm** 6:6
**affixed** 75:15
76:21
**afternoon** 6:13
71:16 72:6
**ago** 22:5,8
**agree** 6:1 68:24
**agreed** 4:14
**ahead** 6:20 8:17
8:18 9:3 64:23
71:19
**al** 1:15 74:6 75:3
76:3
**alleges** 18:15
**amend** 71:13,16
**amendment** 18:13
**american** 49:4,7
49:11,23 51:9
**amount** 53:21
58:5 59:24 60:5
68:21
**amounts** 68:16,17
**annual** 44:22 45:3
49:10 52:2,5 67:2
69:13,15 70:9,11

70:15
**annually** 50:10
51:19 52:10
**annuals** 70:20
**answer** 7:6,7,22
8:6,7,24 9:2,3,4
11:14 39:13 42:2
42:4
**answering** 7:20
8:17
**answers** 3:11 7:12
7:17,21 9:10
**anticipated** 53:16
53:17 59:23 60:3
61:1,8 62:1
**anybody** 34:23
**anyway** 64:24
**appear** 33:5 75:11
76:15
**appearance** 5:5
**appearances** 2:1
**appeared** 2:11,22
**appearing** 5:13,18
**appears** 20:20
25:16
**appended** 76:11
76:18
**applied** 20:1
**appropriate** 57:18
68:19
**approval** 67:24
**approve** 67:8,14
67:17 68:4
**approximately**
45:1 58:17
**april** 20:15,23
21:7 23:1 26:2,14
26:19 29:10,18
32:25 39:23 58:21
**arts** 12:9

**asked** 55:18 59:3
**asking** 10:23 40:3
43:11 52:8 70:9
**asks** 9:1 39:23
47:12 49:7
**asserted** 18:10
**assess** 22:20 67:13
**assessing** 30:9
34:2
**assessment** 3:15
21:22 23:5,7
26:17 29:23 34:25
35:11 36:3,8 41:1
47:22 48:1 55:3
66:5 67:12
**assignment** 75:2
76:2 77:2
**association** 29:4
68:11,22 69:2,3,5
69:9,14 70:10
71:9
**assume** 14:3 36:25
46:13 72:2
**assuming** 58:25
**attached** 26:17
76:7
**attachment** 26:8
26:11,12,22,23
27:18
**attended** 4:7
**attending** 5:5,6,8
**attorney** 5:11,17
6:14 8:23
**audible** 7:17,21
**audited** 66:25
**auditors** 66:22
**august** 28:20
**authority** 69:6
**authorize** 76:11
**authorized** 63:7

**available** 15:16,19
30:13 43:2 44:3
45:10,21 68:7
**ave** 74:1
**avoid** 7:21

**b**

**b** 1:13 2:13 4:3,8
19:18 74:6 75:3
76:3
**bachelor's** 12:9
**back** 10:4 15:16
20:22 27:2 30:4
30:19 32:24 33:18
33:20 35:3 44:18
45:13 46:25,25
59:15 65:7 69:22
70:5 74:15
**bad** 43:10
**balance** 53:19
**bar** 14:22
**based** 14:3 29:11
31:20 35:14,20
47:17 53:2
**basic** 53:15
**basically** 55:3
66:20
**basis** 44:22 49:11
51:18
**bates** 25:6,10,11
25:12 47:5 48:8
53:11 65:24
**bathroom** 64:22
**bathrooms** 43:23
**becoming** 13:10
13:19 16:8
**bedrooms** 43:22
**beginning** 47:9
**behalf** 2:3,13 9:17
29:23
**believe** 15:16
16:12 31:23 32:1

32:11,19 38:6
45:2 46:18 48:15
48:16 61:10 66:16
66:25
**bertelson** 2:14
5:10,10 6:4 8:22
42:1 64:19 65:3
69:1 71:17,20,22
71:25 72:3 74:5
**best** 44:24,25
62:13 73:11
**biggest** 30:2
**bills** 40:8 52:9
**bit** 18:3 46:17
53:24
**biz** 25:10
**black** 51:22 52:1,8
52:16 54:3 56:7
57:2 62:2
**books** 16:2
**bottom** 25:5 48:8
66:1
**bounce** 33:19
**box** 2:17
**break** 8:14,16,18
27:17 64:22,24
65:7
**brent** 51:12
**broke** 18:3 64:11
**brought** 71:2
**buckley** 49:4
**bucks** 45:7
**budget** 3:13 53:3,6
53:12,15,19 59:16
60:11 67:7,9 68:6
**budgeted** 59:24
60:4
**budgets** 11:6,11
60:15
**bullet** 45:16,20

**bushart** 50:18,22
51:8
**business** 6:23
15:17 33:12 42:5
**businesses** 37:24

**c**

**c** 63:17
**ca** 74:25
**call** 21:15,20 23:9
25:10 44:9 55:3
**called** 19:10 20:6
23:4 36:1 70:17
**calls** 34:23 35:1
42:1
**camera** 5:23
**capacity** 1:13
23:13,16
**caption** 17:10
**carried** 60:18
**case** 20:11 74:6
75:3 76:3
**categories** 53:15
**center** 2:6
**central** 1:3
**certain** 59:24
70:20
**certainly** 8:4 36:7
**certificate** 73:1
76:11
**certification** 75:1
76:1
**certify** 73:4,12
**chamber** 2:6
**change** 41:1,16
46:15 68:15,16
74:13,14 76:8
77:3
**changed** 68:12
**changes** 46:13,16
74:12 75:7 76:7,9

**characteristics**
39:20 43:19
**characterization**
39:3
**charge** 29:6,9,14
29:15 37:21 44:7
68:20
**charges** 37:23
**checking** 22:22
55:8
**chief** 13:15,16,20
**civil** 1:5 4:9 75:5
76:5
**claims** 18:9
**clarification** 8:5
**clarify** 41:4
**clark** 5:14 6:21
9:18 10:6 11:18
11:25 12:14 13:10
14:17 15:3,23
16:8 20:2,16
23:16 24:17,22
26:5 27:13 34:23
36:19 41:22 42:12
42:13,20 46:6,22
48:25 49:15,21
51:1 54:9,19
63:18 64:7,15
66:11
**classes** 16:4
**classified** 38:5
**classifieds** 38:2
**clear** 7:15,17
10:23
**cleveland** 74:2
**click** 19:2
**closer** 5:24
**collect** 40:14 44:5
62:10,11
**collected** 25:23

**collecting** 54:18
**collection** 54:24
**collects** 32:23 54:8
**college** 12:4
**columns** 58:14,15
58:23 59:1,21
**combinations**
46:16
**come** 21:11 22:8
30:2 35:21 46:17
51:20 61:17,17
66:23
**coming** 53:17,22
60:5 62:5
**commercial** 19:10
19:17,18,22 27:23
28:12,23,24 29:7
29:11,19,24 30:10
30:16,20 31:1,4,9
33:10,20,22 34:3
41:8 47:14,16,18
47:23 55:13 63:14
64:7,16 65:11
68:9
**commission** 6:17
32:15,16,20 73:24
75:19 76:25 77:25
**commissioner**
1:14
**commonwealth**
73:2
**communications**
10:23
**company** 21:12
29:25 49:7
**complain** 21:21
**complaint** 3:10
17:16 19:14 30:20
31:6 63:15 64:9
**complete** 9:9 55:3

completed  4:17
74:15
computer  40:12
56:15,18 58:2
conclude  68:25
concluded  72:7
conference  69:17
69:17 70:20,21,21
connection  20:1
consequences  7:8
consider  11:9 33:8
34:3,6 35:18 37:8
38:18 39:10 55:7
consideration
33:17
considered  47:16
47:25
consistent  60:16
constitutes  73:10
consult  9:5
consulting  11:10
contacted  46:19
49:14
contain  37:16 38:2
contained  30:12
33:5
contend  63:13
64:7,15
contract  55:15
contrast  39:2
conversion  56:20
convert  56:5,12,13
57:17 58:1 59:20
copies  9:22 36:24
61:16,17
copy  17:20 28:3
46:3 58:5
copying  46:1
corelogic  50:22,25
51:19 52:7,16
54:3 56:6 57:1

