Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF KENTUCKY

3                    CENTRAL DIVISION

4                        FRANKFORT

5          CIVIL ACTION NO. 3:19-CV-00049-GFVT

6           JUDGE GREGORY F. VAN TATENHOVE

7

8                        ZILLOW, INC.,

9                          Plaintiff

10

11                          VS.

12

13    HON. THOMAS B. MILLER, IN HIS/HER OFFICIAL CAPACITY AS

14      COMMISSIONER OF THE KENTUCKY DEPARTMENT OF REVENUE,

15                         ET AL.,

16                        Defendants

17

18

19

20

21

22

23   DEPONENT:  BLAKE ROBERTSON

24   DATE:      MARCH 3, 2021

25   REPORTER:  LINDSEY N. JOHNSON

Page 2

1  APPEARANCES
2
3  ON BEHALF OF THE PLAINTIFF:
4  Darren W. Ford
5  Graydon Head & Ritchey, LLP
6  2400 Chamber Center Drive
7  Suite 300
8  Fort Mitchell, Kentucky 41017
9  Telephone No.: (859) 578-7263
10  Facsimile No.: (859) 578-3073
11  E-mail: dford@graydon.com
12  (Appeared via videoconference)
13
14  ON BEHALF OF THE DEFENDANTS:
15  Richard W. Bertelson, III
16  Nicole Sergent
17  Office of Legal Services for Revenue
18  PO Box 423
19  Frankfort, Kentucky 40602
20  Telephone No.: (502) 564-9572
21  E-mail: richard.berelson@ky.gov
22  E-mail: nicole.sergent@ky.gov
23  (Appeared via videoconference)
24
25

Page 3

1  INDEX
2  Page
3  PROCEEDINGS                                    5
4  DIRECT EXAMINATION BY MR. FORD        6
5  CROSS EXAMINATION BY MR. BERTELSON       75
6  REDIRECT EXAMINATION BY MR. FORD        78
7  RECROSS EXAMINATION BY MR. BERTELSON     81
8
9  EXHIBITS
10  Exhibit                                    Page
11  Exhibit 1 - Notice of Deposition of the       10
12      Office of Property Valuation
13      Administration for Franklin County
14  Exhibit 3 - Complaint for Declaratory &       16
15      Injunctive Relief
16  Exhibit 4 - Answer to Complaint for           63
17      Declaratory & Injunctive Relief
18  Exhibit 6 - Defendants' Responses to          60
19      Plaintiff's First Set of Interrogatories
20  Exhibit 9 - Email String in re: SAGE          71
21  Exhibit 15 - Tax Roll Purchase Fees for Owen County  70
22  Exhibit 16 - Annual PVA Office Budget         46
23      FY 2020-2021 for Owen County
24  Exhibit 17 - Email String in re: Zillow:      18
25      KRS Request - Owen KY

Page 4

1  STIPULATION
2
3  The 30(b)(6) deposition of BLAKE ROBERTSON was taken at
4  the office of Kentuckiana Court Reporters, located at
5  730 West Main Street, Suite 101, Louisville, Kentucky
6  40202, via videoconference in which all participants
7  attended remotely, on Wednesday, the 3rd day of March
8  2021 at 1:34 p.m.; said deposition was taken pursuant
9  to the Federal Rules of Civil Procedure.  The oath in
10  this matter was sworn remotely pursuant to FRCP 30.
11
12
13  It is agreed that Lindsey N. Johnson, being a Notary
14  Public and Court Reporter for the State of Kentucky,
15  may swear the witness and that the reading and signing
16  of the completed transcript by the witness is not
17  waived.
18
19
20
21
22
23
24
25

Page 5

1  PROCEEDINGS
2
3      COURT REPORTER:  We are on the record.  Will
4  all parties present please state your appearance,
5  how you are attending, and the location you are
6  attending from?
7      MR. FORD:  Sure.  This is Darren Ford.  I am
8  attorney for Plaintiff, Zillow, Inc., and I'm
9  attending via Zoom from Fort Mitchell, Kentucky.
10      MR. BERTELSON:  And this is Rick Bertelson.
11  I'm staff attorney for the Office of Legal
12  Services for revenue, and I'm representing the
13  Defendants in this case, and I'm appearing from the
14  old Owenton courthouse.
15      THE WITNESS:  This is Blake Robertson, I'm the
16  Owen County PVA, and I am at the old courthouse in
17  Owen County, Kentucky.
18      MS. SERGENT:  And this is Nicole Sergent.  I'm
19  appearing on behalf of the Defendants, and I am
20  appearing via Zoom from Lexington, Kentucky.
21      COURT REPORTER:  Thank you.  Mr. Robertson,
22  will you please hold your driver's license up to
23  the camera and wait until it is focused?  Thank
24  you.
25      Do all parties present agree that the witness

2 (Pages 2 - 5)

Page 6

1  is, in fact, Blake Robertson?
2       MR. FORD:  Yes.
3       MR. BERTELSON:  I do.
4       COURT REPORTER:  Thank you.
5       MR. FORD:  All right.  Good afternoon --
6       COURT REPORTER:  Oh, hold on.  Hold on.
7  Sorry, Mr. Ford.  I have to swear the witness.
8  I was just waiting for him to put his ID back in
9  his wallet.
10      MR. FORD:  Yeah, you need to swear him.
11  That's the most important part.  So my
12  apologies.
13      COURT REPORTER:  Mr. Robertson, will you
14  please raise your right hand?  Do you swear or
15  affirm that the testimony you are about to give
16  will be the truth, the whole truth, and nothing but
17  the truth?
18      THE WITNESS:  I do.
19      COURT REPORTER:  Thank you.  Mr. Ford?
20      MR. FORD:  Thank you, Ms. Johnson.  My
21  apologies there for jumping ahead.
22          DIRECT EXAMINATION
23  BY MR. FORD:
24      Q.  Mr. Robertson, good afternoon.  My name is
25  Darren Ford.  I'm an attorney for Zillow, Inc.  I

Page 7

1  represent them in an action filed in the United States
2  District Court for the Eastern District of Kentucky,
3  naming a number of Defendants, including the office of
4  property valuation administrator for Owen County,
5  Kentucky.
6       If you could go ahead and please introduce
7  yourself.
8       A.  Yeah.  So I'm Blake Robertson, the Owen
9  County PVA.
10      Q.  All right.  And Mr. Robertson, have you been
11  deposed before?
12      A.  I have not.
13      Q.  Okay.  Just a few ground rules.  Essentially,
14  you're here to answer questions that I ask under oath.
15      Most important thing for us to try to do
16  today is to get a clear record.  Ms. Johnson over here
17  will be taking down testimony, which includes both my
18  questions, your answers, as well as any objections that
19  Mr. Bertelson may interject during your testimony.
20      So the most important thing that we're going
21  to try to do today is to not talk over one another.  I
22  am sometimes bad at that, and just we tend to get into
23  conversations sometimes and flow of things, and it
24  makes it very hard, though, for her to take down what's
25  being said.

Page 8

1       So try our best today to make sure that you
2  wait for me to finish my question and you give your
3  answer.  Give a little bit of a pause to give
4  Mr. Bertelson a chance to object.  That'll ensure that
5  we can get a clear record, okay?
6       A.  All right.
7       Q.  And another important thing to remember, too,
8  is that I want to make sure that, when you are
9  answering a question, that you understand the question
10 that I've asked.  There's some jargon used by PVAs
11 that, you know,
12 I may use reading off of a -- reading off of an e-mail
13 or other document.
14      If there's some -- some term that you don't
15 understand or there's some part of my question that you
16 don't understand, please ask for clarification.
17      I don't want you to answer questions that you
18 don't understand, and I will do my best to either try
19 to explain, or I'll just simply rephrase the question
20 or move on, okay?
21      A.  All right.
22      Q.  And then the third thing that's important to
23 remember is you're not a hostage.  So if you need to
24 get up and take a break at any point in time for any
25 reason, just let me know.

Page 9

1       My only request is that you go ahead and
2  answer whatever question may be pending at that time,
3  okay?
4       A.  All right.
5       Q.  Now, you may be hearing throughout the
6  deposition Mr. Bertelson interject some objections at
7  times.  Now, unless he specifically instructs you to
8  not answer a question, you're free to wait until he
9  finishes his objection and then go ahead and answer
10 that question.
11      Of course, if he instructs you not to answer
12 the question, then you'll confer with him, and you
13 won't answer that question, okay?
14      A.  All right.
15      Q.  Now, you understand that you are here today
16 to testify on behalf of the office of property
17 valuation administrator for Owen County, correct?
18      A.  Yes.
19      Q.  And I'm going to use the acronym "PVA,"
20 because that's a lot to spit out, and I think it'll go
21 a lot faster if I do that.
22      You understand if I use PVA that I'm
23 referring to property valuation administrator, right?
24      A.  Yes, sir.
25      Q.  And I will try to be specific when I -- you

3 (Pages 6 - 9)

Page 10

1  know, if I refer specifically to your county -- I know
2  there's more than one PVA. But if it's not clear and
3  you need a clarification whether I'm meaning you or all
4  PVAs, that's a good example of when you should ask for
5  some clarification there.
6       Let's go ahead and look at Exhibit 1, which
7  is a collection of notices of deposition. Hopefully
8  you have that there somewhere in front of you.
9       MR. BERTELSON: We have it in e-mail, or you
10 can also look at it here, if you want.
11  A.  Okay. I've -- I've got it here.
12  Q.  Okay. If you could turn to -- let's see.
13      Unfortunately, these pages didn't get
14 numbered, so it's going to be the sixth page,
15 basically.
16  A.  Yeah, we got it.
17  Q.  And that's the Notice of Deposition of the
18 Office of Property Valuation Administrator at the top
19 there.
20      Do you see that?
21  A.  Yeah.
22  Q.  And on the second page of that document,
23 there's a numbered list of topics.
24  A.  Uh-huh.
25  Q.  Have you had a chance to review those topics

Page 11

1  prior to today?
2  A.  Yeah, I looked through them.
3  Q.  Okay. And what did you do to just generally
4  prepare to testify on the topics that are identified in
5  that second page, numbers 1 through 11?
6  A.  I guess I -- I kind of looked over some --
7  looked over the prior e-mails, looked over our fee
8  schedule, looked over our budget again, just kind of,
9  you know, went -- went through the list over again,
10 because it's kind of -- I guess we got that year or so
11 back, so kind of to refresh my memory, went over, you
12 know, each one.
13  Q.  Okay. And when you say, "prior e-mails," do
14 you mean e-mails between you and Zillow regarding their
15 request?
16  A.  Yes, sir.
17  Q.  Okay. Any other e-mails that weren't
18 involving
19 Zillow that you reviewed in preparation for testifying
20 on these topics?
21  A.  No.
22  Q.  Now, when you say, "fee schedule," you mean
23 the PVA commercial fee guidelines?
24  A.  Yes. Set forth by the department of revenue,
25 yes.

Page 12

1  Q.  And then budget, that's your individual
2  office's budget for fiscal year?
3  A.  Yeah. It would be my county's budget, yeah.
4  Q.  Okay. Anything else? Did you talk to anyone
5  other than counsel about preparing for the deposition,
6  employees of your office or anyone else to -- on any of
7  these topics?
8  A.  No.
9  Q.  Okay. All right. Mr. Robertson, I'd like to
10 get a little bit of background about you.
11      Did you go to high school?
12  A.  I was --
13  Q.  Where did you go to high school? You went to
14 high school. Where did you go to high school?
15  A.  I went to Owen County school until the sixth
16 grade, and then I was home schooled. So I have a -- a
17 home school diploma. Eventually got my GED, so...
18  Q.  Okay. All right. And did you go to college?
19  A.  I did not.
20  Q.  And how long have you been the Owen County
21 PVA?
22  A.  Since June of 2016, but I've worked in the
23 office since February of 2010.
24  Q.  Okay. And then -- so between February 2010
25 and June of 2016, what was your title or role with the

Page 13

1  Owen County --
2  A.  I was -- sorry. I was the field
3  representative.
4  Q.  Okay. And what does a field representative
5  do?
6  A.  Well, in our small county, it actually does
7  just about everything in the main office. I was the
8  primary one going out in the field taking pictures of
9  homes, new homes, existing homes, you know, gaining all
10 the information necessary for -- for each parcel out
11 there. But -- but as well I -- you know, I answered
12 phones, did office duties as well.
13  Q.  Okay. And so when you were field
14 representative, obviously the PVA, him or herself --
15 was it a he or a she that you worked under during that
16 time frame?
17  A.  It was a he.
18  Q.  Okay. Was the PVA during that time frame,
19 obviously he was there at the office. How many
20 employees did the office have during that time,
21 full-time employees?
22  A.  Two and a part-time.
23  Q.  Does that include the PVA, or is that in
24 addition to the PVA?
25  A.  No, that -- that was in addition.

4 (Pages 10 - 13)

Page 14

1    Q.   Okay.  So PVA, two full-time and one
2  full-time?
3    A.   Yes, sir.
4    Q.   And is that the same staffing that you
5  currently have, with you being the PVA now and having
6  two full-time employees and one part-time?
7    A.   The part-time I have is labeled summertime
8  help.  So he will -- he's a college student, and so
9  he's only going to be working for six months.  So I --
10  I don't know how exactly you want to put that down, but
11  --
12    Q.   He's not employed right now, but he will
13  probably be employed in the summertime?
14    A.   Yeah.
15    Q.   But things always change, so could change.
16        But at least right now, you only have two
17  full-time employees?
18    A.   That's correct.
19    Q.   Okay.  Prior to working as a field
20  representative -- well, let me ask you this: When did
21  you complete your GED, home schooling high school
22  degree?
23    A.   My -- my home-schooling degree, my high
24  school diploma, let's see, that was in 2007.  But the
25  state did not -- did not recognize my home-schooling

Page 15

1  diploma, and so I got the GED for -- specifically for
2  this job.
3    Q.   Okay.  Between 2007 and 2010, what were you
4  doing work-wise during that period?
5    A.   I worked probably four or five different
6  factory jobs.  Mazak was one of them.  And most notably
7  -- I left Toyota to come to work to -- for here.
8        I was --
9    Q.   Go ahead.
10    A.   Do what?
11    Q.   No.  I said go ahead.  I didn't mean to cut
12  you off.  Please.
13        So you said Toyota?
14    A.   Yeah.  I was second shift at Toyota and just
15  really wanted to get back on first shift.  And I grew
16  up in the county, and there -- there's not a lot of
17  jobs to be had in this county, and so this is just kind
18  of moving back home for me.  So that's -- that's what I
19  --
20    Q.   Were you -- you said Mazak and Toyota.  Were
21  you up in northern Kentucky?
22    A.   So I've never lived outside the county, so
23  I -- I stayed here in the county.  But yes, I was
24  working in northern Kentucky, that being Mazak.  A
25  couple of different factories there, kind of -- it was

Page 16

1  kind of during the recession there.  And so I kind of
2  bounced around to a couple of different factories,
3  ended up at Toyota for about a year, and then -- and
4  then here.
5    Q.   So really, 2010 is when you went to work at
6  the PVA for Owen County.
7        You worked there six years, and then you were
8  -- it's an elected position, right, so --
9    A.   Yes.
10    Q.   -- you were elected in 2016?
11    A.   Actually, our -- our PVA passed away, and so
12  I was appointed in June of 2016, and then I ran in the
13  general election and -- and won in November of 2016.
14    Q.   Okay.  So your elected term began in November
15  of 2017, and you were appointed basically between
16  June 16 and November 17 due to the death of the
17  previous PVA; is that accurate?
18    A.   Yes.
19    Q.   Let's take a look, if you would, at Exhibit
20  3.
21        (EXHIBIT 3 MARKED FOR IDENTIFICATION)
22    A.   Okay.  We got it pulled up here.
23    Q.   Okay.  And this document is captioned, same
24  caption, United States District Court, Eastern District
25  of Kentucky at the top there, and Zillow, Inc. versus a

Page 17

1  bunch of folks.  And you are identified on the second
2  page of this document as the property valuation
3  administrator for Owen County, Kentucky.
4        Do you see that?
5    A.   Yes.
6    Q.   And then the third page, it has the caption
7  or the title, "Complaint for Declaratory & Injunctive
8  Relief."  That's where the allegations of the complaint
9  start.
10        Do you see that?
11    A.   Yes, I do.
12    Q.   Now, prior to me instructing you to look at
13  this document, have you had a chance to look at it at
14  any point in time?
15    A.   Yes, I did.
16    Q.   Generally, what is your understanding of the
17  nature of the claims that Zillow, Inc. has asserted
18  against your office in this action?
19    A.   That we are infringing upon the free speech
20  rights of Zillow, First and Fourteenth Amendment, that
21  they are commercial or noncommercial.
22    Q.   And towards the end of this complaint, there
23  are a number of attachments, and one of those
24  attachments is a letter that was sent to you by Sue
25  Noto on April 25, 2019.  And if you note on the top of

5 (Pages 14 - 17)

Page 18

1 this complaint, on the far right-hand corner, there's -
2 - it says, "Page ID number."
3        Do you see that? It's at the top there. I
4 think your PDF is going to have the same one. So if we
5 -- so page 48 of the PDF should line up with the page
6 ID number.
7    Q. Okay.
8    Q. And that's a letter to you dated
9 April 25, 2019.
10       Do you see that?
11   A. Yes.
12   Q. And the second page of that document, page
13 ID 49, is -- it says, "Susan Noto, Source Acquisition
14 Strategist."
15       Do you see that?
16   A. Can you scroll down to the next page. Okay.
17       Yes, I do.
18   Q. Okay. Do you recall receiving this request
19 in or about April 25, 2019?
20   A. I do.
21   Q. Okay. And do you recall having some
22 back-and-forth e-mail exchanges with Ms. Noto?
23   A. Yes, I do.
24   Q. Okay. Let's pull, if you would, the
25 exchanges which are in Exhibit 17. Let me know when

Page 19

1 you have that in front of you.
2       (EXHIBIT 17 MARKED FOR IDENTIFICATION)
3    A. Got it. Okay.
4    Q. Okay. In Exhibit 17, at the bottom there it
5 has Bates -- what we call a Bates number. It starts
6 with the prefix "DEF 000145."
7       Do you see that?
8    A. Yeah.
9    Q. Okay. And continues through 146 there on the
10 second page.
11   A. Yes.
12   Q. All right. If we looked at the second page,
13 where the e-mail string begins, it's an e-mail from Sue
14 Noto to you dated April 25, 2019 that just says, "Dear
15 Mr. Robertson, please see attached KRS request for
16 current tax assessment data."
17       Do you see that?
18   A. Yes.
19   Q. And was what was attached to that the letter
20 that we looked at in the Exhibit 3, the two-page letter
21 there on page ID 48 through 49.
22       Do you recall if that's the attachment that
23 you got?
24   A. Yeah, I believe so.
25   Q. Okay. And the next e-mail from you, you're

Page 20

1 writing back to Ms. Noto the next day. "Thank you for
2 the request -- or "Thank you for request. After
3 looking at the cost, please contact us with a check so
4 we can get this to you. Have a wonderful day."
5       And then she writes back, "Hi, Mr. Robertson.
6       Are the fees of $18,901.05 quoted based on
7 your office's determination that Zillow's intended use
8 for the records is for a 'commercial purpose,' based on
9 the information
10 I provided in my letter?" And then she asks you for
11 reasons your office made that determination.
12       And then your response to her was, "This
13 charge is a fee that we would charge for anyone
14 requesting this information. We don't care how you use
15 the information internally. We just ask that you do
16 not sell this info to anyone else without our
17 authorization."
18       So in terms of the $18,901.05, did you secure
19 that amount from looking at the PVA commercial purpose
20 fee guidelines -- or commercial fee guidelines that the
21 department of revenue puts out?
22   A. Yes, I did.
23   Q. Okay. And just for, again, another acronym
24 that I will use here, if I use the acronym "DOR,"
25 you'll understand that I mean the department of

Page 21

1 revenue?
2    A. Yes.
3    Q. Okay. And turning back to Exhibit 3 for a
4 moment, which is the complaint, and if you could turn
5 to the page ID in Exhibit 3 number 34, which is a
6 document that has the title "PVA Open Records
7 Commercial Fee Guidelines."
8    A. Okay.
9    Q. Let me know when you have that in front of
10 you.
11   A. I got it.
12   Q. Okay. So in terms of coming up with the
13 $18,901.05 quote that you provided Ms. Noto, is this
14 the source of that number, or are these the fees that
15 you relied upon?
16   A. Yes.
17   Q. All right. So you say in your e-mail that
18 you would charge anyone, based on these commercial fee
19 guidelines, requesting the type of information that
20 Ms. Noto requested.
21       Are you familiar with the commercial purpose
22 statute in the open records act, and specifically
23 KRS 61.874 and 133.047, which are specific to PVAs?
24 Are you familiar with those statutes?
25   A. I -- I don't know word for word. I -- I --

6 (Pages 18 - 21)

Page 22

1    I'm familiar to be general, yeah, sure.
2    Q.  Okay.  And again, I know you're not a lawyer,
3 so I won't be asking you questions that require you to
4 give me a legal response, but I do want to get your
5 understanding as the Owen County PVA.
6    Do you understand that there is a provision
7 in the open records act that dictates what a public
8 agency in Kentucky can charge for public records?
9    A.  Yeah, yeah.
10    Q.  Okay.  And do you understand in the open
11 records act, that there are two types of requests, a
12 commercial purpose request and a noncommercial request?
13    A.  Yeah.
14    Q.  Okay.  And so is it your interpretation or
15 view that the PVA Open Records Commercial Fee
16 Guidelines that were on page 34 of the complaint,
17 Exhibit A, that those commercial fee guidelines apply
18 to both commercial and noncommercial requests?
19    A.  No.  That would be just for commercial.
20    Q.  Okay.  And so the charge that you quoted
21 Zillow of $18,901.05, is that a product of your
22 determination that Zillow had made a request for a
23 commercial purpose?
24    A.  I -- well, that was a determination that I
25 thought Zillow was a commercial entity, yes.