58:11,18 62:2
corner  20:5 28:15
48:9
correct  9:20 10:19
11:15,21 13:12
21:24 22:4 23:25
24:5,11,12,15 26:2
26:3,6 27:21 29:3
29:12,15,16,20,21
31:20,25 32:3,5,6
32:12,13 35:5,15
35:16 36:9,10
37:14,15 39:7,24
39:25 40:10,20,21
41:19 43:15 44:19
45:9 46:23 48:15
48:17,25 49:9
50:14,17 51:13
52:6,18 53:7,13,14
53:23 54:16,22
56:7 57:11,12,14
57:15,21,24 59:14
61:3 62:12 65:15
65:16 67:9,15,22
67:24 68:10 69:7
69:8,11,12 71:13
71:16
corrections  74:12
76:17
correctly  66:21
cost  28:5
counsel  5:12 10:24
11:5 25:23 73:13
county  5:14 6:21
9:18 10:6 11:18
12:14,18 13:10,10
13:13,17 14:7,14
14:17,20,24 15:3,4
15:23 16:8,11
20:2,17 21:14
22:6,10 23:16

24:17,22 27:13
34:23 36:19 41:22
42:12,13,20 46:6
46:22 48:25 49:16
49:21 51:1 54:9
54:19 63:19 64:7
64:15 66:11 75:10
76:15
couple  51:4
courier  40:19
course  9:4 15:2
45:8 48:24 66:10
71:14
courses  16:13,14
16:19
court  1:1 4:4,15
5:3,19,22 6:5,10
6:15 7:13 17:10
69:20,24 73:23
75:7
covered  16:19
covid  61:20
create  35:8,10
creates  35:4 53:2
curiosity  22:19,23
current  6:23 26:17
28:23
currently  17:7
53:13
cut  70:12
cv  1:5

**d**

darren  2:4 5:7
6:13 64:19
dash  26:5
data  15:15,18
26:17 30:18 31:13
31:18,22 32:20
35:8 39:22 43:3
49:7,8 51:22
55:22 56:13 59:20

60:8 62:2,11
database  40:2,9,20
40:23 41:12,21
43:12,13 44:3
48:21 51:5 54:1
54:10 55:9,12,22
56:1,3,11 57:18
58:1
date  1:24 22:7
26:14 28:19 43:18
43:22 45:5 73:5
74:8 75:3,9,19
76:3,13,25 77:20
77:25
dated  20:15 26:2
26:14,19
day  4:7 16:5 54:13
72:6 75:16 76:22
77:22
days  15:17,17
74:18
deal  46:11 57:6
dear  26:16 74:10
december  11:19
12:15 15:24 49:16
decide  41:14 42:16
65:18
decided  37:6
68:17,18
declaratory  17:16
dedicated  56:16
deed  75:14 76:20
deemed  47:22
74:19
def  25:7,12,13
47:6,9 48:9 50:3
50:22 51:10,23
53:12 65:25 66:3
defendants  1:16
2:13 5:13,17
17:11 62:20

[define - explanation]

**define** 39:22
**defined** 63:14 64:8
**definition** 19:17
  19:22,25 30:20
  31:1,3,8 32:14
  33:21,21 38:14
**definitions** 30:24
**degree** 12:8
**depart** 68:20
**department** 1:14
  5:11 6:18 13:4,6
  27:11 29:2 53:1
  66:16,18 67:19
  74:22
**depending** 41:14
  44:14
**depends** 44:8
**deponent** 1:23
**deposed** 7:2
**deposition** 3:9 4:3
  4:8 8:22 10:5
  12:21 18:2,6
  71:14 72:7 74:8
  74:11 75:1,3 76:1
  76:3
**deputy** 13:15,17
  13:20
**describe** 40:2,5
  59:19
**described** 59:18
**describing** 57:17
**description** 20:6
**desire** 54:21
**desktop** 56:10,15
  56:16 57:17
**determine** 29:6
**determined** 29:18
  33:9 47:13
**dford** 2:10
**difference** 23:6
  41:24

**differences** 42:9
**different** 38:9,12
  41:23 44:8 58:14
  68:20
**difficult** 7:19
**direct** 3:4 6:11
**direction** 73:10
**directly** 73:14
**discretion** 68:19
**discuss** 23:10
  70:17
**discussed** 16:1
  47:21 59:20
**discussing** 70:25
**discussions** 71:7
**disqualify** 37:12
  38:20
**distinguished** 40:7
**distinguishes**
  36:12,13
**district** 1:1,2 6:15
  6:16
**division** 1:3
**document** 10:3,10
  10:15 11:5 17:21
  20:5,14,20 25:4,13
  27:7 28:11 48:7
  49:2 52:22,25
  53:1,5 62:24
  63:10 65:24 66:9
**documents** 10:25
  11:5
**doing** 12:16,20
  41:23,24,25 58:23
  66:21
**dollar** 62:7
**door** 60:5
**dor** 13:3,3 53:4
  66:14,22 67:7,12
  67:17,21,23 68:1,9
  68:12 69:10

**drive** 2:6 57:23
  58:6 59:5
**driver's** 5:23
**duly** 73:7
**duties** 48:24 66:11
  66:15

**e**

**e** 2:10,20 3:14
  25:20,22 26:1,23
  29:10,17 47:9,11
  47:23 49:3 55:25
  57:20 59:4
**eastern** 1:2 6:16
**edition** 40:25
  65:10
**editorially** 41:14
**either** 32:15 52:14
  59:21 69:20 73:13
**elected** 17:6
**email** 74:17
**employed** 16:10
**employee** 56:20
  73:13
**employees** 10:25
  56:23,25
**employment** 16:15
  67:20
**enclosed** 74:11
**encourage** 8:5
**entered** 76:9
**entire** 39:19 40:20
  40:23 41:12 44:3
  75:5 76:5
**entity** 37:12 69:3
**errata** 74:13,18
  76:7,10,18 77:1
**esquire** 2:4,14,15
**essentially** 30:17
**estate** 23:18 39:5,7
  39:10 42:6,12
  51:22