Page 23

1    Q.  Okay.  Well, determination it was a
2 commercial entity -- was your determination that it was
3 a commercial entity, then, determinative of your
4 decision that the commercial fee guidelines should
5 apply to its request in terms of pricing?
6    A.  Yes, I think so.
7    Q.  Other than Zillow being a commercial entity,
8 were there any other pieces of information at the time,
9 so going back to -- sorry, let me pull this.  Going
10 back to the April and May correspondence that you had
11 with Ms. Noto that we looked at in Exhibit 17, was
12 there -- were there any other factors, other than
13 Zillow being a commercial entity, that you relied upon
14 in making your decision that the commercial fee
15 guidelines should be used in providing Zillow with a
16 price quote?
17    A.  No.
18    Q.  In terms of your review of the information
19 that Zillow included in its letter to you from Ms. Noto
20 of April 25, 2019 -- again, this is Exhibit G to the
21 complaint, Exhibit 3, page ID 48 -- in terms of your
22 determination that Zillow was a commercial entity and
23 that, therefore, the commercial purpose fee statute
24 would apply to its request, did you rely upon
25 information in this letter, or was it just your general

Page 24

1 familiarity with Zillow and its website and kind of
2 what it -- you know, what it did, or what it does?
3    A.  Honestly, both.
4    Q.  Okay.  So let's separate the two.
5    So the first part is prior familiarity with
6 Zillow, just knowing -- like, everybody knows who
7 Zillow is.  You know, what was your general
8 understanding of what Zillow's business was, you know,
9 prior to getting this request that influenced your
10 decision that it was a commercial entity and that the
11 commercial fee guidelines should apply?
12    A.  Okay.  So as a PVA, we -- we watch the
13 market, the -- the real estate market pretty closely
14 and, you know, try to -- try to see what people are
15 listing properties for, and -- at least in my county,
16 and Zillow's a -- a -- you know, has gained in
17 popularity, and a lot of people choose to list on
18 Zillow.
19    And so I pay attention to Zillow, kind of
20 know how Zillow works, and -- but as well as we -- we
21 check MLS sites and stuff, so that's kind of why I
22 know, you know, who Zillow is, you know, how it works,
23 and -- and that -- that type of thing.  Try -- I just
24 try to keep up with listings.
25    Q.  And let me -- and I don't want to

Page 25

1 mischaracterize anything you just said, but I just want
2 to make sure I break that down a little bit, because
3 there was a lot in there that you just said, and I want
4 to make sure I understand it.
5    So as part of your duty as PVA for Owen
6 County, it's of interest to you and important to you,
7 to kind of know what houses are being sold for and what
8 the -- the health of the real estate market generally
9 is, correct?
10    A.  Yeah.  Yeah.  I mean, you know, we -- we tend
11 to not know what something sold for until, you know, a
12 week to a month after its already sold, but I can see
13 what stuff are listing -- listing for.  So kind of --
14 it -- it just kind of helps and kind of helps kind of
15 know -- know the market.  Just another -- another
16 educational tool maybe, so to speak.
17    Q.  So you use it to acquire information about
18 the Owen County real estate market.
19    Do you use it to look at sort of surrounding
20 counties, too, you know, ones where you don't have
21 records for?
22    A.  No.
23    Q.  Just Owen County, then?
24    A.  Yeah.
25    THE WITNESS:  He's locked up.

7 (Pages 22 - 25)

Page 26

1       COURT REPORTER:  Yeah.
2       MR. BERTELSON:  Hey, Darren, you're --
3       COURT REPORTER:  Yeah.  We'll go off the
4   record.
5       (OFF THE RECORD)
6       COURT REPORTER:  Back on the record.
7  BY MR. FORD:
8       Q.  All right.  We're back from a brief technical
9   glitch there.
10      And Mr. Robertson, I was asking you generally
11  how -- you know, what you look at Zillow for, what
12  purpose.
13      Are you familiar with a feature on Zillow.com
14  called the Zestimate?
15      A.  Yes.
16      Q.  Okay.  And what is your understanding of the
17  Zestimate?  What is that?
18      A.  That basically they estimate what your home's
19  value is.
20      Q.  Okay.  And in terms of the types of
21  information that you had looked at Zillow for, is the
22  Zestimate something that you've looked at in the past
23  at all to get sort of an idea of property values in
24  Owen County at all?  Is that a tool that you used?
25      A.  No.

Page 27

1       Q.  So just something you're familiar with, but
2   it's not something that you specifically consulted on
3   Zillow.com?
4       A.  Correct.
5       Q.  Okay.  Other than getting information from
6   Zillow about maybe home sales, you know, other general
7   information about what may be happening in the real
8   estate market in Owen County listings, that sort of
9   thing, is there any other way that you, in your
10  official capacity as an Owen County PVA, use Zillow's
11  website as a tool of any sort?
12      A.  No, sir.
13      Q.  So it's solely an information source for you?
14      A.  Correct.
15      Q.  And have you ever paid any money to Zillow
16  for any of the information that you've acquired from
17  them?
18      A.  No.
19      Q.  All right.  So that was in the context of me
20  asking you about your assessment of Zillow and using
21  the commercial fee guidelines, and that's the prior
22  knowledge about Zillow before getting the actual letter
23  from Sue Noto.
24      The second part of your answer was that you
25  relied on some of the information in her letter in

Page 28

1  determining that Zillow was a commercial entity and
2  that the commercial fee guidelines should be used in
3  calculating a quote for the records that they
4  requested, correct?
5       A.  Correct.
6       Q.  What specific information in this letter,
7  which is, again, Exhibit 3, Exhibit G to the complaint,
8  which starts on page 48 and goes through page 49, what
9  information in this letter did you rely upon in making
10 that determination?
11      A.  So there was a link sent in that letter, and
12 looking at the link, I believe I remember getting on
13 there and -- and actually looking at the Z -- the
14 Zestimate, I think is what it's called, and seeing that
15 they used -- and a part of creating the -- the
16 Zestimate, is that they used our information to create
17 that.
18      And then I believe also on that link, the
19 financials in Zillow, something like $700 million in a
20 -- in a quarter last year.  So to me, that's -- that's
21 a pretty big, commercialized operation there.
22      Q.  Okay.  So in the link that I think you're
23 referring to in Exhibit G is the
24 www.Zillow.com/corp/about.htm?  That's the link you
25 clicked?

Page 29

1       A.  Yeah.  I believe so, yeah.
2       Q.  You said there was some information about
3  Zillow's revenue in there that, you know, you looked
4  at?
5       A.  Yeah.
6       Q.  Other than the information in the link, was
7  there anything else within the -- in the letter itself
8  that you used to make the determination that it was a
9  commercial entity and that the commercial fee
10 guidelines should apply?
11      A.  Yeah.  Also right above it, it talks about --
12 there's the -- a sentence right above the link there.
13      It says, "Zillow generates revenue from,
14 among other sources, the sale of advertising space on
15 Zillow.com, where the information contained in these
16 records will appear."  So they're selling space because
17 of the information.
18      Q.  So in other words, the fact that they sell
19 advertising on their website where the information
20 appears, that was influential in your determination
21 that it was a commercial entity to which the commercial
22 fee guidelines should apply?
23      A.  Correct.
24      Q.  Back in -- and let's just put a date on this
25 so we're not -- back in Exhibit 17, your e-mail to Sue

8 (Pages 26 - 29)

1 after her -- or her question about whether that was a
2 commercial purpose fee on May 7. So that's the date
3 that you responded to her.
4        Prior to May 7, 2019, did you consult any SEC
5 filings that Zillow had made?
6    A.   No, I don't believe so.
7    Q.   Now, are you familiar with the provision in
8 the open records act that states that a newspaper is
9 not a -- or a request from a newspaper is not for a
10 commercial purpose, doesn't fall within that
11 definition?
12       Are you familiar with that provision in the
13 statute?
14    A.   Yeah. I did know that it was in there, yeah.
15    Q.   You did know that prior to receiving Zillow's
16 request?
17    A.   I did go back and look it up. So I -- I --
18 honestly, I -- I don't know if I remembered that or
19 not, honestly.
20    Q.   Okay. Let's turn -- if you could turn to
21 page 10 of the complaint. That's Exhibit 3.
22    A.   Okay.
23    Q.   And you see at the top there, and I'll just -
24 - for the record here, this is part of the allegations
25 in the complaint on page 10. The actual paragraph

1 starts back on page 8. It's paragraph 24. And it's
2 KRS Section 61.874(4), and it basically summarizes that
3 section of the statute.
4        And then there it has the term "commercial
5 purpose" as defined by the ORA as follows, and it says,
6 "Commercial purpose means the direct or indirect use of
7 any part of a public record." And then B, "Commercial
8 purpose shall not include publication or related use of
9 a public record by a newspaper or periodical."
10       Do you see that?
11    A.   Yes.
12    Q.   Okay. So in terms of your familiarity with
13 the open records act, at the time when you received
14 Zillow's request in April of 2019, were you familiar
15 with those carveouts of what commercial purpose means?
16    A.   Like I said, I mean, I -- I'm not a studier
17 of the KRS, so I -- I generally knew, yes, but
18 specifically, you know, word for word, I can't say that
19 I did.
20    Q.   Okay. And just determining that the
21 commercial fee guidelines applied to Zillow; did you
22 undertake any analysis to determine whether it should
23 be classified or its purpose should be classified as
24 publication or related use of a public record by a
25 newspaper or periodical?

1    A.   No.
2    Q.   So you didn't think at any point in time, in
3 terms of classifying Zillow's request, as to whether or
4 not that exception should apply?
5    A.   Are you asking me did I think Zillow was a
6 newspaper, or...?
7    Q.   Well, I'm asking you, did you undertake an
8 analysis to determine whether or not that exception
9 there should apply to Zillow's request?
10    A.   No, I did not.
11    Q.   And was there any reason you decided -- or
12 strike that. Was there a reason that you didn't
13 undertake to determine whether that exception applied?
14       What I mean by that was, was it something
15 that crossed your mind and you said, "No, I don't need
16 to worry about that," or it just didn't occur to you?
17    A.   Are you asking me that it didn't occur to me
18 that Zillow would be like a newspaper or -- I'm not
19 understanding the question.
20    Q.   It's a bad question.
21       So when you received Zillow's request, in
22 terms of analyzing whether the commercial purpose fee
23 guidelines should apply to its request, did you
24 consider at any point in time whether or not it might
25 be a newspaper or periodical?

1    A.   No, I never considered Zillow to be a
2 newspaper.
3    Q.   Okay. And was there a reason that you didn't
4 consider them to be a newspaper or periodical?
5    A.   I mean, none specifically that pops into my
6 head. I -- I just never considered them to be a
7 newspaper. When I think of a newspaper, I think of
8 weather, sports, a publication, like lots of -- lots of
9 different things. News. A lot of stuff comes to mind.
10       Zillow doesn't come to mind when I think of a
11 newspaper.
12    Q.   Okay. So in terms of your analyzing whether
13 something is or not a newspaper or periodical, you look
14 at the types of information that they publish, correct?
15    A.   Yeah. To a certain extent, yeah.
16    Q.   Okay. And is there any other features of a
17 newspaper or a periodical that, in your view, makes it
18 plainly obvious to you that Zillow wouldn't satisfy
19 either one of those definitions of newspaper or
20 periodical in your mind?
21    A.   Nothing necessarily just jumps out to me, but
22 nothing jumps out to me that would say Zillow is. I --
23       I don't see any connection, honestly.
24    Q.   Okay. Well, let me ask you this: You
25 testified earlier that you had looked at Zillow prior

9 (Pages 30 - 33)

Page 34

1 to getting this request to get information about Owen
2 County real estate, right?
3     A. Correct.
4     Q. Okay. So what in your mind distinguishes
5 you're going to Zillow to get information about the
6 Owen County real estate and you going to -- I don't
7 know if you read the Lexington Herald-Leader or what
8 your favorite newspaper is -- but going to, let's say
9 the Lexington Herald-Leader to find out sports scores?
10     What differentiates, you know, your doing
11 those two things in your mind?
12     A. Honestly, I don't even know how to answer
13 that question, because I've never considered ever going
14 to Zillow for news.
15     Q. And so in your view, information about the
16 Owen County real estate market listings, that sort of
17 thing, that's not news in your definition of news?
18     A. No, that -- that's work.
19     Q. That's work. Okay. So let me give you
20 another hypothetical.
21     If you wanted to see what properties were
22 sold in another county, you could potentially go to a
23 newspaper to find that information, correct?
24     A. Correct.
25     Q. Because some have listings of properties and

Page 35

1 property sales, correct?
2     A. Yeah.
3     Q. So what would be the difference between that
4 information appearing in a newspaper and that
5 information appearing in Zillow, in your mind?
6     A. Honestly, I didn't know Zillow posted -- or
7 posted sales.
8     Q. Okay. Well, if you -- have you ever looked
9 at a -- characteristics of a piece of property on
10 Zillow, like a specific piece of property?
11     A. Not characteristics, no.
12     Q. Okay. So you wouldn't be aware if there was
13 information on a particular individual property saying
14 the last sale date?
15     A. I mean, honestly, I have all that information
16 in my office. I only look at my county when I get on
17 MLS or Zillow. So, no, I don't go to Zillow for that
18 info.
19     Q. Sure. But Zillow gets that -- or at least
20 your understanding is Zillow gets that sort of
21 information from offices similar to yours and then
22 publishes that information, correct?
23     A. Right.
24     Q. Including the last sale date, for instance,
25 right?

Page 36

1     A. Correct.
2     Q. So in your mind, what's the difference
3 between you going to Zillow if you wanted to obtain the
4 last sale date for a particular piece of property and
5 you going to a newspaper to obtain that same
6 information?
7     What's the difference between those two
8 sources in your mind?
9     A. It -- honestly, it's just something I -- I
10 don't do. But again, when you talk about current
11 sales, if you're -- if you're looking at something
12 current, that's where you would go to a newspaper to
13 get a prior sale. You're not going to go to a
14 newspaper because it's only going to show you either
15 that -- that week or -- or that month.
16     Q. Well, let's use a specific newspaper.
17     So what -- in Owen County, what's the most
18 sort of useful newspaper, I guess, for folks in Owen
19 County if they want to find out what's going on
20 locally?
21     A. We have a newspaper called the News-Herald.
22     Q. And does the News-Herald have a classified
23 section?
24     A. They do.
25     Q. And have you ever looked at the classified

Page 37

1 section in the News-Herald?
2     A. Sure.
3     Q. Does it ever contain classifieds for real
4 estate listings?
5     A. I'm sure it does. That's not why I go to the
6 classifieds, but I'm sure it does. Yeah.
7     Q. Okay. In your view, what's the difference
8 between someone that goes to Zillow to see what houses
9 may be listed in Owen County today or going to
10 News-Herald to see what classified real property
11 listings may be in that newspaper? Is there a
12 difference in the source, in your view?
13     A. Yes. Like I said, I just think that a
14 newspaper is going to give you the sales of that week,
15 and Zillow's going to give you listings and going to
16 give you prior sales back, you know, multiple years in
17 the past.
18     Q. If the News-Herald came to you and said,
19 "Hey, we want your property tax roll for fiscal year" -
20 - or for, let's say -- not fiscal year, but "calendar
21 year 2020," would you -- what would you charge to the
22 News-Herald?
23     A. Honestly, I don't -- I would have to -- to
24 work that up. It would -- it would be at -- at our
25 cost, what it would cost us. I honestly don't have

10 (Pages 34 - 37)

Page 38

1 that figures. They've never asked me for that, so I
2 don't know.
3   Q.  But you wouldn't charge them under the
4 commercial fee guidelines?
5   A.  No.
6   Q.  And would it change your assessment of what
7 you would charge the News-Herald if the News-Herald
8 said, "Hey, we're going to publish this information in
9 our newspaper"? Would that change what you would
10 charge them?
11   A.  Can you say that one more time? I'm sorry.
12   Q.  Sure. If -- in making that request to your
13 office, that they want your property tax roll for 2020,
14 the News-Herald, and said, "We're going to publish all
15 of this information in a special edition of the
16 News-Herald about, you know, recent -- or the real
17 estate market in Owen County," would the fact that they
18 were going to publish it, you know, in their newspaper,
19 would that change whether you considered their request
20 to be for a commercial or noncommercial purpose, or
21 would you still consider that to be a noncommercial
22 purpose request?
23   A.  Yeah. I would still, judging by that KRS
24 that -- that takes the newspapers out, I would still
25 say that that was noncommercial.