**estimate** 35:11
  53:20
**estimated** 53:3
**et** 1:14 74:6 75:3
  76:3
**events** 9:14
**everyday** 54:11
**exact** 22:7
**exactly** 35:21
**examination** 3:4
  6:11
**excel** 55:24 56:6
  56:13 57:19 58:2
  58:8,10 59:1
**exception** 38:14
**excuse** 7:6 18:10
**executed** 76:10
**execution** 75:14
  76:19
**exhibit** 3:8 9:21,24
  16:23,24 17:9
  25:1 26:13 27:2
  28:8 45:14 47:3,4
  48:4,5,8 52:19,20
  53:11 59:15 62:15
  62:17,19 65:21,22
**exhibits** 3:7,17
  9:22
**expect** 32:12
**expected** 57:3 60:5
**expects** 32:8
**expenses** 53:16
  59:23 60:2
**experience** 21:11
**expiration** 75:19
  76:25 77:25
**expires** 45:5 73:24
**explanation** 38:24

**f**

**f**  1:6
**fact**  6:2 23:6 37:11
  38:19 41:15,16
**factored**  33:11
**factors**  47:25
**fair**  31:15 32:10
  38:25 39:3 40:15
  41:18 43:10 49:21
  54:4,17 56:10
**fall**  69:17 70:21
**familiar**  15:7
  19:23 34:21 39:6
**familiarity**  33:13
**far**  35:6 47:24
  50:11 69:12
**fargo**  52:8,11
**farm**  14:2,11
**fayette**  12:18 13:9
  13:13,17 14:1,7,13
  14:20,24 15:4
  16:10 21:14,19
  22:6,10 23:4 35:4
  36:2 65:15
**federal**  4:9
**fee**  28:12,23 29:11
  32:15 47:17,18
  55:14 61:1 63:14
  64:8,16 65:11
  68:9,12,14,17,20
  69:10
**feel**  11:13 68:19
**fees**  61:4 65:18
**fi**  70:1
**field**  14:2,11
**fielding**  49:20
**file**  56:2,6 57:18
  57:19 58:2
**filed**  6:15 60:9
**final**  8:12

**financially**  73:14
**find**  43:6 74:11
**finish**  8:17 64:2
  70:13
**finished**  9:3
**fire**  67:23,25
**fired**  68:2
**firing**  67:19
**first**  14:6,8,24
  15:22,25 17:9
  18:12,17 21:25
  22:8 24:6,8 25:18
  26:1 45:17 49:2,4
  49:7,11,13,23 54:7
  55:20 56:9 62:20
  73:7
**fiscal**  53:6,8,12
  61:22
**five**  10:4 13:18
  56:24 58:19
**flow**  64:20
**fluctuate**  60:15
**focused**  5:24 16:5
**folks**  36:1
**follow**  9:5 29:5
  71:22
**ford**  2:4 3:4 5:7,7
  6:3,10,12,14 42:8
  64:23 65:6 69:19
  69:21,23 70:2,4
  71:23 72:5
**foregoing**  73:4
  75:13 76:18
**form**  27:11,13,19
  28:2,4,4 73:10
**format**  25:6 56:3
**formulates**  35:14
**fort**  5:8
**forth**  47:1
**fortune**  52:23

**forward**  74:15
**four**  13:18,18 17:4
  17:5 67:4,11
**fourteenth**  18:13
**frankfort**  1:4 2:18
  70:18
**frcp**  4:10
**free**  9:5 24:14
  75:14 76:20
**frequently**  46:12
**front**  9:23 44:10
  62:15
**ft**  2:8
**ftp**  57:21 58:6 59:4
**fulfill**  54:21 59:11
**fulfilled**  55:17
**fulfilling**  53:25
  56:17 57:1,4
**full**  5:20 9:9
**function**  54:18
  62:3

**g**

**geenex**  50:6
**gef**  50:3
**general**  18:8 33:12
**generally**  11:2
  19:9
**generate**  62:8
**generates**  33:2
  38:9,10
**george**  11:25
**getting**  41:16 42:6
  62:11 67:23
**gfvt**  1:5
**give**  6:7 7:12 11:1
  34:13 35:10 70:13
  71:12
**given**  7:9 38:24
  60:23 71:14,15
**gives**  19:17 56:11

**giving**  7:17,21
  8:24 9:9
**glanced**  18:7
**glitch**  70:6
**go**  6:20 8:17,18
  9:3 11:23 12:4
  22:2,12 27:5
  30:22 33:20 34:17
  38:23 40:13 43:6
  43:16,25 45:13
  46:25 54:24 55:22
  56:10 57:17 58:15
  59:20 61:18 64:23
  65:1 67:18 68:2
  71:19,23
**goes**  19:3 25:13
  48:12 54:8 66:3
**going**  7:11 10:1,3
  20:10,11 22:7,17
  30:11 31:12 33:18
  35:3 51:7,20
  53:16,21 54:18
  63:25 64:20 67:13
  70:16,19 71:11
**good**  6:13 39:21
  42:17 72:6
**gotten**  48:20 50:25
  51:3
**government**  14:25
  66:14 69:4
**governmental**
  63:13 64:5,14
  69:2,6
**graduate**  12:2,6
**graydon**  2:5
**graydon.com**  2:10
**great**  71:2
**gregory**  1:6
**grill**  14:22
**ground**  7:5

**group**   20:15
**guess**   32:4 43:11
  44:24,25 69:16
  70:15
**guidelines**   28:12
  28:23 29:5,11
  47:18 65:11,18
  68:10,12,20
**guys**   70:1

**h**

**half**   14:5 16:5
**hand**   6:6 20:5
  28:15 48:8
**handled**   50:16
  67:20
**happen**   8:4
**happening**   42:12
**happens**   67:3
**hard**   62:6
**hazen**   49:3,4
**he'll**   69:21
**head**   2:5 7:17,18
  19:2 44:12
**hear**   8:21 18:4
**heard**   21:7 40:1
**helping**   65:17
**helps**   42:16
**herald**   36:16
  40:19
**hereof**   73:6
**hey**   34:24 46:2
  64:19 69:10
**high**   11:23,25
  21:23 23:8 36:3
**hire**   68:3,5
**hires**   67:18
**hiring**   67:19
**hit**   44:18 56:12
**hits**   44:9,9,11,13
  44:13,13,14,16,21
  45:1,8

**hold**   5:23 22:7
  31:5 44:25
**home**   23:14,18
  42:16
**homeowner**   23:22
**homes**   23:18
**hon**   1:13 2:13 74:6
  75:3 76:3
**honest**   32:22
**hopefully**   7:19
  9:22 69:21
**hostage**   8:13
**house**   23:20,24
  24:10,17,21 34:18
  42:17
**houses**   24:2 30:1
  42:6
**hr**   67:19
**huge**   29:25
**huh**   33:1
**huhs**   7:18

**i**

**idea**   21:17 22:1
**identification**   9:24
  16:24 47:4 48:5
  52:20 62:17 65:22
**identified**   24:10
  63:16 64:9,17
**iii**   2:14
**imagine**   46:11
**immediately**   12:16
  14:10
**important**   7:14,25
  8:12
**incentive**   16:18
**incidents**   9:12
**include**   19:19
  33:22 43:18 61:1
  61:4
**included**   26:12,23
  74:13