Page 39

1   Q.  Okay. But you've never received any sort of
2 request from the News-Herald like that?
3   A.  No. No.
4   Q.  Do you ever get requests from the News-Herald
5 for individual property characteristics? Like, do they
6 call you up and say, "Hey, you know, there's a fire.
7 We would like to know who owns this property"?
8   A.  No, not to my knowledge. I mean, it may have
9 potentially happened, but it is --
10   Q.  It's rare?
11   A.  Very rare, yes, sir. Yeah.
12   Q.  So it may have happened, but sitting here
13 today, you don't have any specific recollection of an
14 incident where that happened?
15   A.  No, I do not.
16   Q.  I think you said in terms of if you got a
17 request from the News-Herald for property tax roll
18 file, that you would need to determine what your cost
19 was under the open records act in terms of what you
20 could charge them, right?
21   A.  Yeah, yeah.
22   Q.  And you don't have -- I mean, it's a
23 hypothetical, but you don't have an -- you don't have
24 an idea of sort of what that cost would be for, you
25 know, providing the property tax roll file at whatever

Page 40

1 your cost is?
2   A.  I've -- I've never had anybody that I would
3 consider noncommercial ever ask for the entire tax
4 roll, so, honestly, I -- I do not.
5   Q.  Okay. Let's look back at Exhibit 1 for a
6 moment, which is the notice of deposition with the list
7 of topics. Let me know when you got that. That's page
8 6 where it's got that numbered list there.
9     (EXHIBIT 1 MARKED FOR IDENTIFICATION)
10   A.  Okay.
11   Q.  So number 3 in that topic list is the amount
12 the PVA would have charged for the records sought by
13 the Zillow request if Zillow's purpose in making the
14 request had been for noncommercial purposes within the
15 meaning of KRS 61.8743.
16     Just to clear that topic off my list, is it
17 fair to say that you would -- your answer to that
18 question would be the same as your answer to the
19 hypothetical about the News-Herald, that if it was a
20 noncommercial request, you would charge whatever your
21 cost was to provide those records to Zillow; is that
22 fair?
23   A.  Yes.
24   Q.  Okay. The next topic here was the out-of-
25 pocket cost the PVA would incur to respond to the

Page 41

1 Zillow request. I think you've already answered that,
2 essentially, by saying you don't have that number
3 immediately available to you in terms of that cost.
4 But let's try to get at it maybe a different way in
5 terms of the resources that would be required to
6 satisfy that request.
7     In terms of what your office would need to do
8 to get Zillow the information that it's requested, the
9 property tax roll file, what are the steps that would
10 be necessary to do that, and who would perform those
11 steps?
12   A.  Well, it would be me and -- and my two
13 deputies. It would also depend on how Zillow is
14 requesting that information, whether that be paper or
15 electronically, what have you, on what different
16 format.
17   Q.  Well, let's look at the actual request here
18 and see if we can't nail it down here, because I do
19 believe they specifically requested, in a -- in
20 electronic format. So let me pull that here. And
21 that's, again, on page 49.
22     Forty-eight, 48 of Exhibit 3 is that request
23 that Ms. Noto made to you on April 25?
24   A.  Okay.
25   Q.  And so she lays out the requester, copies of

11 (Pages 38 - 41)

Page 42

1 the current 2018 assessment files or tax roll file,
2 "All parcels in Owen County contained the following
3 information." She gives a laundry list there of
4 information. And then she says, "To the extent your
5 office maintains these records in a standard electronic
6 format, such as database, delimited text, or Microsoft
7 Excel, I request that your office provide the records
8 in the same format pursuant to KRS 61.874." So let's
9 start with that part.
10     Does your office maintain the information
11 that she requested there? And I realize it may not be
12 all of it, but whatever information you had available
13 and that was included in your quote that you gave her
14 of $18,000, do you maintain that information in any of
15 the formats that she indicated in her letter?
16   A.  Yes, I do.
17   Q.  Okay. Which format?
18   A.  We can convert it to the Microsoft Excel.
19   Q.  Okay. So would it be possible for your
20 office to provide the information or -- in a Microsoft
21 Excel format?
22   A.  Yes.
23   Q.  So walk me through the physical process of --
24 you know, assuming, obviously, you get the money in the
25 door and that's taken care of -- what would be the

Page 43

1 actual process of -- and let's just assume that she
2 wants the -- I don't think she specified this, but
3 let's just say she asked for the records to be copied
4 to a thumb drive.
5     So let's, you know, assume those facts. And
6 what would be the process to actually get those records
7 to Ms. Noto in response to her request?
8   A.  So it would be the cost of the thumb -- now,
9 are you saying if she was a noncommercial entity? Is
10 that --
11   Q.  Well, we're assuming she's paid your $18,000.
12   A.  Okay.
13   Q.  But I'm only talking about just the actual
14 act of copying and getting --
15   A.  Okay.
16   Q.  -- the records to her.
17   A.  Okay. I got you. Yeah. So we would have to
18 download it into an Excel spreadsheet. Once that
19 process was complete, we would then transfer it to the
20 thumb drive and then mail her the thumb drive.
21   Q.  Okay. And so the first step there, basically
22 converting the information to an Excel format, there's
23 a -- somebody in your office who is able to do that, or
24 is everybody who works there is capable of doing that?
25   A.  Pretty much any one of us, yeah.

Page 44

1   Q.  Okay. So one of you will go ahead and
2 convert that to an Excel file, and then that file will
3 be created on, like, a desktop computer or something?
4   A.  Yes.
5   Q.  And then you would plug -- you would -- well,
6 you have to -- I don't know if you would keep them on
7 there, but obviously, you have thumb drives. Either
8 you have to buy it or you've got a supply. There's
9 some cost to that thumb drive.
10     You would stick that thumb drive into the
11 desktop USB port and copy the document to that USB
12 port, right?
13   A.  Correct.
14   Q.  And then you would mail out, overnight,
15 whatever, that thumb drive to Ms. Noto in this case?
16   A.  Yes.
17   Q.  Is there any other activity or process
18 involved in getting the records that your office
19 maintains to a requester other than what was just
20 described, putting aside the collection and
21 preliminary, you know, efforts of actually getting the
22 information into your office?
23   A.  No.
24   Q.  Okay. And in terms of -- and maybe you have
25 an estimate of this, but, you know, from the point of

Page 45

1 sitting down at the desktop and, you know, copying or
2 converting the information to Excel and then copying
3 it, you know, how long does it generally take someone
4 in your office to accomplish?
5   A.  I've never had anybody buy my entire tax roll
6 with the characteristics and everything that Zillow
7 requested, so honestly, I do not know how long that
8 would take to download.
9   Q.  All right. If we took out the
10 characteristics piece and -- because it sounds like
11 that's sort of a unique request that you don't
12 typically get from other requesters, from your typical
13 commercial requester, how long does it usually take to
14 get that information to them?
15   A.  Yeah. So we've sold two to CoreLogic and one
16 to Black Knight, and I think, you know, typically takes
17 us ten to 15, maybe 20 minutes.
18   Q.  Now, this will sound a little bit like a
19 silly question, but I've got to ask it just to make
20 sure I -- I'm not missing something here.
21     Is there any difference in that process that
22 you've just described in terms of the physical act of
23 converting the information to Excel and copying it to
24 a, you know, external media device like a thumb drive
25 and sending it to a requester?

12 (Pages 42 - 45)

Page 46

1        Is there any difference in that process based
2  on whether the request is a commercial or noncommercial
3  purpose?
4     A.  No.
5     Q.  So the only difference in the process is
6  going to be the price, ultimately, that the person has
7  to pay to get you to even start doing that, right?
8     A.  Correct.
9     Q.  All right.  Let's pull out -- this is going
10  to be, I think, Exhibit 16.
11        MR. BERTELSON:  Got it.
12        THE WITNESS:  All right.
13     Q.  And exhibit -- excuse me, Exhibit 16 has at
14  the top there, Annual PVA Office Budget FY 2020 through
15  2021, as dated June 25, 2020, and "Owen" over in the
16  left-hand corner, and has the Bates number down at the
17  very bottom there of DEF 000144.
18        Do you see that?
19        (EXHIBIT 16 MARKED FOR IDENTIFICATION)
20     A.  Yes.
21     Q.  All right.  And as I understand this, this is
22  the annual budget that you, as PVA for Owen County,
23  would submit to DOR, correct?
24     A.  Correct.
25     Q.  Okay.  And also, I understand that your

Page 47

1  fiscal year runs from July 1, 2020, at least this
2  year's July 1, 2020, through June 30, 2021, right?
3     A.  Correct.
4     Q.  And so the budget I have here in front of me
5  is for the year that we're currently in, correct?
6     A.  Yes.
7     Q.  So I really only have two basic questions
8  about this budget, but they have proven to potentially
9  be a little tricky.  So if you don't understand a
10  question that I'm asking, please clarify.  I want to
11  make sure that you understand exactly what I'm asking
12  you here.
13        The first category here in this budget is
14  anticipated expenses, right?
15     A.  Yes.
16     Q.  And there's a number of line items, including
17  salaries, and then accounts and so on and so forth,
18  right?
19     A.  Yes.
20     Q.  And, you know, using layperson, nonaccounting
21  person terminology here, this is the money that your
22  office spends to conduct its day-to-day operations,
23  right?
24     A.  Yes, that's correct.
25     Q.  Then the second part of this document, I

Page 48

1  would call it half, but it's less than half, but it's
2  the anticipated receipts there.
3        Do you see that?
4     A.  Yes, I see it.
5     Q.  Okay.  And that's money that's coming in the
6  door, right?
7     A.  Yeah.
8     Q.  Okay.  So do you -- as PVA, do you prepare
9  these budgets yourself, or do you send them out to
10  somebody else?  Or who prepares this budget?
11     A.  We -- we do it in the office.
12     Q.  And you may have some help from your
13  deputies, but it's internally created, right?
14     A.  Yes.
15     Q.  And I noticed with Franklin County as well,
16  but the budget zeros out, so you've got exactly as
17  much, you know, in terms of what you're spending versus
18  what you expect to come in to get to zero, right?
19     A.  That's correct.
20     Q.  Is that just by state law that you need to
21  have a balanced budget?  Obviously -- I mean, this is
22  going to probably change one way or the other, but is
23  it that, you know, here's our estimates, and we've got
24  to balance that budget to zero, and so here's what we
25  think is our best, you know, good-faith estimate for

Page 49

1  the year?
2     A.  That's correct.
3     Q.  Okay.  So it's not just a happy coincidence
4  that you ended up with a zero in terms of money going
5  out and money coming in, right?
6     A.  Yeah.
7     Q.  Okay.  So in terms of anticipated expenses,
8  you know, you get some public records requests, I
9  assume, every fiscal year?
10     A.  I -- we rarely get a public record, an -- are
11  you talking about an open public records request?
12     Q.  Yeah, open records request, public records
13  request, whatever you want to call it.  Somebody who's
14  coming to you, third party, saying, "We would like your
15  records."
16        One or two a year?
17     A.  Yeah.  Yeah, I think we sold the tax roll
18  three times this year.
19     Q.  Okay.
20     A.  Not the full tax roll, but...
21     Q.  A portion of it?
22     A.  Yeah.  A portion, yeah.
23     Q.  Okay.  And so it's not like there's, you
24  know, years that go by where you get no requests under
25  the open records act from third parties for your

13 (Pages 46 - 49)

Page 50

1  records, right?
2     A.  Right, that's correct.
3     Q.  And presumably, you get an annual request
4  from mortgage companies, you know, to send them -- the
5  tax bills to you?
6     A.  Two -- two companies are pretty much every
7  year.
8     Q.  Okay.  And one of those, I assume, is Wells
9  Fargo?
10    A.  No.
11    Q.  No.  Okay.  What are the two companies you
12 get every year?
13    A.  CoreLogic and Black Knight.
14    Q.  And so you can anticipate at least getting
15 those two requests every year?
16    A.  Those are on the regular, yes.
17    Q.  And you may get more or, you know, one may
18 not make a request, but that's sort of what you're --
19 that's what you would anticipate on an average year,
20 right?
21    A.  Correct, yeah.
22    Q.  So in the anticipated expenses portion of
23 this budget, so that's money going out the door, money
24 that you're spending for, you know, things that cost
25 your office money, do you budget for cost to your

Page 51

1  office to satisfy a request from a CoreLogic or a Black
2  Knight?
3        Is that an expense that appears somewhere
4  that you estimate, you know, brief fiscal year, it's
5  going to cost us, you know, a thousand dollars, for
6  instance, to satisfy those requests?  Is that amount
7  anywhere in the anticipated expense portion of this
8  budget?
9     A.  I think it could be -- if it was anywhere, it
10 would be in the salaries.  I mean, that's -- that's my
11 job.  That's our -- our deputies' jobs.  That's what we
12 take care of, so...
13    Q.  Do you have any hourly employees, or is
14 everybody on a salary?
15    A.  Everybody's on salary.
16    Q.  Okay.  So there's not, like, a -- let me put
17 it this way: Nobody in your office is being hired to
18 handle the two public records requests that you get
19 every year, right?
20    A.  No.
21    Q.  Not hourly, so it's not like you're just,
22 "Well, might need to do three hours of overtime, you
23 know, or six hours of overtime"?
24    A.  It would be against the law, as little as I
25 could pay them for that.  So no, nobody's signing up

Page 52

1  for that.
2     Q.  Right.  But I mean, the point is you're not
3  thinking, "Oh, boy, we have to pay some overtime for
4  these two public records requests" and budgeting that
5  in, because everybody's salary, and you don't need to
6  do that, right?
7     A.  Right.
8     Q.  Okay.  So -- but in terms of those other
9  expenses, you know, like a -- I don't know, electricity
10 cost or some -- you know, what other expenses would you
11 potentially have in satisfying a public records request
12 other than staff time?
13    A.  I -- I mean -- I guess, potentially, you
14 could say office supplies maybe, with paper and --
15 and/or thumb drive or something of that nature, but...
16    Q.  You would pass the thumb drive, though,
17 through to the requester, the cost of the thumb drive
18 through to the requester, though, right?
19    A.  Yeah, yeah.
20    Q.  So would you include that cost in an expense
21 line saying, "We need to buy, you know, two thumb
22 drives this year to potentially handle black -- you
23 know, Black Knight and CoreLogic, or it's like now
24 we're going to -- we're going to recoup that anyway, so
25 you know, we're not going to separately line item that

Page 53

1  sort of -- that sort of item?
2     A.  I mean, we do have a line item in there for
3  our office supplies, but if -- if -- I guess if we're
4  already passing the buck to them, you know, if they're
5  paying for the thumb drive or what have you, I think
6  with paper, you know, if it's -- you know, if they're
7  getting a copy of every property card, that would be
8  9,500 or so sheets, you know, of paper.
9        Yeah, I would have to -- I would have to make
10 sure I budgeted for something like that, but --
11    Q.  Then you --
12    A.  -- thumb drive, no.
13    Q.  But then you would recoup that on the income
14 line as fee income from --
15    A.  I -- I would, yeah, but I would have to
16 budget something for -- to show that much money to buy
17 paper.
18    Q.  That makes sense.  So let me see if I can
19 summarize.
20        So to the extent that you have, you know,
21 expenses when satisfying a public records request, such
22 as copy paper, copy ink, that sort of thing --
23    A.  Yeah.
24    Q.  -- you're going to budget a certain amount
25 for office supplies.  You may factor in, you know, what

14 (Pages 50 - 53)

Page 54

1  you might need for that, but it's not a separate public
2  records office supplies line item, it's just general
3  office supplies considering maybe we need it for that
4  sort of thing?
5      A.  Correct.
6      Q.  I think I'm -- so that makes sense.
7          And so we've got office supplies, and then,
8  you know, salaries to the extent that, you know, the
9  employees may be doing that work, but there's not a
10 line item that says, "We expect to pay overtime,"
11 because they're all salaried employees, so that's not a
12 -- that's not an issue.  And they're not just doing
13 public records stuff, they're doing everything else
14 your office needs to do, right?
15     A.  They're -- they're doing all of the work that
16 for -- that -- well, we have that info for open records
17 requests, yeah.
18     Q.  Well, and that's a good clarification.  So I
19 guess -- you know, let me expound on that a little bit.
20         So, you know, you collect the information so
21 that you can prepare the property tax roll file.
22         You collect all of that information pursuant
23 to statute, correct?  The law requires that you collect
24 that information, right?
25     A.  That is correct, yeah.

Page 55

1      Q.  And you -- you're going to collect that
2  information to create that -- those records
3  irrespective of whether you get a public records
4  request for it, right?
5      A.  Yes.
6      Q.  And so, for instance, let's say that, you
7  know, for whatever reason, the four years go by, and
8  you don't get any public records requests from your
9  property tax roll file.
10         It's not like, all of a sudden, no reason for
11 your office to exist anymore, right?
12     A.  That's correct, yeah.
13     Q.  And you're not collecting any information for
14 the property tax roll file or other information that
15 you maintain?
16         You're not collecting any information
17 specifically for public records requesters, right?
18     A.  No.  We're not hired by public records
19 requesters to do this certain job, no.
20     Q.  And that partially answers my question, but
21 let me see if I can clarify it a little bit, is
22 There's no piece of information that when you send your
23 folks out into the field to get information so that you
24 can prepare your property tax roll file?  There's not a
25 piece of information that you say, "Well, let's get

Page 56

1  that information because I know CoreLogic wants it"?
2      A.  That -- yes, that would be correct.  We
3  don't.
4      Q.  There's no information like that, right?
5      A.  No.  We do not do that, no.
6      Q.  Okay.  So going down to the anticipated
7  receipts portion of your budget there, you obviously
8  anticipate getting some income from CoreLogic and Black
9  Knight every year when they buy your property tax roll
10 file, correct?
11     A.  Yes.
12     Q.  Okay.  And where does that anticipated income
13 appear in the anticipated receipts portion, if at all?
14     A.  I believe that would be in the miscellaneous
15 income.
16     Q.  Okay.  So about -- that mass $5,025 there
17 listed as miscellaneous income, is that number just the
18 fee income that you expect from CoreLogic and Black
19 Knight, or is that -- does that include some other fee
20 income that you receive for nonpublic records request-
21 related activities?
22     A.  It would pretty much just be them.  You know,
23 we charge -- when people come in and make copies, we --
24 we charge for that.  Occasionally, people will order
25 some maps from us, and we charge for that.  But it's --

Page 57

1  it doesn't add too much to that grand total there of
2  $5,000.
3      Q.  So it's mostly CoreLogic and Black Knight
4  that is budgeted there?
5      A.  Yes, sir.
6      Q.  Okay.  That answered my question.
7          Now, prior -- the topic, at least in the
8  notice of deposition, was for fiscal years what would
9  be 2020 and 2019, I guess.
10         Do you know what you had budgeted in those
11 years for those fees from CoreLogic and Black Knight?
12         Was it about the same as what was here?
13     A.  I would guess.  I -- I do not know for sure,
14 but I would guess it would be roughly the exact same,
15 yeah.
16     Q.  But there was, to your recollection -- I
17 recognize you don't have that information right in
18 front of you, but there was, to your recollection, a
19 line item for those prior budgets that you included for
20 anticipated income or anticipated receipts from the two
21 recurring public records requesters on an annual basis?
22     A.  Yeah.  I believe so, yeah.
23     Q.  And so let's look back to the list of topics
24 in Exhibit 1, and one topic asks for "The expenses
25 incurred by the PVA," so your office, "in 2019 and 2020

15 (Pages 54 - 57)

Page 58

1 for responding to public records requests made for
2 commercial purposes."
3       And obviously, that would be an after-the-
4 fact sort of assessment, but do you know what your cost
5 was to copy or to -- well, let me back up here and ask
6 it this way. CoreLogic and Black Knight, how do they
7 request the data that they request on an annual basis?
8 Do they get it in Excel, or what type of format do they
9 get it in?
10      A. Usually Excel.
11      Q. Okay. So do you know what your office's
12 expenses were for copying or converting the data to
13 Excel that they requested and then copying it to
14 whatever media they requested and sending it to them?
15      Do you know what those expenses were for
16 fiscal year 2020 and 2019?
17      A. I mean, honestly, I don't because we don't --
18 I mean, I don't section out every little duty of my
19 deputies to see how much time they're spending here or
20 there, and, you know, that. I -- I got enough on my
21 plate as it is. I -- I'm not going to break it down
22 that far, so...
23      Q. And again, they're salaried, right, so --
24      A. Right.
25      Q. -- they're not going to be paid overtime for

Page 59

1 doing that or, you know, anything like that?
2       A. No.
3       Q. Okay. So in terms of that number, you would
4 have no way of getting me that information if I wanted
5 to get it?
6       A. No.
7       Q. All right. Let's go down to topic number 9,
8 which is "The processes and systems used by the PVA to
9 respond to public records requests, including the
10 identity of any employee of the PVA who performs job
11 responsibilities related to responding to public
12 records requests and the identity of any computer
13 hardware purchased for the purpose of responding to
14 public records requests or dedicated to responding to
15 public records requests."
16      I think we already answered the first part of
17 that, which is that you and your deputies may be
18 responsible for doing that, so there's no specific
19 person who necessarily makes the copies, but all three
20 of you can do it, right?
21      A. Correct.
22      Q. And then the second part of this -- you know,
23 "computer hardware purchased for the purpose of
24 responding to public records requests or dedicated to
25 responding to public records requests."