**includes**   53:4
**income**   60:8 61:1
  61:8,9 62:2
**incorporated**
  76:12
**independent**   16:3
**index**   3:1
**indicates**   26:7,22
**indicating**   74:13
**indicator**   28:19
**indirectly**   73:14
**individual**   43:7,14
**information**   24:16
  24:21,22 27:23
  29:22 30:8,11,15
  31:20 32:2 33:4
  35:14,20 39:1,24
  40:9,12,14,25
  41:21 42:15,24
  43:1,6,13,19,21,24
  44:1,5,18 45:10,17
  45:21 46:1,3,21
  48:21 53:2 54:8
  54:14,19 55:6
  56:5 66:13
**injunctive**   17:16
**input**   40:12
**inputs**   54:9
**inputted**   55:6
**insight**   34:13,15
  34:18 35:17,19
  39:1
**insights**   36:11
**instruction**   9:5
**instructs**   9:1,4
**intended**   31:17
  32:2 34:4 40:24
  47:13,15
**intention**   30:15
**interactions**   33:14

**interest**   63:16
**interested**   73:14
**interests**   63:13
  64:6,14
**interfere**   64:20
**interject**   8:23
**interpretation**
  66:20
**interrogatories**
  3:11 62:21
**interrogatory**
  63:10
**introduce**   6:20
**introduction**
  18:18
**investigate**   23:7
**involved**   68:23
**involvement**   65:17
**issues**   67:20
**it'll**   56:13
**item**   59:23 60:1,4

**j**

**january**   49:17
**jason**   1:23 4:3
  5:21 6:2,21 25:18
  63:18 64:15 74:8
  75:4,9 76:4,13
  77:20
**job**   14:24 57:2,3,4
  66:21
**johnson**   1:25 4:14
  7:13 73:22
**judge**   1:6
**july**   53:9
**june**   53:9

**k**

**keep**   7:19
**kentuckiana**   4:4
**kentucky**   1:2,14
  2:8,18 4:5,15 5:9

5:11,15,18 6:16,17
6:22,25 12:1
14:23 15:5,8,11,23
16:4,5,9,12,20
17:3 18:25 19:9
21:1 26:5 29:20
51:9 54:20 73:2
**kept** 43:3
**kick** 69:22
**kind** 15:20,22
23:17 43:1 46:14
58:9 59:2 60:18
**knight** 51:22 52:1
52:8,16 54:3 56:7
57:2 62:3
**know** 8:15 9:13
11:10 13:6 15:13
15:18 16:5 19:1
22:6,9 24:17
30:23 31:22 33:13
35:6,25 37:23
38:4,12 42:12,17
43:18,22,22 45:14
46:5,14 49:15
50:11 52:23,24
54:7 56:2,3 58:25
59:21 61:7 62:15
64:2,23 67:5
68:18 69:12
**knowing** 35:21
**knowledge** 11:9
11:14 33:12 35:13
37:12 69:11
**krs** 18:20 26:4,17
47:17
**ky.gov** 2:20,21

**l**

**lack** 34:11 36:11
**landscape** 25:6
**large** 73:2

**law** 53:19 54:20
63:15
**lawsuit** 6:14 70:25
71:3,8
**layperson's** 15:10
**lbar** 23:21
**leader** 36:16 40:19
**leasing** 32:5
**left** 28:15
**legal** 2:16 5:12
37:19 74:1 77:1
**length** 47:21 71:2
**letter** 26:13 30:4,9
32:24 47:10 63:17
74:19
**letterhead** 20:15
**level** 44:8 67:21
**lexington** 5:18
14:23 36:16 40:19
**license** 5:23
**likes** 58:11
**lindsey** 1:25 4:14
73:22
**line** 26:4,7 59:23
60:1,4,22 74:13
76:7 77:3
**list** 10:10,17 24:1
45:16
**listed** 11:8 17:12
18:19 23:22,24
24:3,17,20 76:7,17
**listing** 76:7
**litigation** 18:11
25:24
**little** 5:24 11:20
18:3 46:16,24
53:24
**llp** 2:5
**local** 36:19
**located** 4:4

**location** 5:5
**login** 42:25
**long** 11:17 13:16
13:22 17:2 22:5
58:1,2,17 69:24
**longer** 62:4
**look** 17:9 18:17
19:7,23 20:19
22:13 23:10,13
24:6,7,8,9 25:1,5
25:22 30:19,25
32:24 42:20 43:25
44:16 50:3 66:23
66:23
**looked** 11:4,6
21:18 23:18,20
26:13 30:20 47:11
60:17 63:25
**looking** 10:24
24:19,20 34:17
39:16 44:15 45:17
47:23
**looks** 25:19 49:2
50:5,12,21 66:24
**lose** 62:1
**lost** 69:25
**lot** 39:24 52:23
60:15,21,21 64:21
**louisville** 4:5
40:19
**love** 69:23
**lower** 23:5 34:24
61:22 68:17

**m**

**madam** 74:10
**magazine** 38:16
39:6,10
**magazines** 39:6
**mail** 2:10,20 3:14
25:20 26:1,23
29:10,17 47:9,11

47:23 49:3 55:25
57:20 59:4
**mails** 25:22
**main** 4:5 6:25
42:10
**maintain** 48:17,23
56:1,3
**major** 12:10,11
**majority** 68:24
**making** 29:22
30:17 31:12 32:20
48:1
**mandated** 16:14
16:17
**manual** 3:15 66:6
**march** 1:24 4:7
74:4
**marked** 3:17 9:24
16:24 47:4 48:5,7
52:20 62:17 65:22
**market** 23:18
42:13,18
**matter** 4:10 5:13
11:15 73:9
**matters** 10:18
**mdb** 56:1
**mean** 19:1 23:9
33:10,15 34:6,16
34:20 35:7 36:15
41:4,10 44:4,16
51:18 60:15 68:15
**meaning** 29:19
37:9
**means** 12:24
**medications** 9:8
9:12
**meet** 68:7 70:18
70:19
**meeting** 70:17
**meetings** 69:13,14
70:9,11,22 71:1,8

**[mentioned - okay]**

mentioned 47:24
met 70:10
middle 27:22
midwest 74:17
 77:1
miller 1:13 2:13
 74:6 75:3 76:3
mind 7:20 30:3
 36:13 46:12 60:19
minute 30:22 58:4
minutes 58:4,19
miscellaneous
 60:7
mississippi 12:5
mitchell 2:8 5:8
mls 24:3,5,8
moment 27:3
 63:23
money 30:18
 31:13 32:23 38:4
 53:16,17,21 59:24
 62:11
monthly 38:16
 45:3
months 45:8
motor 14:8
move 58:15 59:21
moving 58:23

**n**

n 1:25 4:14
name 5:16,20 6:13
 17:10,12 74:6
 75:3,4,15 76:3,4
 76:21
natural 7:22
nature 7:8 18:9,15
 41:6
necessarily 16:17
 19:5
need 8:14 58:9
 59:10 70:17

needs 53:19 62:7
neely 1:23 4:3
 5:19,21,22 6:2,5
 6:13,21,23 7:2 9:8
 9:16 10:14,21
 11:17,24 15:2
 16:22 20:4 25:2
 25:18 26:16 32:17
 42:22 48:3,7
 52:23 54:17 62:24
 63:18 64:5,15
 65:7 70:5 71:11
 71:24 74:8 75:4,9
 76:4,13 77:20
never 23:17 36:4
 40:17 54:23
new 46:17 54:13
 58:13 67:18 68:4
news 34:10 37:7
 39:1
newspaper 33:24
 34:5,7,9,12 36:14
 36:15,19 37:7,9,13
 37:14,25 39:18
 41:2,17
nicole 2:15 5:16
nicole.sergent
 2:21
nine 12:19 13:10
 14:17 61:11
nods 7:18
noncommercial
 27:24 29:15 33:17
normally 24:6
 61:16
notarized 74:14
notary 4:14 73:23
 74:25 75:10,18
 76:15,23 77:23
note 27:22 74:12

noteworthy 36:7
notice 3:9 10:2,5
 37:18,19
notify 68:1,1
noto 20:20 26:2
 28:4 29:9,17 30:5
 32:25 46:19 47:1
noto's 29:23 45:13
nowadays 34:23
number 20:6,11
 20:12 21:21 22:15
 25:10,11,12 41:7
 43:22,23 46:11,18
 47:5 48:8 53:12
 60:10,14,15,20
 61:8,22 63:10
 65:24 74:7,13
numbered 10:10
 20:10
numbers 14:3
 19:2,4,4 20:4 25:4
 25:6 28:16 53:4
 67:7 76:7