Page 60

1       Do you have a computer or desktop, or any
2 piece of hardware, that is dedicated to responding to
3 public records requests?
4       A. No.
5       Q. And so you described, you know, the process
6 of converting the data to an Excel spreadsheet. That
7 process is done on a desktop that you would use for
8 other business, you know, or other office activities,
9 and so on and so forth?
10      It's not dedicated to public records
11 requests, correct?
12      A. Correct.
13      Q. All right. Moving on to number 10, the next
14 topic, which is, "The PVA's answer to Interrogatory
15 Number 13, including whether and how each of the
16 interests identified in response to that interrogatory
17 is "substantial," and how each substantial interest is
18 advanced by the Commercial Purpose Fee Statutes (as
19 that term is defined in the Complaint)."
20      So this is Exhibit 6, which we have not yet
21 pulled out for your deposition yet, so I'll give you --
22      I'll give you a moment to grab that.
23      (EXHIBIT 6 MARKED FOR IDENTIFICATION)
24      A. Got it.
25      Q. Okay. All right. So interrogatory number 13

Page 61

1 is on page 26.
2       A. Okay.
3       Q. And -- well, first off, do you recognize this
4 document or the responses in this document?
5       A. I do.
6       Q. So interrogatory number 13 provides, "State
7 what governmental interests you contend the Commercial
8 Purpose Fee Statutes (as that term is defined in the
9 Complaint) advance, and how the law advances each
10 interest identified." And response below that is you,
11 Blake Robertson, PVA, Owen County.
12      Now, I assume that this answer was prepared
13 with the assistance of counsel. And I don't want to
14 get into any conversations you had with your lawyers,
15 but I assume you did not write this, because that would
16 be very impressive for a nonlawyer if you did that.
17      A. You're correct.
18      Q. Okay. But I assume you reviewed it prior to
19 signing your name and saying that it was accurate, and
20 that you agreed with what was in there before it went
21 out, correct?
22      A. That's correct.
23      Q. All right. So here's what I want to ask
24 about this is -- and let me do this. Let me give you a
25 chance to read it, because I'm sure you probably

16 (Pages 58 - 61)

Page 62

1 haven't seen it in a few months. So take a moment and
2 just read those three paragraphs.
3        And I'm only going to have probably a couple
4 of questions for you on it, but I don't want you to
5 have to be sitting there reading it while I'm talking,
6 okay?
7    A.  All right.
8    Q.  We can stay on the record while he finishes
9 reading.
10        Just let me know when you're done,
11 Mr. Robertson, okay?
12    A.  Okay.  Okay.
13    Q.  All right.  So you've had a chance to review
14 the response to interrogatory number 13, Mr. Robertson?
15    A.  Yes.
16    Q.  Okay.  Are there any governmental interests
17 that you did not identify in your response to number 13
18 that you, sitting here today under oath in this
19 deposition, would add to that response?
20    A.  I don't believe so, no.
21    Q.  So as far as you know, sitting here today,
22 this answer is complete, and you don't intend to add
23 any additional governmental interests that you claim
24 are advanced by the commercial purpose fee statutes,
25 correct?

Page 63

1    A.  Correct.
2    Q.  All right.  And the last topic I think we've
3 already covered, but we'll just go ahead, and I'll ask
4 you very quickly, is your answer to the complaint, and
5 that is Exhibit 4.  If you could pull that out for me.
6        (EXHIBIT 4 MARKED FOR IDENTIFICATION)
7    A.  Okay.
8    Q.  And you recognize this document?
9    A.  Yeah.
10    Q.  And this is the answer that you -- that -- or
11 that your attorney has filed on your behalf to Zillow's
12 complaint, correct?
13    A.  Yes.
14    Q.  And if you could turn with me to page 6.
15    A.  Okay.
16    Q.  Paragraph 20.
17    A.  All right.
18    Q.  And we had talked earlier in your deposition
19 about the information that you had relied upon in
20 determining that it was appropriate to quote Zillow a
21 price that was based upon the commercial purpose fee
22 guidelines.
23        Do you recall that testimony?
24    A.  Yes.
25    Q.  And this paragraph in the answer states that

Page 64

1 "As the Defendant PVAs correctly determined from the
2 facts provided by Plaintiff, Zillow, in its
3 communications with the PVAs that Zillow is, in fact, a
4 'commercial purpose' requestor."
5        Does the testimony that you gave me earlier,
6 summarizing what you relied upon in making that
7 assessment, is that complete, or is there any other
8 additional information, looking at this response and
9 the answer, that you would supplement and say, "No, I
10 also relied -- I also relied upon additional
11 information"?
12    A.  No.
13    Q.  In terms of the correct fees, the commercial
14 purpose fee guidelines that we looked -- I'm sorry, not
15 commercial purpose fee -- the commercial fee guidelines
16 that we looked at that were attached to the complaint
17 at Exhibit A on page -- and this is Exhibit 3, by the
18 way -- on page ID -- and this is Exhibit 3, by the
19 believe we looked at that briefly earlier on.  That's
20 the PVA Open Records Commercial Fee Guidelines?
21    A.  Yeah.
22    Q.  I just have a couple of questions for you
23 that in terms of your understanding of your obligations
24 as an Owen County PVA.
25        Is it your understanding that these

Page 65

1 commercial fee guidelines are published by DOR?
2    A.  That's correct.
3    Q.  And is it your understanding that, as Owen
4 County PVA, you are obligated to charge at least the
5 amounts specified in here with the caveat that you can
6 charge more if your office incurs additional charges in
7 responding to a public records request?
8    A.  That's correct.
9    Q.  So as far as your understanding is, this is
10 the minimum that you could charge for records.
11        So if you wanted to charge nothing for them,
12 in your view, you would be violating the law if you did
13 that?
14    A.  That's correct.
15    Q.  Okay.  Is your understanding of your
16 obligation to charge consistently with the commercial
17 fee guidelines, where does -- where does the source of
18 your understanding --
19    A.  Can I back up just a second?
20    Q.  Yeah, of course.
21    A.  That -- that last question there, I don't
22 know that I know that it would be violating a law.  I -
23 - I don't know about that.
24    Q.  Okay.
25    A.  I do believe that that's the minimum fee, but

17 (Pages 62 - 65)

Page 66

1 violating a law, that's -- I don't know if it would be
2 violating law or not.
3    Q.  Well, I don't want to put you on the spot
4 here.
5    A.  Yeah, I just -- I thought about that after I
6 said it, and I'm like, hold up.  I -- I'm -- I don't
7 actually know about that.
8    Q.  Okay.  Let me -- let me phrase it a little
9 differently then, because I just want to -- I want to
10 get your understanding.  And I recognize, obviously,
11 you're not a lawyer, so you can't give me a legal
12 opinion on whether it would or not be.  I'm just -- I'm
13 just -- I'm curious about, in your view, how you
14 interpret sort of your obligations in terms of charging
15 for public records at your office.
16       So the question, I guess, is that, do you
17 feel that if you decided to implement your own pricing
18 policy at Owen County PVA for your records, that that
19 would be frowned upon by DOR?
20    A.  I don't know that it would be necessarily
21 DOR, but I -- I think it would be unfair to my other --
22 other county PVAs that -- that need the monies as well
23 and that go by those guidelines.  I think it just helps
24 us all be uniform.
25    Q.  Okay.  And so in terms of my earlier

Page 67

1 question, in terms of whether you think you have the
2 discretion to charge less if you wanted to, you don't -
3 - you don't know if you do or not, or you think you do,
4 but you choose not to because you believe it would be
5 inequitable to do so with respect to your other PVA
6 colleagues?
7    A.  No, I think that's what we need to charge.
8       That would be the minimum, yeah.
9    Q.  And so you think that that minimum is
10 mandated by law somewhere?
11    A.  Again, I think that's kind of getting into
12 the legal side of things.  I -- I don't -- I don't know
13 about the law, whether it would be breaking a law or
14 not.
15    Q.  Let me ask it this way, then: Do you think
16 that it's, then, generally DOR's policy to have its
17 PVAs charge in accordance with those fee guidelines?
18    A.  You know, I -- I think that would be PVA
19 policy, honestly.  All of us, you know, saying, "Hey,
20 this is the guideline we all need to follow so that
21 we're of one accord.
22    Q.  In terms of your understanding of
23 hierarchical structure in -- within the Commonwealth of
24 Kentucky, do you have a agency or public body that you
25 view as supervising your office?

Page 68

1    A.  Yeah.  I mean, you could definitely say that
2 the DOR supervises me.  I mean, they have field
3 auditors that, you know, are in my office.  So, yeah,
4 sure.
5    Q.  And so you would at least view the DOR as
6 being above you on the food chain from a supervisory
7 standpoint?
8    A.  Sure, yeah.
9    Q.  And these commercial fee guidelines come from
10 DOR, so they come with at least a imprimatur of this is
11 what the DOR wants you to do?
12    A.  Yes, but it's also in help with the -- the
13 PVA association, so...
14    Q.  Okay.  So the PVA association also has some
15 input on what these -- what these fees should be?  Is
16 that fair to say?
17    A.  That is correct, yeah.
18    Q.  Now, this document, if you look at the top
19 left-hand corner, is 8-12.
20       Do you see that, the commercial purpose --
21    A.  Yeah.
22    Q.  -- or the commercial fee guidelines?  Yeah.
23       So is that -- do you understand that to have
24 been the last date that these were revised, would be
25 August of 2012?

Page 69

1    A.  That's correct, yeah.
2    Q.  Okay.  And I believe at that point, you were
3 a field representative at Owen County PVA at that time?
4    A.  That is correct.
5    Q.  Do you recall having any involvement in
6 coming up with the fees that were in these fee
7 guidelines?
8    A.  None whatsoever.
9    Q.  Do you know if your former boss -- what was
10 his name?
11    A.  Jimmy Coyle.
12    Q.  Mr. Coyle.  Do you recall if Mr. Coyle had
13 any involvement in assisting and setting these rates?
14    A.  I do not know, honestly.
15       MR. FORD:  All right.  Why don't you give me
16 five minutes to make sure I've checked all of my
17 questions off here, and I may be able to pass the
18 witness to you, Rick.  So give me five minutes, and
19 I'll hopefully be back here.
20       MR. BERTELSON:  Are we off the record?
21       COURT REPORTER:  Off the record.
22        (OFF THE RECORD)
23       COURT REPORTER:  Back on the record.
24 BY MR. FORD:
25    Q.  Okay.  I just have a few more questions for

18 (Pages 66 - 69)

Page 70

1  you, Mr. Robertson.  Clean up stuff here.  I want to
2  make sure we have you here.
3        If you could look at Exhibit 15 for me.
4        (EXHIBIT 15 MARKED FOR IDENTIFICATION)
5  A.  Got it.  Okay.
6  Q.  And at the bottom there, you see the Bates
7  number DEF 000133?
8  A.  Yes.
9  Q.  Okay.  And this document goes all the way
10 through DEF 000143?
11 A.  Yeah.
12 Q.  And I don't need you to read every single
13 page here, but do these look-like documents that you
14 compiled for purposes of responding to document
15 requests that
16 Zillow served in this case?
17 A.  Yeah, it is.
18 Q.  All right.  And these are all documents that
19 your office maintains somewhere in a file?
20 A.  That's correct.
21 Q.  You maintain all of them in the normal course
22 of your public office role as property valuation
23 administrator for Owen County?
24 A.  Yeah.
25 Q.  And I think these are mostly, just generally

Page 71

1  speaking, receipts and contracts with CoreLogic for the
2  tax roll?
3  A.  And Black Knight, yeah.
4  Q.  Black Knight, yeah.
5        So those are the -- those are the two
6  requesters that you anticipate getting on an annual
7  basis, right?
8  A.  That's correct.
9  Q.  And these are true and accurate copies of
10 those documents, to the best of your knowledge, right?
11 A.  Yes.
12 Q.  Okay.  All right.  And then I also want you
13 to take a look at Exhibit 9.
14        And this is a e-mail -- well, let me know
15 when you have it open, Mr. Robertson.
16        (EXHIBIT 9 MARKED FOR IDENTIFICATION)
17 A.  Got it.
18 Q.  This is an e-mail string that starts with the
19 Bates number DEF 000349 at the bottom there.  It goes
20 through DEF 000353.
21        Do you see that?
22 A.  Yes.
23 Q.  Okay.  And the last page, page 5, is the
24 first e-mail on the string from a Mack, who is I guess
25 a Mack Bushart?

Page 72

1  A.  Yes.
2  Q.  And who is Mack Bushart?
3  A.  He's the president of our PVA association, or
4  he's our liaison.  He's who goes to Frankfort, to the
5  legislature, for us, for the PVA association.
6  Q.  So he's like your PVA association
7  representative in Frankfort?
8  A.  Yeah, yeah.
9  Q.  So if he's going to lobby -- if someone's
10 going to lobby the legislature for something related to
11 PVA business, that -- he's the one that would do it?
12 A.  That's correct.
13 Q.  Okay.  And I quickly looked here.  Looks like
14 you were copied on this very, very, very long e-mail
15 listing here.
16        Do you recall receiving this e-mail, by any
17 chance?
18 A.  Yes, I do.
19 Q.  Okay.  And the subject of this is, "Latest
20 open requests from SAGE," right?
21 A.  Yeah.
22 Q.  Do you know who SAGE is?
23 A.  I mean, I've heard of them, but not really.
24        They've never requested any info from me.
25 Q.  Okay.  So they're not somebody that you ever

Page 73

1  received a public records request from, but do you
2  understand the topic of this to be requests that he's
3  made to other counties?
4  A.  Yeah.
5  Q.  Okay.  And then there -- on the third page of
6  this document, there's an e-mail from a Jonathan Bruer,
7  Carlisle County PVA.
8        Do you see that one?
9  A.  I do.
10 Q.  And he's sort of suggesting there, I think, a
11 -- an idea that you had expressed a little earlier,
12 this idea that it's important for the -- all counties
13 or all PVAs to make sure they're on the same page with
14 respect to how they "write their records to public
15 records requesters"?
16 A.  That's correct.
17 Q.  Okay.  And he says at the bottom of his
18 e-mail there, "I think it is imperative that we come to
19 a 120 county agreement in how to quote this before we
20 lose our ability to charge at all."
21        Do you see that?
22 A.  I do.
23 Q.  Okay.  Is your concern in saying that you
24 followed the DOR fee schedule, is part of that the
25 concern that you might lose the ability to charge for

19 (Pages 70 - 73)

Page 74

1 the records?
2    A.  I think that's maybe a little bit of
3 speculation there, but I guess it's always a
4 possibility, sure.  Anything's a possibility.
5    Q.  I'm just trying to get -- I'm just trying to
6 play off the testimony earlier about saying that you,
7 you know, felt it was unfair for you to have a
8 different fee schedule than other PVAs and try to see
9 if that sentiment is reflected there in Mr. Bruer's
10 e-mail.
11    A.  I think we should all -- yeah.  I -- I do
12 believe that we should all be charging the -- the same
13 amount.  Yes, I do believe that.
14    Q.  Okay.  And do you recall if you've ever had
15 any conversations with Mr. Bushart, or Mr. Bushart has
16 sent out any e-mails where they were not seeking legal
17 advice but talking about this particular lawsuit and
18 the merits of this particular lawsuit?
19    A.  No, I don't.
20    MR. BERTELSON:  Clarification.  When you're
21 talking about "this particular lawsuit," are you
22 talking about SAGE or Zillow?
23    MR. FORD:  Good objection and correction.
24 BY MR. FORD:
25    Q.  So when I said that question was directed at

Page 75

1 this lawsuit, i.e. Zillow's lawsuit versus the various
2 PVAs.
3    Are you aware of any e-mails that Mr. Bushart
4 has sent out to the group talking about this lawsuit
5 and its impact?
6    A.  No, not -- I mean, nothing comes to mind
7 right now, no.
8    Q.  And I'm only asking you for what you
9 remember.
10    If there's nothing specific that you
11 remember, that's fine.
12    A.  Okay.
13    MR. FORD:  All right.  Let me just make
14 sure...
15    Okay, Mr. Robertson.  I think that's going to
16 do it for me.  I believe Mr. Bertelson may have
17 questions for you, but I will terminate my
18 deposition here subject to my right to recross you
19 on any questions that Mr. Bertelson may ask.
20    MR. BERTELSON:  All right.  I'm -- I don't
21 have a whole lot, so hopefully we'll be done over
22 here in just a few minutes.
23         CROSS EXAMINATION
24 BY MR. BERTELSON:
25    Q.  Blake, again, thanks for being here today.  I

Page 76

1 know you have a busy schedule, and we're taking up some
2 of your time today doing this, but I do appreciate you
3 being available and answering Mr. Ford's questions.
4    Let's see.  Do you know -- we talked about
5 Zillow.com.  When would you say you started going onto
6 their website and looking at listings and things?
7    A.  Probably when I became PVA in 2016.
8    Q.  Okay.  So about four or five years?
9    A.  Yeah.
10    Q.  Okay.  All right.  So do you know what Zillow
11 does to make money from their website and their
12 business model?
13    A.  The Zestimate, the -- the -- the information
14 that they have regarding homes and property.  They use
15 that to -- to have people buy and sell homes, which
16 makes advertisers want to advertise on their website.
17    Q.  Okay.  Do they have other businesses that
18 they're now getting into that you're aware of?
19    MR. FORD:  Objection.  Foundation.
20    A.  Not that I'm aware of.
21    Q.  Mr. Ford kind of chuckled when he asked you
22 about how you could possibly have known about
23 Zillow.com.
24    Do you know why he thought that question was
25 kind of funny or amusing?