**o**

o'neill 51:12
oath 4:10 7:7,9
 65:8 70:7
objection 8:24 9:3
 42:1 69:1
obtains 35:14
obviously 11:10
 43:16
occasion 23:23
october 50:13
 51:22
offer 39:1
offered 16:17
office 2:16,17 3:12
 3:13 4:4 5:12,14
 9:17 10:5 11:19
 12:18 15:14 18:11

21:14,22 22:20
 23:7 27:20 28:24
 31:14 35:8 39:24
 42:22 43:3 48:17
 48:24 54:7 56:11
 56:19,23 57:7
 58:14 59:25 61:21
 62:3,7 66:6,10,18
 67:1,17
office's 18:10 23:5
offices 35:15
official 1:13 65:11
 75:15 76:21
officials 69:4
oh 17:1 34:13
 64:12 69:19
ohio 74:2
okay 7:23 8:10,11
 8:19,20 9:6,7,16
 9:21 11:7,13,17
 13:2,4,5,9,16,22
 14:3,6,10 15:7,20
 16:3,25 18:8
 19:15 20:13,13
 21:16,25 22:5,17
 23:12,23 25:3
 27:4,6,17,22 29:5
 30:4,7,14 31:2,8
 31:23 32:24 33:8
 33:18 35:3,24
 36:1,21 37:6 39:9
 39:14,17 41:5
 42:21 43:1 45:7
 45:15 46:11,20
 47:2,7 48:6,19
 49:15 50:2,4,9,12
 51:7,17 52:7,13,15
 52:21 55:11 56:1
 56:5,19,25 58:5,9
 58:17 59:17 60:3
 60:10,25 61:7,12

61:19 62:1,10,14
62:18 63:9,11
64:1,3,12 65:4,23
66:17,24 67:2
68:9 69:25 70:22
71:23
**old** 11:11
**once** 54:14 59:12
**ones** 42:10
**ongoing** 71:3
**online** 22:12 37:11
38:20
**open** 15:5,8,11,23
16:4,6,9,20 18:25
19:10 21:1 28:12
29:20 47:18
**operating** 67:9
**opinion** 30:17 39:2
42:2
**opportunity** 70:13
71:13
**option** 44:20
**order** 58:12,16
**orders** 58:14
**organize** 64:24
**organizing** 58:7,9
**orientation** 15:25
16:1
**oriented** 39:7
**outlook** 25:20
**override** 69:11
**oversee** 66:21
**overtime** 57:13
**overvalued** 22:21
**overview** 11:2
**owner** 22:24 23:4
23:9 24:10
**owners** 21:14,19
22:10 24:1 36:6

**p**

**p.m.** 4:8 72:7
**packet** 26:1
**page** 3:2,8 8:1
10:3,10 17:9,12,15
19:13 20:6,11,12
20:19 25:18 26:13
26:18 27:5 28:8
30:6,19,22,25 31:5
31:6,6 33:20
45:13,17 47:5,8,8
49:2 63:9 73:6
74:13,15 76:7
77:3
**pages** 10:4 20:9
28:9
**paper** 9:22 36:24
61:16
**paragraph** 18:17
**parameters** 59:22
**parcel** 43:20,25
44:17,18 46:21,22
**parcels** 43:14 46:5
46:6
**part** 32:7,14 33:18
33:21 38:13 59:13
76:9
**participants** 4:6
**particular** 22:13
35:19 43:20 44:17
**parties** 5:4 6:1
**pass** 71:17,19
**pay** 24:13 30:1
38:4 55:14
**payment** 55:15
**pays** 45:25
**pending** 8:17
**people** 27:14
29:25 38:4 42:16
42:19 61:17

**percent** 38:6
**percentage** 57:3
**perform** 54:18
62:4
**performance** 57:3
**performing** 66:11
66:15
**performs** 67:17
**period** 9:14
**periodical** 33:24
34:5,7 38:14,15,19
38:21 39:11,19
**periodicals** 38:25
**periods** 15:21
**person** 57:7 61:24
**personal** 11:9,14
23:13
**personally** 75:11
76:15
**personnel** 67:20
**pertain** 18:24
**phone** 74:3
**physical** 34:11
36:24 37:7
**piece** 8:12 33:8
35:19
**pieces** 35:20
**place** 24:3,6 37:18
39:21 73:6
**plaintiff** 1:9 2:3
5:7
**plaintiff's** 62:20
**plan** 41:13 67:12
**please** 5:4,19,22
5:24 6:5,20 26:16
72:3 74:11,11
**point** 8:14 17:23
45:16,20 51:20
55:2,7,16,18 71:6
**political** 12:11,12

**poorly** 8:3
**position** 12:17
13:13,15,17,19,25
14:4,6,8,11 68:8
**post** 2:17
**potentially** 57:20
**precise** 46:8
**predecessor** 50:16
50:19
**predecessor's**
60:17
**predict** 49:12
51:20
**prefix** 25:7
**preparation** 18:1
18:5 19:6
**prepare** 10:21
11:2
**present** 5:4 6:1
**presumably** 21:21
57:19
**pretty** 27:16 38:1
52:24 60:16
**prevent** 9:9
**previous** 47:11
60:14,17
**previously** 3:17
20:1
**price** 42:16
**print** 34:10
**printed** 25:19
**printing** 37:7
45:25
**prior** 12:16 13:10
13:19 14:17,20
16:8 17:20,23
21:7,10 22:25
61:23
**probably** 39:12,21
46:12,15 50:15
58:24 63:24 64:23

68:23
**problem**  8:15
**procedure**  4:9
 75:5 76:5
**proceedings**  3:3
 5:1
**process**  53:25 54:7
 55:20 56:9 57:16
 59:7,18,19
**production**  25:23
 74:15,17,22
**profit**  32:8,12
**promotions**  67:19
**prompted**  23:6
**properties**  40:13
 43:7 44:4 54:19
 55:5 67:13
**property**  6:16
 9:18 10:6 11:18
 12:14,25 18:24
 20:16 21:14,19,22
 22:10,14,21,23
 23:4,9,13 24:10
 30:12 35:11,19
 36:6 39:20 40:2,8
 40:20,23 41:12,21
 43:4,12,18 48:20
 51:4 52:9 53:25
 54:9,13 55:12
 61:18
**proposed**  67:7,7
**provide**  53:3 56:6
**provided**  11:6
 25:23
**public**  4:15 26:24
 27:8 29:7 33:23
 39:9 48:20 49:20
 54:21,23 56:17
 57:1,4,8 60:6 61:2
 61:9 62:12 75:10
 75:18 76:15,23