Page 77

1    A.  Because everybody knows Zillow.  They're a
2 huge company.
3    Q.  Okay.  How do you know that they're a huge
4 company?
5    A.  If you open the Facebook app, if -- you know,
6 if you watch TV, there's advertisements.  Yeah.
7    They're -- they're everywhere.
8    Q.  Do you think their Facebook or TV
9 advertisements are -- do they get those for free, or do
10 they have to pay for them?
11    MR. FORD:  Objection.  Speculation.
12    Go ahead.
13    A.  I'm sure they pay for advertisement.
14    Q.  Did you see the Saturday Night Live skit
15 involving Zillow.com?
16    A.  I did not.
17    Q.  Okay.  Mr. Ford asked you about CoreLogic and
18 Black Knight making open records requests; is that
19 right?
20    A.  Yes.
21    Q.  Okay.  Do CoreLogic and Black Knight pay the
22 quoted fees for their open records requests?
23    A.  They do.
24    Q.  Okay.  Do they ever try to get their open
25 records requests for a reduced amount by pretending to

20 (Pages 74 - 77)

Page 78

1 be a newspaper, or...?
2    A.  They do not.
3       MR. FORD:  Objection.  Argumentative.
4    Go ahead.
5    Q.  He also -- Mr. Ford also asked you about the
6 hierarchical arrangement between the Department of
7 Revenue and your office.
8       Do you recall that questioning?
9    A.  Yes.
10    Q.  And is it -- is it correct that DOR -- the
11 Department of Revenue directs the operations of your
12 office on a day-to-day basis?
13    A.  No.
14    Q.  Okay.
15       MR. BERTELSON:  All right.  I think that's it.
16          REDIRECT EXAMINATION
17 BY MR. FORD:
18    Q.  I just have two questions for you,
19 Mr. Robertson, based on Mr. Bertelson's questions to
20 you.
21       One, at any point in your communications or
22 interactions with Ms. Noto or Zillow, did they ever
23 represent to you that they were a newspaper?
24    A.  No.
25    Q.  Did they ever represent to you that you were

Page 79

1 -- that they were a periodical?
2    A.  No.
3    Q.  Is there any information that they provided
4 to you or gave to you during the course of making their
5 public records request that you deemed to be false?
6    A.  No.
7    Q.  Second question is regarding DOR.  I
8 understand your testimony is, obviously they don't run
9 your day-to-day business.
10       You don't have a representative of the DOR
11 that oversees what you do on the day-to-day, right?
12    A.  That's correct.
13    Q.  Hypothetically speaking, though, if you got a
14 directive from the DOR that said that you could no
15 longer charge for your property tax roll file, would
16 you comply with such a hypothetical order?
17       MR. BERTELSON:  Objection.  Speculative and
18    calls for a legal conclusion, but you can answer if
19    you understand it, or know the answer to it.
20    A.  Yeah, that's -- that's a huge hypothetical.
21 BY MR. FORD:
22    Q.  You can answer.  Go ahead.
23    A.  I don't -- I -- I don't want to answer that
24 question.
25    Q.  Well, you got to answer my questions,

Page 80

1 Mr. Robertson.
2       You understand who Mr. Thomas Miller is,
3 correct?
4    A.  Yes, I do.
5    Q.  He's the commissioner of the Department of
6 Revenue, correct?
7    A.  Yes.
8    Q.  And if Mr. Miller gave you a directive that
9 you could no longer charge for your property tax roll
10 file, would you comply with that order?
11    A.  Again, that -- that would be -- that would be
12 something that the PVA association would -- I'm sure
13 there -- there would be a lot of talks going on from
14 that order given down.
15    Q.  Okay.  Last question is, if you were no
16 longer able to charge for your records, the property
17 tax roll file, are there any activities that your
18 office currently performs that you would no longer be
19 able to perform?
20    A.  Can you say that one more time?
21    Q.  If you lost -- if you lost the revenue, the
22 $5,000 or so that you receive from CoreLogic and Black
23 Knight on an annual basis, are there any activities
24 that your office currently performs that it would no
25 longer be able to perform without that revenue?

Page 81

1    A.  No.
2       MR. FORD:  Okay.  All right.  That's all I
3    have.
4       You have the opportunity, Mr. Robertson, to
5    read and sign.  I believe Mr. Bertelson elected to
6    go ahead and exercise that option for you.
7       I assume, Rick, same thing here?
8       MR. BERTELSON:  Yeah, I'm going to -- I'm
9    going to ask him to read and sign.
10       Can I ask just a couple more follow-ups based
11    on what you asked him?
12       MR. FORD:  Subject to my ability to recross
13    him, go ahead.
14       MR. BERTELSON:  Okay.
15          RECROSS EXAMINATION
16 BY MR. BERTELSON:
17    Q.  You have -- as PVA, do you have the services
18 of your county attorney available to you?
19    A.  That's correct.
20    Q.  Do you consult the county attorney on legal
21 questions from time to time?
22    A.  From time to time, yes.
23    Q.  So if the DOR director told you to stop
24 collecting fees, is that something you might talk to
25 your county attorney about?

21 (Pages 78 - 81)

Page 82

1    MR. FORD:  Objection.  Speculation.
2    Go ahead.
3    A.  Yes.
4    MR. BERTELSON:  Okay.  That's all I've got.
5    MR. FORD:  Nothing further from me.
6         (DEPOSITION CONCLUDED AT 3:24 P.M.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

1                    Veritext Legal Solutions
                      1100 Superior Ave
2                         Suite 1820
                     Cleveland, Ohio 44114
3                    Phone: 216-523-1313
4
    March 18, 2021
5
    To: Mr. Bertelson
6
    Case Name: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
7
    Veritext Reference Number: 4458274
8
9   Witness: Blake Robertson      Deposition Date:  3/3/2021
10  Dear Sir/Madam:
11
12  Enclosed please find a deposition transcript.  Please have the witness
    review the transcript and note any changes or corrections on the
13  included errata sheet, indicating the page, line number, change, and
14  the reason for the change.  Have the witness' signature notarized and
15  forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18  If the errata is not returned within thirty days of your receipt of
19  this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

Page 83

1         CERTIFICATE OF REPORTER
2         COMMONWEALTH OF KENTUCKY AT LARGE
3
4  I do hereby certify that the witness in the foregoing
5  transcript was taken on the date, and at the time and
6  place set out on the Title page hereof, by me after
7  first being duly sworn to testify the truth, the whole
8  truth, and nothing but the truth; and that the said
9  matter was recorded by me and then reduced to
10 typewritten form under my direction, and constitutes a
11 true record of the transcript as taken, all to the best
12 of my skill and ability. I certify that I am not a
13                              ither counsel and that I am in
14                              ally, directly or indirectly,
15
16
17
18
19
20
21
22 LINDSEY JOHNSON,
23 COURT REPORTER/NOTARY
24 MY COMMISSION EXPIRES:05/24/2023
25 SUBMITTED ON: 03/15/2021



Page 85

1                 DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
3  ASSIGNMENT REFERENCE NO: 4458274
   CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
   DATE OF DEPOSITION: 3/3/2021
4  WITNESS' NAME: Blake Robertson
   In accordance with the Rules of Civil
5  Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7  I have made no changes to the testimony
   as transcribed by the court reporter.
8
9  Date_____      Blake Robertson
10 Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
13 They have read the transcript;
   They signed the foregoing Sworn
14 Statement; and
   Their execution of this Statement is of
15 their free act and deed.
16 I have affixed my name and official seal
17 this _____ day of_____, 20____.
18 _____
   Notary Public
19 _____
   Commission Expiration Date
20
21
22
23
24
25

22 (Pages 82 - 85)

Page 86

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4458274
3      CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/3/2021
4      WITNESS' NAME: Blake Robertson
5        In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7        I have listed my changes on the attached
       Errata Sheet, listing page and line numbers as
8      well as the reason(s) for the change(s).
9        I request that these changes be entered
       as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11     as this Certificate, and request and authorize
       that both be appended to the transcript of my
12     testimony and be incorporated therein.
13     _____
       Date            Blake Robertson
14
         Sworn to and subscribed before me, a
15     Notary Public in and for the State and County,
       the referenced witness did personally appear
16     and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18          in the appended Errata Sheet;
         They signed the foregoing Sworn
19          Statement; and
         Their execution of this Statement is of
20          their free act and deed.
21       I have affixed my name and official seal
22     this _____ day of_____, 20____.
23     _____
         Notary Public
24
       _____
25       Commission Expiration Date
```

Page 87