77:23
**publication**  33:23
 34:4,19
**publish**  30:15 37:7
 40:24 41:13,20
 42:24
**published**  29:2
 36:22,24
**publishes**  66:14
**pull**  27:17 55:22
**purchase**  45:6
**purpose**  19:11,17
 19:18,22 22:17,22
 28:25 29:7,19,24
 30:10,16,21 31:1,4
 31:9 33:10,20,22
 34:3 41:9 47:14
 47:16,23 55:13
 63:14 64:8,16
**purposes**  12:22
 22:18 46:2
**pursuant**  4:9,10
 21:1 47:16 54:19
 54:20
**put**  15:15 30:1
 37:24 38:5 42:17
 44:17 46:2 57:23
 58:6
**puts**  66:15 68:9
**putting**  54:13
**pva**  6:21 12:18,22
 12:24 13:10,11,14
 13:17 14:1,7,14,20
 14:24 15:3,4,24,25
 16:8,11 17:2 20:2
 21:14,19 22:6
 23:4,16 24:17,22
 27:8 28:12 29:4
 34:22 35:4 36:2
 48:25 49:16 51:1
 62:7 63:18 64:7

64:15 65:11,15
 66:6,11 68:11,22
 69:2,9,14 70:10
 71:8
**pva's**  5:14 47:18
**pvas**  11:1 40:1
 56:2 69:5

| q |
| --- |

**quarterly**  69:14
**question**  8:2,4,16
 8:18,23,25 9:2,4
 17:1 36:8 42:4
 43:10 63:12 64:1
 64:4
**questions**  7:6,7,12
 7:17,20 8:1,7 9:10
 63:4 71:21
**quick**  64:22
**quickly**  65:20
**quoted**  29:9

| r |
| --- |

**raise**  6:6
**random**  49:11
**range**  44:11,13,14
**read**  33:15 63:24
 72:3 75:5,6,12
 76:5,6,17
**reading**  4:16 19:2
 64:2 71:25 74:19
**real**  23:17 39:5,7
 39:10 42:6,12
 51:22
**really**  18:16 22:23
 33:15 46:20 49:16
 49:19 61:20
**realtors**  42:6
 61:17
**reason**  31:23 32:1
 32:19 69:23 74:14
 76:8 77:3

**recall**  9:13 16:19
 20:22 23:3,8
 49:25 70:23,25
**receipt**  74:18
**receipts**  53:3,17
 60:4
**receive**  12:8 57:11
 57:13 61:5
**received**  15:4,20
 15:22 16:9 24:25
 39:5,9 40:18
 58:12
**receiving**  15:17
 20:22
**recognize**  18:23
 26:12 27:10,19
 28:19 31:3,8
**recollection**  19:5
**record**  5:3,20 7:15
 12:22 33:23 39:9
 41:6 61:18 65:5
 70:3,6 73:11 76:9
**recorded**  73:9
**records**  3:12 15:5
 15:8,11,11,23 16:4
 16:6,10,20 18:25
 19:10 21:2 26:24
 27:8,15 28:5,12
 29:7,20 30:12
 32:2 33:5 41:7
 43:17 47:18 48:16
 48:19,20,23 49:21
 54:21,23 55:19,21
 56:17 57:1,4,8
 59:12 60:6,6 61:2
 61:2,9 62:12
 66:23
**recross**  71:20
**reduced**  73:9
**refer**  16:2 20:10

**reference** 74:7
  75:2 76:2
**referenced** 75:11
  76:15
**referring** 13:3
**refresh** 19:5
**regard** 28:24
**regular** 48:24
  51:18,18
**related** 33:23 34:4
**relating** 48:19
**relation** 18:25
**relationship** 66:18
**relative** 73:13
**relied** 29:22 30:9
  35:22 36:1
**relief** 17:17
**rely** 66:14
**relying** 32:9 33:11
**remainder** 61:13
**remember** 8:13
  44:12
**remotely** 4:7,10
**remove** 9:21
**rent** 32:2
**renting** 32:3
**reorganizing** 59:1
**rep** 14:11
**repeat** 18:4 41:3
  64:11
**reporter** 1:25 4:15
  5:3,19,22 6:5,10
  7:13 69:20,24
  73:1,23 75:7
**reporters** 4:4
**representative**
  14:2
**reproduction**
  26:24 27:8,14
  29:6

**request** 15:18
  20:22,25 26:5,17
  26:24 27:8,14
  29:18,23 30:5,10
  30:16 33:9 34:2
  35:8 39:5,9,11,12
  39:15,23 40:18,22
  40:24 41:2,8,16
  43:12 45:13 47:10
  47:22 49:10,24,24
  49:25 50:5,9,12,22
  51:3,9,21 53:25
  54:23 55:11 58:20
  59:11,21 76:9,11
**requested** 15:13
  39:11 41:6,7
  55:23 57:19
**requester** 29:7,15
  52:1 55:14,17,19
  55:21 57:20 59:3
**requesters** 60:6
  61:2,9
**requesting** 31:13
  40:11 41:15 43:7
**requests** 28:25
  48:20 49:21 50:25
  51:17 52:2,5 54:3
  54:21 56:17 57:1
  57:5,8 59:25
**required** 55:16
  58:22 74:25
**requirements**
  55:17 68:8
**reserve** 71:20
**residential** 13:21
  13:22,25
**residents** 41:22
  42:11
**respect** 8:1 58:20
**respond** 15:16
  47:15

**responding** 21:4
**responds** 57:8
**response** 26:19
  47:12 54:3 63:17
  63:18,19,20,24
  64:10,17
**responses** 62:20
  63:1,3,6
**responsibilities**
  57:4
**rest** 72:6
**restaurant** 14:22
**restriction** 45:24
  46:2
**returned** 74:18
**revenue** 1:14 2:16
  6:19 13:4,6 27:11
  29:3 33:3 38:9,11
  53:2 60:5 62:4
  66:16,19
**revenue's** 5:11
**review** 17:23 18:1
  18:5 19:6 63:6
  74:12 75:1 76:1
**reviewed** 10:25
**richard** 2:14
**richard.berelson**
  2:20
**rick** 5:10 72:2
**right** 6:6 7:2,11
  9:16,19 10:9,14,17
  12:25 13:7 15:2
  16:22 20:4,5
  24:14,25 25:20
  26:5 27:11 28:2
  28:22 30:19 31:4
  31:5,9,11,24 32:16
  35:9,12 36:3,9
  38:13,14 40:9
  43:5,12,14 44:17
  45:8 46:8,14,22