```
1            ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2          ASSIGNMENT NO: 4458274
3    PAGE/LINE(S) /     CHANGE     /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date            Blake Robertson
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25     Commission Expiration Date
```

23 (Pages 86 - 87)

[& - activities]                                                                              Page 1

**&**

**&**   2:5 3:14,17 17:7

**0**

**000133**   70:7
**000143**   70:10
**000144**   46:17
**000145**   19:6
**000349**   71:19
**000353**   71:20
**00049**   1:5
**03/15/2021**   83:25
**05/24/2023**   83:24

**1**

**1**   3:11 10:6 11:5
40:5,9 47:1,2
57:24
**10**   3:11 30:21,25
60:13
**101**   4:5
**11**   11:5
**1100**   84:1
**120**   73:19
**13**   60:15,25 61:6
62:14,17
**133.047**   21:23
**146**   19:9
**15**   3:21 45:17 70:3
70:4
**16**   3:14,22 16:16
46:10,13,19
**17**   3:24 16:16
18:25 19:2,4
23:11 29:25
**18**   3:24 84:4
**18,000**   42:14 43:11
**18,901.05**   20:6,18
21:13 22:21
**1820**   84:2
**1:34**   4:8

**2**

**20**   45:17 63:16
85:16 86:22 87:22
**2007**   14:24 15:3
**2010**   12:23,24 15:3
16:5
**2012**   68:25
**2016**   12:22,25
16:10,12,13 76:7
**2017**   16:15
**2018**   42:1
**2019**   17:25 18:9,19
19:14 23:20 30:4
31:14 57:9,25
58:16
**2020**   37:21 38:13
46:14,15 47:1,2
57:9,25 58:16
**2020-2021**   3:23
**2021**   1:24 4:8
46:15 47:2 84:4
**216-523-1313**   84:3
**24**   31:1
**2400**   2:6
**2408**   83:19
**25**   17:25 18:9,19
19:14 23:20 41:23
46:15
**26**   61:1

**3**

**3**   1:24 3:14 16:20
16:21 19:20 21:3
21:5 23:21 28:7
30:21 40:11 41:22
64:17
**3/3/2021**   84:8 85:3
86:3
**30**   4:3,10 47:2
**300**   2:7

**34**   21:5 22:16
64:18
**3:19**   1:5
**3:24**   82:6
**3rd**   4:7

**4**

**4**   3:16 31:2 63:5,6
**40202**   4:6
**40602**   2:19
**41017**   2:8
**423**   2:18
**44114**   84:2
**4458274**   84:7 85:2
86:2 87:2
**46**   3:22
**48**   18:5 19:21
23:21 28:8 41:22
**49**   18:13 19:21
28:8 41:21

**5**

**5**   3:3 71:23
**5,000**   57:2 80:22
**5,025**   56:16
**502**   2:20
**564-9572**   2:20
**578-3073**   2:10
**578-7263**   2:9

**6**

**6**   3:4,18 4:3 40:8
60:20,23 63:14
**60**   3:18
**61.874**   21:23 31:2
**61.874.**   42:8
**61.8743.**   40:15
**63**   3:16

**7**

**7**   30:2,4
**70**   3:21

**700**   28:19
**71**   3:20
**730**   4:5
**75**   3:5
**78**   3:6

**8**

**8**   31:1
**8-12**   68:19
**81**   3:7
**859**   2:9,10

**9**

**9**   3:20 59:7 71:13
71:16
**9,500**   53:8

**a**

**ability**   73:20,25
81:12 83:12
**able**   43:23 69:17
80:16,19,25
**about.htm**   28:24
**accomplish**   45:4
**accord**   67:21
**accounts**   47:17
**accurate**   16:17
61:19 71:9
**acknowledge**
85:11 86:16
**acquire**   25:17
**acquired**   27:16
**acquisition**   18:13
**acronym**   9:19
20:23,24
**act**   21:22 22:7,11
30:8 31:13 39:19
43:14 45:22 49:25
85:14 86:20
**action**   1:5 7:1
17:18 83:15
**activities**   56:21
60:8 80:17,23

activity  44:17
actual  27:22 30:25
  41:17 43:1,13
add  57:1 62:19,22
addition  13:24,25
additional  62:23
  64:8,10 65:6
address  84:15
administration
  3:13
administrator  7:4
  9:17,23 10:18
  17:3 70:23
advance  61:9
advanced  60:18
  62:24
advances  61:9
advertise  76:16
advertisement
  77:13
advertisements
  77:6,9
advertisers  76:16
advertising  29:14
  29:19
advice  74:17
affirm  6:15
affixed  85:15
  86:21
afternoon  6:5,24
agency  22:8 67:24
agree  5:25
agreed  4:13 61:20
agreement  73:19
ahead  6:21 7:6 9:1
  9:9 10:6 15:9,11
  44:1 63:3 77:12
  78:4 79:22 81:6
  81:13 82:2
al  1:15 84:6 85:3
  86:3

allegations  17:8
  30:24
amendment  17:20
amount  20:19
  40:11 51:6 53:24
  74:13 77:25
amounts  65:5
amusing  76:25
analysis  31:22
  32:8
analyzing  32:22
  33:12
annual  3:22 46:14
  46:22 50:3 57:21
  58:7 71:6 80:23
answer  3:16 7:14
  8:3,17 9:2,8,9,11
  9:13 27:24 34:12
  40:17,18 60:14
  61:12 62:22 63:4
  63:10,25 64:9
  79:18,19,22,23,25
answered  13:11
  41:1 57:6 59:16
answering  8:9
  76:3
answers  7:18
  55:20
anticipate  50:14
  50:19 56:8 71:6
anticipated  47:14
  48:2 49:7 50:22
  51:7 56:6,12,13
  57:20,20
anybody  40:2 45:5
anymore  55:11
anything's  74:4
anyway  52:24
apologies  6:12,21
app  77:5

appear  29:16
  56:13 85:11 86:15
appearance  5:4
appearances  2:1
appeared  2:12,23
appearing  5:13,19
  5:20 35:4,5
appears  29:20
  51:3
appended  86:11
  86:18
applied  31:21
  32:13
apply  22:17 23:5
  23:24 24:11 29:10
  29:22 32:4,9,23
appointed  16:12
  16:15
appreciate  76:2
appropriate  63:20
april  17:25 18:9
  18:19 19:14 23:10
  23:20 31:14 41:23
argumentative
  78:3
arrangement  78:6
aside  44:20
asked  8:10 38:1
  43:3 76:21 77:17
  78:5 81:11
asking  22:3 26:10
  27:20 32:5,7,17
  47:10,11 75:8
asks  20:10 57:24
asserted  17:17
assessment  19:16
  27:20 38:6 42:1
  58:4 64:7
assignment  85:2
  86:2 87:2

assistance  61:13
assisting  69:13
association  68:13
  68:14 72:3,5,6
  80:12
assume  43:1,5
  49:9 50:8 61:12
  61:15,18 81:7
assuming  42:24
  43:11
attached  19:15,19
  64:16 86:7
attachment  19:22
attachments  17:23
  17:24
attended  4:7
attending  5:5,6,9
attention  24:19
attorney  5:8,11
  6:25 63:11 81:18
  81:20,25
auditors  68:3
august  68:25
authorization
  20:17
authorize  86:11
available  41:3
  42:12 76:3 81:18
ave  84:1
average  50:19
aware  35:12 75:3
  76:18,20

b

b  1:13 4:3 31:7
  84:6 85:3 86:3
back  6:8 11:11
  15:15,18 18:22
  20:1,5 21:3 23:9
  23:10 26:6,8
  29:24,25 30:17
  31:1 37:16 40:5

[back - clarification]

57:23 58:5 65:19
69:19,23 84:15
**background** 12:10
**bad** 7:22 32:20
**balance** 48:24
**balanced** 48:21
**based** 20:6,8 21:18
46:1 63:21 78:19
81:10
**basic** 47:7
**basically** 10:15
16:15 26:18 31:2
43:21
**basis** 57:21 58:7
71:7 78:12 80:23
**bates** 19:5,5 46:16
70:6 71:19
**began** 16:14
**begins** 19:13
**behalf** 2:3,14 5:19
9:16 63:11
**believe** 19:24
28:12,18 29:1
30:6 41:19 56:14
57:22 62:20 64:19
65:25 67:4 69:2
74:12,13 75:16
81:5
**bertelson** 2:15 3:5
3:7 5:10,10 6:3
7:19 8:4 9:6 10:9
26:2 46:11 69:20
74:20 75:16,19,20
75:24 78:15 79:17
81:5,8,14,16 82:4
84:5
**bertelson's** 78:19
**best** 8:1,18 48:25
71:10 83:11
**big** 28:21

**bills** 50:5
**bit** 8:3 12:10 25:2
45:18 54:19 55:21
74:2
**black** 45:16 50:13
51:1 52:22,23
56:8,18 57:3,11
58:6 71:3,4 77:18
77:21 80:22
**blake** 1:23 4:3
5:15 6:1 7:8 61:11
75:25 84:8 85:4,9
86:4,13 87:20
**body** 67:24
**boss** 69:9
**bottom** 19:4 46:17
70:6 71:19 73:17
**bounced** 16:2
**box** 2:18
**boy** 52:3
**break** 8:24 25:2
58:21
**breaking** 67:13
**brief** 26:8 51:4
**briefly** 64:19
**bruer** 73:6
**bruer's** 74:9
**buck** 53:4
**budget** 3:22 11:8
12:1,2,3 46:14,22
47:4,8,13 48:10,16
48:21,24 50:23,25
51:8 53:16,24
56:7
**budgeted** 53:10
57:4,10
**budgeting** 52:4
**budgets** 48:9
57:19
**bunch** 17:1

**bushart** 71:25
72:2 74:15,15
75:3
**business** 24:8 60:8
72:11 76:12 79:9
**businesses** 76:17
**busy** 76:1
**buy** 44:8 45:5
52:21 53:16 56:9
76:15

**c**

**ca** 84:25
**calculating** 28:3
**calendar** 37:20
**call** 19:5 39:6 48:1
49:13
**called** 26:14 28:14
36:21
**calls** 79:18
**camera** 5:23
**capable** 43:24
**capacity** 1:13
27:10
**caption** 16:24 17:6
**captioned** 16:23
**card** 53:7
**care** 20:14 42:25
51:12
**carlisle** 73:7
**carveouts** 31:15
**case** 5:13 44:15
70:16 84:6 85:3
86:3
**category** 47:13
**caveat** 65:5
**center** 2:6
**central** 1:3
**certain** 33:15
53:24 55:19
**certificate** 83:1
86:11

**certification** 85:1
86:1
**certify** 83:4,12
**chain** 68:6
**chamber** 2:6
**chance** 8:4 10:25
17:13 61:25 62:13
72:17
**change** 14:15,15
38:6,9,19 48:22
84:13,14 86:8
87:3
**changes** 84:12
85:7 86:7,9
**characteristics**
35:9,11 39:5 45:6
45:10
**charge** 20:13,13
21:18 22:8,20
37:21 38:3,7,10
39:20 40:20 56:23
56:24,25 65:4,6,10
65:11,16 67:2,7,17
73:20,25 79:15
80:9,16
**charged** 40:12
**charges** 65:6
**charging** 66:14
74:12
**check** 20:3 24:21
**checked** 69:16
**choose** 24:17 67:4
**chuckled** 76:21
**civil** 1:5 4:9 85:5
86:5
**claim** 62:23
**claims** 17:17
**clarification** 8:16
10:3,5 54:18
74:20

clarify   47:10
55:21
classified   31:23,23
36:22,25 37:10
classifieds   37:3,6
classifying   32:3
clean   70:1
clear   7:16 8:5 10:2
40:16
cleveland   84:2
clicked   28:25
closely   24:13
coincidence   49:3
colleagues   67:6
collect   54:20,22,23
55:1
collecting   55:13
55:16 81:24
collection   10:7
44:20
college   12:18 14:8
come   15:7 33:10
48:18 56:23 68:9
68:10 73:18
comes   33:9 75:6
coming   21:12 48:5
49:5,14 69:6
commercial   11:23
17:21 20:8,19,20
21:7,18,21 22:12
22:15,17,18,19,23
22:25 23:2,3,4,7
23:13,14,22,23
24:10,11 27:21
28:1,2 29:9,9,21
29:21 30:2,10
31:4,6,7,15,21
32:22 38:4,20
45:13 46:2 58:2
60:18 61:7 62:24
63:21 64:4,13,15

64:15,20 65:1,16
68:9,20,22
commercialized
28:21
commission   83:24
85:19 86:25 87:25
commissioner
1:14 80:5
commonwealth
67:23 83:2
communications
64:3 78:21
companies   50:4,6
50:11
company   77:2,4
compiled   70:14
complaint   3:14,16
17:7,8,22 18:1
21:4 22:16 23:21
28:7 30:21,25
60:19 61:9 63:4
63:12 64:16
complete   14:21
43:19 62:22 64:7
completed   4:16
84:15
comply   79:16
80:10
computer   44:3
59:12,23 60:1
concern   73:23,25
concluded   82:6
conclusion   79:18
conduct   47:22
confer   9:12
connection   33:23
consider   32:24
33:4 38:21 40:3
considered   33:1,6
34:13 38:19

considering   54:3
consistently   65:16
constitutes   83:10
consult   30:4 81:20
consulted   27:2
contact   20:3
contain   37:3
contained   29:15
42:2
contend   61:7
context   27:19
continues   19:9
contracts   71:1
conversations
7:23 61:14 74:15
convert   42:18 44:2
converting   43:22
45:2,23 58:12
60:6
copied   43:3 72:14
copies   41:25 56:23
59:19 71:9
copy   44:11 53:7
53:22,22 58:5
copying   43:14
45:1,2,23 58:12,13
corelogic   45:15
50:13 51:1 52:23
56:1,8,18 57:3,11
58:6 71:1 77:17
77:21 80:22
corner   18:1 46:16
68:19
corp   28:24
correct   9:17 14:18
25:9 27:4,14 28:4
28:5 29:23 33:14
34:3,23,24 35:1,22
36:1 44:13 46:8
46:23,24 47:3,5,24
48:19 49:2 50:2

50:21 54:5,23,25
55:12 56:2,10
59:21 60:11,12
61:17,21,22 62:25
63:1,12 64:13
65:2,8,14 68:17
69:1,4 70:20 71:8
72:12 73:16 78:10
79:12 80:3,6
81:19
correction   74:23
corrections   84:12
86:17
correctly   64:1
correspondence
23:10
cost   20:3 37:25,25
39:18,24 40:1,21
40:25 41:3 43:8
44:9 50:24,25
51:5 52:10,17,20
58:4
counsel   12:5 61:13
83:13
counties   25:20
73:3,12
county   3:13,21,23
5:16,17 7:4,9 9:17
10:1 12:15,20
13:1,6 15:16,17,22
15:23 16:6 17:3
22:5 24:15 25:6
25:18,23 26:24
27:8,10 34:2,6,16
34:22 35:16 36:17
36:19 37:9 38:17
42:2 46:22 48:15
61:11 64:24 65:4
66:18,22 69:3
70:23 73:7,19
81:18,20,25 85:10

86:15
**county's**  12:3
**couple**  15:25 16:2
   62:3 64:22 81:10
**course**  9:11 65:20
   70:21 79:4
**court**  1:1 4:4,14
   5:3,21 6:4,6,13,19
   7:2 16:24 26:1,3,6
   69:21,23 83:23
   85:7
**courthouse**  5:14
   5:16
**covered**  63:3
**coyle**  69:11,12,12
**create**  28:16 55:2
**created**  44:3 48:13
**creating**  28:15
**cross**  3:5 75:23
**crossed**  32:15
**curious**  66:13
**current**  19:16
   36:10,12 42:1
**currently**  14:5
   47:5 80:18,24
**cut**  15:11
**cv**  1:5

**d**

**darren**  2:4 5:7
   6:25 26:2
**data**  19:16 58:7,12
   60:6
**database**  42:6
**date**  1:24 29:24
   30:2 35:14,24
   36:4 68:24 83:5
   84:8 85:3,9,19
   86:3,13,25 87:20
   87:25
**dated**  18:8 19:14
   46:15

**day**  4:7 20:1,4
   47:22,22 78:12,12
   79:9,9,11,11 85:16
   86:22 87:22
**days**  84:18
**dear**  19:14 84:10
**death**  16:16
**decided**  32:11
   66:17
**decision**  23:4,14
   24:10
**declaratory**  3:14
   3:17 17:7
**dedicated**  59:14
   59:24 60:2,10
**deed**  85:14 86:20
**deemed**  79:5
   84:19
**def**  19:6 46:17
   70:7,10 71:19,20
**defendant**  64:1
**defendants**  1:16
   2:14 3:18 5:13,19
   7:3
**defined**  31:5 60:19
   61:8
**definitely**  68:1
**definition**  30:11
   34:17
**definitions**  33:19
**degree**  14:22,23
**delimited**  42:6
**department**  1:14
   11:24 20:21,25
   78:6,11 80:5
   84:22
**depend**  41:13
**deponent**  1:23
**deposed**  7:11
**deposition**  3:11
   4:3,8 9:6 10:7,17

12:5 40:6 57:8
   60:21 62:19 63:18
   75:18 82:6 84:8
   84:11 85:1,3 86:1
   86:3
**deputies**  41:13
   48:13 51:11 58:19
   59:17
**described**  44:20
   45:22 60:5
**desktop**  44:3,11
   45:1 60:1,7
**determination**
   20:7,11 22:22,24
   23:1,2,22 28:10
   29:8,20
**determinative**
   23:3
**determine**  31:22
   32:8,13 39:18
**determined**  64:1
**determining**  28:1
   31:20 63:20
**device**  45:24
**dford**  2:11
**dictates**  22:7
**difference**  35:3
   36:2,7 37:7,12
   45:21 46:1,5
**different**  15:5,25
   16:2 33:9 41:4,15
   74:8
**differentiates**
   34:10
**differently**  66:9
**diploma**  12:17
   14:24 15:1
**direct**  3:4 6:22
   31:6
**directed**  74:25

**direction**  83:10
**directive**  79:14
   80:8
**directly**  83:14
**director**  81:23
**directs**  78:11
**discretion**  67:2
**distinguishes**  34:4
**district**  1:1,2 7:2,2
   16:24,24
**division**  1:3
**document**  8:13
   10:22 16:23 17:2
   17:13 18:12 21:6
   44:11 47:25 61:4
   61:4 63:8 68:18
   70:9,14 73:6
**documents**  70:13
   70:18 71:10
**doing**  15:4 34:10
   43:24 46:7 54:9
   54:12,13,15 59:1
   59:18 76:2
**dollars**  51:5
**door**  42:25 48:6
   50:23
**dor**  20:24 46:23
   65:1 66:19,21
   68:2,5,10,11 73:24
   78:10 79:7,10,14
   81:23
**dor's**  67:16
**download**  43:18
   45:8
**drive**  2:6 43:4,20
   43:20 44:9,10,15
   45:24 52:15,16,17
   53:5,12
**driver's**  5:22
**drives**  44:7 52:22

**[due - fee]**

Page 6

| | | | |
|---|---|---|---|
| **due** 16:16 | **enclosed** 84:11 | **excuse** 46:13 | **f** |
| **duly** 83:7 | **ended** 16:3 49:4 | **executed** 86:10 | |
| **duties** 13:12 | **ensure** 8:4 | **execution** 85:14 | **f** 1:6 |
| **duty** 25:5 58:18 | **entered** 86:9 | 86:19 | **facebook** 77:5,8 |

**e**

**e** 2:11,21,22 8:12
10:9 11:7,13,14,17
18:22 19:13,13,25
21:17 29:25 71:14
71:18,24 72:14,16
73:6,18 74:10,16
75:3

**earlier** 33:25
63:18 64:5,19
66:25 73:11 74:6

**eastern** 1:2 7:2
16:24

**edition** 38:15

**educational** 25:16

**efforts** 44:21

**eight** 41:22

**either** 8:18 33:19
36:14 44:7 83:13

**elected** 16:8,10,14
81:5

**election** 16:13

**electricity** 52:9

**electronic** 41:20
42:5

**electronically**
41:15

**email** 3:20,24
84:17

**employed** 14:12
14:13

**employee** 59:10
83:13

**employees** 12:6
13:20,21 14:6,17
51:13 54:9,11

**entire** 40:3 45:5
85:5 86:5

**entity** 22:25 23:2,3
23:7,13,22 24:10
28:1 29:9,21 43:9

**errata** 84:13,18
86:7,10,18 87:1

**essentially** 7:13
41:2

**estate** 24:13 25:8
25:18 27:8 34:2,6
34:16 37:4 38:17

**estimate** 26:18
44:25 48:25 51:4

**estimates** 48:23

**et** 1:15 84:6 85:3
86:3

**eventually** 12:17

**everybody** 24:6
43:24 51:14 77:1

**everybody's** 51:15
52:5

**exact** 57:14

**exactly** 14:10
47:11 48:16

**examination** 3:4,5
3:6,7 6:22 75:23
78:16 81:15

**example** 10:4

**excel** 42:7,18,21
43:18,22 44:2
45:2,23 58:8,10,13
60:6

**exception** 32:4,8
32:13

**exchanges** 18:22
18:25

**executed** 86:10

**execution** 85:14
86:19

**exercise** 81:6

**exhibit** 3:10,11,14
3:16,18,20,21,22
3:24 10:6 16:19
16:21 18:25 19:2
19:4,20 21:3,5
22:17 23:11,20,21
28:7,7,23 29:25
30:21 40:5,9
41:22 46:10,13,13
46:19 57:24 60:20
60:23 63:5,6
64:17,17 70:3,4
71:13,16

**exhibits** 3:9

**exist** 55:11

**existing** 13:9

**expect** 48:18 54:10
56:18

**expense** 51:3,7
52:20

**expenses** 47:14
49:7 50:22 52:9
52:10 53:21 57:24
58:12,15

**expiration** 85:19
86:25 87:25

**expires** 83:24

**explain** 8:19

**expound** 54:19

**expressed** 73:11

**extent** 33:15 42:4
53:20 54:8