48:3,7,8,15 49:8
  49:16,23 50:18,21
  51:12 52:7 53:6,8
  53:9,17,20,22,24
  54:10,12,15,21,25
  55:9 56:9,17 57:7
  59:8,13 61:2
  62:19 63:23 64:4
  70:5,7 71:11,19,20
  71:23
**ritchey** 2:5
**robertson's** 63:20
  63:24 64:10,17
**rogers** 11:25
**role** 20:2
**roll** 39:19 40:20,23
  41:12,21 43:12
  48:21 49:8 51:5
  54:1 55:12 58:13
  60:2,8 61:11
**roughly** 13:24
  14:14 15:9 22:8
  22:11 45:7,8 58:6
  61:10,13 62:9
**rules** 4:9 7:5 75:5
  76:5
**runs** 53:9

| s |
|---|

**s** 74:15 76:8,8 77:3
**salary** 32:15 57:11
**sale** 23:19,24 24:2
  24:11,18 30:1
  33:3 43:18,22
  60:8
**sales** 38:9,11 60:2
  61:11,24 62:2,12
**satisfy** 55:18 59:22
  59:25
**saw** 33:16 52:8
**saying** 28:5 34:24
  70:14

**says** 10:5 19:16,18
  27:8 33:21,23
  34:24 60:1,20
  63:18,19 67:13
**schedule** 68:14,18
  69:10
**school** 11:23,25
**science** 12:11,12
**seal** 75:15 76:21
**second** 17:12
  20:19 33:18,21
  47:8 69:21
**section** 18:20
**see** 10:2,7,12
  17:13,18 18:20,21
  19:16,20 20:7,14
  22:2,14 23:13,17
  23:21,23 24:9
  25:8,14 26:9,16,20
  26:25 27:7,25
  28:6,13,17 33:6,25
  39:12 42:9 45:16
  47:19 48:4,10,13
  49:5 50:7,23
  51:19,24 60:12
  62:22 63:12,21
  66:1,7 69:20
**seeing** 22:23 39:15
**seen** 10:14 17:20
  19:23 62:24
**segregate** 15:21
**sell** 31:18 61:16
**selling** 31:22 42:6
  60:6 61:1
**send** 59:22
**sending** 28:2,4
**sense** 34:14
**sent** 29:17 30:5
  32:25 63:7
**september** 14:15

**sequentially** 20:10
  25:13
**sergent** 2:15 5:16
  5:16
**service** 32:5 43:8
  43:25 45:22,25
  46:21 61:5,9
**services** 2:16 5:12
  24:4
**serving** 5:12 17:7
**set** 45:4 62:20 73:6
**severing** 5:17
**shakes** 7:18
**sheet** 74:13 76:7
  76:10,18 77:1
**short** 65:7 70:6
**shown** 74:16
**sign** 42:6 55:15
  68:4 72:4
**signature** 74:14
**signed** 75:13 76:18
**signing** 4:16 72:1
  74:19
**similar** 58:5 60:14
**sincerely** 74:21
**sir** 7:10,24 9:11,15
  10:8,13,16,20
  11:12,16,22 12:13
  13:1,8 14:12,19
  15:1,6,9 17:14,19
  18:7,7,22 19:8,12
  19:21 20:3,8
  25:15,21,25 26:21
  27:1,9,12 28:1,7
  28:10 29:8,13
  31:10,16 32:18
  35:2 38:22 39:4
  40:6,16 44:2,6,23
  45:9 46:10 48:2
  48:11,14,18,22
  49:1,22 50:20

51:6,25 52:3,6
  53:10,18 54:5
  55:1,4,10 56:8,14
  57:6,10,22,25 58:7
  59:6,9 60:2,13,24
  61:6 62:23,25
  63:5,8,22 65:9,13
  66:2,4,8,12 67:10
  67:15 70:8 71:10
  71:18 74:10
**site** 57:21 58:6
  59:4
**six** 17:3 56:24
**skill** 73:12
**skip** 51:8
**slash** 28:16
**slightly** 50:15
**software** 25:20
  40:13 56:11
**solar** 50:6
**sold** 23:21 24:19
  24:20,21 60:8
**solicit** 31:20,22
**solicitation** 31:24
**solutions** 51:23
  74:1 77:1
**somebody** 22:15
  45:24 67:25 68:1
  68:3
**sorry** 12:12 14:16
  33:19 49:17 50:3
  59:19 64:12 70:1
**sort** 7:18,22 8:8
  11:11 16:3,16
  22:8,20 23:19
  42:15 46:1 49:11
  50:10 51:20 52:2
  52:16 57:3,13
  64:24 67:4 69:3
**sorts** 42:18 67:16

**sources** 33:3
**south** 6:25
**space** 33:4
**speak** 22:22
**special** 40:25
**specifically** 9:1
**speculate** 42:19
**speculation** 42:2
**spent** 16:5
**spits** 53:5
**splits** 46:14
**spoken** 11:1
**sporadic** 52:4,15
**spot** 68:7
**spreadsheet** 55:24
  58:8,10 59:2
**standard** 27:10
**stands** 60:20
**start** 10:4 14:13
  67:9
**started** 12:14 17:2
  21:13 22:6 51:1
  57:16
**starting** 49:16
**starts** 47:10
**state** 4:15 5:4,20
  53:19 62:6 63:13
  67:21 75:10 76:15
**state's** 67:18
**statement** 75:13
  75:14 76:19,19
**states** 1:1 6:15
  33:2
**statewide** 69:5
**statute** 32:10 37:9
**statutes** 18:18,23
  18:23 19:6,7
  63:14 64:8,16
**step** 54:7 55:20
  56:9 59:2,7

stick   42:10
stipulation   4:1
stop   37:6,8
stories   36:11 39:1
story   34:19
street   4:5 6:25
strike   25:16 45:11
   46:25
string   47:9
subdivisions   46:17
subject   10:18
   11:15 26:4
submit   67:6,12
submitted   73:25
subparagraph
   19:18
subscribed   43:8
   75:10 76:14 77:21
subscription   38:16
   42:25 43:24 44:4
   44:7,21 45:4,11,22
   45:25 46:21 61:5
   61:8
subset   40:8
substantive   71:7
suggest   36:2
suggins   14:22
suite   2:7 4:5 74:2
summary   31:15
   40:15
summer   69:17
   70:21
sun   36:17,18 37:6
   37:16,19,23 38:5,8
   40:18,22 41:1,11
   41:20,24 42:5
superior   74:1
supervisor   13:21
   13:23 14:1
suppose   42:3

sure   27:16 32:22
   36:6 38:1,6 65:3
   66:21,24 68:6
susan   20:20
swear   4:16 6:6
sworn   4:10 73:7
   75:10,13 76:14,18
   77:21
system   40:12
   58:13

**t**

take   8:14,15,18
   15:25 16:15 33:16
   34:9 58:1,3,17
   63:23 64:21,24,25
taken   4:3,8 71:25
   73:5,11
talk   23:11 46:24
   53:24
talked   36:6
talking   22:14
   25:11 39:22 55:24
   71:6
tasked   56:25
tatenhove   1:6
tax   26:17 39:19
   40:2,7,8,20,23
   41:12,21 43:12
   48:21 49:8 51:4
   52:9 53:25 55:12
   55:23 58:13 60:1
   60:8 61:11
taxes   14:9
technical   70:6
telephone   2:9,19
tell   21:20 69:10
telling   22:24
ten   58:19
tendency   7:22
term   8:3 12:22
   17:2,6 19:10 22:1