**external** 45:24

**facsimile** 2:10

**fact** 6:1 29:18
38:17 58:4 64:3

**factor** 53:25

**factories** 15:25
16:2

**factors** 23:12

**factory** 15:6

**facts** 43:5 64:2

**fair** 40:17,22
68:16

**faith** 48:25

**fall** 30:10

**false** 79:5

**familiar** 21:21,24
22:1 26:13 27:1
30:7,12 31:14

**familiarity** 24:1,5
31:12

**far** 18:1 58:22
62:21 65:9

**fargo** 50:9

**faster** 9:21

**favorite** 34:8

**feature** 26:13

**features** 33:16

**february** 12:23,24

**federal** 4:9

**fee** 11:7,22,23
20:13,20,20 21:7
21:18 22:15,17
23:4,14,23 24:11
27:21 28:2 29:9
29:22 30:2 31:21
32:22 38:4 53:14
56:18,19 60:18
61:8 62:24 63:21
64:14,15,15,20

65:1,17,25 67:17
68:9,22 69:6
73:24 74:8
**feel** 66:17
**fees** 3:21 20:6
21:14 57:11 64:13
68:15 69:6 77:22
81:24
**felt** 74:7
**field** 13:2,4,8,13
14:19 55:23 68:2
69:3
**figures** 38:1
**file** 39:18,25 41:9
42:1 44:2,2 54:21
55:9,14,24 56:10
70:19 79:15 80:10
80:17
**filed** 7:1 63:11
**files** 42:1
**filings** 30:5
**financially** 83:14
**financials** 28:19
**find** 34:9,23 36:19
84:11
**fine** 75:11
**finish** 8:2
**finishes** 9:9 62:8
**fire** 39:6
**first** 3:19 15:15
17:20 24:5 43:21
47:13 59:16 61:3
71:24 83:7
**fiscal** 12:2 37:19
37:20 47:1 49:9
51:4 57:8 58:16
**five** 15:5 69:16,18
76:8
**flow** 7:23
**focused** 5:23

**folks** 17:1 36:18
55:23
**follow** 67:20 81:10
**followed** 73:24
**following** 42:2
**follows** 31:5
**food** 68:6
**ford** 2:4 3:4,6 5:7
5:7 6:2,5,7,10,19
6:20,23,25 26:7
69:15,24 74:23,24
75:13 76:19,21
77:11,17 78:3,5,17
79:21 81:2,12
82:1,5
**ford's** 76:3
**foregoing** 83:4
85:13 86:18
**form** 83:10
**format** 41:16,20
42:6,8,17,21 43:22
58:8
**formats** 42:15
**former** 69:9
**fort** 2:8 5:9
**forth** 11:24 18:22
47:17 60:9
**forty** 41:22
**forward** 84:15
**foundation** 76:19
**four** 15:5 55:7
76:8
**fourteenth** 17:20
**frame** 13:16,18
**frankfort** 1:4 2:19
72:4,7
**franklin** 3:13
48:15
**frcp** 4:10
**free** 9:8 17:19 77:9
85:14 86:20

**front** 10:8 19:1
21:9 47:4 57:18
**frowned** 66:19
**full** 13:21 14:1,2,6
14:17 49:20
**funny** 76:25
**further** 82:5
**fy** 3:23 46:14

## g

**g** 23:20 28:7,23
**gained** 24:16
**gaining** 13:9
**ged** 12:17 14:21
15:1
**general** 16:13 22:1
23:25 24:7 27:6
54:2
**generally** 11:3
17:16 25:8 26:10
31:17 45:3 67:16
70:25
**generates** 29:13
**getting** 24:9 27:5
27:22 28:12 34:1
43:14 44:18,21
50:14 53:7 56:8
59:4 67:11 71:6
76:18
**gfvt** 1:5
**give** 6:15 8:2,3,3
22:4 34:19 37:14
37:15,16 60:21,22
61:24 66:11 69:15
69:18
**given** 80:14
**gives** 42:3
**glitch** 26:9
**go** 7:6 9:1,9,20
10:6 12:11,13,14
12:18 15:9,11
26:3 30:17 34:22

35:17 36:12,13
37:5 44:1 49:24
55:7 59:7 63:3
66:23 77:12 78:4
79:22 81:6,13
82:2
**goes** 28:8 37:8
70:9 71:19 72:4
**going** 7:20 9:19
10:14 13:8 14:9
18:4 23:9,9 34:5,6
34:8,13 36:3,5,13
36:14,19 37:9,14
37:15,15 38:8,14
38:18 46:6,9
48:22 49:4 50:23
51:5 52:24,24,25
53:24 55:1 56:6
58:21,25 62:3
72:9,10 75:15
76:5 80:13 81:8,9
**good** 6:5,24 10:4
48:25 54:18 74:23
**governmental**
61:7 62:16,23
**grab** 60:22
**grade** 12:16
**grand** 57:1
**graydon** 2:5
**graydon.com** 2:11
**gregory** 1:6
**grew** 15:15
**ground** 7:13
**group** 75:4
**guess** 11:6,10
36:18 52:13 53:3
54:19 57:9,13,14
66:16 71:24 74:3
**guideline** 67:20
**guidelines** 11:23
20:20,20 21:7,19

22:16,17 23:4,15
24:11 27:21 28:2
29:10,22 31:21
32:23 38:4 63:22
64:14,15,20 65:1
65:17 66:23 67:17
68:9,22 69:7

**h**

**half**  48:1,1
**hand**  6:14 18:1
46:16 68:19
**handle**  51:18
52:22
**happened**  39:9,12
39:14
**happening**  27:7
**happy**  49:3
**hard**  7:24
**hardware**  59:13
59:23 60:2
**head**  2:5 33:6
**health**  25:8
**heard**  72:23
**hearing**  9:5
**help**  14:8 48:12
68:12
**helps**  25:14,14
66:23
**herald**  34:7,9
36:21,22 37:1,10
37:18,22 38:7,7,14
38:16 39:2,4,17
40:19
**hereof**  83:6
**hey**  26:2 37:19
38:8 39:6 67:19
**hi**  20:5
**hierarchical**  67:23
78:6
**high**  12:11,13,14
12:14 14:21,23

**hired**  51:17 55:18
**hold**  5:22 6:6,6
66:6
**home**  12:16,17
14:21,23,25 15:18
27:6
**home's**  26:18
**homes**  13:9,9,9
76:14,15
**hon**  1:13 84:6 85:3
86:3
**honestly**  24:3
30:18,19 33:23
34:12 35:6,15
36:9 37:23,25
40:4 45:7 58:17
67:19 69:14
**hopefully**  10:7
69:19 75:21
**hostage**  8:23
**hourly**  51:13,21
**hours**  51:22,23
**houses**  25:7 37:8
**huge**  77:2,3 79:20
**huh**  10:24
**hypothetical**
34:20 39:23 40:19
79:16,20
**hypothetically**
79:13

**i**

**i.e.**  75:1
**idea**  26:23 39:24
73:11,12
**identification**
16:21 19:2 40:9
46:19 60:23 63:6
70:4 71:16
**identified**  11:4
17:1 60:16 61:10

**identify**  62:17
**identity**  59:10,12
**iii**  2:15
**immediately**  41:3
**impact**  75:5
**imperative**  73:18
**implement**  66:17
**important**  6:11
7:15,20 8:7,22
25:6 73:12
**impressive**  61:16
**imprimatur**  68:10
**incident**  39:14
**include**  13:23 31:8
52:20 56:19
**included**  23:19
42:13 57:19 84:13
**includes**  7:17
**including**  7:3
35:24 47:16 59:9
60:15
**income**  53:13,14
56:8,12,15,17,18
56:20 57:20
**incorporated**
86:12
**incur**  40:25
**incurred**  57:25
**incurs**  65:6
**index**  3:1
**indicated**  42:15
**indicating**  84:13
**indirect**  31:6
**indirectly**  83:14
**individual**  12:1
35:13 39:5
**inequitable**  67:5
**influenced**  24:9
**influential**  29:20
**info**  20:16 35:18
54:16 72:24

**information**  13:10
20:9,14,15 21:19
23:8,18,25 25:17
26:21 27:5,7,13,16
27:25 28:6,9,16
29:2,6,15,17,19
33:14 34:1,5,15,23
35:4,5,13,15,21,22
36:6 38:8,15 41:8
41:14 42:3,4,10,12
42:14,20 43:22
44:22 45:2,14,23
54:20,22,24 55:2
55:13,14,16,22,23
55:25 56:1,4
57:17 59:4 63:19
64:8,11 76:13
79:3
**infringing**  17:19
**injunctive**  3:15,17
17:7
**ink**  53:22
**input**  68:15
**instance**  35:24
51:6 55:6
**instructing**  17:12
**instructs**  9:7,11
**intend**  62:22
**intended**  20:7
**interactions**  78:22
**interest**  25:6 60:17
61:10
**interested**  83:14
**interests**  60:16
61:7 62:16,23
**interject**  7:19 9:6
**internally**  20:15
48:13
**interpret**  66:14
**interpretation**
22:14

**interrogatories**
3:19
**interrogatory**
60:14,16,25 61:6
62:14
**introduce** 7:6
**involved** 44:18
**involvement** 69:5
69:13
**involving** 11:18
77:15
**irrespective** 55:3
**issue** 54:12
**it'll** 9:20
**item** 52:25 53:1,2
54:2,10 57:19
**items** 47:16

**j**

**jargon** 8:10
**jimmy** 69:11
**job** 15:2 51:11
55:19 59:10
**jobs** 15:6,17 51:11
**johnson** 1:25 4:13
6:20 7:16 83:22
**jonathan** 73:6
**judge** 1:6
**judging** 38:23
**july** 47:1,2
**jumping** 6:21
**jumps** 33:21,22
**june** 12:22,25
16:12,16 46:15
47:2

**k**

**keep** 24:24 44:6
**kentuckiana** 4:4
**kentucky** 1:2,14
2:8,19 4:5,14 5:9
5:17,20 7:2,5

15:21,24 16:25
17:3 22:8 67:24
83:2
**kind** 11:6,8,10,11
15:17,25 16:1,1
24:1,19,21 25:7,13
25:14,14,14 67:11
76:21,25
**knew** 31:17
**knight** 45:16
50:13 51:2 52:23
56:9,19 57:3,11
58:6 71:3,4 77:18
77:21 80:23
**know** 8:11,25 10:1
10:1 11:9,12 13:9
13:11 14:10 18:25
21:9,25 22:2 24:2
24:7,8,14,16,20,22
24:22,22 25:7,10
25:11,11,15,15,20
26:11 27:6 29:3
30:14,15,18 31:18
34:7,10,12 35:6
37:16 38:2,16,18
39:6,7,25 40:7
42:24 43:5 44:6
44:21,25 45:1,3,7
45:16,24 47:20
48:17,23,25 49:8
49:24 50:4,17,24
51:4,5,23 52:9,9
52:10,21,23,25
53:4,6,6,8,20,25
54:8,8,19,20 55:7
56:1,22 57:10,13
58:4,11,15,20 59:1
59:22 60:5,8
62:10,21 65:22,22
65:23 66:1,7,20
67:3,12,18,19 68:3

69:9,14 71:14
72:22 74:7 76:1,4
76:10,24 77:3,5
79:19
**knowing** 24:6
**knowledge** 27:22
39:8 71:10
**known** 76:22
**knows** 24:6 77:1
**krs** 3:25 19:15
21:23 31:2,17
38:23 40:15 42:8
**ky** 3:25
**ky.gov** 2:21,22

**l**

**labeled** 14:7
**large** 83:2
**latest** 72:19
**laundry** 42:3
**law** 48:20 51:24
54:23 61:9 65:12
65:22 66:1,2
67:10,13,13
**lawsuit** 74:17,18
74:21 75:1,1,4
**lawyer** 22:2 66:11
**lawyers** 61:14
**layperson** 47:20
**lays** 41:25
**leader** 34:7,9
**left** 15:7 46:16
68:19
**legal** 2:17 5:11
22:4 66:11 67:12
74:16 79:18 81:20
84:1 87:1
**legislature** 72:5,10
**letter** 17:24 18:8
19:19,20 20:10
23:19,25 27:22,25
28:6,9,11 29:7

42:15 84:19
**lexington** 5:20
34:7,9
**liaison** 72:4
**license** 5:22
**lindsey** 1:25 4:13
83:22
**line** 18:5 47:16
52:21,25 53:2,14
54:2,10 57:19
84:13 86:7 87:3
**link** 28:11,12,18
28:22,24 29:6,12
**list** 10:23 11:9
24:17 40:6,8,11,16
42:3 57:23
**listed** 37:9 56:17
86:7,17
**listing** 24:15 25:13
25:13 72:15 86:7
**listings** 24:24 27:8
34:16,25 37:4,11
37:15 76:6
**little** 8:3 12:10
25:2 45:18 47:9
51:24 54:19 55:21
58:18 66:8 73:11
74:2
**live** 77:14
**lived** 15:22
**llp** 2:5
**lobby** 72:9,10
**locally** 36:20
**located** 4:4
**location** 5:5
**locked** 25:25
**long** 12:20 45:3,7
45:13 72:14
**longer** 79:15 80:9
80:16,18,25

**look** 10:6,10 16:19 17:12,13 25:19 26:11 30:17 33:13 35:16 40:5 41:17 57:23 68:18 70:3 70:13 71:13

**looked** 11:2,6,7,7 11:8 19:12,20 23:11 26:21,22 29:3 33:25 35:8 36:25 64:14,16,19 72:13

**looking** 20:3,19 28:12,13 36:11 64:8 76:6

**looks** 72:13

**lose** 73:20,25

**lost** 80:21,21

**lot** 9:20,21 15:16 24:17 25:3 33:9 75:21 80:13

**lots** 33:8,8

**louisville** 4:5

**m**

**mack** 71:24,25 72:2

**madam** 84:10

**mail** 2:11,21,22 8:12 10:9 18:22 19:13,13,25 21:17 29:25 43:20 44:14 71:14,18,24 72:14 72:16 73:6,18 74:10

**mails** 11:7,13,14 11:17 74:16 75:3

**main** 4:5 13:7

**maintain** 42:10,14 55:15 70:21

**maintains** 42:5 44:19 70:19

**making** 23:14 28:9 38:12 40:13 64:6 77:18 79:4

**mandated** 67:10

**maps** 56:25

**march** 1:24 4:7 84:4

**marked** 16:21 19:2 40:9 46:19 60:23 63:6 70:4 71:16

**market** 24:13,13 25:8,15,18 27:8 34:16 38:17

**mass** 56:16

**matter** 4:10 83:9

**mazak** 15:6,20,24

**mean** 11:14,22 15:11 20:25 25:10 31:16 32:14 33:5 35:15 39:8,22 48:21 51:10 52:2 52:13 53:2 58:17 58:18 68:1,2 72:23 75:6

**meaning** 10:3 40:15

**means** 31:6,15

**media** 45:24 58:14

**memory** 11:11

**merits** 74:18

**microsoft** 42:6,18 42:20

**midwest** 84:17 87:1

**miller** 1:13 80:2,8 84:6 85:3 86:3

**million** 28:19

**mind** 32:15 33:9 33:10,20 34:4,11 35:5 36:2,8 75:6

**minimum** 65:10 65:25 67:8,9

**minutes** 45:17 69:16,18 75:22

**miscellaneous** 56:14,17

**mischaracterize** 25:1

**missing** 45:20

**mitchell** 2:8 5:9

**mls** 24:21 35:17

**model** 76:12

**moment** 21:4 40:6 60:22 62:1

**money** 27:15 42:24 47:21 48:5 49:4,5 50:23,23,25 53:16 76:11

**monies** 66:22

**month** 25:12 36:15

**months** 14:9 62:1

**mortgage** 50:4

**move** 8:20

**moving** 15:18 60:13

**multiple** 37:16

**n**

**n** 1:25 4:13

**nail** 41:18

**name** 6:24 61:19 69:10 84:6 85:3,4 85:15 86:3,4,21

**naming** 7:3

**nature** 17:17 52:15

**necessarily** 33:21 59:19 66:20

**necessary** 13:10 41:10

**need** 6:10 8:23 10:3 32:15 39:18 41:7 48:20 51:22 52:5,21 54:1,3 66:22 67:7,20 70:12

**needs** 54:14

**never** 15:22 33:1,6 34:13 38:1 39:1 40:2 45:5 72:24

**new** 13:9

**news** 33:9 34:14 34:17,17 36:21,22 37:1,10,18,22 38:7 38:7,14,16 39:2,4 39:17 40:19

**newspaper** 30:8,9 31:9,25 32:6,18,25 33:2,4,7,7,11,13 33:17,19 34:8,23 35:4 36:5,12,14,16 36:18,21 37:11,14 38:9,18 78:1,23

**newspapers** 38:24

**nicole** 2:16 5:18

**nicole.sergent** 2:22

**night** 77:14

**nobody's** 51:25

**nonaccounting** 47:20

**noncommercial** 17:21 22:12,18 38:20,21,25 40:3 40:14,20 43:9 46:2

**nonlawyer** 61:16

**nonpublic** 56:20

**normal** 70:21

**northern** 15:21,24

notably 15:6
notarized 84:14
notary 4:13 83:23
  84:25 85:10,18
  86:15,23 87:23
note 17:25 84:12
notice 3:11 10:17
  40:6 57:8
noticed 48:15
notices 10:7
noto 17:25 18:13
  18:22 19:14 20:1
  21:13,20 23:11,19
  27:23 41:23 43:7
  44:15 78:22
november 16:13
  16:14,16
number 7:3 17:23
  18:2,6 19:5 21:5
  21:14 40:11 41:2
  46:16 47:16 56:17
  59:3,7 60:13,15,25
  61:6 62:14,17
  70:7 71:19 84:7
  84:13
numbered 10:14
  10:23 40:8
numbers 11:5
  86:7

**o**

oath 4:9 7:14
  62:18
object 8:4
objection 9:9
  74:23 76:19 77:11
  78:3 79:17 82:1
objections 7:18
  9:6
obligated 65:4
obligation 65:16

obligations 64:23
  66:14
obtain 36:3,5
obvious 33:18
obviously 13:14
  13:19 42:24 44:7
  48:21 56:7 58:3
  66:10 79:8
occasionally 56:24
occur 32:16,17
office 2:17 3:12,22
  4:4 5:11 7:3 9:16
  10:18 12:6,23
  13:7,12,19,20
  17:18 20:11 35:16
  38:13 41:7 42:5,7
  42:10,20 43:23
  44:18,22 45:4
  46:14 47:22 48:11
  50:25 51:1,17
  52:14 53:3,25
  54:2,3,7,14 55:11
  57:25 60:8 65:6
  66:15 67:25 68:3
  70:19,22 78:7,12
  80:18,24
office's 12:2 20:7
  58:11
offices 35:21
official 1:13 27:10
  85:15 86:21
oh 6:6 52:3
ohio 84:2
okay 7:13 8:5,20
  9:3,13 10:11,12
  11:3,13,17 12:4,9
  12:18,24 13:4,13
  13:18 14:1,19
  15:3 16:14,22,23
  18:7,16,18,21,24
  19:3,4,9,25 20:23

21:3,8,12 22:2,10
  22:14,20 23:1
  24:4,12 26:16,20
  27:5 28:22 30:20
  30:22 31:12,20
  33:3,12,16,24 34:4
  34:19 35:8,12
  37:7 39:1 40:5,10
  40:24 41:24 42:17
  42:19 43:12,15,17
  43:21 44:1,24
  46:25 48:5,8 49:3
  49:7,19,23 50:8,11
  51:16 52:8 56:6
  56:12,16 57:6
  58:11 59:3 60:25
  61:2,18 62:6,11,12
  62:12,16 63:7,15
  65:15,24 66:8,25
  68:14 69:2,25
  70:5,9 71:12,23
  72:13,19,25 73:5
  73:17,23 74:14
  75:12,15 76:8,10
  76:17 77:3,17,21
  77:24 78:14 80:15
  81:2,14 82:4
old 5:14,16
once 43:18
ones 25:20
open 21:6,22 22:7
  22:10,15 30:8
  31:13 39:19 49:11
  49:12,25 54:16
  64:20 71:15 72:20
  77:5,18,22,24
operation 28:21
operations 47:22
  78:11
opinion 66:12

opportunity 81:4
option 81:6
ora 31:5
order 56:24 79:16
  80:10,14
outside 15:22
overnight 44:14
oversees 79:11
overtime 51:22,23
  52:3 54:10 58:25
owen 3:21,23,25
  5:16,17 7:4,8 9:17
  12:15,20 13:1
  16:6 17:3 22:5
  25:5,18,23 26:24
  27:8,10 34:1,6,16
  36:17,18 37:9
  38:17 42:2 46:15
  46:22 61:11 64:24
  65:3 66:18 69:3
  70:23
owenton 5:14
owns 39:7

**p**

p.m. 4:8 82:6
page 3:2,10 10:14
  10:22 11:5 17:2,6
  18:2,5,5,12,12,16
  19:10,12,20,21
  21:5 22:16 23:21
  28:8,8 30:21,25
  31:1 40:7 41:21
  61:1 63:14 64:17
  64:18,18 70:13
  71:23,23 73:5,13
  83:6 84:13,15
  86:7 87:3
pages 10:13
paid 27:15 43:11
  58:25

**paper** 41:14 52:14 53:6,8,17,22
**paragraph** 30:25 31:1 63:16,25
**paragraphs** 62:2
**parcel** 13:10
**parcels** 42:2
**part** 6:11 8:15 13:22 14:6,7 24:5 25:5 27:24 28:15 30:24 31:7 42:9 47:25 59:16,22 73:24 86:9
**partially** 55:20
**participants** 4:6
**particular** 35:13 36:4 74:17,18,21
**parties** 5:4,25 49:25
**party** 49:14
**pass** 52:16 69:17
**passed** 16:11
**passing** 53:4
**pause** 8:3
**pay** 24:19 46:7 51:25 52:3 54:10 77:10,13,21
**paying** 53:5
**pdf** 18:4,5
**pending** 9:2
**people** 24:14,17 56:23,24 76:15
**perform** 41:10 80:19,25
**performs** 59:10 80:18,24
**period** 15:4
**periodical** 31:9,25 32:25 33:4,13,17 33:20 79:1

**person** 46:6 47:21 59:19
**personally** 85:11 86:15
**phone** 84:3
**phones** 13:12
**phrase** 66:8
**physical** 42:23 45:22
**pictures** 13:8
**piece** 35:9,10 36:4 45:10 55:22,25 60:2
**pieces** 23:8
**place** 83:6
**plainly** 33:18
**plaintiff** 1:9 2:3 5:8 64:2
**plaintiff's** 3:19
**plate** 58:21
**play** 74:6
**please** 5:4,22 6:14 7:6 8:16 15:12 19:15 20:3 47:10 84:11,11
**plug** 44:5
**po** 2:18
**pocket** 40:25
**point** 8:24 17:14 32:2,24 44:25 52:2 69:2 78:21
**policy** 66:18 67:16 67:19
**pops** 33:5
**popularity** 24:17
**port** 44:11,12
**portion** 49:21,22 50:22 51:7 56:7 56:13
**position** 16:8

**possibility** 74:4,4
**possible** 42:19
**possibly** 76:22
**posted** 35:6,7
**potentially** 34:22 39:9 47:8 52:11 52:13,22
**prefix** 19:6
**preliminary** 44:21
**preparation** 11:19
**prepare** 11:4 48:8 54:21 55:24
**prepared** 61:12
**prepares** 48:10
**preparing** 12:5
**present** 5:4,25
**president** 72:3
**presumably** 50:3
**pretending** 77:25
**pretty** 24:13 28:21 43:25 50:6 56:22
**previous** 16:17
**price** 23:16 46:6 63:21
**pricing** 23:5 66:17
**primary** 13:8
**prior** 11:1,7,13 14:19 17:12 24:5 24:9 27:21 30:4 30:15 33:25 36:13 37:16 57:7,19 61:18
**probably** 14:13 15:5 48:22 61:25 62:3 76:7
**procedure** 4:9 85:5 86:5
**proceedings** 3:3 5:1
**process** 42:23 43:1 43:6,19 44:17

45:21 46:1,5 60:5 60:7