40:1,4 41:17
   63:14 64:8
terminology   8:9,9
   40:4
terms   11:7 17:3
   23:18 32:9 34:2
   38:18 39:22 47:25
   52:16 57:16 58:2
   58:22 59:3
testify   9:17 10:19
   10:22 73:7
testimony   6:7
   71:13,15 75:6,7
   76:6,9,12
thank   6:10 72:5
thing   7:25 8:16,21
   11:11 16:16 23:19
   46:14 54:11 58:22
   59:2 60:7 65:20
   67:2,4 70:16
things   7:18 12:20
   30:2 42:18 55:8
think   7:20 22:5
   26:11 27:18 31:11
   31:21 36:13,15,16
   36:17 40:17 42:11
   42:15 44:11,24
   46:17 52:14 62:5
   68:22 71:2,11
thinking   14:16
third   17:15
thirty   74:18
thomas   1:13 2:13
   74:6 75:3 76:3
thought   32:11
   36:7
thoughts   64:25
three   13:24 15:17
   15:17
throws   53:4

thumb   57:23 58:6
   59:5
time   8:14 15:3,21
   17:23 21:25 23:3
   23:9 34:9,22 35:3
   37:5,5 42:17
   49:13 55:2,7 58:2
   58:5 65:14 69:25
   70:18 72:5 73:5
times   24:18,23
   69:18
title   17:16 18:18
   28:11 62:19 66:5
   73:6
today   7:9 8:4 9:8
   9:17 10:19,22
   11:3 13:2 14:16
   17:20,24 18:2,6
   19:7
told   21:25 40:23
top   20:5 25:17
   30:25 44:12 46:12
   63:12
topics   10:10,18,22
   11:7,8,13,15
training   15:4,20
   15:22 16:9,15
transcribe   7:19
transcribed   75:7
transcript   4:17
   73:5,11 74:11,12
   75:5,12 76:5,11,17
transmit   59:3
treat   21:4
true   73:11
truth   6:8,8,8 22:24
   73:7,8,8
truthful   9:10
try   7:15 8:5 27:17
   64:12 70:19

**trying** 22:15
**tuesday** 4:7
**turn** 10:1,9 16:22
  17:11,15 19:13
  20:12 26:18 27:2
  28:8 30:4 47:5
  48:4 51:7 52:19
  59:15 62:14 63:9
**twice** 36:23
**two** 11:20 14:4
  15:21 30:2 49:20
  53:15 58:4 69:16
  70:11,20,22
**type** 38:17 43:6,21
  43:23 44:14 70:16
**types** 34:25 59:25
**typewritten** 73:10
**typically** 60:22

**u**

**uh** 7:18 33:1
**underfunded** 62:8
  62:9
**underneath** 18:17
**understand** 7:8
  8:3,8,10 9:16
  10:17 12:24 19:9
  20:25 24:1 31:17
  32:16 41:17 63:1
  65:8,10,12 67:11
  70:7
**understanding**
  15:10 18:8,9,14
  28:22 31:15 37:13
  38:10,15 52:22
  53:8 66:17 67:6
**understood** 31:12
**united** 1:1 6:15
**university** 12:5
**unlimited** 44:20
**upload** 57:20

**use** 8:8,9 12:22,24
  13:2,3 22:15
  24:22 25:20 27:13
  27:23 30:11 32:2
  32:7,11,20,23
  33:23 34:4,4 40:1
  40:5 47:13,15
  56:2,15 66:10
**useful** 24:16 42:11
**user** 32:8 44:15
**users** 30:13,16
**uses** 19:10 27:20
**usual** 60:21,22
**usually** 58:3
**utilize** 68:13,14
**utilized** 20:1 23:1

**v**

**v** 1:11 74:6 75:3
  76:3
**validation** 55:8
**valuation** 6:17
  9:18 10:6 11:18
  12:15,25 18:24
  20:16
**value** 23:10 35:11
  36:5
**van** 1:6
**various** 6:16 17:11
  35:20
**vehicle** 14:8
**verifying** 22:18
**veritext** 74:1,7
  77:1
**veritext.com.**
  74:17
**versus** 61:9
**videoconference**
  2:11,22 4:6
**view** 30:14 34:8
  38:21,25 41:23
  68:13

**violated** 18:12
**violation** 18:15
**visited** 37:4
**visiting** 22:18

**w**

**w** 2:4,14
**wait** 5:23 9:2
  69:21
**waived** 4:17 74:19
**want** 8:7,15 10:22
  27:14 30:4 38:23
  41:11,13,15 44:16
  44:21 54:6,6
  55:19 57:21 59:4
  63:23 64:19 65:20
**wanted** 17:1
**water** 51:9
**way** 7:11 31:23
  38:8,10 46:20
  48:12 66:3 73:14
**ways** 7:16,22
  22:25
**we've** 38:24 47:21
  52:7 69:18
**website** 22:18
  24:11 30:1,12,15
  32:21,23 33:14
  34:17 37:2,4,8
  41:21 42:21 43:2
  43:5 61:14
**week** 36:23 52:24
**wells** 52:8,11
**went** 70:1,11
**west** 4:5
**wi** 70:1
**wife** 23:15
**winchester** 5:14
  6:22,25 12:1
  36:16,18 37:6,16
  37:19,23 38:5,8
  40:18,22,25 41:11

41:20,24 42:5
**witness** 4:16,17
  5:21 6:1,9 65:4
  70:1 73:4 74:8,11
  75:1,4,11 76:1,4
  76:15
**witnesses** 71:12
**witness'** 74:14
**worded** 8:3
**work** 7:11 12:16
  56:18 65:2
**worked** 12:18 13:9
**working** 14:21
  15:3 65:14
**worries** 70:2
**worth** 23:14 35:20
  49:20
**wow** 60:21 69:24
**wrap** 71:12
**writes** 26:16
**wrong** 48:16

**y**

**yeah** 7:6 15:10
  30:25 33:15 36:15
  60:19 61:15 69:20
**year** 12:2,6 14:5,5
  14:13 37:20 40:14
  41:12 45:1,5,5
  46:18 51:21 52:17
  53:6,9,12 55:2,6,9
  55:23 57:18 58:12
  60:14,16,16,23
  61:10,16,23 67:8
  67:14 69:17 70:23
  71:8
**years** 11:20 12:19
  13:10,18,24 14:4
  14:17 17:3,4,5
  22:8 49:20 51:4
  61:23 62:9 67:4
  67:12

| z |
|---|
| **zero**  53:20 71:22 |
| **zestimate**  21:17,20 |
| 22:1,9,13,19,22 |
| 23:5 34:21,24,24 |
| 35:4,9,10,12,18,22 |
| 36:4 43:9 |
| **zestimates**  21:15 |
| 33:13 |
| **zillow**  1:8 2:3 5:7 |
| 6:14 17:10 18:10 |
| 18:14 20:15 21:8 |
| 21:11,11,18 22:2,9 |
| 23:1,12,17,21,22 |
| 24:2,6,9,14 26:4 |
| 26:24 29:24,25 |
| 31:12,17 32:1,12 |
| 32:19,22 33:2 |
| 34:6,8 35:4,13 |
| 36:12,12,13,17 |
| 37:11 38:10,19,19 |
| 40:11 43:7,11,16 |
| 58:22 74:6 75:3 |
| 76:3 |
| **zillow's**  30:9,14 |
| 33:9,12 34:2 |
| 39:23 47:13,22 |
| 58:20 |
| **zillow.com**  22:13 |
| 33:4 41:23,25 |
| **zillow.com's**  22:18 |
| **zoom**  5:8,18 69:23 |
| 70:24 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.