**processes** 59:8
**product** 22:21
**production** 84:15 84:17,22
**properties** 24:15 34:21,25
**property** 3:12 7:4 9:16,23 10:18 17:2 26:23 35:1,9 35:10,13 36:4 37:10,19 38:13 39:5,7,17,25 41:9 53:7 54:21 55:9 55:14,24 56:9 70:22 76:14 79:15 80:9,16
**proven** 47:8
**provide** 40:21 42:7,20
**provided** 20:10 21:13 64:2 79:3
**provides** 61:6
**providing** 23:15 39:25
**provision** 22:6 30:7,12
**public** 4:14 22:7,8 31:7,9,24 49:8,10 49:11,12 51:18 52:4,11 53:21 54:1,13 55:3,8,17 55:18 57:21 58:1 59:9,11,14,15,24 59:25 60:3,10 65:7 66:15 67:24 70:22 73:1,14 79:5 85:10,18 86:15,23 87:23

**publication** 31:8
31:24 33:8
**publish** 33:14 38:8
38:14,18
**published** 65:1
**publishes** 35:22
**pull** 18:24 23:9
41:20 46:9 63:5
**pulled** 16:22 60:21
**purchase** 3:21
**purchased** 59:13
59:23
**purpose** 20:8,19
21:21 22:12,23
23:23 26:12 30:2
30:10 31:5,6,8,15
31:23 32:22 38:20
38:22 40:13 46:3
59:13,23 60:18
61:8 62:24 63:21
64:4,14,15 68:20
**purposes** 40:14
58:2 70:14
**pursuant** 4:8,10
42:8 54:22
**put** 6:8 14:10
29:24 51:16 66:3
**puts** 20:21
**putting** 44:20
**pva** 3:22 5:16 7:9
9:19,22 10:2
11:23 12:21 13:14
13:18,23,24 14:1,5
16:6,11,17 20:19
21:6 22:5,15
24:12 25:5 27:10
40:12,25 46:14,22
48:8 57:25 59:8
59:10 61:11 64:20
64:24 65:4 66:18
67:5,18 68:13,14

69:3 72:3,5,6,11
73:7 76:7 80:12
81:17
**pva's** 60:14
**pvas** 8:10 10:4
21:23 64:1,3
66:22 67:17 73:13
74:8 75:2

**q**

**quarter** 28:20
**question** 8:2,9,9
8:15,19 9:2,8,10
9:12,13 30:1
32:19,20 34:13
40:18 45:19 47:10
55:20 57:6 65:21
66:16 67:1 74:25
76:24 79:7,24
80:15
**questioning** 78:8
**questions** 7:14,18
8:17 22:3 47:7
62:4 64:22 69:17
69:25 75:17,19
76:3 78:18,19
79:25 81:21
**quickly** 63:4 72:13
**quote** 21:13 23:16
28:3 42:13 63:20
73:19
**quoted** 20:6 22:20
77:22

**r**

**raise** 6:14
**ran** 16:12
**rare** 39:10,11
**rarely** 49:10
**rates** 69:13
**read** 34:7 61:25
62:2 70:12 81:5,9

85:5,6,12 86:5,6
86:17
**reading** 4:15 8:12
8:12 62:5,9 84:19
**real** 24:13 25:8,18
27:7 34:2,6,16
37:3,10 38:16
**realize** 42:11
**really** 15:15 16:5
47:7 72:23
**reason** 8:25 32:11
32:12 33:3 55:7
55:10 84:14 86:8
87:3
**reasons** 20:11
**recall** 18:18,21
19:22 63:23 69:5
69:12 72:16 74:14
78:8
**receipt** 84:18
**receipts** 48:2 56:7
56:13 57:20 71:1
**receive** 56:20
80:22
**received** 31:13
32:21 39:1 73:1
**receiving** 18:18
30:15 72:16
**recession** 16:1
**recognize** 14:25
57:17 61:3 63:8
66:10
**recollection** 39:13
57:16,18
**record** 5:3 7:16
8:5 26:4,5,6 30:24
31:7,9,24 49:10
62:8 69:20,21,22
69:23 83:11 86:9
**recorded** 83:9

**records** 20:8 21:6
21:22 22:7,8,11,15
25:21 28:3 29:16
30:8 31:13 39:19
40:12,21 42:5,7
43:3,6,16 44:18
49:8,11,12,12,15
49:25 50:1 51:18
52:4,11 53:21
54:2,13,16 55:2,3
55:8,17,18 56:20
57:21 58:1 59:9
59:12,14,15,24,25
60:3,10 64:20
65:7,10 66:15,18
73:1,14,15 74:1
77:18,22,25 79:5
80:16
**recoup** 52:24
53:13
**recross** 3:7 75:18
81:12,15
**recurring** 57:21
**redirect** 3:6 78:16
**reduced** 77:25
83:9
**refer** 10:1
**reference** 84:7
85:2 86:2
**referenced** 85:11
86:15
**referring** 9:23
28:23
**reflected** 74:9
**refresh** 11:11
**regarding** 11:14
76:14 79:7
**regular** 50:16
**related** 31:8,24
56:21 59:11 72:10

relative  83:13
relied  21:15 23:13
  27:25 63:19 64:6
  64:10,10
relief  3:15,17 17:8
rely  23:24 28:9
remember  8:7,23
  28:12 75:9,11
remembered
  30:18
remotely  4:7,10
rephrase  8:19
reporter  1:25 4:14
  5:3,21 6:4,6,13,19
  26:1,3,6 69:21,23
  83:1,23 85:7
reporters  4:4
represent  7:1
  78:23,25
representative
  13:3,4,14 14:20
  69:3 72:7 79:10
representing  5:12
request  3:25 9:1
  11:15 18:18 19:15
  20:2,2 22:12,12,22
  23:5,24 24:9 30:9
  30:16 31:14 32:3
  32:9,21,23 34:1
  38:12,19,22 39:2
  39:17 40:13,14,20
  41:1,6,17,22 42:7
  43:7 45:11 46:2
  49:11,12,13 50:3
  50:18 51:1 52:11
  53:21 55:4 56:20
  58:7,7 65:7 73:1
  79:5 86:9,11
requested  21:20
  28:4 41:8,19
  42:11 45:7 58:13

58:14 72:24
requester  41:25
  44:19 45:13,25
  52:17,18
requesters  45:12
  55:17,19 57:21
  71:6 73:15
requesting  20:14
  21:19 41:14
requestor  64:4
requests  22:11,18
  39:4 49:8,24
  50:15 51:6,18
  52:4 54:17 55:8
  58:1 59:9,12,14,15
  59:24,25 60:3,11
  70:15 72:20 73:2
  77:18,22,25
require  22:3
required  41:5
  84:25
requires  54:23
resources  41:5
respect  67:5 73:14
respond  40:25
  59:9
responded  30:3
responding  58:1
  59:11,13,14,24,25
  60:2 65:7 70:14
response  20:12
  22:4 43:7 60:16
  61:10 62:14,17,19
  64:8
responses  3:18
  61:4
responsibilities
  59:11
responsible  59:18
returned  84:18

revenue  1:14 2:17
  5:12 11:24 20:21
  21:1 29:3,13 78:7
  78:11 80:6,21,25
review  10:25
  23:18 62:13 84:12
  85:1 86:1
reviewed  11:19
  61:18
revised  68:24
richard  2:15
richard.berelson
  2:21
rick  5:10 69:18
  81:7
right  6:5,14 7:10
  8:6,21 9:4,14,23
  12:9,18 14:12,16
  16:8 18:1 19:12
  21:17 26:8 27:19
  29:11,12 34:2
  35:23,25 39:20
  44:12 45:9 46:7,9
  46:12,21 47:2,14
  47:18,23 48:6,13
  48:18 49:5 50:1,2
  50:20 51:19 52:2
  52:6,7,18 54:14,24
  55:4,11,17 56:4
  57:17 58:23,24
  59:7,20 60:13,25
  61:23 62:7,13
  63:2,17 69:15
  70:18 71:7,10,12
  72:20 75:7,13,18
  75:20 76:10 77:19
  78:15 79:11 81:2
rights  17:20
ritchey  2:5
robertson  1:23 4:3
  5:15,21 6:1,13,24

7:8,10 12:9 19:15
  20:5 26:10 61:11
  62:11,14 70:1
  71:15 75:15 78:19
  80:1 81:4 84:8
  85:4,9 86:4,13
  87:20
role  12:25 70:22
roll  3:21 37:19
  38:13 39:17,25
  40:4 41:9 42:1
  45:5 49:17,20
  54:21 55:9,14,24
  56:9 71:2 79:15
  80:9,17
roughly  57:14
rules  4:9 7:13 85:5
  86:5
run  79:8
runs  47:1

| s |
|---|

s  84:15 86:8,8 87:3
sage  3:20 72:20,22
  74:22
salaried  54:11
  58:23
salaries  47:17
  51:10 54:8
salary  51:14,15
  52:5
sale  29:14 35:14
  35:24 36:4,13
sales  27:6 35:1,7
  36:11 37:14,16
satisfy  33:18 41:6
  51:1,6
satisfying  52:11
  53:21
saturday  77:14
saying  35:13 41:2
  43:9 49:14 52:21

61:19 67:19 73:23
74:6
**says** 18:2,13 19:14
29:13 31:5 42:4
54:10 73:17
**schedule** 11:8,22
73:24 74:8 76:1
**school** 12:11,13,14
12:14,15,17 14:21
14:24
**schooled** 12:16
**schooling** 14:21,23
14:25
**scores** 34:9
**scroll** 18:16
**seal** 85:15 86:21
**sec** 30:4
**second** 10:22 11:5
15:14 17:1 18:12
19:10,12 27:24
47:25 59:22 65:19
79:7
**section** 31:2,3
36:23 37:1 58:18
**secure** 20:18
**see** 10:12,20 14:24
17:4,10 18:3,10,15
19:7,15,17 24:14
25:12 30:23 31:10
33:23 34:21 37:8
37:10 41:18 46:18
48:3,4 53:18
55:21 58:19 68:20
70:6 71:21 73:8
73:21 74:8 76:4
77:14
**seeing** 28:14
**seeking** 74:16
**seen** 62:1
**sell** 20:16 29:18
76:15

**selling** 29:16
**send** 48:9 50:4
55:22
**sending** 45:25
58:14
**sense** 53:18 54:6
**sent** 17:24 28:11
74:16 75:4
**sentence** 29:12
**sentiment** 74:9
**separate** 24:4 54:1
**separately** 52:25
**sergent** 2:16 5:18
5:18
**served** 70:16
**services** 2:17 5:12
81:17
**set** 3:19 11:24 83:6
**setting** 69:13
**sheet** 84:13 86:7
86:10,18 87:1
**sheets** 53:8
**shift** 15:14,15
**show** 36:14 53:16
**shown** 84:16
**side** 67:12
**sign** 81:5,9
**signature** 83:19
84:14
**signed** 85:13 86:18
**signing** 4:15 51:25
61:19 84:19
**silly** 45:19
**similar** 35:21
**simply** 8:19
**sincerely** 84:21
**single** 70:12
**sir** 9:24 11:16 14:3
27:12 39:11 57:5
84:10

**sites** 24:21
**sitting** 39:12 45:1
62:5,18,21
**six** 14:9 16:7 51:23
**sixth** 10:14 12:15
**skill** 83:12
**skit** 77:14
**small** 13:6
**sold** 25:7,11,12
34:22 45:15 49:17
**solely** 27:13
**solutions** 84:1
87:1
**somebody** 43:23
48:10 49:13 72:25
**someone's** 72:9
**sorry** 6:7 13:2
23:9 38:11 64:14
**sort** 25:19 26:23
27:8,11 34:16
35:20 36:18 39:1
39:24 45:11 50:18
53:1,1,22 54:4
58:4 66:14 73:10
**sought** 40:12
**sound** 45:18
**sounds** 45:10
**source** 18:13
21:14 27:13 37:12
65:17
**sources** 29:14 36:8
**space** 29:14,16
**speak** 25:16
**speaking** 71:1
79:13
**special** 38:15
**specific** 9:25 21:23
28:6 35:10 36:16
39:13 59:18 75:10
**specifically** 9:7
10:1 15:1 21:22

27:2 31:18 33:5
41:19 55:17
**specified** 43:2 65:5
**speculation** 74:3
77:11 82:1
**speculative** 79:17
**speech** 17:19
**spending** 48:17
50:24 58:19
**spends** 47:22
**spit** 9:20
**sports** 33:8 34:9
**spot** 66:3
**spreadsheet** 43:18
60:6
**staff** 5:11 52:12
**staffing** 14:4
**standard** 42:5
**standpoint** 68:7
**start** 17:9 42:9
46:7
**started** 76:5
**starts** 19:5 28:8
31:1 71:18
**state** 4:14 5:4
14:25 48:20 61:6
85:10 86:15
**statement** 85:13
85:14 86:19,19
**states** 1:1 7:1
16:24 30:8 63:25
**statute** 21:22
23:23 30:13 31:3
54:23
**statutes** 21:24
60:18 61:8 62:24
**stay** 62:8
**stayed** 15:23
**step** 43:21
**steps** 41:9,11

stick 44:10
stipulation 4:1
stop 81:23
strategist 18:14
street 4:5
strike 32:12
string 3:20,24
  19:13 71:18,24
structure 67:23
student 14:8
studier 31:16
stuff 24:21 25:13
  33:9 54:13 70:1
subject 72:19
  75:18 81:12
submit 46:23
submitted 83:25
subscribed 85:10
  86:14 87:21
substantial 60:17
  60:17
sudden 55:10
sue 17:24 19:13
  27:23 29:25
suggesting 73:10
suite 2:7 4:5 84:2
summarize 53:19
summarizes 31:2
summarizing 64:6
summertime 14:7
  14:13
superior 84:1
supervises 68:2
supervising 67:25
supervisory 68:6
supplement 64:9
supplies 52:14
  53:3,25 54:2,3,7
supply 44:8
sure 5:7 8:1,8 22:1
  25:2,4 35:19 37:2

37:5,6 38:12
45:20 47:11 53:10
57:13 61:25 68:4
68:8 69:16 70:2
73:13 74:4 75:14
77:13 80:12
surrounding
  25:19
susan 18:13
swear 4:15 6:7,10
  6:14
sworn 4:10 83:7
  85:10,13 86:14,18
  87:21
systems 59:8

**t**

take 7:24 8:24
  16:19 45:3,8,13
  51:12 62:1 71:13
taken 4:3,8 42:25
  83:5,11
takes 38:24 45:16
talk 7:21 12:4
  36:10 81:24
talked 63:18 76:4
talking 43:13
  49:11 62:5 74:17
  74:21,22 75:4
talks 29:11 80:13
tatenhove 1:6
tax 3:21 19:16
  37:19 38:13 39:17
  39:25 40:3 41:9
  42:1 45:5 49:17
  49:20 50:5 54:21
  55:9,14,24 56:9
  71:2 79:15 80:9
  80:17
technical 26:8
telephone 2:9,20

ten 45:17
tend 7:22 25:10
term 8:14 16:14
  31:4 60:19 61:8
terminate 75:17
terminology 47:21
terms 20:18 21:12
  23:5,18,21 26:20
  31:12 32:3,22
  33:12 39:16,19
  41:3,5,7 44:24
  45:22 48:17 49:4
  49:7 52:8 59:3
  64:13,23 66:14,25
  67:1,22
testified 33:25
testify 9:16 11:4
  83:7
testifying 11:19
testimony 6:15
  7:17,19 63:23
  64:5 74:6 79:8
  85:6,7 86:6,9,12
text 42:6
thank 5:21,23 6:4
  6:19,20 20:1,2
thanks 75:25
thing 7:15,20 8:7
  8:22 24:23 27:9
  34:17 53:22 54:4
  81:7
things 7:23 14:15
  33:9 34:11 50:24
  67:12 76:6
think 9:20 18:4
  23:6 28:14,22
  32:2,5 33:7,7,10
  37:13 39:16 41:1
  43:2 45:16 46:10
  48:25 49:17 51:9
  53:5 54:6 59:16

63:2 66:21,23
67:1,3,7,9,11,15
67:18 70:25 73:10
73:18 74:2,11
75:15 77:8 78:15
thinking 52:3
third 8:22 17:6
  49:14,25 73:5
thirty 84:18
thomas 1:13 80:2
  84:6 85:3 86:3
thought 22:25
  66:5 76:24
thousand 51:5
three 49:18 51:22
  59:19 62:2
thumb 43:4,8,20
  43:20 44:7,9,10,15
  45:24 52:15,16,17
  52:21 53:5,12
time 8:24 9:2
  13:16,18,20,21,22
  14:1,2,6,6,7,17
  17:14 23:8 31:13
  32:2,24 38:11
  52:12 58:19 69:3
  76:2 80:20 81:21
  81:21,22,22 83:5
times 9:7 49:18
title 12:25 17:7
  21:6 83:6
today 7:16,21 8:1
  9:15 11:1 37:9
  39:13 62:18,21
  75:25 76:2
told 81:23
tool 25:16 26:24
  27:11
top 10:18 16:25
  17:25 18:3 30:23
  46:14 68:18

**topic** 40:11,16,24 57:7,24 59:7 60:14 63:2 73:2
**topics** 10:23,25 11:4,20 12:7 40:7 57:23
**total** 57:1
**toyota** 15:7,13,14 15:20 16:3
**transcribed** 85:7
**transcript** 4:16 83:5,11 84:11,12 85:5,12 86:5,11,17
**transfer** 43:19
**tricky** 47:9
**true** 71:9 83:11
**truth** 6:16,16,17 83:7,8,8
**try** 7:15,21 8:1,18 9:25 24:14,14,23 24:24 41:4 74:8 77:24
**trying** 74:5,5
**turn** 10:12 21:4 30:20,20 63:14
**turning** 21:3
**tv** 77:6,8
**two** 13:22 14:1,6 14:16 19:20 22:11 24:4 34:11 36:7 41:12 45:15 47:7 49:16 50:6,6,11,15 51:18 52:4,21 57:20 71:5 78:18
**type** 21:19 24:23 58:8
**types** 22:11 26:20 33:14
**typewritten** 83:10
**typical** 45:12

**typically** 45:12,16

**u**

**uh** 10:24
**ultimately** 46:6
**understand** 8:9,15 8:16,18 9:15,22 20:25 22:6,10 25:4 46:21,25 47:9,11 68:23 73:2 79:8,19 80:2
**understanding** 17:16 22:5 24:8 26:16 32:19 35:20 64:23,25 65:3,9,15 65:18 66:10 67:22
**undertake** 31:22 32:7,13
**unfair** 66:21 74:7
**unfortunately** 10:13
**uniform** 66:24
**unique** 45:11
**united** 1:1 7:1 16:24
**ups** 81:10
**usb** 44:11,11
**use** 8:12 9:19,22 20:7,14,24,24 25:17,19 27:10 31:6,8,24 36:16 60:7 76:14
**useful** 36:18
**usually** 45:13 58:10

**v**

**v** 84:6 85:3 86:3
**valuation** 3:12 7:4 9:17,23 10:18 17:2 70:22

**value** 26:19
**values** 26:23
**van** 1:6
**various** 75:1
**veritext** 84:1,7 87:1
**veritext.com.** 84:17
**versus** 16:25 48:17 75:1
**videoconference** 2:12,23 4:6
**view** 22:15 33:17 34:15 37:7,12 65:12 66:13 67:25 68:5
**violating** 65:12,22 66:1,2
**vs** 1:11

**w**

**w** 2:4,15
**wait** 5:23 8:2 9:8
**waiting** 6:8
**waived** 4:17 84:19
**walk** 42:23
**wallet** 6:9
**want** 8:8,17 10:10 14:10 22:4 24:25 25:1,3 36:19 37:19 38:13 47:10 49:13 61:13,23 62:4 66:3,9,9 70:1 71:12 76:16 79:23
**wanted** 15:15 34:21 36:3 59:4 65:11 67:2
**wants** 43:2 56:1 68:11
**watch** 24:12 77:6
**way** 27:9 41:4 48:22 51:17 58:6

**59:4** 64:18 67:15 70:9 83:14
**we've** 45:15 48:23 54:7 63:2
**weather** 33:8
**website** 24:1 27:11 29:19 76:6,11,16
**wednesday** 4:7
**week** 25:12 36:15 37:14
**wells** 50:8
**went** 11:9,9,11 12:13,15 16:5 61:20
**west** 4:5
**whatsoever** 69:8
**wise** 15:4
**witness** 4:15,16 5:15,25 6:7,18 25:25 46:12 69:18 83:4 84:8,11 85:1 85:4,11 86:1,4,15
**witness'** 84:14
**won** 16:13
**wonderful** 20:4
**word** 21:25,25 31:18,18
**words** 29:18
**work** 15:4,7 16:5 34:18,19 37:24 54:9,15
**worked** 12:22 13:15 15:5 16:7
**working** 14:9,19 15:24
**works** 24:20,22 43:24
**worry** 32:16
**write** 61:15 73:14
**writes** 20:5

**[writing - zoom]**

| | |
|---|---|
| **writing**  20:1 | **z** |
| **www.zillow.com** | **z**  28:13 |
| 28:24 | **zero**  48:18,24 49:4 |
| **y** | **zeros**  48:16 |
| **yeah**  6:10 7:8 | **zestimate**  26:14,17 |
| 10:16,21 11:2 | 26:22 28:14,16 |
| 12:3,3 14:14 | 76:13 |
| 15:14 19:8,24 | **zillow**  1:8 3:24 5:8 |
| 22:1,9,9,13 25:10 | 6:25 11:14,19 |
| 25:10,24 26:1,3 | 16:25 17:17,20 |
| 29:1,1,5,11 30:14 | 22:21,22,25 23:7 |
| 30:14 33:15,15 | 23:13,15,19,22 |
| 35:2 37:6 38:23 | 24:1,6,7,18,19,20 |
| 39:11,21,21 43:17 | 24:22 26:11,21 |
| 43:25 45:15 48:7 | 27:6,15,20,22 28:1 |
| 49:6,12,17,17,22 | 28:19 29:13 30:5 |
| 49:22 50:21 52:19 | 31:21 32:5,18 |
| 52:19 53:9,15,23 | 33:1,10,18,22,25 |
| 54:17,25 55:12 | 34:5,14 35:5,6,10 |
| 57:15,22,22 63:9 | 35:17,17,19,20 |
| 64:21 65:20 66:5 | 36:3 37:8 40:13 |
| 67:8 68:1,3,8,17 | 40:21 41:1,8,13 |
| 68:21,22 69:1 | 45:6 63:20 64:2,3 |
| 70:11,17,24 71:3,4 | 70:16 74:22 76:10 |
| 72:8,8,21 73:4 | 77:1 78:22 84:6 |
| 74:11 76:9 77:6 | 85:3 86:3 |
| 79:20 81:8 | **zillow's**  20:7 24:8 |
| **year**  11:10 12:2 | 24:16 27:10 29:3 |
| 16:3 28:20 37:19 | 30:15 31:14 32:3 |
| 37:20,21 47:1,5 | 32:9,21 37:15 |
| 49:1,9,16,18 50:7 | 40:13 63:11 75:1 |
| 50:12,15,19 51:4 | **zillow.com**  26:13 |
| 51:19 52:22 56:9 | 27:3 29:15 77:15 |
| 58:16 | **zillow.com.**  76:5 |
| **year's**  47:2 | 76:23 |
| **years**  16:7 37:16 | **zoom**  5:9,20 |
| 49:24 55:7 57:8 | |
| 57:11 76:8 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.