Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF KENTUCKY

3                    CENTRAL DIVISION

4                       FRANKFORT

5           CIVIL ACTION NO. 3:19-CV-00049-GFVT

6

7                      ZILLOW, INC.,

8                        Plaintiff

9

10                          v.

11

12

13     HON. THOMAS B. MILLER, IN HIS/HER OFFICIAL CAPACITY

14    AS COMMISSIONER OF THE KENTUCKY DEPARTMENT OF REVENUE,

15                        ET AL.,

16                       Defendants

17

18

19

20

21

22

23   DEPONENT:  JASON SCRIBER

24   DATE:       MARCH 5, 2021

25   REPORTER:  SANDRA VENTURA

Page 2

1          APPEARANCES

2

3 ON BEHALF OF THE PLAINTIFF, ZILLOW, INC.:

4 Darren Ford

5 Graydon Head & Ritchey, LLP

6 2400 Chamber Center Drive

7 Suite 300

8 Ft. Mitchell, Kentucky 41017

9 Telephone No.: (859) 578-7263

10 E-mail: dford@graydon.com

11 (Appeared via videoconference)

12

13 ON BEHALF OF THE DEFENDANTS, HON. THOMAS B. MILLER, IN

14 HIS/HER OFFICIAL CAPACITY AS COMMISSIONER OF THE

15 KENTUCKY DEPARTMENT OF REVENUE, ET AL.:

16 Rick Bertelson

17 Nicole Sergeant

18 Bethany Rice

19 Office of Legal Services for Revenue

20 501 High Street

21 Frankfort, Kentucky 40601

22 Telephone No.: (502) 564-4581

23 E-mail: richard.bertelson@ky.gov

24

25 (Appeared via videoconference)

Page 3

1          INDEX

2             Page

3 Direct Examination by Mr. Ford       6

4 Cross-Examination by Mr. Bertelson      97

5 Redirect Examination by Mr. Ford     109

6 Recross-Examination by Mr. Bertelson    121

7 Further Direct Examination Mr. Ford     123

8 Further Recross-Examination by Mr. Bertelson   123

9

10         EXHIBITS

11 Exhibits                Page

12 Exhibit 1 - Compilation of Notices       9

13 Exhibit 3 - Complaint           16

14 Exhibit 6 - Defendants' Responses to Plaintiff's

15     First Set of Interrogatories      85

16 Exhibit 11 -Fee Schedule Partial Cost Analysis   95

17 Exhibit 18 -Invoices            71

18 Exhibit 19 -Annual PVA Office Budget FY 2020

19      through 2021           72

20 Exhibit 20 -Series of E-mails        21

21 Exhibti 33 -Series of E-mails        89

22

23

24

25

Page 4

1          STIPULATION

2

3 The deposition of JASON SCRIBER, taken at KENTUCKIANA

4 REPORTERS, 730 WEST MAIN STREET, SUITE 101, LOUISVILLE,

5 KENTUCKY 40202, via videoconference in which all

6 participants attended remotely, on FRIDAY, the 5TH day

7 of MARCH, 2021, at approximately 9:01 A.M. EST; said

8 deposition was taken pursuant to the Federal Rules of

9 Civil Procedure.  The above-referenced notarial act

10 involved the use of communication technology.

11 Specifically, the court reporter appeared by

12 videoconference pursuant to KRS 423.455 and complied

13 with all statutory requirements.

14

15 It is agreed that SANDRA VENTURA, being a Notary Public

16 and Court Reporter may swear the witness and that the

17 reading and signing of the completed transcript by the

18 witness is not waived.

19

20

21

22

23

24

25

Page 5

1         PROCEEDINGS

2

3     COURT REPORTER:  Will all parties except for

4 the witness please state your appearance, how you

5 are attending, and your location?

6     MR. FORD:  Sure.  Darren Ford for Plaintiff,

7 Zillow, Inc.  I'm in Fort Mitchell, Kentucky

8 participating via Zoom.

9     MR. BERTELSON:  All right.  This is Rick

10 Bertelson.  I'm with the Kentucky Department of

11 Revenue, Office of Legal Services for Revenue, and

12 I'm representing Mr. Scriber and the other PVAs, as

13 well as the Department of Revenue in this case.

14     MS. SERGEANT:  And I'm Nicole Sergeant.  I am

15 an attorney with the finance cabinet, The Office of

16 Legal Services for the Department Of Revenue, and I

17 also represent the defendants in this case.  And

18 I'm appearing via Zoom out of Lexington, Kentucky.

19     COURT REPORTER:  Mr. Scriber, will you please

20 state your full name for the record?

21     THE WITNESS:  Jason Arnold Scriber.

22     COURT REPORTER:  Okay.  And do all parties

23 agree that the witness is, in fact, Mr. Scriber

24 without showing his driver's license?

25     MR. FORD:  For plaintiff, Zillow, Inc., yes.

2 (Pages 2 - 5)

Page 6

1    MR. BERTELSON:  And for the defendants, yes.
2    COURT REPORTER:  Please raise your right hand,
3    sir.
4    THE WITNESS:  (Raises hand).
5    COURT REPORTER:  Do you solemnly swear or
6    affirm the testimony you're about to give in this
7    case will be the truth, the whole truth, nothing
8    but the truth so help you God?
9    THE WITNESS:  I do.
10    COURT REPORTER:  Thank you.
11    DIRECT EXAMINATION
12    BY MR. FORD:
13    Q.  All right.  Good morning, Mr. Scriber.  My
14    name is Darren Ford, I'm an attorney for Zillow, Inc. in
15    an action filed by them in the United States District
16    Court for the Eastern District of Kentucky against
17    various property valuation administrators and the
18    commissioner of the Department of Revenue.  If you could
19    go ahead and please state your name.
20    A.  Jason Arnold Scriber.
21    Q.  Mr. Scriber, have you been deposed before?
22    A.  No.
23    Q.  Okay.  Well, I'm just going to give you a
24    little overview of how this works.  You're here this
25    morning to answer questions that I ask under oath.  You

Page 7

1    understand the nature and consequences of the oath that
2    you just gave?
3    A.  Yes.
4    Q.  Okay.  Essentially, it's question-and-answer
5    format.  It's important that, because we have a court
6    reporter here who will be taking down our testimony,
7    it's very important that we try not to speak over one
8    another.  So it will feel a little awkward at first, but
9    I think, you know, hopefully we will get into a rhythm
10    where, you know, you'll let me finish my question, give
11    a little bit of a beat, and then answer.  That way we
12    can ensure that Ms. Ventura here is getting a clear
13    record of what we're saying.
14    The other thing is that, obviously, you know,
15    we're doing this via Zoom, so there may be times when
16    you can't hear what I said, or there's something that I
17    said that may not make sense to you, terminology,
18    something along those lines.  If you don't understand my
19    question, at any point in time, you would like me to
20    clarify or rephrase, please let me know.  You can just
21    ask and say, "I don't understand," and, hopefully, I
22    will try to rephrase or repeat in the case of a
23    technical difficulty, so please don't hesitate to make
24    sure that you understand the questions that I ask.  And
25    the final thing is that you're not a prisoner here, so

Page 8

1    obviously if you need to take a break at any point in
2    time, just let me know.  My only request is that you
3    answer any question that may be currently pending, okay?
4    A.  Sure.
5    Q.  All right.  Mr. Scriber, are you on any
6    medications today that might affect your ability to
7    recall events or to testify truthfully?
8    A.  No.
9    Q.  All right.  Another feature of depositions,
10    for the uninitiated, is that Mr. Bertelson here who --
11    he's your attorney, correct?
12    A.  That is correct.
13    Q.  All right.  Mr. Bertelson here may -- at
14    various times during the deposition -- may interject an
15    objection to my question.  Give him a chance to finish
16    explaining the basis for his objection.  Once he's done
17    doing that, unless he has instructed you to not answer
18    the question, as soon as he is done, you're free to
19    continue and answer the question.  There will be times
20    where I may address his objection by rephrasing my
21    question, at which point I will let you know that I'm
22    going to rephrase, and, then, you don't have to
23    obviously answer the previously asked question.  But
24    that's one of the reasons that we want to make sure that
25    there's a little bit of a gap between my question and

Page 9

1    your answer.  That'll give Mr. Bertelson a chance to
2    interject and make his objection.  And, of course, he
3    may instruct you not to answer a question.  We haven't
4    run into that, but obviously if he instructs you not to
5    answer a question, you can have a conversation with him,
6    we can discuss that, but obviously don't answer the
7    question, if he instructs you not to.  All right.  Any
8    questions for me so far about the deposition process?
9    A.  No, sir.
10    Q.  All right.  Mr. Scriber, you understand you're
11    here today to testify on behalf of your office as
12    property valuation administrator as a rule 30(b)(6)
13    witness?
14    A.  Yes.
15    Q.  Okay.  And you are the property valuation
16    administrator for Henry County; is that correct?
17    A.  Yes.
18    Q.  Okay.  And how long have you been the property
19    valuation administrator for Henry County?
20    A.  Twenty-four years.
21    Q.  Wow.  Okay.  And we're going to go ahead and
22    mark first exhibit here, which is Exhibit 1.  I don't
23    know if you have paper copies or if you have PDF copies.
24    How are you doing this, this morning?
25    A.  I have paper copies.

3 (Pages 6 - 9)

1          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
2      Q.   Perfect.  Okay.  So Exhibit 1 is a compilation
3  of notices of deposition for each of the counties that's
4  been named as a defendant in this action.  Unfortunately,
5  they are not page numbered.  That's my fault.  But if
6  you flip through to the third version of this, and
7  you'll see each one of them is five pages.  You are the
8  third in order here.  You could turn to the -- that
9  page.  And it will say, "Notice of Deposition of the
10 Office of Property Valuation Administrator for Henry
11 County" in -- at the caption there.  Hopefully you'll
12 see it.  Let me know when you get there.
13     A.   Yes.  I'm there.
14     Q.   Okay.  And if you could turn to the second
15 page of that document or second page of that notice, I'm
16 sorry, second page of that notice which is the following
17 page from where you just were.  Hopefully I didn't make
18 you go back to the beginning.
19     A.   No.  I'm good.
20     Q.   There's a numbered list there, one through 11.
21 Do you see that?
22     A.   Yes, sir.
23     Q.   Okay.  And prior to today's deposition, did
24 you have a chance to review those topics?
25     A.   Yes.

1      Q.   Okay.  And, just generally speaking, I don't
2  want you to reveal any communications that you had with
3  your counsel here, Mr. Bertelson or anybody else
4  representing you in this action, but can you just tell
5  me generally what types of activities that you did to
6  prepare to testify on topics one through 11 identified
7  in Exhibit 1 for the notice of deposition for you today?
8      A.   I just basically did my research for my
9  office.
10     Q.   Okay.  What kind of research did you do?
11     A.   Well, there was some questions regarding
12 budget.  Of course, that's within my office.  I reviewed
13 that.  I reviewed the fee schedule.  Reviewed the
14 statutes that are listed in this -- in these 11 items.
15 That's about the extent of it.
16     Q.   Did you talk to anybody in your office, or
17 anybody -- any other PVAs?  And again, I don't want to
18 get into any communications you had with your lawyers.
19 But did you have any conversations with any of your
20 employees or any other PVAs about any of these topics?
21     A.   Not necessarily, no, sir.
22     Q.   When you say "not necessarily," what do you
23 mean?
24     A.   I have generalized conversation with my
25 employees every day.

1      Q.   But not about these topics specifically?
2      A.   No.  No.
3      Q.   Okay.  And that's what I was asking.
4      A.   No.
5      Q.   Obviously, I know you speak with your
6  employees every day.  But you weren't -- you didn't go
7  to them and say, Hey, I'm supposed to testify, you know,
8  on one of these topics, could you tell me something for
9  me to be able to testify?  You didn't do anything like
10 that?
11     A.   No.
12     Q.   Okay.  So, then, all the preparation for this,
13 then, was your own research and review of your documents
14 in order to testify today?
15     A.   Yes.
16     Q.   All right.  Very good.
17          Mr. Scriber, I'm going talk a little bit about
18 your background.  Where did you go to high school?
19     A.   Eminence High School.
20     Q.   Okay.  Where is that?
21     A.   That's in Eminence, Kentucky.
22     Q.   And what year did you graduate?
23     A.   '91.
24     Q.   And did you attend college?
25     A.   I did.

1      Q.   Okay.  Where did you go to college?
2      A.   Kentucky Wesleyan College.
3      Q.   Okay.  And did you get a degree?
4      A.   Yes, business administration.
5      Q.   And what year was that?
6      A.   '95.
7      Q.   And I don't want to go through your entire job
8  history, but you said you'd been the property valuation
9  administrator for Henry County for 24 years, so that
10 would put us, really, about a year after you graduated
11 from college; is that about right?
12     A.   Yes, sir.
13     Q.   Okay.  And what -- did you do any other jobs
14 between graduating from college and becoming property
15 valuation administrator?
16     A.   Yes.  I was assistant manager for a water
17 district, basically, for the 22 months between my
18 graduation and becoming a PVA.
19     Q.   Okay.  And were you -- when you first became
20 the Henry County property valuation administrator, were
21 you elected or appointed for that first term?
22     A.   Appointed.
23     Q.   Okay.  So you were appointed, and, then, you
24 ran for the election the next -- in the next term,
25 basically?

Page 14

1   A.  Yes.  I was appointed in '97, and I ran for
2 the office in '98.
3   Q.  Okay.  And there's not been any gaps since
4 then; it's been straight 24 years as property valuation
5 administrator?
6   A.  Correct.
7   Q.  Okay.  So you've been doing it, and I've
8 probably done it once or twice.  So just want to make
9 sure for the record that we're both clear, that we're
10 using the same terms.  And I'm positive that we are, but
11 just for ease of conversation here today, I'll use the
12 term "PVA," you know, for property valuation
13 administrator.  You understand what that means?
14   A.  Yes, sir.
15   Q.  I will -- I don't know that there is going to
16 be any need for me to reference other county PVAs, but a
17 couple of things, if there is, I may specifically
18 reference another county PVA.  I'll make clear that I'm
19 referring to another county PVA.  If I refer to just
20 PVA, you know, you can assume that I'm referring to your
21 office specifically.  But I do want you -- if there's
22 any confusion in your mind as to whether I'm referring
23 to you or some other PVA, please don't hesitate to ask
24 for clarification, so that I can be specific that I'm
25 referring to your office, if that's my intention, or if

Page 15

1 I'm referring to other offices.  Okay?
2   A.  Okay.
3   Q.  And another acronym that I will probably use
4 at times is DOR.  You understand that will refer to the
5 Department of Revenue?
6   A.  Yes.
7   Q.  Very good. All right, Mr. Scriber.  How many
8 employees does your office have?
9   A.  I have three full-time employees.
10   Q.  And what are their titles?
11   A.  I have a chief deputy.  I have a chief
12 assessment clerk, and then I believe the other is
13 administrative assistant.
14   Q.  No part-time employees?
15   A.  No.
16   Q.  What are the job responsibilities of the chief
17 deputy, just generally?
18   A.  Well, in an office our size, all of them have
19 similar responsibilities and capabilities.  Let's put it
20 that way.  But the chief deputy is basically in charge
21 when I'm not here.  Very similar responsibilities as
22 what I have.
23   Q.  Okay.  How about the chief assessment clerk?
24 What are his or her responsibilities, generally?
25   A.  Their responsibility is -- regarding

Page 16

1 assessments, collection of -- or maintenance of
2 assessment data, characteristics.  Things of that
3 nature.
4   Q.  And then, I mean, administrative assistant
5 sounds probably pretty self-explanatory, so I assume
6 it's just office-related support, that sort of thing,
7 for both you and your deputy clerk --
8   A.  Correct.
9   Q.  -- and your chief assessment clerk?
10   A.  Correct.
11   Q.  All right.  Very good.
12      Now, Mr. Scriber, you're familiar with the
13 Kentucky Open Records Act, I assume, correct?
14   A.  Yes, sir.
15   Q.  All right.  And you said that in preparation
16 for your deposition today that you had reviewed some
17 statutes.  Let's take a look, if we could, we'll mark
18 this as exhibit three to your deposition.
19   A.  Uh-huh.
20      (EXHIBIT 3 MARKED FOR IDENTIFICATION)
21   Q.  And this is the complaint that was filed in
22 this action.  You will see on the first page, at the top
23 there it has the Eastern District of Kentucky caption,
24 plaintiff Zillow, Inc., and then a number of defendants.
25 You are identified on the second page in your official

Page 17

1 capacity as the property valuation administrator for
2 Henry County.  And then on the third page of the
3 document, it has the caption complaint for declaratory
4 and injunctive relief. Do you see that?
5   A.  Yes.
6   Q.  Okay.  And if you would, turn to page -- let
7 me make sure here.  Actually, stay on page three and
8 look at paragraph one.  You testified in terms of your
9 preparation for this that you had reviewed the statutes
10 that you understood to be at issue in this litigation.
11 There are three statutes identified in paragraph one
12 there, if you see, 61.874, 61.8745 and 133.047.  Do you
13 see those?
14   A.  Yes.
15   Q.  And they're defined, for purposes of the
16 complaint, as the commercial purpose fee statutes; do
17 you see that?
18   A.  Yes.
19   Q.  Are those the three statutes the text of which
20 you reviewed in preparation for your deposition today?
21   A.  Yes.
22   Q.  Okay.  And Mr. Scriber, if you could, just
23 generally, what's your general understanding as a
24 layperson -- well, let me ask you:  You're not an
25 attorney, right, Mr. Scriber?

Page 18

1    A.  That's correct.

2    Q.  Okay.  So any questions I ask you today, and

3  I'll be clear about this, and I'm sure Mr. Bertelson

4  will object, as well, at times.  But I'm only going to

5  ask you questions as a layperson, your understanding of

6  statutes or of the law as the property valuation

7  administrator.  So with that caution, what is your

8  general understanding of the allegations that have been

9  made in this complaint against your office?

10       MR. BERTELSON:  And I will object based on, it

11     calls for a legal conclusion, but I will not

12     instruct him not to answer.

13  BY MR. FORD:

14    Q.  Yeah.  And one other cautionary instruction I

15  will give you, Mr. Scriber, is:  I don't want you to

16  reveal to me any understanding of this case that came

17  from your attorneys.  I just want -- you know -- well,

18  let me ask you this:  Have you reviewed this complaint

19  at some point in the past?

20    A.  Complaint?  This --

21    Q.  This document right here.

22    A.  -- written review?

23    Q.  Yeah.  Have you read through it at some point?

24    A.  Yes.

25    Q.  Okay.  So based on that read of the complaint,

Page 19

1  what is your general understanding of the claims that

2  have been asserted against your office?

3    A.  From what I take, is that it -- Zillow is

4  claiming to be noncommercial user.

5    Q.  So your understanding is that Zillow is making

6  a claim that it is a noncommercial purpose -- or --

7  strike that.  Your understanding is that Zillow is

8  claiming that the public records request that it has

9  made to your office was for a noncommercial purpose?

10    A.  That's the claim, yes.

11    Q.  Okay.  In terms of the statutes that you

12  reviewed in preparation for today, do you understand

13  that the Kentucky Open Records Act refers to public

14  records requests that are made for a noncommercial

15  purpose, and for a commercial purpose; you understand

16  there's a distinction in the act as to those two terms?

17    A.  Yes.

18    Q.  Okay.  Let's look at, and stay in Exhibit 3,

19  and if you note at the top there, there's some blue

20  lettering.  I don't know if you have a color copy or

21  not.  But there's some notations up at the very top

22  there, it's a stamp that the court puts.  And on the

23  right-hand side it says "page ID."  Do you see that?

24    A.  Yes.

25    Q.  Okay.  If you could flip to -- let me find

Page 20

1  this here, page ID 46 with me.  And let me know when

2  you're there.

3    A.  I'm there.

4    Q.  Okay.  Mr. Scriber, you note that this at the

5  top there has a header of "Zillow Group."  It's the --

6  has a date of April 25, 2019 addressed to you as

7  property valuation administrator.  And then there's a

8  body of the letter there that continues to the second

9  page, page ID 47 of Exhibit 3, and it's signed by Susan

10  Noto.  Do you see that?

11    A.  Yes.

12    Q.  Okay.  Do you recall receiving this letter

13  from Ms. Noto sometime shortly after or on April 25,

14  2019?

15    A.  Yes.

16    Q.  Okay.  And did you understand when you

17  received this letter from Ms. Noto, that Ms. Noto is

18  making a request under the Kentucky Open Records Act?

19    A.  Yes.

20    Q.  Okay.  Now, ultimately your office did not

21  fulfill this request; is that correct?

22    A.  Correct.

23    Q.  And you quoted Ms. Noto a fee for the records

24  that she requested by this letter, correct?

25    A.  No, I did not.

Page 21

1    Q.  You did not.  Okay.  My apologies.  Let me

2  pull -- let's pull this here, then.  If you can pull

3  Exhibit 20 for me, Mr. Scriber?

4         (EXHIBIT 20 MARKED FOR IDENTIFICATION)

5    A.  Okay.

6    Q.  And this document has a Bates number, what we

7  refer to as this numbering down here at the very bottom

8  here that has a prefix of DEF, and then it goes on

9  000127 through 132.  Do you see that?

10    A.  Yes.

11    Q.  Okay.  If you could turn with me to the second

12  page of this document, which is DEF 000128.  And it's

13  really the body of the e-mail that's described, really,

14  in the first page at the bottom from Sue Noto to you,

15  April 25, 2019.  And she says, "Dear Mr. Scriber, please

16  see attached ARS request for current tax assessment

17  data."  Do you see that?

18    A.  Yes.

19    Q.  Okay.  And then your response to her is on the

20  first page of this document, DEF 127, you write to Ms.

21  Noto, April 29, you say, "The information that you have

22  requested is available for a fee, according to our fee

23  schedule.  If you would like to request this

24  information, please complete the attached form and

25  return.  Once I receive the form, I can provide you with

Page 22

1 a quote on the cost of information." Do you see that?
2   A.   Yes.
3   Q.   All right.  And is the form that you're
4 referring to in this e-mail string, the form that is
5 part of this document at DEF 000129?
6   A.   Yes.
7   Q.   Okay.  And so, is it fair to say --
8 characterize what you're doing here is you're sending
9 Ms. Noto a form and asking her to fill this form out to
10 obtain the records that she requested in her letter of
11 April 25, 2019?
12   A.   Yes.
13   Q.   Okay.  And then the next letter -- next e-
14 mail, Ms. Noto writes back to you and she says, "Hi, Mr.
15 Scriber.  Based on the information I provided in my
16 request, does your office consider Zillow's intended use
17 to be for a 'commercial purpose'?  And if so, can you
18 provide the reasons for this decision." Do you see that?
19   A.   Yes.
20   Q.   Okay.  And then you wrote back to her on May
21 2nd.  You say, "You intended use is considered a
22 commericial purpose pursuant to KRS 61.8704 A." Do you
23 see that?
24   A.   Yes.
25   Q.   Okay.  What factors did you rely upon in

Page 23

1 determining that Zillow's request of April 25, 2019 was
2 for a commercial purpose, and you quote, KRS 61.8704 A?
3   A.   It's pretty apparent that -- and it's pretty
4 well-known -- that Zillow is a real estate business. The
5 website, plenty of advertisements, things of that
6 nature.  I did my own research as far as what their
7 business was.  There were numerous articles out, I
8 believe back into, as early as 2018, about Zillow
9 purchasing homes through Zillow offers, things of that
10 nature.  I saw where Zillow was -- actually had homes
11 for sale that were owned by Zillow.  So you had real
12 estate transactions, things like that.  Also, saw where
13 Zillow was registered with Kentucky Real Estate
14 Commission as a broker, a registered firm.  That, in
15 essence, told me that it was a commericial use.
16   Q.   Okay.  Prior to April 25 of 2019, and I guess
17 more specifically, prior to Ms. Noto's e-mail to you of
18 May 1 where she asks whether you considered her request
19 for commercial purpose, were you familiar with Zillow?
20   A.   Sure.
21   Q.   Okay.  Had you ever gone on their website
22 prior to getting that request?
23   A.   Sure.
24   Q.   Okay.  What purposes had you gone on their
25 website for prior to getting that request?

Page 24

1   A.   Just home searches.  I do my research on home
2 listings, home sales, things of that nature.  There's
3 also, I mean, you can -- can't hardly turn on the
4 television without seeing a Zillow commercial or any
5 kind of social media without a Zillow link.  Things of
6 that nature.  So it's pretty -- pretty easy to make the
7 connection.
8   Q.   Okay.  Would it be fair to say that you'd been
9 familiar with Zillow's existence, at least for a few
10 years, before you got this request?
11   A.   Yes.
12   Q.   Okay.  And you said that you had gone on their
13 website to look at home listings and home sales, was
14 that within Henry County?
15   A.   Yes.  And I mean, I -- within Kentucky.  Just
16 in general, I might see a listing on social media or
17 something.  And as a matter of fact, there was one out
18 of state I clicked on that looked interesting.  Things
19 of that nature, so...
20   Q.   Do you use -- well, strike that.  Do you use
21 Zillow.com's information in any way in connection with
22 performing your role as property valuation for Henry
23 County?  And what I mean by that is: Do you use it to
24 get information that you find useful to performing your
25 official duties as PVA for Henry County?

Page 25

1   A.   No.
2   Q.   Okay.  So, then, your use of Zillow.com, then,
3 was strictly in a personal capacity, interest in real
4 estate, that sort of thing?
5   A.   Yes.
6   Q.   Okay.  Have you ever engaged in any
7 transactions on Zillow in which you paid Zillow any
8 money, you know, gave them a credit card, anything like
9 that?
10   A.   No.
11   Q.   Okay.  Do you use any sources of information,
12 MLS or classifieds, anything like that, in your
13 day-to-day role as PVA?
14   A.   I utilize the MLS system.
15   Q.   Okay.  What do you utilize the MLS system for
16 in your official capacity of the PVA?
17   A.   Verification of sales data.
18   Q.   And you have never used Zillow for
19 verification of sales data; is that fair to say?
20   A.   No.  Yeah, that is fair to say.  I have
21 never -- I don't rely on Zillow as any kind of a sales
22 verification source.
23   Q.   All right.  So in terms of going back to Ms.
24 Noto's request, if you could turn with me back to
25 Exhibit 3, which is the complaint.

7 (Pages 22 - 25)

Page 26

1    A.  Uh-huh.
2    Q.  And on page nine of the complaint, at the very
3  bottom, you see there's a paragraph there that says,
4  "The term commercial purpose is defined by the ORA as
5  follows," and then on the next page, page ten, it gives
6  a definition of commercial purpose.  Do you see that?
7    A.  Yes.
8    Q.  All right.  Does that that look familiar to
9  you, that definition of commercial purpose?
10    A.  Yes.
11    Q.  Okay.  And the paragraph, subparagraph A, it
12  says, "Commercial purpose means the direct or indirect
13  use of any part of a public record or records, any form
14  for sale, resale, solicitation, rent or lease of a
15  service, or any use by which the user expects a profit
16  either through commission, salary or fee."
17        Was that the definition that you utilized when
18  you made the determination that Zillow's request was for
19  a commercial purpose?
20    A.  Yes.
21    Q.  Okay.  And using -- in that definition, what
22  were the factors or, you know, words that you looked at
23  and said, okay, I believe based on my knowledge of
24  Zillow, and the research that you described that you
25  did, you know, which parts of the statute, you know,

Page 27

1  were determinative for you in making that determination?
2    A.  I mean, the entire statute.  I mean,
3  commercial purpose is for commercial purpose.  Zillow is
4  a commercial entity.
5    Q.  Okay.  Well, let me ask -- let me break it
6  down, then, for you, in terms of the statute here.
7  Did you understand that Zillow was making its request
8  for the purposes of a direct or indirect use of the
9  records that you -- that had been requested from your
10  office for sale?  Did you understood that they were
11  going to sell the records?
12    A.  No.
13    Q.  Did you understand that they were going to
14  resell the records?
15    A.  Honestly, I don't know what they were going to
16  do with it, because they never completed the form and
17  told me what they were going to do with it.
18    Q.  Okay.  Well, so, let's go back to your e-mail,
19  then, which is Exhibit 20.
20    A.  Uh-huh.
21    Q.  And you in your e-mail to Ms. Noto of May 2,
22  2019, you say "Your intended use is considered a
23  commercial purpose."  Do you see that?
24    A.  Yes.
25    Q.  So you told Ms. Noto that you considered the

Page 28

1  use for which she intended to -- or strike that.
2  That you considered the purpose of her request and her
3  intended use to be for a commercial purpose, right?
4    A.  Uh-huh.
5    Q.  So you made a determination that her request
6  was for a commercial purpose, correct?
7    A.  I consider all these requests commercial
8  purpose.  I've never had any one otherwise.
9    Q.  Okay.  So, you've never received a public
10  records request to your office that you didn't consider
11  to be for a commercial purpose?
12    A.  Not of this extent, no.  Not for a database,
13  no.
14    Q.  Okay.  So let's distinguish, then, just so
15  we're clear on what we're talking about, when you say
16  "database," are you referring to your property tax roll
17  files, all of the information about the parcels that you
18  collect in any given year?
19    A.  Yes, and the history.
20    Q.  And the history of the property, right?
21    A.  Yes.
22    Q.  So, that -- you consider that to be your
23  database, right?
24    A.  Correct.
25    Q.  All right.  And that -- and you would consider

Page 29

1  that to be a public record that is available to the
2  public?
3    A.  Yes, it is.
4    Q.  Okay.  And, you know, because it's multiple
5  properties, if I use the term "bulk request," is that a
6  fair characterization of, you know, what is being
7  requested since it says it's lots of different property
8  information?
9    A.  Yes.
10    Q.  Okay.  Do you ever receive requests to your
11  office for individual parcel information?  So, like, you
12  know, just -- they just want one piece of property?
13    A.  Yes.
14    Q.  Okay.  And you wouldn't consider that,
15  obviously, to be a bulk request or request for your
16  database, correct?
17    A.  Correct.
18    Q.  But still a public record, though, because
19  it's part of the same database, right?
20    A.  Yes.
21    Q.  Have you ever received a request for an
22  individual parcel or the information that you maintain
23  about individual parcels, that you consider to be a
24  noncommercial request?
25    A.  Sure.  Property owners come in all the time

8 (Pages 26 - 29)

Page 30

1 and want a copy of their property card.
2   Q.   Okay.
3   A.   We provide that.
4   Q.   All right.  So if a property owner, someone
5 who owns that particular piece of property wants to find
6 out, you know, what their property tax bill is or other
7 information about the property that you have on file,
8 they can come in and ask you for that piece of
9 information, and that is defined, I believe, in the
10 statute, as a noncommercial purpose request, correct?
11   A.   I don't know that it's defined in there as the
12 property owner being a noncommercial request.
13   Q.   Okay.  What about in 133.047?  Does it -- does
14 that statute -- I know you looked at this before -- does
15 that statute specifically say that someone asking for
16 information on his own property, you know, that they
17 shouldn't be charged for that?  And I'll help you out
18 there, Mr. Scriber.  If you look at page ten, paragraph
19 21.
20   A.   Uh-huh.
21   Q.   And if you look at -- it actually moves on to
22 page 11, subsection C there.  And it says, "Any person
23 seeking information."  Do you see that?
24   A.   Yes.
25   Q.   Okay.  So, really, it's not defined as

Page 31

1 noncommercial, but that statute says that someone
2 seeking information on their own property, that they're
3 not -- they shouldn't be charged for personnel time for
4 getting that, right?
5   A.   That's correct, but it doesn't state
6 noncommercial.
7   Q.   Correct.  You're right.  So it doesn't define
8 it as noncommercial.  It simply says, you can't charge
9 them in accordance with the commercial fee guidelines,
10 right?
11   A.   Correct.
12   Q.   Okay.  And so, are there any other types of
13 requests that you receive that you would deem to be
14 noncommercial in that you couldn't charge the fees
15 specified under the commercial fee guidelines?
16   A.   Only other requests that I've ever had is
17 intergovernmental, so another government office.  That's
18 about the extent of the request that I've ever had.
19   MR. FORD:  Okay.  And I think someone just
20   joined us in the deposition.  I see Bethany Rice,
21   so I just want to identify who that is so I know
22   who's listening in.
23   COURT REPORTER:  I'm sorry.  Ms. Bethany Rice
24   has been on since the beginning.
25   MR. FORD:  Okay.  She has?  Okay.  I missed

Page 32

1 that.  All right.  My apologies.
2   MS. RICE:  I beg your pardon.  I didn't speak
3   up.  I am here as an attorney with the Office of
4   Legal Services for Revenue with the Department of
5   Revenue and the Finance Administration Cabinet in
6   an observation role.
7   MR. FORD:  Perfect.  Okay.  Just wanted to
8   make sure I -- just wanted to sure I knew who was
9   on the call.
10   MS. RICE:  I apologize.
11   MR. FORD:  No, no.  That's fine.  Not at all.
12 I missed that your name wasn't there from the
13 beginning, so that's me.  I should have mentioned
14 it earlier.
15 BY MR. FORD:
16   Q.   So apologize, Mr. Scriber.  So moving on.  So
17 the other type of request that you get that you would
18 consider to be noncommercial would be intergovernmental
19 requests?
20   A.   That's correct.
21   Q.   Okay.  And give me an example of the types of
22 intergovernmental requests that you receive for your
23 database or individual parcels?
24   A.   I have never received an intergovernmental
25 request for an entire database.  What you're -- what I

Page 33

1 was referring to is:  We typically get requests from
2 other county offices for -- for instance, planning and
3 zoning, they may need information about surrounding
4 property owners, things of that nature.  That
5 information is readily available here in the office.
6 They will come get that information, and we can assist
7 them with it.
8   Q.   Okay.  Do you ever get requests from law
9 enforcement looking for information on a piece of
10 property?  Anything like that?
11   A.   Sure.  Sure.
12   Q.   Okay.  But that's -- that wouldn't be bulk
13 requests, that would be individual parcels or that kind
14 of things, right?
15   A.   That's correct, no bulk requests.
16   Q.   Okay.  And do you charge -- you don't charge
17 any of those intergovernmental requesters under the
18 commercial fee guidelines, correct?
19   A.   Correct.
20   Q.   Okay.  And just so we're talking -- make sure
21 we're talking about the same thing, when I say
22 "commercial fee guidelines," if you look at Exhibit 3
23 again and go to page ID No. 34.  And at the top there it
24 says "PVA open records commercial fee guidelines."
25 Let me know when you're there.

9 (Pages 30 - 33)

Page 34

1    A.  I'm there.
2    Q.  And over to the left-hand side says, 62FO15,
3  and then 08/12.  Do you see that?
4    A.  Yes.
5    Q.  All right.  Does this, to you, look like the
6  current version of the PVA open records commercial fee
7  guidelines that are utilized by your office?
8    A.  Yes.
9    Q.  Okay.  So when you say -- or when I say
10  "commercial fee guidelines" or you make reference, those
11  are the fee guidelines that you're making reference to,
12  and also I just want to make sure that that's what I'm
13  referring to as well.
14    A.  Correct.
15    Q.  All right.  So you wouldn't charge an
16  intergovernmental requester, you know, any of the
17  charges listed in that document for any property record
18  that it might -- that government might request, right?
19    A.  Not typically, but I've never had one request
20  the extent of Zillow's request, you know, as far as a
21  complete database, no.
22    Q.  Okay.  Do you receive bulk requests from any
23  other requesters to your office?
24    A.  Yes.
25    Q.  Okay.  And what kind of other bulk requests,

Page 35

1  do you typically receive?
2    A.  I receive bulk requests for GIS data, bulk
3  request for property tax roll -- or property database
4  information.
5    Q.  And what kinds of businesses or companies make
6  those requests to you?
7    A.  A lot of -- let's see.  I guess, mortgage
8  companies, property research companies, tax management
9  companies.  Things of that nature.
10    Q.  Any companies that publish real estate
11  listings or information about properties that would be,
12  like, analogous to Zillow, in your opinion?
13    A.  Not that -- not that I'm aware of.  There is -
14  - I have had a company of -- well, such as CoreLogic
15  that does utilize a lot of that information in the same
16  basis, but not exactly the same way, no.
17    Q.  Okay.  Do you have a local newspaper there in
18  Henry County?
19    A.  Yes.
20    Q.  What's it called?
21    A.  Henry County Local.
22    Q.  And is that a multicounty paper, or is it just
23  Henry County?
24    A.  Just Henry County.
25    Q.  Okay.  And how often is the Henry County Local

Page 36

1  published; do you know?
2    A.  Once a week.
3    Q.  And does the Henry County Local, does it
4  contain classified ads?
5    A.  Yes.
6    Q.  Okay.  Have you ever received a request for an
7  individual parcel or any sort of record from your office
8  from the Henry County Local newspaper?
9    A.  No.
10    Q.  All right.  And if you look back to page ten
11  of the complaint again, Exhibit 3.  And at the top there
12  you can see there's an A that defines commercial
13  purpose, and then B it says, "Commercial purpose shall
14  not include."  Do you see that?
15    A.  Yes.
16    Q.  Okay.  And then it goes on to say,
17  "Publication or related use of a public record by a
18  newspaper or periodical."
19       Do you see that?
20    A.  Uh-huh.  Yes.
21    Q.  Would you consider the Henry County Local to
22  be a newspaper within the meaning of this statute?
23    A.  Yes.
24    Q.  Okay.  What about a periodical?  Would you
25  consider them to be a periodical?

Page 37

1    A.  Circumstantial.
2    Q.  Okay.  What are the features, in your view,
3  that makes your local paper, the Henry County Local, a
4  newspaper or when you would consider them a newspaper,
5  within the meaning of this statute KRS 61.870?
6    A.  They produce a newspaper.
7    Q.  Okay.  And what are the features of a
8  newspaper in your understanding as a layperson?
9    A.  I'm -- I'm not sure what you mean.
10    Q.  Sure.  How would you define a newspaper, if
11  you were asked to -- if you were asked to make a
12  response to a request that the Henry County Local made
13  to your office and you had to determine if they were a
14  newspaper, what about them would make them a newspaper
15  within the meaning of that statute?
16    A.  I mean, they physically produce a newspaper.
17    Q.  Okay.  So if a company that only had a
18  newsletter or something it published online, came to you
19  and asked you for records, you would consider that type
20  of publication to not be a newspaper; is that fair to
21  say?
22    A.  I can't say that.  I don't know.
23    Q.  All right.  What would be, then -- let's say
24  that, you know, a requester came to you and did not
25  actually physically publish a paper, but published news

10 (Pages 34 - 37)

Page 38

1  and information about Henry County, what would be the
2  information that you would look at to determine whether
3  or not they were a newspaper?
4      A.  Sounds very hypothetical to me, and it would
5  be circumstantial on the basis, if it is for a public
6  benefit.
7      Q.  Okay.  "For a public benefit," I think you
8  said?
9      A.  Yes.
10     Q.  All right.  Did you consider whether or not
11 Zillow's intended use of the information that it had
12 requested from your office would be for a public
13 benefit?
14     A.  I didn't see it as a public benefit, no.
15     Q.  Okay.  Why not?
16     A.  It's a commercial use.
17     Q.  Okay.  So, distinguish for me, I guess, your
18 view of what a newspaper does and what Zillow does in
19 the public benefit commercial use context.
20     A.  Well, I -- you know, a newspaper deals with
21 all kinds of various topics.  Zillow deals with real
22 estate, period.  That it's exclusively dealing with real
23 estate.  That, you know, it's just the basis of it.
24     Q.  Okay.  So, the fact that Zillow only publishes
25 information about real estate, that, in your view, would

Page 39

1  distinguish it from a traditional newspaper?
2      A.  Somewhat, and also because they receive fees
3  and revenues from sales and advertising, and they
4  purchase and sell property.  It's pretty apparent that
5  they're in it for the money.
6      Q.  Is it your understanding that the Henry County
7  Local newspaper, does it have ads in its paper?
8      A.  Yes, it does.
9      Q.  Do you know if it receives fees for those ads?
10     A.  I would say it does, yes.
11     Q.  So you would assume that it does, right?
12     A.  That's correct.
13     Q.  So what's the difference between Zillow's
14 advertising model and the Henry County Local's
15 advertising model, to your knowledge?
16     A.  As far as I'm concerned, the advertising model
17 for Zillow is just one part of their entity.
18     Q.  Okay.
19     A.  They make -- they make revenue off of the
20 information that they provide online, as well as make
21 revenue from the instant offers, the agents that -- that
22 subscribe to them.
23     Q.  Okay.  Do you think that the Henry County
24 Local makes revenue from its advertising?
25     A.  I'll be honest with you, the Henry County

Page 40

1  Local probably makes no revenue.  Their advertising
2  probably produces that -- that paper and is subsidized
3  from other counties.
4      Q.  Okay.  You understand what the term "revenue"
5  means, generating income, right?  It doesn't mean in
6  profit.
7      A.  I do, but it substantiates the existence of
8  its paper.
9      Q.  Right.  And my question wasn't whether they
10 are profitable, but they exist because they advertise,
11 right?
12     A.  I assume that.  I don't know their financials.
13     Q.  Well, and that's an unfair question.  But at
14 least a portion of their operational costs come from
15 people paying them to advertise stuff in their paper,
16 right?
17     A.  I -- I can't verify that.
18     Q.  Okay.  But you would assume that they make
19 money from their advertising, correct?
20     A.  I don't assume much of anything.
21     Q.  All right.  Well, I think you did earlier.  You
22 said that your belief was that you had to pay to put an
23 ad in the Henry County Local.
24     A.  I assume that.  I mean, I -- I can't verify
25 that.

Page 41

1      Q.  No, I understand.  But you also don't know
2  what Zillow does either, fair?  I mean, you don't know
3  how they make money, because you're not an employee of
4  Zillow, right?
5      A.  I am not an employee of Zillow, but I'm --
6      Q.  So you made the same assumption about Zillow
7  that you would make --
8          MR. BERTELSON:  Objection.  Would you let him
9      finish the question, please?
10     Q.  Okay.  Finish your answer.
11     A.  I'm not an employee of Zillow but information
12 is readily available on how Zillow's mechanism performs
13 and they generate revenue.
14     Q.  And you don't know whether the Henry County
15 Local generates revenue, based on advertisements that it
16 sells?
17     A.  Well, I would -- I mean, I assume that.  I'm
18 not in their business model, so I'm not an employee of
19 theirs, nor do I retain the financials.  I can tell you
20 this.  I can tell you this, is that I have paid for
21 notices that I have had to place from this office in the
22 paper.  I have had to pay for those.  That's all I can
23 tell you.  I can't verify anything other than that.
24     Q.  Okay.  Well, then, that's helpful.  So you've
25 placed notices, in your official capacity as PVA of

11 (Pages 38 - 41)

Page 42

1 Henry County, in the Henry County Local, correct?
2    A.   That's correct.
3    Q.   And they've charged you to do that, correct?
4    A.   That's correct.
5    Q.   Okay.  Have you ever placed a classified with
6 the Henry County Local in your personal capacity?
7    A.   No.
8    Q.   Okay.  But at least for your official
9 capacity, you've paid the Henry County Local money for
10 putting information in the paper?
11    A.   That's correct.
12    Q.   So let's go back to page 10 of the complaint
13 again and the definition of commercial purpose.  And I
14 think -- we were talking about intended use of Zillow's
15 request, and I think we said that it -- you didn't
16 believe that they were going to sell your records or
17 resell your records, did you understand that they were
18 going to be using the records that they were requesting
19 for any form of solicitation?
20    A.   I don't -- I can't answer that.
21    Q.   Well, you must have answered it at the time
22 when you told Ms. Noto that her request was for a
23 commercial purpose, right?
24    A.   I've told literally anyone that's -- that
25 requested that amount, that it's commercial purposes.

Page 43

1    Q.   Okay.
2    A.   I -- I mean, all requests that I get are
3 commercial purpose other than the intergovernmental
4 agency stuff that I receive, and that's few and far
5 between.
6    Q.   Okay.
7    A.   And it's never to the extent of this request.
8    Q.   So it -- when you were applying this statute
9 with respect to Zillow, you did not consider whether it
10 fell within the definition of a newspaper that it was
11 using -- or intended to use that information to publish
12 or related use by a newspaper or periodical?
13    A.   I had no inclination as to whether Zillow was
14 a newspaper or a periodical.  I don't see it as being
15 that.
16    Q.   All right.  Well, let's look at the letter
17 again, which is on page 46 here.  Yeah, page 46 of the
18 complaint here, Exhibit 3.  And turn to the second page,
19 47.
20    A.   Uh-huh.
21    Q.   And you said you had no information with
22 respect to whether or not it intended to use that
23 information, like a newspaper.  And so I just want to
24 confirm, so this -- did you use this paragraph at the
25 top of 47 there that starts off, "As you may know"?

Page 44

1    A.   Yes.
2    Q.   And so in your view, at the time reading that,
3 there was no information provided in that paragraph
4 that, in your review, would have suggested or made you
5 consider whether or not Zillow qualified as a -- or
6 Zillow's request qualified as intended use as
7 publication by a newspaper or periodical?
8    A.   No.
9    Q.   Let me ask you a hypothetical, Mr. Scriber,
10 and we'll give your counsel a chance to object to it, of
11 course, but...
12        If Zillow were to include on its website
13 sports scores and some, you know, national news about
14 politics, in addition to all the other real estate
15 information, would that change your view as to whether
16 or not Zillow was or may be a newspaper for purposes of
17 the Public Open Records Act?
18        MR. BERTELSON:  Objection.  Calls for
19    speculation, but if he knows the answer -- he can
20    answer the question, but it calls for speculation.
21 BY MR. FORD:
22    Q.   Okay.  Go ahead, Mr. Scriber.
23    A.   You would have to ask the original drafter of
24 the Open Records Act for that information.  I can't
25 define what they have listed in law.

Page 45

1    Q.   Okay.  Well, you can't define what they have
2 listed.  I mean, you have to apply statutes in your day-
3 to-day job, right?
4    A.   Correct.
5    Q.   And one of those statutes is the Kentucky Open
6 Records Act, right?
7    A.   Uh-huh.
8    Q.   Okay.  And I don't want to get into any of the
9 substance, but is it accurate to say that you don't call
10 up the county attorney or the Department of Revenue
11 attorneys here, like Mr. Bertelson, and ask them for
12 legal advice every time you receive a public records
13 request; is that accurate to say you don't do that?
14        MR. BERTELSON:  I'll object as far as that
15    question calls for potentially disclosing
16    attorney/client privilege information, but I think
17    he can answer as to the general question as to
18    whether or not he consults counsel with regard to
19    open records requests on a regular basis.
20 BY MR. FORD:
21    Q.   And I don't want to get into substance, at
22 all.  I want to know if you call up the public attorney
23 every time you get a public records request?
24    A.   No.
25    Q.   Okay.  So, in that case, you are asked to

12 (Pages 42 - 45)

Page 46

1  determined whether you're -- or you make a determination
2  as to whether you're complying with the law when you get
3  a public records request, and you don't necessarily seek
4  legal counsel every time you get a request, correct?
5      A.  Correct.
6      Q.  Okay.  So when you say you can't, you know,
7  apply a statute, that's not accurate.  You do that every
8  day, right, Mr. Scriber?
9      A.  I didn't say I could apply a statute.  I can't
10 define some of the verbiage that is in the law.  That is
11 from the -- the lawmakers that created that law.
12     Q.  Okay.  Well, if Ms. Noto in her e-mail to you
13 on May 1, 2019 in Exhibit 20, which is DEF 000127, if
14 she asked you, does your office consider Zillow's
15 intended use to be for a commercial purpose, right?
16     A.  Uh-huh.
17     Q.  And -- "yes"?
18     A.  Yes.
19     Q.  Okay.  And you said, yes, basically, right?
20     A.  Yes.
21     Q.  Okay.  And so that determination as to whether
22 it was for a commercial purpose, that would have to be
23 made looking at the statute and the language that we
24 were looking at in Exhibit 3, right?
25     A.  Correct.

Page 47

1      Q.  And so part of applying -- or part of
2  answering her question as to whether it was a commercial
3  purpose, would require you to determine whether or not
4  Zillow was a newspaper or periodical, correct?
5      A.  Correct.
6      Q.  Okay.  And so my question to you was:  You
7  know, what about Zillow, in your mind at the time,
8  distinguished it from a newspaper or periodical with
9  respect to its intended use as described in this letter?
10     A.  I don't consider it a newspaper or periodical.
11     Q.  And why not?
12     A.  Because it's not a newspaper or periodical.
13     Q.  Okay.  But explain to me what about Zillow
14 does distinguishes it from a newspaper or periodical.
15     A.  They sell real estate.
16     Q.  Okay.  So, the fact that they sell real estate
17 and buy homes and sell homes, that distinguishes them
18 from a newspaper; is that fair to say?
19     A.  That's pretty obvious.
20     Q.  Okay.  Is there anything in Ms. Noto's letter
21 to you of April 25, 2019 that indicates that they
22 intended to use your records to buy and sell real
23 estate?
24     A.  No, but it also didn't define their total
25 business use.

Page 48

1      Q.  Okay.  Did you follow up with her to ask
2  whether or not they -- she intended to use the records
3  that she was requesting to buy and sell real estate?
4      A.  I sent her a form to fill out to complete and
5  specify what she was asking for.  It's pretty much a
6  considered -- considered a commercial use unless you
7  tell me something otherwise.  She failed -- or she never
8  completed the form.  And any other conversation,
9  basically, I felt like it was just baiting me in to see
10 if I was going to charge them commercial fees or not.
11 You know, if I would have followed through -- if I was
12 intent on getting the information, I believe I would
13 have filled out the request form and followed through.
14     Q.  Okay.  Well, Mr. Scriber, I mean, it's fair to
15 say that you told Ms. Noto that her request was for a
16 commercial purpose before she filled out the form that
17 you sent her, correct?
18     A.  Yes.
19     Q.  Okay.  So, if I understood your testimony, I
20 think you were saying that you were waiting for her to
21 tell you whether it was for a commercial or
22 noncommercial use?
23     A.  Well, I mean, she -- you know, you complete
24 that request form and specify what you're going to use
25 that information for.

Page 49

1      Q.  Okay.  And so, if Zillow had completed that
2  form and included in the form the information that it
3  put in its letter, that it intends to make some or all
4  of the information contained in the real property
5  records sought by this request available to users of its
6  website, Zillow.com, free of charge, if she had included
7  that in the form that you had sent her and indicated
8  that she believed that was a noncommercial request,
9  would you have accepted that?
10     A.  No.
11     Q.  Okay.  So in other words, you really weren't
12 asking her to self-classify, you would have said, no,
13 I'm sorry.  Your request is for a commercial purpose.
14 I'm going to charge you commericial fee guideline rates,
15 correct?
16     A.  I was just asking her to clarify her request.
17 The request is just a standard procedure, the
18 application, fill it out and then we can give an
19 adequate quote on the cost of the information.
20     Q.  Okay.  Well, but, again, going back to my
21 question.  If she had indicated -- if she had repeated
22 the information she included in her letter as to the
23 intent of the request and what they intended to use that
24 -- the information that she was requesting for, the --
25 that form and indicated that, in her view, it was a --

13 (Pages 46 - 49)

Page 50

1 it was for a noncommercial purpose because it was going
2 to be disseminated to use free of charge, like yourself,
3 would you have accepted that classification -- self-
4 classification?
5     MR. BERTELSON: Objection. Asked and
6 answered.
7  Q. Go ahead, Mr. Scriber.
8  A. I have no further comment.
9  Q. You have to answer the question, Mr. Scriber.
10 Would you have accepted the self-classification as
11 noncommercial purpose if Ms. Noto had indicated in that
12 form --
13  A. No, I would not have. Because I believe her
14 statement as to their businesses is misleading.
15  Q. Okay. What about that statement in your view,
16 that Zillow intends to make some or all of the
17 information contained in the real property records
18 sought by this request available to users of its website
19 Zillow.com free of charge, what about that statement, in
20 your view, would have been misleading?
21  A. Well, I -- that is not misleading, but their
22 business practices, that is only one part of their
23 business practice. The reason that people -- the reason
24 that real estate agents, the reason that Zillow is
25 registered as a broker and a real estate agent in

Page 51

1 Kentucky is that this information is why they receive
2 fees in advertising and is vital to their business
3 mechanism.
4  Q. Okay. Mr. Scriber, if the Henry County Local
5 paper asked you for the same database information that
6 Zillow asked you for, would you charge them under the
7 commercial fee guidelines?
8  A. I've never had that request.
9  Q. Okay. I'm asking you: If they did make that
10 request, and they told you that their purpose was to
11 publish that information in their newspaper, would you
12 charge them as a commercial purpose request?
13  A. Yes. If they wanted the electronic database,
14 yes, I would.
15  Q. Okay. But you would consider Henry County
16 Local to be a newspaper?
17  A. Yes. They're welcome at any time to come in
18 here and make copies of every property record.
19  Q. For free of charge?
20  A. No. It's 10 cents a copy. It's readily
21 available.
22  Q. And you're talking about the Henry County
23 Local, correct? That you would charge them --
24  A. Yes, anyone.
25  Q. Okay. So you don't distinguish, then, between

Page 52

1 commercial and noncommercial requesters when it comes to
2 requesting the property tax roll file or other database
3 information in bulk?
4  A. No. I -- I mean, I haven't in the past. I
5 haven't had that request.
6  Q. Do you think it would be lawful for you to
7 charge a newspaper for your database under the
8 commercial fee guidelines if they told you their
9 intended purpose was to publish that information in a
10 newspaper?
11  A. I'm making -- I'm making the information
12 readily available without the database. It's readily
13 available in my office at any time.
14  Q. That's not my question. I'm asking you: Do
15 you believe it is permitted under the Open Records Act
16 for you to charge a newspaper, or something that you
17 would consider to be a newspaper, under the commercial
18 fee guidelines for copies of your property tax roll
19 file?
20  A. I can't answer that.
21  Q. Why can't you answer that?
22  A. I've never had that situation occur, so I
23 don't know.
24  Q. Going back to your assertion about Zillow's
25 real estate buying and selling business, was there any

Page 53

1 information that you acquired in classifying Zillow's
2 request as being for a commercial purpose, was there any
3 information that you had at that time that indicated to
4 you that Zillow planned to use the information it was
5 requesting to buy and sell real estate?
6  A. Well, there was -- there's plenty of
7 information that was available about them buying and
8 selling real estate.
9  Q. And I -- I understand that you understand that
10 that's part of their overall business, but in terms of
11 the intent --
12  A. So you're saying -- you're saying that is part
13 of their overall business, right?
14  Q. What I'm saying is: I understand that you
15 understand that. But what I'm saying is that to the
16 extent that --
17  A. Well, that's what you stated, so...
18  Q. -- they didn't indicate in the letter that
19 they intended to use the records for that purpose, what
20 I'm asking you is: What other information did you have
21 available to you that said that, no, Zillow, in fact,
22 did intend to use the records they were requesting to
23 buy and sell real estate, that it was not just to make
24 it available on their website free of charge?
25  A. I mean, that information is readily available.

14 (Pages 50 - 53)

Page 54

1 They've been -- the instant offers, things of that
2 nature.  They -- they have been buying and selling homes
3 as far back as, what I can find is, like, 2017.  It's no
4 -- no big secret that they are using that information to
5 buy and flip homes.
6    Q.  Okay.  Do you know what your office would have
7 -- would charge for the records that Zillow requested by
8 its April 25, 2019 request, if your office considered
9 that request to be for a noncommercial purpose?  Do you
10 know what that charge would have been?
11    A.  No.
12    Q.  Okay.  If you go back to Exhibit 1 of -- that
13 we marked earlier on in your deposition, which is that
14 notice that has the list of topics.
15    A.  Uh-huh.
16    Q.  And you see number three there?  It says, The
17 amount the PVA would have charged for the records sought
18 by the Zillow request if Zillow's purpose in making
19 requests had been for noncommercial purposes within the
20 meaning of KRS 61.8743.  Do you see that?
21    A.  Uh-huh.
22    Q.  In preparation for your deposition today, did
23 you undertake to determine what that cost would be?
24    A.  Well, if it was for noncommercial purpose, it
25 would be just like anyone else, they could come in and

Page 55

1 make a copy of the record for 10 cents a copy.
2    Q.  So you would not provide an electronic copy of
3 your database for a noncommercial purpose requester; is
4 that what you're saying?
5    A.  Not typically, no.
6    Q.  I'm not saying not typically, but --
7    A.  No.
8    Q.  -- you understand that the Public Records Act
9 concern or the Open Records Act allows you to not
10 provide electronic copies of your records to a public
11 records requester, if that's the form in which they
12 request them?
13    A.  I don't know.  Restate that.
14    Q.  Sure.
15       So, a noncommercial requester comes into your
16 office --
17    A.  Uh-huh.
18    Q.  -- and requests an electronic copy of your
19 property tax roll file in an Excel format, for instance.
20 What is the noncommercial purpose charge for that
21 request?
22    A.  Well, I really never calculated that.  It
23 typically would have been the, you know, 10 cents per --
24 per a copy.  Being as we have, I don't know, 29 -- let
25 me see, 15, 16,000 cards, front and backside, I mean,

Page 56

1 you're looking at probably $3,200 for copies.
2    Q.  Mr. Scriber, let me ask you this, though:  You
3 can provide that information in an Excel format,
4 correct?
5    A.  Sure.  Well, then that would be the same
6 charge.  That's a manipulated database, I would think,
7 you know.
8    Q.  I'm not following.
9       So the 10 cents is for paper copies, no?
10    A.  Sure.
11    Q.  Okay.  So someone's not asking for paper
12 copies, they want an Excel format version of your
13 database; you would charge them the paper copy cost?
14    A.  I don't know.  I have never calculated that.
15 I've never had a request for that extent of a database,
16 someone wanting a database.  That's just unheard of.  I
17 don't know.  I can't really comment on that.
18    Q.  I see.
19    A.  Don't know.
20    Q.  You can't tell me what you would charge for an
21 electronic copy of your property tax roll file to a
22 requester who was making a request for a noncommercial
23 purpose; is that what you're telling me?
24    A.  Yes.
25    Q.  And you made no effort, prior to today, to

Page 57

1 determine that in response to topic number three in the
2 notice of deposition that you reviewed, correct?
3    A.  I -- yeah.  That's from my experience.
4    Q.  No.  My question is:  You didn't endeavor to
5 go out and get the information to be able to testify on
6 topic three, correct?
7    A.  Well, I didn't find it pertinent to this
8 information -- this situation, because this is a
9 commercial use.
10    Q.  You didn't find the topic that was identified
11 here pertinent to --
12    A.  Well, it is pertinent, but, you know, the
13 statute pretty much defines what the charge should be.
14    Q.  Okay.
15    A.  There's no need of me expanding on the
16 statute.
17    Q.  Let me just make clear, so we can move on.  I
18 might need to bring you back and answer this question or
19 we can do it through written discovery, but as to topic
20 number three, which is the amount you would have charged
21 for the records sought by Zillow's request, if it had
22 been made for a noncommercial purpose, you can't tell me
23 that amount, correct?
24    A.  I don't know that amount.
25    Q.  Okay.  Moving on to topic four, it says, the

Page 58

1  out-of-pocket costs the PVA would incur to respond to
2  the Zillow request; do you see that?
3      A.  Yes.
4      Q.  Okay.  Did you endeavor to determine what the
5  out-of-pocket costs your office would incur to respond
6  to Zillow's request?
7      A.  That can be -- you know, we have costs for
8  everyday operation, costs for creation of that material,
9  costs for maintenance of the software that creates that
10 database.  It can be very extensive, as far as what it
11 costs.
12     Q.  If you receive a request to your office for a
13 copy of your property tax roll file in electronic
14 format, what electronic formats do you have available
15 that you could provide to a requester?
16     A.  Okay.  You just said the tax roll file.
17     Q.  Well, let's be clear here.  I don't want to
18 create confusion here.  So, if we look back at Exhibit 3
19 and page 46, which is the letter from Ms. Noto.
20     A.  Uh-huh.
21     Q.  Okay.  And you see, she describes the records
22 as the current 2018 assessment files or tax roll file;
23 do you see that?
24     A.  On the first page?
25     Q.  Yeah.

Page 59

1      A.  In the first paragraph?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Okay.  And you have something that you would
5  consider to be your office's tax roll file?
6      A.  Yes.
7      Q.  And is that -- you've been using the term
8  "database," but is that basically what you would refer
9  to as your database?
10     A.  No.
11     Q.  Okay.  What would you refer to as your
12 database, then?
13     A.  The database.
14     Q.  Okay.
15     A.  Tax roll file -- tax roll file -- just one
16 second.  The tax roll file is going to be a list of tax
17 bills for any current year.
18     Q.  Okay.
19     A.  The tax roll database contains the information
20 that she says regarding the following information.
21     Q.  Okay.  So would you consider her request,
22 then, to be a request for the tax roll database?
23     A.  Yes.
24     Q.  Okay.  So let's call it the tax roll database
25 so that you're clear, because when I use the term "tax

Page 60

1  roll database," I'll understand that it's what Ms. Noto
2  here was basically, in your review, requesting from your
3  office.
4      A.  Sure.
5      Q.  Okay.
6      A.  Sure.
7      Q.  And then as to the taxable database, you see
8  at the bottom there she says, "To extent your office
9  maintains these records in the standard electronic
10 format." Do you see that?
11     A.  Yes.
12     Q.  Okay.  Does your office maintain the tax roll
13 database in any of the formats, electronic formats, that
14 she requested, delimited text or Microsoft, Excel?
15     A.  Yes.
16     Q.  Okay.  Which formats does your office maintain
17 your tax roll database in?
18     A.  It's in an MDB file.
19     Q.  Okay.  So you --
20     A.  But it can be -- it can be -- well, the files
21 that -- that we would typically send out would be in a
22 text file.
23     Q.  Okay.  So you would convert the MDB file
24 format to a text format, and then that's what you would
25 maybe send to a CoreLogic or some other type of

Page 61

1  requester, if they're asking for a portion of it?
2      A.  A portion of?
3      Q.  Well, if they're only -- if they were only
4  looking for the tax roll file and not the tax roll
5  database, then you could provide that to them in a text
6  format?  Because I think you said earlier -- and let me
7  just clarify.
8          You've never received a request for your
9  entire tax roll database; is that correct?
10     A.  I have received that, yes.
11     Q.  You have received that?
12     A.  Yes.
13     Q.  Oh, okay.  And so -- gotcha.  Okay.  I was
14 confused on that.
15          So you have actually provided your entire tax
16 roll database?
17     A.  I have, and I have -- yes, I have sold it,
18 yes.
19     Q.  Okay.  And what electronic format do you
20 provide your tax roll database in, typically, to a
21 requester that asks for it, electronic format?
22     A.  In a text file, and it's -- it's -- it's
23 created through our software to export it to four text
24 files I believe.
25     Q.  Got it. So it converts -- your software

16 (Pages 58 - 61)

1 converts the information in your database to a text
2 file, and then you copy that text file and that's what
3 you produce, if you're producing the tax roll database?
4    A.  Yes.
5    Q.  Okay.  Walk me through the physical steps
6 necessary to accomplish that.  So, you get a request for
7 your tax roll database from public records requester,
8 you quote them a fee, they pay that fee.  Now what do
9 you need to do, as your office, to get that requester
10 the actual records?  And assume for our hypothetical
11 that they want it on a thumb drive.
12    A.  Basically, just -- before we extract any data,
13 we back it up, make sure the data is valid, and then use
14 the software to extract those files and then save it to
15 a thumb drive.
16    Q.  And do you use a desktop computer for that?
17    A.  Yes.
18    Q.  Okay.  And I notice -- I think you're sitting
19 in your office right now.  You've got a -- are you
20 sitting in your office right now?
21    A.  Yes.
22    Q.  Okay.  I notice behind you you've got a
23 desktop there.  Is that computer that you have behind
24 you there, is that something you could use to make that
25 copy or access your servers to get that information and

1 make that copy if you needed to?
2    A.  Yes.
3    Q.  Okay.  So, who in your office has the
4 requisite knowledge or skills to be able to copy that
5 information and get it to a public records requester?
6    A.  Only me.
7    Q.  Your deputy clerk would never satisfy a
8 public records request, you know --
9    A.  Not to that extent, no, sir.
10    Q.  Okay.
11    A.  Not for a database.
12    Q.  So if someone makes that type of request, then
13 you're doing the whole copying from start to finish,
14 basically?
15    A.  Yes.
16    Q.  All right.  And I think you said the first
17 step in that process was to backup and validate the
18 data; is that right?
19    A.  Uh-huh.
20    Q.  Okay.  So you would ensure that the data that
21 you were about to convert was backed up in case
22 something went wrong, basically?
23    A.  Correct.
24    Q.  Okay.  And approximately how long does that
25 backup take?

1    A.  I don't know.  It varies, but not very long.
2 You're talking two or three minutes to copy over the
3 database.
4    Q.  Okay.  And then validate, what does that mean
5 in terms of validating the data, like, what is it that
6 you have to do to validate it?
7    A.  Basically, we just -- I run totals.  They --
8 through our software, basically, run the totals and make
9 sure that there's no outliers.  You know, there's always
10 a clerical error somewhere, don't get me wrong, but as
11 far as number-wise, that there's not an added zero or
12 two zeros or something, and our totals are not extremely
13 off -- off track.
14    Q.  Okay.  So your software that you use to
15 maintain your database is capable of checking for
16 errors, basically, or weird numbers?  Like if you have a
17 property that, due to a clerical error, is listed as
18 being worth $100 million, like, you would see that and
19 say, that's obviously not right.  That needs to be
20 fixed.  That kind of thing?
21    A.  Yes.  It's not a totally automated process,
22 but I can do it within the basis -- I mean, through my
23 manipulation or through my auditing, personal auditing
24 of that information, yes.  We can --
25    Q.  So it's partially a report that your software

1 can run, but then you visually looking at it to make
2 sure you don't see anything that looks off; is that
3 fair?
4    A.  That's -- yes, that's fair to say.
5    Q.  Okay.  And how long does that -- you know, and
6 I realize the number of records may differ from year to
7 year, but probably stays relatively constant.  How long
8 does it take you to validate the data, you know, for
9 such a request if you were to get one?
10    A.  If there aren't any big errors, things of that
11 nature, probably 15, 20 minutes.  If there is an error,
12 it could take a substantial amount of time.  I mean, you
13 -- you know, anywhere from an hour to maybe three or
14 four hours just to locate down the issues.  Plus, if
15 there's been some database corruption as, far as a file,
16 you know, we have a backup process, things of that
17 nature that -- we have an online backup.  We'd have to go
18 retrieve that previous version.  Things that -- you know,
19 it's just a lot of variables involved in -- if things
20 were to go array -- awry.  Excuse me.
21        MR. BERTELSON:  And, Darren, I don't want to
22    interrupt your flow or anything, but I think I'm
23    going to ask for a break for a couple minutes.
24        MR. FORD:  Yeah.  Sure.  No, this is as good a
25    time as any.

17 (Pages 62 - 65)

Page 66

1          (OFF THE RECORD)
2 BY MR. FORD:
3     Q.  So my next question, Mr. Scriber, with respect
4 to validation, if in the process of validating that
5 data, for purposes of responding to a public records
6 request, you discover an error, that's an error that
7 would be in the database itself, correct?
8     A.  Yes.  I -- yes, I assume.  Yeah.  It would
9 have to be in the database.
10     Q.  Yeah.  And so that's something that you would
11 want to correct irrespective of the fact that you were
12 responding to a public records request, right?
13     A.  Correct.
14     Q.  Okay.  So the -- if it were to take you one to
15 four hours or so to correct that request, if you had
16 discovered it in another context, it would have taken --
17 presumably, it would take you a similar amount of time
18 to correct that error, correct?
19     A.  Sure.
20     Q.  So after validating the data, I think the next
21 step that you said in the process of fulfilling a public
22 records request was to extract the data, I believe you
23 said?
24     A.  Yes.
25     Q.  Okay.  And when you say "extract the data,"

Page 67

1 that would mean converting the -- I think you said MBD
2 is the format you use, converting your MBD database to a
3 text format?
4     A.  Yes.
5     Q.  How long does that conversion take?
6     A.  It's pretty much instantaneous for our
7 software.  You know, it's just a matter of minutes, you
8 know, one to two minutes, I would think.
9     Q.  And, then, once you -- and then the software
10 spits out a file that you can, then, save to your
11 desktop or something like that; is that basically how it
12 works?
13     A.  Yes.
14     Q.  Okay.  And then you would save that text file
15 to the thumb drive or whatever media was being
16 requested, correct?
17     A.  Yes.
18     Q.  Okay.  And, conceivably, it would be possible,
19 if the text file wasn't too large for you, to e-mail it
20 as well?
21     A.  Yes.
22     Q.  And have you ever done that with a public
23 records request?  Have you ever e-mailed them a copy of
24 the text file, or has it always been some sort of
25 separate media that you've used?

Page 68

1     A.  I've used e-mail or upload to an FTP site.
2 Things of that nature.
3     Q.  Okay.  And is that the end of the process,
4 then, in terms of satisfying, once that goes out either
5 via e-mail or some other format, you're done and there's
6 nothing more -- nothing left to do with respect to
7 fulfilling that public records request?
8     A.  Yes.
9     Q.  Okay.  Have you endeavored -- for purposes of
10 testifying today, have you endeavored to determine what
11 your electricity costs would be to complete that process
12 in terms of using your computer to convert the file and
13 all that?
14     A.  No.
15     Q.  Okay.  Other than electricity costs and your
16 time, is there any other expense that your office incurs
17 to perform those steps that we just discussed from
18 backup to e-mailing the data or sending it out?
19     A.  I mean, there -- you know, there's hardware
20 and software costs involved.
21     Q.  And when you say, there's hardware and
22 software costs, you don't buy any new software or
23 hardware to satisfy a public records request, correct?
24     A.  No, no.  But I have to use hardware and
25 software to create those files.

Page 69

1     Q.  Okay.  And does -- is there a subscription
2 charge or transactional fee of some sort that you have
3 to pay to convert the MDB to a text file?
4     A.  No.
5     Q.  Okay.  So -- and presumably you use that same
6 MDB software to do everything else that your office does
7 with respect to those records, correct?
8     A.  Yes.
9     Q.  So that software that you're describing there
10 that you use to satisfy the public records request,
11 that's not software that you buy specifically to satisfy
12 public records requests, correct?
13     A.  No.
14     Q.  Okay.
15     A.  It's included in the software.
16     Q.  Right.
17     A.  Or, I mean, it's a capability of the software
18 that's included.
19     Q.  Right.  It's a capability, but it's not --
20 that isn't its sole purpose?
21     A.  Not exclusively.
22     Q.  Right.  And the computer that you use to do
23 this, presumably like the one that's sitting behind you
24 on the video there, that computer, you use that for
25 things other than public records requests, correct?

18 (Pages 66 - 69)

Page 70

1    A.  Yes.
2    Q.  Is there anything that you use in the process
3 of fulfilling a request, from backup to sending out the
4 text file, that is a piece of hardware or some sort of
5 subscription of transactional fee that you need to pay
6 that is exclusive to you fulfilling public records
7 requests?
8    A.  No.
9    Q.  Okay.  And you're salaried; is that right,
10 Mr. Scriber?
11    A.  Yes, sir.
12    Q.  Okay.  So you don't receive any sort of
13 overtime or additional compensation for your -- if you
14 work more than eight hours in a day?
15    A.  No, sir.
16    Q.  Is there any difference -- and, again, this is
17 a hypothetical -- but is there any difference that you
18 can see in how you would complete that process of
19 sending out a text file of your property tax roll
20 database to a public records requester based upon
21 whether the request was for a commercial or a
22 noncommercial purpose?
23    A.  Could you please restate that?  I'm sorry.
24    Q.  Sure.
25       So you described a process of fulfilling a

Page 71

1 public records request, right?  As to that process, from
2 backup to e-mailing or whatever you -- however you
3 transmit the file to the requester, is there some charge
4 or other step that you would need to perform in that
5 process that would be different based upon whether the
6 request was for a commercial or a noncommercial purpose
7 under the statute, or would the process be identical?
8    A.  Identical.
9    Q.  All right.  Mr. Scriber, if you could turn to
10 Exhibit 18.
11    A.  Yes, sir.
12       (EXHIBIT 18 MARKED FOR IDENTIFICATION)
13    Q.  And this is a document, again, we're marking
14 as Exhibit 18, and it has Bates number DEF 000115
15 through DEF 000125.  The first page of this has your
16 office's header, Henry County Property Valuation
17 Administrator, and then its -- looks mostly invoices.  I
18 think there's an e-mail in the middle there between you
19 and somebody at CoreLogic, but do you recognize this
20 document?
21    A.  Yes.
22    Q.  Okay.  And is this a document that you
23 collected for purposes of responding to document
24 requests in this case?
25    A.  Yes.

Page 72

1    Q.  And these are all documents that you maintain
2 in your office's records, correct?
3    A.  Yes.
4    Q.  And would you consider all of these to be
5 public records?
6    A.  Yes.
7    Q.  Okay.  And these are all true and accurate
8 copies of these records; is that correct?
9    A.  Yes.
10    Q.  And I believe all the invoices in here are for
11 requests for various data, so they're not all the same,
12 but would you consider all of the invoices in here to be
13 invoices for requests that you deem to be for a
14 commercial purpose?
15    A.  Yes.
16    Q.  If you can put that one aside.  Let's turn to
17 Exhibit 19, Mr. Scriber?
18    A.  Okay.
19       (EXHIBIT 19 MARKED FOR IDENTIFICATION)
20    Q.  And this one is titled at the top there,
21 "Annual PVA Office Budget FY 2020 through 2021."
22       Do you see that?
23    A.  Yes.
24    Q.  And is this a document that you prepared?
25    A.  Yes.

Page 73

1    Q.  And I understand that this is a document that
2 you submit to the DOR on an annual basis; is that
3 correct?
4    A.  Yes.
5    Q.  Okay.  The fiscal indicated at the top here is
6 2021 through 2021 -- I'm sorry -- 2020 through 2021.  As
7 I understand PVAs have a fiscal year that runs July 1 of
8 the year through June 30 of the following year; is that
9 correct?
10    A.  Yes.
11    Q.  Okay.  So this budget is for July 1, 2020
12 through June 30 of 20 -- of this year, correct?
13    A.  Yes.
14    Q.  Okay.  And we're in the middle of COVID, so
15 this one might be a little different than prior years'
16 budget, obviously?
17    A.  No.  I wouldn't think there's substantial
18 difference.
19    Q.  Okay.  So in your case, pretty similar to
20 prior years then?
21    A.  Yeah.
22    Q.  I won't hold you to the exact numbers but --
23    A.  No, no.  Yeah.  Pretty similar.
24    Q.  Okay.  So a couple things I want to ask you
25 about, about this budget.  The first one is:  You

19 (Pages 70 - 73)

Page 74

1 understand, you know, there's two sides to this budget.
2 One is money going out, and the other is money going in,
3 right?  And the money going out is anticipated expenses;
4 money coming in is anticipated receipts, right?
5       A.  Right.
6       Q.  And I believe there's a -- well, I don't know
7 the statute, but my understanding is that you're
8 obligated under Kentucky law to have a balanced budget
9 so that whatever you're estimating for the upcoming year
10 you have to have enough money coming in to match up with
11 the money coming out.  Obviously it may not end up that
12 way, but that's the, at least, goal, correct?
13       A.  Yes.
14       Q.  Okay.  So let's look just at the anticipated
15 expenses portion of this.  And my question on that is:
16 Is there a line item or is there an amount included
17 somewhere in the anticipated expenses portion of this
18 budget that is an estimate for, in this case, fiscal
19 year 2020 through 2021, an estimate for how much your
20 office will spend on satisfying public records requests?
21       A.  No.
22       Q.  Okay.  The second category of this is
23 "anticipated receipts" at the bottom there.  I
24 understand that the amount that you may anticipate
25 getting from public records requesters is included on

Page 75

1 the miscellaneous income line; is that accurate for your
2 budget, as well?
3       A.  Yes.
4       Q.  Okay.  And so for fiscal year 2020 through
5 2021, you have $8,000 listed there, right?
6       A.  Yes.
7       Q.  Is that $8,000, is that all money that you
8 would get from selling your -- your data, or is it some
9 portion of that and then there's other income included
10 in that $8,000 number?
11       A.  No.  The major -- the 8,000 is information
12 sales, yes.
13       Q.  So commercial purpose requests, getting a fee
14 from those requesters, the 8,000 is your estimate of how
15 much you get on an annual basis for that?
16       A.  Yes.
17       Q.  Okay.  Mr. Scriber, if you did not receive
18 that $8,000, or roughly thereabouts, on an annual basis,
19 are there any activities that your office would no
20 longer perform as a result of no longer having that
21 income?
22       A.  All of our income is -- well, I guess
23 employment is -- is dependent on a sufficient amount of
24 income, because we, as PVA offices have to submit a -- a
25 significant portion of our in-office revenue back to

Page 76

1 subsidize salaries.  We also use income generated to
2 maintain computer systems, software, money for travel,
3 data collection, telephone charges, Internet charges,
4 just, you know, basically the day-to-day process of --
5 of creating and maintaining this database, everything
6 goes into that.
7       Q.  So that's not quite my question.
8             I guess -- let me rephrase it and ask a
9 different way.
10             Is the income that you anticipate receiving
11 from selling your records to public records requests of
12 approximately $8,000, is that anticipated income tied
13 to, let's say, for instance, a particular employee that
14 you hire?  So, in other words, if you weren't getting
15 that $8,000, you wouldn't hire that employee.  Is
16 anything that you can identify and say, yeah, if I
17 didn't get that 8,000, if I couldn't anticipate that
18 revenue, my office either would not hire somebody or we
19 wouldn't perform some specific activity, anything like
20 that?
21       A.  Yes, we are required to submit a -- like I
22 said -- a substantial part of our revenues back to
23 Department of Revenue to subsidize our employees'
24 salary.  If I don't have that income, than I either have
25 to, one, reduce hours, make an employee part-time, or I

Page 77

1 simply have to lose a position, an employee, which
2 significantly affects the day-to-day procedures in this
3 office, and -- such as collecting and maintaining a
4 database.
5       Q.  Okay.  So -- and if you need to use a
6 calculator or phone, I certainly did.  It looks like the
7 $8,000 represents approximately one-and-a-half percent
8 of your total budget; is that fair?
9       A.  Uh-huh.
10       Q.  "Yes"?
11       A.  Sure.
12       Q.  Okay.  So if your -- if your office lost one-
13 and-a-half percent of its budget, you are saying you
14 would have to lay employees off?
15       A.  Very possible, yes.
16       Q.  Okay.  What other activities would you not be
17 able to perform without that $8,000?
18       A.  Possibly I wouldn't have a substantial amount
19 of funds to pay for employees to go out and inspect
20 properties.  We have to reimburse our employees for
21 miles traveled.  So, you know, physically inspecting
22 properties may take a substantial longer time.
23             We're supposed to do it once every four years
24 to inspect a property.  If I don't have someone
25 available or money to pay mileage, and things of that

20 (Pages 74 - 77)

Page 78

1 nature, we may not inspect them that often or may not
2 inspect them at all.
3    Q.  Is there any activity with respect to;
4 fulfilling public records requests that you would -- you
5 know that you would eliminate if that $8,000 line item
6 was eliminated, if you couldn't charge for your records?
7 In other words, is there something that, you know, is
8 currently dedicated hardware or employee time, overtime
9 that you would eliminate tied to that $8,000?
10    A.  Sure.  We have -- we have to purchase aerial
11 photography to maintain our mapping system and, also,
12 for our auditing of property and structures and things
13 of that nature.  That would be something I could no
14 longer purchase, and that would be a significant impact
15 upon our inspection of properties and auditing process.
16    Q.  Okay.  So you would not be able to -- I think
17 you said you wouldn't be able to purchase aerial
18 photography; is that correct?
19    A.  Yes.
20    Q.  Okay.  How much does aerial photography cost
21 on an annual basis, roughly?
22    A.  Gosh, annual basis.  Rough estimate, 12,000 a
23 year.
24    Q.  Okay.  And what was the other?  You mentioned
25 something else that you probably wouldn't purchase

Page 79

1 without the $8,000.  What was the other thing?
2    A.  Purchase?
3    Q.  Or that you wouldn't do because of the --
4    A.  Well, about going out and inspecting property,
5 not having the money to reimburse my employees for their
6 travel throughout the --
7    Q.  Let me ask you on that one, so my
8 understanding is that you have -- you're obligated by
9 statute to prepare property tax roll file annually,
10 correct?
11    A.  Yes.
12    Q.  So, whether you got that $8,000 or not, you're
13 still obligated by law to do that, correct?
14    A.  Right.  Uh-huh.
15    Q.  Okay.  So you would still do that even without
16 the $8,000 right?  You're not saying you would stop
17 performing your statutory duty without the $8,000,
18 correct?
19    A.  There is -- no.  I would -- I would produce
20 that, but I would not perform my statutory duty of
21 inspecting a piece of property once every four years.
22 Inevitably, I have to produce a tax roll file.
23    Q.  Okay.  So you wouldn't inspect the properties
24 as frequently; is that what you're saying?
25    A.  Correct.

Page 80

1    Q.  And does the statute obligate you to inspect
2 properties a certain amount of time?
3    A.  Once every four years.
4    Q.  Okay.  So you're saying you would violate the
5 law because you didn't get the $8,000?
6    A.  Possibly.  That could be --
7    Q.  Possibly or you would?
8    A.  Well, you're asking me several different
9 things here.  If I give up aerial photography and things
10 of that nature, I might be able to sustain.  But, if I
11 lose an employee -- it depends on what I have to do
12 administratively as to what's going to suffer, whether
13 it's going to be our aerial, mapping, if -- or whether
14 it's going to be our inspections or it's going to be
15 less employees.  It would depend.
16    Q.  Okay.  In terms of the information that --
17 well, let me strike that.
18       You mentioned aerial photography as something
19 that your office purchases or -- do you engage somebody
20 to do the aerial photography, or it's just something
21 that you buy on the open market?
22    A.  No, it's a contracted -- contracted process.
23    Q.  So you hire somebody to go fly a plane or
24 helicopter over the county and take pictures of
25 property, right?

Page 81

1    A.  Correct.
2    Q.  And that costs you $12,000, roughly, a year?
3    A.  Yes.
4    Q.  Okay.  First question is:  Is that statutorily
5 mandated that you create -- that you do aerial
6 photography?
7    A.  It is statutorily mandated that we maintain a
8 mapping system of Henry County, and that includes our
9 aerial photography and our GIS system.
10    Q.  Okay.  So you're by law obligated to conduct
11 aerial photography?
12    A.  Yes.  That's the process -- well, that's the
13 process of maintaining our mapping system, yes.
14    Q.  Okay.  So, the aerial photography that you
15 contract for and that you do on an annual basis, that's
16 not something that you perform strictly so you can
17 satisfy public records requests, correct?  You do that
18 because it's required by law, right?
19    A.  Yes.
20    Q.  Okay.  Is there any piece of information that
21 your office collects that you only collect because you
22 want to be able to respond to public records requests?
23    A.  No.
24    Q.  If you didn't receive any public records
25 requests going forward, so you lost the fee income

21 (Pages 78 - 81)

Page 82

1 because of that, is there any piece of information that
2 you currently collect as part of your duties as Henry
3 County PVA that you would voluntarily decide to stop
4 collecting, that isn't mandated by law, to be able to
5 prepare the property tax roll file?
6   A.  I don't -- I don't know of anything.
7   Q.  Okay.  And I just want to understand generally
8 with your budget process, with -- with the DOR -- let me
9 strike that.
10       Is the DOR the entity that sets your budgets
11 on an annual basis?
12   A.  They approve our budgets, yes.
13   Q.  Better word.
14       So you submit your proposed budget to DOR, and
15 they approve it, correct?
16   A.  Yes.
17   Q.  Okay.  And in the anticipated receipts line,
18 the big number here is state allocation, right?
19   A.  Yes.  Yes.  Sorry.  I --
20   Q.  That's okay.
21       And state allocation is money that you receive
22 from the state to run your office, right?
23   A.  That is 100 percent personnel.
24   Q.  You mean personnel expenses?
25   A.  Yes.

Page 83

1   Q.  I gotcha.  Okay.
2       So the state allocation there is -- so the
3 state pays your employees' salaries, basically?
4   A.  Yes.
5   Q.  So that's not money you have to worry about
6 coming up with yourself, that's just, whatever the
7 salaries are, the state pays them?
8   A.  Actually, a portion -- I'm sorry.  Go ahead.
9   Q.  Well, so I think you were going to say a
10 portion of that is your responsibility, but at least the
11 largest portion of it is state money going to pay your
12 salary; is that --
13   A.  The largest portion, but I think -- I think my
14 portion for this year is probably $45,000 of that 397.
15   Q.  Okay.  So --
16   A.  I basically subsidize that number through our
17 local funds.
18   Q.  Okay.  And in terms of your anticipated
19 receipts, if, let's say, next year, you, for whatever
20 reason, believe that you weren't going to -- you weren't
21 going to receive any public records request for which
22 you could generate fee income, do you have the ability
23 on your budget to propose a larger state allocation of
24 funds or increase an amount in any of those other line
25 items in order to make up for that shortfall?

Page 84

1   A.  No.
2   Q.  You don't?
3   A.  No other source of income.
4   Q.  You can't change any of these numbers when
5 you --
6   A.  There's no other source of income.  I -- I
7 don't have an adjustable source of income.  The only
8 income that we have is money that is directly from the -
9 - provided to us by the County Fiscal Court, which is
10 statutory, and moneys that are given to us by the cities
11 for use of our -- for purchasing the use of our tax
12 roll.  I send every dollar that I receive from the
13 county and cities to the state, to offset my deputy
14 employees hiring shortfall.
15   Q.  Okay.  Have you ever had a budget shortfall --
16   A.  Yes.
17   Q.  -- in your 24 years? "Yes"?
18   A.  We -- if you're familiar with Kentucky state
19 government, we always have a budget shortfall.  We've
20 had numerous cuts over the years.  And those have been,
21 basically, absorbed statewide by layoffs.  Fortunately,
22 I haven't had a layoff.  We have had furloughs in past
23 years where we were forced by state government to
24 furlough employees for a certain amount of time.  I've
25 had to actually send additional moneys that -- that I

Page 85

1 had saved over multiple years.  For instance, I had
2 saved up moneys to purchase aerial photography one year,
3 and we were -- we were cut by state government.  We had
4 to send up additional money.  And that's kind of --
5 let's see, that's -- if you look at that Exhibit 19,
6 there's a 199A account, district billings.  That number
7 is fluent depending upon state budget necessities.  If
8 we see a 1 percent cut, I'm going to have to come up
9 with the 1 percent money within my appropriated budget,
10 and that means I have to start cutting things, you know,
11 subscription fees, flights, you know, whatever it is, I
12 have to do without.  And that just -- that can delay the
13 adequacy of our data.
14   Q.  Is there anything in your budget, in the
15 anticipated expenses portion of your budget, that is an
16 expense that you allocate for satisfying public records
17 requests?
18   A.  Not -- not a specific line item, no, none.
19   Q.  Okay.  We covered up through topic nine.
20       Look at -- in your notice of deposition if you
21 could look at topic ten and also pull for me Exhibit 6.
22   A.  Did you say Exhibit 6?
23       (EXHIBIT 6 MARKED FOR IDENTIFICATION)
24   Q.  Exhibit 6, yeah.
25   A.  Got it.  Okay.  You said question 10,

22 (Pages 82 - 85)

Page 86

1 Exhibit 6?
2    Q.   I may have confused you a little bit.
3    A.   Oh, sorry.
4    Q.   That's okay.
5         Exhibit 1 is what I was referring to when I
6 said number 10, but you don't need to pull that in front
7 of you.
8    A.   Okay.
9    Q.   I'll just read it to you.  I want you to look
10 at Exhibit 6 and specifically -- well, I'll have one
11 question for you before that, but it will be on page 26
12 is where we're going to look at, interrogatory number
13 13.
14    A.   Page 26?
15    Q.   Yep.
16    A.   All right.
17    Q.   So my first question is, is at any point in
18 time when -- after you received Zillow's public records
19 request, did you ever look at any Zillow SEC filings in
20 determining that the intended use was for a commercial
21 purpose?
22    A.   I never viewed SEC filings.
23    Q.   So you never looked at a 10-K or anything like
24 that?
25    A.   No.

Page 87

1    Q.   Okay.  Take a look at interrogatory number 13
2 for me.  And the question asked is:  "State what
3 governmental interests you contend the commercial
4 purpose fee statutes, as that term is defined in the
5 complaint advanced, and how the law advances each
6 interest identified."  And I just want you to take a
7 minute and -- well, let me first direct you, if you
8 notice letter D is response of Jason Scriber, PVA, Henry
9 County.  And the response is:  "My response is the same
10 as Mr. Robertson's response at 13A above."  Do you see
11 that?
12    A.   Yes.
13    Q.   Okay.  So I'm going to make it real easy.  I'm
14 not going to ask you about everything here Mr. Robertson
15 said.  But take a moment.  I want to make sure that
16 you've had a chance to look at this again and read that,
17 and then I'm going to ask you a question about it.
18         So, just let me know when you're finished
19 reading that, okay?
20    A.   Okay.
21         (WITNESS REVIEWS DOCUMENT)
22    A.   Okay.
23    Q.   Have you had a chance to read that, Mr.
24 Scriber?
25    A.   Yes, sir.

Page 88

1    Q.   And when -- prior to -- well, let me ask you
2 this:  I assume you saw these at some point prior to
3 today, these interrogatory responses?
4    A.   Yes.  Yes.
5    Q.   Okay.  And did you have a chance to review
6 Mr. Robertson's answer there prior to your understanding
7 of these being served on us as Zillow's counsel?
8    A.   I'm sorry?
9    Q.   Did you have a chance to read Mr. Robertson's
10 answer and approve that you agreed with that prior to
11 these interrogatories coming to us?
12    A.   Yes.
13    Q.   Okay.  And my question for you:  Is there
14 anything that you would add to Mr. Robertson's answer
15 here with respect to governmental interest that you,
16 Jason Scriber, contend the commercial purpose fee
17 statutes advance?
18    A.   No, not that I'm aware of.
19    Q.   Okay.  And so just make sure, a clear record.
20 So all of the governmental interests that you would
21 argue, the commercial purpose fee statutes advance, are
22 contained in Mr. Robertson's response from your position
23 as PVA of Henry County?
24    A.   Yes.
25         MR. FORD:  All right.  Why don't you give me

Page 89

1 about, I'd say 10 minutes here.  I'm going to
2 organize my docs here, make sure I've covered
3 everything.  I may have one or two more questions,
4 but I think we're about to wrap up, okay?
5         MR. BERTELSON:  Okay.
6         (OFF THE RECORD)
7 BY MR. FORD:
8    Q.   All right.  Mr. Scriber, we're back on the
9 record after a short break.  You understand you're still
10 under oath?
11    A.   Yes, sir.
12         (EXHIBIT 33 MARKED FOR IDENTIFICATION)
13    Q.   Okay.  And I wanted to mark as Exhibit 33 --
14    A.   Uh-huh.
15    Q.   -- which is a document that has Bates numbers
16 DEF 000406 through DEF 000417.  And you have a copy of
17 that document in front of you, Mr. Scriber?
18    A.   Yes, I do.
19    Q.   Okay.  And it looks like it's a series of e-
20 mails, e-mail threads, strings, however you want to
21 describe them.  The first one in -- is an e-mail that
22 starts on DEF 000407 from you to David Gordon dated
23 August 27, 2012 at 1:33 p.m.  Do you see that?
24    A.   Yes.
25    Q.   Okay.  And your question, Mr. Gordon, is,

23 (Pages 86 - 89)

Page 90

1 "David, what is the time frame on getting the new fee
2 schedule placed on the PVA website?" Do you see that?
3    A.  Yes.
4    Q.  Who is Mr. Gordon?
5    A.  He was -- and forgive me, I'm not sure of his
6 actual -- I don't know if he was commissioner or -- I
7 think he was director of -- was director of property
8 valuation, I guess.  I think that's his -- that was his
9 title.  I'm not sure exactly.  But basically he was over
10 the Department of Property Valuation.  I think it's
11 director.
12    Q.  Okay.  And I won't hold you to his exact
13 title, but your understanding was, he was a DOR official
14 who was -- who oversaw property valuation administrators
15 in Kentucky?
16    A.  Yes.
17    Q.  Okay.  And what is, in your layman's
18 understanding, just your understanding, the relationship
19 between the Department of Revenue and the property
20 valuation administrators in Kentucky?
21    A.  Department of Revenue is our oversight, our --
22 you know, who oversees our daily function, enforces
23 statute, and, you know, makes sure that we are adhering
24 to applicable statutes, laws, what have you.
25    Q.  And I understand that you occasionally will

Page 91

1 have DOR auditors that come into your office and check
2 things; is that accurate?
3    A.  That's correct.
4    Q.  Okay.  And is it fair to say that you would
5 view the commissioner of revenue, or the DOR at this
6 point, Thomas Miller, the person who has the ability to
7 issue directives to your office if you were to so
8 choose?
9    A.  Yes.
10    Q.  Okay.  And you would follow those directives?
11    A.  To the best of my ability, yes, sir.
12    Q.  Always with that caveat, but at least you
13 would understand that he's not, you know, like I say,
14 I'm up in Fort Mitchell, so I'll just say, you know, if
15 the Kenton County judge executive called you up and
16 said, Hey, would you do this, you might question that
17 legal authority.
18    A.  Yes.
19    Q.  But Mr. Miller, you recognize, he has legal
20 authority to issue directives to your office?
21    A.  That is correct.
22    Q.  Okay.  And, then, if you could turn -- same
23 exhibit we were just looking at, 33, if you could turn
24 to the page marked DEF 000409.
25    A.  Uh-huh.

Page 92

1    Q.  And the middle e-mail, really at the bottom
2 there, is an e-mail from you dated August 8, 2012 to a
3 bunch of folks who look like some DOR folks and some
4 PVAs; is that a fair characterization of that e-mail?
5    A.  Yes.
6    Q.  Okay.  And the subject line of that e-mail is
7 "Final Draft of Fee Schedule."  Do you see that?
8    A.  Yes.
9    Q.  All right.  And you basically said, here's the
10 final draft of the fee schedule, that you would like to
11 submit it to revenue today.  Now, I'm sure not
12 coincidentally this e-mail is dated August of 2012, and
13 the commercial fee guidelines that we looked at earlier
14 had an 08/12 on them.  Do you remember that?
15    A.  Yes, sir.
16    Q.  Okay.  And so, is it fair to say that that
17 final version is what you were talking about here -- I
18 mean, it may not be identical in terms of the draft that
19 you send, but that's the ultimate result of that back
20 and forth is that version that we looked at in the
21 complaint, correct?
22    A.  Yes.
23    Q.  And is that the last time that the PVAs and
24 DOR revised the commercial fee guidelines was this
25 August 2012 version?

Page 93

1    A.  Yes.
2    Q.  Okay.  So there --
3    A.  As I understand it.
4    Q.  There hasn't been any sort of subsequent
5 effort to revise them since 2012 --
6    A.  I am not aware --
7    Q.  Well, strike that.  I won't say there hasn't
8 been any effort, but to your knowledge, there is no more
9 current official version of those guidelines than the
10 August 12 that you currently use, correct?
11    A.  There is not.
12    Q.  Okay.
13    A.  That is the most current version.
14    Q.  And in terms of that process of putting those
15 guidelines together, it looks like you had some role in
16 that; is that accurate?
17    A.  Yes, sir.
18    Q.  Okay.  What was your role in the process of
19 putting together those August 2012 commercial fee
20 guidelines that are the current guidelines being used?
21    A.  I was appointed as the chair of that committee
22 with -- the chair for the PVAs with that committee of
23 PVAs and DOR in basically revising the fee schedule.
24    Q.  Okay.
25    A.  So I kind of coordinated the meeting, got

24 (Pages 90 - 93)

Page 94

1 other PVAs and all pertinent DOR staff into the meeting
2 to revise the fee schedule.
3   Q.   And was, just generally, and I understand that
4 it's a while ago, so I won't test your memory here, but
5 generally speaking, you know, was the process of making
6 recommendations of what things should cost, and then DOR
7 consulting with PVAs and coming to sort of an agreement
8 on what you think those guidelines should look like?
9   A.   Yeah, pretty much.
10   Q.   Okay.  And in terms of those guidelines,
11 themselves, do you understand that they are mandatory in
12 that those are the minimums that you can charge to
13 commercial purpose requesters?
14   A.   Yes.
15   Q.   Okay.  So you have, in your view, no
16 discretion to charge a commercial purpose requester any
17 less than what those guidelines prescribe for any
18 particular record; is that accurate?
19   A.   Yes.
20   Q.   But you could charge more if your office were
21 to incur additional costs responding to public records
22 requests, correct?
23   A.   Yes.
24   Q.   And was there -- just generally, again, I
25 don't want to test your memory here because it was a

Page 95

1 while ago, but did DOR or the PVA association, did it
2 conduct any sort of studies to determine what
3 appropriate commercial fee guidelines should be, or was
4 it more of a: Here's what we think as PVAs, it should
5 cost?
6   A.   Well, I mean, there was a fee schedule in
7 place to begin with.  And, then, the 2012 was basically
8 an effort to revise and actually lower some of those
9 fees.  So, that was -- our concentrated effort was to
10 make them more feasible to a commercial user.
11   Q.   And this is -- this document's after that,
12 Exhibit 11, hopefully you have a paper copy of it right
13 there?
14   A.   Bear with me just a second.
15   Q.   Sure.
16        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
17   A.   Eleven? Yes, sir.
18   Q.   And it has at the top there, "Fee Schedule
19 Partial Cost Analysis" and it says November 19, 2018.
20 Do you see that?
21   A.   Yes, sir.
22   Q.   Is this a document that you recognize?
23   A.   Yes.  I mean, I've seen it before.  And it may
24 have been compiled by Mark Tackett, maybe.  I have seen
25 this, yes.

Page 96

1   Q.   Okay.  Do you recall any similar type of
2 document being prepared in connection with creating the
3 commercial fee guidelines back in 2012?
4   A.   Not specifically.  Not to this detail.  And I
5 think this -- this is specifically addressing the GIS
6 parcels only.
7   Q.   Okay.
8   A.   Yeah.  I don't -- I don't recall anything like
9 that.
10   Q.   In terms of the commercial fee guidelines that
11 were prepared back in August of 2012 or finalized in
12 August of 2012, do you recall if there was any study
13 done or analysis done of the impact that commercial
14 purpose requests had on PVAs versus noncommercial
15 purpose requests?  In other words seeing sort of a
16 burden analysis, anything like that?
17   A.   No.
18        MR. FORD:  Okay.  All right, Mr. Scriber.  I
19   always give my witnesses an opportunity to amend or
20   correct any testimony that they have given here
21   today.  Is there anything that you would like to
22   amend or correct before I pass you to Mr.
23   Bertelson, reserving my right to continue my cross
24   based on any questions he may might to ask?
25        MS. SERGEANT:  Not that I'm aware of at this

Page 97

1   point.
2        MR. FORD:  Okay.  Well, on that, I will pass
3   you to Mr. Bertelson, if he has questions, subject
4   to my right to recross.
5        MR. BERTELSON:  Actually, could I have five
6   minutes?  I'd like to consult with other counsel.
7        MR. FORD:  Yeah.  Sure.
8        (OFF THE RECORD)
9        CROSS-EXAMINATION
10 BY MR. BERTELSON:
11   Q.   Jason, just wanted to say thank you for your
12 time today.  I know this is a big chunk out of time out
13 of your day.  You've got a busy, important job.  And we
14 appreciate you taking time to -- sitting here and
15 answering questions for us. I've only got a few
16 questions for you to go back and then clarify some
17 things with regard to what Mr. Ford asked you.
18   A.   Okay.
19   Q.   Let's look at Exhibit Number 3, which is the
20 complaint, and then go back to page number 46, which is
21 the letter you received from Susan Noto.
22   A.   Yes.
23   Q.   Oh, I'm sorry.  Actually, go to Exhibit 20,
24 I'm sorry.  Exhibit 20 --
25   A.   20.

25 (Pages 94 - 97)

Page 98

1  Q.  -- which is the e-mail between you?
2  A.  Oh, I'm sorry.  Yes.
3  Q.  And do you see on the first page, denoted DEF
4  000127 --
5  A.  Yes.
6  Q.  -- there's an e-mail, May 1st, 2019 at
7  7:11 p.m. from Susan Noto to you; is that correct?
8  A.  Yes.
9  Q.  Can you read that, her e-mail there?
10  A.  "Hi, Mr. Scriber.  Based on the information I
11  provided in my request, does your office consider
12  Zillow's intended use to be for a commercial purpose?
13  And if so, can you provide the reasons for this
14  decision?  Thank you."
15  Q.  Okay.  What did you think of Ms. Noto's
16  question to you, then, that she asked?
17  A.  I just -- it seemed odd.  Like, they already
18  knew that I was going -- or intending to chart -- or
19  consider them commericial.  Kind of like, I don't know,
20  it was baiting -- baiting me into saying, yes, I guess.
21  I don't know.
22  Q.  Okay.  Had you ever gotten a question like
23  that from any other open record requester before?
24  A.  No.
25  Q.  Okay.  Have you ever gotten a question like

Page 99

1  that from an open records requester since then?
2  A.  No.
3  Q.  Okay.  All right.  There were a lot of
4  questions by Mr. Ford to you about Zillow.com and the
5  newspapers and specifically about things -- things that
6  might be in the newspaper.  Does the newspaper contain
7  stories about government and politics and public figures
8  and elected officials?
9  A.  It can and typically does, yeah.
10  Q.  Okay.  What is the effect of publishing
11  information about government and public officials for
12  the public to read?
13  A.  Well, it -- it lets the general public know
14  what their local government is doing.  Gives them some
15  kind of an insight as to the inner workings of their
16  government and how their tax money is being expended
17  or --
18  Q.  Would you call that a public purpose?
19  A.  Yes.
20  Q.  Okay.  In order to publish those kind of
21  stories, do newspapers or periodicals occasionally have
22  to ask public agencies for documents that would be
23  responsive in an open records request?
24  A.  Yes.
25  Q.  Okay.  Mr. Ford asked you a hypothetical

Page 100

1  question about Zillow.com having sport stories and
2  general news on its website.  Do you know if, in fact,
3  Zillow.com had news or sports on its website on or
4  before May 2, 2019?
5  A.  I'm not aware of that, no.
6  Q.  Okay.  We also talked about -- or Mr. Ford
7  asked you about the charges about -- for a noncommercial
8  purpose request for the scope of the records that Zillow
9  asked for; do you recall that?
10  A.  Yes.
11  Q.  Okay.  And do you recall in response to
12  interrogatory number 12, in response to the
13  interrogatories, you indicated how many property records
14  that were involved in that response including Zillow,
15  that would have been involved?
16  A.  It had to be, what, 13,000, 14,000, something.
17  Q.  Maybe you could refer to Exhibit 6 and look at
18  page number -- let's see.  I saved this.  Okay.  Let's
19  see.  In response to number -- question number six.
20  A.  Uh-huh.
21  Q.  Do you know how many -- well, I'll just ask
22  you this: Do you know how many individual of -- strike
23  that.
24      How much individual property records are in
25  the database?

Page 101

1  A.  With all buildings, records have to be around
2  -- and this is a guess, but I -- 16- to 18,000,
3  probably, structures and -- and property costs.
4
5
6  Q.  Okay.  Look at -- look at page number eight of
7  Exhibit No. 6.
8  A.  Oh, okay.
9  Q.  And that's where you're talking about
10  responding to different open record requesters --
11  A.  Uh-huh.
12  Q.  -- like CoreLogic and in the response under D,
13  number two?
14  A.  Yes.
15  Q.  So there's -- they ask for the entire database
16  changes only, so that's 8,716 parcels?
17  A.  Uh-huh.
18  Q.  And the tax file bill, 8,985?
19  A.  Uh-huh.
20  Q.  So the total number of the parcels, looks like
21  in Henry County, 8,716 plus 8,985?
22  A.  No.  The 8,716 are only records that were
23  changed.
24  Q.  Okay.
25  A.  Okay.  Because we had previously sold

26 (Pages 98 - 101)

Page 102

1  CoreLogic -- our information, and -- or in an
2  agreement that they -- instead of purchasing the entire
3  database -- they only purchased the changes, what is
4  changed from --
5      Q.  Okay.
6      A.  -- each request.
7      Q.  Okay.  Actually, look down on page nine, and
8  the first whole paragraph is Black Knight?
9      A.  Uh-huh.
10     Q.  In 2019 they asked for the entire database; is
11 that correct?
12     A.  Yes.
13     Q.  Okay.  And that would consist of 20,401
14 parcels?
15     A.  Yeah.
16     Q.  Okay.
17     A.  Yeah.  That was actually little bit more than
18 what -- okay.
19     Q.  Okay.  So would that reflect --
20     A.  That would be every structure, every account,
21 every lot that we had, every record.
22     Q.  Okay.  So if someone made a noncommercial
23 purpose open records request for all 20,401 parcel
24 records, what would you charge them for a physical copy
25 for each of those parcel records?

Page 103

1      A.  Probably be 10 cents, so $2,040.
2      Q.  All right.  10 cents per a page?
3      A.  Yes.
4      Q.  Is that 10 cents per a page a requirement of
5  the law?
6      A.  I believe it is.
7      Q.  Okay.  Are you familiar with the finance and
8  administration regulations with regards to open records?
9      A.  Somewhat, yes.
10     Q.  Okay.  And have you looked at recently 200 KAR
11 1:020 section three?
12     A.  Yes.
13     Q.  Okay.  And is that 10 cents per page clause we
14 talked about reflected in that regulation?
15     A.  Yes, it is.
16     Q.  Okay.  So if -- if someone wanted -- what --
17 what you talked about when you -- when you download this
18 information into a text file, does that necessarily come
19 out as 20,000 pages or is that displayed in a different
20 way?  Can you explain that a little bit better?
21     A.  It's not -- the data isn't exported into a
22 formatted page.  It is data that can be manipulated
23 through software and what have you, but each -- all that
24 data represents these 20,400 or, estimate, 20,000
25 records, so --

Page 104

1      Q.  Okay.  Can it be put into a Word document or a
2  PDF format?
3      A.  It can't really be put in a Word document.  We
4  can do a PDF, but that means actually creating a PDF
5  of each -- we would have to go into each individual
6  account --
7      Q.  Okay.
8      A.  -- and create a PDF of each structure's card,
9  each record.
10     Q.  Would that be very time consuming?
11     A.  Very -- that would be very time consuming, to
12 create a PDF, yes.
13     Q.  Okay.  But if you just took the data, the raw
14 data that's put on that -- into that text file that you
15 call it --
16     A.  Uh-huh.
17     Q.  -- does it pop up -- if you wanted to look at
18 it on your computer, would you look at it through, like,
19 the notepad application?
20     A.  Yes.  Notepad, note pad plus --
21     Q.  Okay.
22     A.  -- something of that nature.
23     Q.  And could you copy it from there and paste it
24 into a Word document, maybe?
25     A.  Well, it's just data.

Page 105

1      Q.  Okay.
2      A.  It's not -- I guess you could.
3      Q.  And would that -- would that consist of a
4  number of pages, then?
5      A.  Yes.
6      Q.  And then if you charge 10 cents per a page, it
7  would just be whatever --
8      A.  Right.
9      Q.  -- 10 cents times however many pages?
10     A.  Yeah.  Yeah.
11     Q.  Okay.
12     A.  Yeah.
13     Q.  Now, if someone strictly wants a physical jump
14 drive, a USB jump drive electronic format version, would
15 you give him a jump drive or a CD-ROM or something like
16 that?
17     A.  I can, yes.
18     Q.  Okay.  What's the cost of one of those?
19     A.  Minimal.  I mean, I -- it -- it wouldn't be a
20 very large one, so they're not -- they're not very
21 expensive anymore.  I don't know.  I -- three or $4,
22 maybe.
23     Q.  Okay.
24     A.  I'm just guessing.
25     Q.  And would you charge the person requesting,

27 (Pages 102 - 105)

Page 106

1 that three or $4 for that --
2    A.  Sure.
3    Q.  Okay.  Would you charge the postage?
4    A.  Sure.
5    Q.  For mailing it?
6    A.  Sure.
7    Q.  Okay.  All right.  Mr. Ford asked you about
8 the prior organization between the Department of Revenue
9 and the PVAs.  Does the Department of Revenue direct you
10 on a day-to-day basis of your regular office operations?
11    A.  No.
12    Q.  Okay.
13    A.  Not necessarily -- no, no, no.
14    Q.  Okay.  Do you have a county attorney in Henry
15 County?
16    A.  Yes.
17    Q.  Do you consult with your county attorney for
18 legal advice occasionally?
19    A.  Occasionally, if need be, but --
20    Q.  Do questions ever come up like:  How do I deal
21 with an open meetings request or how do I deal with an
22 open records request?
23    A.  No.
24    Q.  "No"?
25        Okay.  Does the county attorney represent you

Page 107

1 on a property valuation challenged by a property owner
2 through the local board of assessment appeals?
3    A.  Yes.
4    Q.  Okay.  So they are -- the county attorney is
5 involved in some way in helping -- in assisting your
6 office with legal advice?
7    A.  Yes.  Yes.  I would say so, and I have asked
8 for that.
9    Q.  Okay.  Let me look real quick on my stuff
10 here.  You said you looked at the statute with regard to
11 the definition of commercial purchase; is that correct?
12    A.  Yes.
13    Q.  And that's how -- the KRS 61874; is that
14 right?
15    A.  Yes.
16    Q.  And more specifically 4C, correct?
17    A.  Yes.
18    Q.  And that's -- I'm sorry.  No.  My bad.  I
19 misled you.  My apologies.
20    A.  4A.
21    Q.  I meant --
22    A.  61874 A.
23    Q.  -- 61874A.
24    A.  Yes, sorry.
25    Q.  Sorry about that.  Looking at too many things.

Page 108

1 And 4B actually talks about the newspapers and
2 periodical exception in it?
3    A.  Yes.
4    Q.  The statute reads, "Commercial purpose shall
5 not include publication or related use of a public
6 record by a newspaper or periodical."  Is that correct?
7    A.  Yes.
8    Q.  Okay.  So let me ask you kind of a
9 hypothetical, because you said you've never -- you've
10 never gotten that request.  But a newspaper asking you
11 for the entire database, you said that's never happened
12 and would be unusual; is that correct?
13    A.  Correct.
14    Q.  Okay.  So if a newspaper asks you for that
15 entire database information and then published it in the
16 newspaper for public reading, would that be publication
17 or related use of a record as reflected here, you think?
18    A.  Yes.
19    Q.  Okay.  But if the newspaper had a side hustle
20 where they are also selling real estate and acting as a
21 mortgage company and giving information to relators for
22 a fee, what would you think that purpose would be for
23 the bigger request that they give you?
24    A.  Commercial use.
25        MR. BERTELSON:  Okay.  That's all the

Page 109

1    questions I've got.
2        REDIRECT EXAMINATION
3 BY MR. FORD:
4    Q.  Okay.  I've got a couple follow-ups, Mr.
5 Scriber.
6        So, Mr. Bertelson asked you about
7 distinguishing between -- or defining what a newspaper
8 does; do you recall that, in terms of politics and
9 public benefit and publishing news. Do you recall that
10 line of questioning?
11    A.  Yes.
12    Q.  Do you think it's important for the public in
13 your county, Henry County, to know what's happening in
14 the local real estate market?
15    A.  Yes.
16    Q.  Do you think that Zillow's website provides
17 useful information to people who might be considering
18 selling or buying a house in Henry County, based upon
19 your personal use of that website in the past?
20    A.  I would say it depends on how accurate the
21 information is.  Some of the information that I've seen
22 is not very accurate.
23    Q.  Okay.  So Zillow.com doesn't have any
24 information that you think, personally, from your prior
25 use, is useful to somebody who might be considering

28 (Pages 106 - 109)

Page 110

1 selling or buying a house in Henry County?
2     A.   Personally, I would go to a local Realtor or
3 come to the PVA office and get firsthand information.
4     Q.   Okay.  Does your office offer a -- some sort
5 of program that you can go on and see what recent houses
6 have sold for in that neighborhood, like a visual map
7 that lists, you know, recent sales or current listings?
8     A.   Yes.
9     Q.   Okay.  So you have, like, a -- you have, like,
10 a Zillow.com type website where you can go on and
11 manipulate a map and click on individual houses and see
12 what -- you know, they're selling for, what they sold
13 for?
14     A.   No, it's subscription based.
15     Q.   Okay.  So you've charged for some sort of
16 similar product that Zillow offers, in terms of
17 information?
18     A.   Yes.
19     Q.   Okay.
20     A.   Well, I don't know about similar product.  I --
21 we don't buy and sell property in this office with our
22 website, so...
23     Q.   No.  I understand that.  But you understand
24 that Zillow.com provides information about current
25 listings and recent home sales and that that's in a map

Page 111

1 visual format with pictures of the house and that sort
2 of thing, right?
3     A.   Well, yes, but I've also seen that in other
4 publications, as well.
5     Q.   I'm not --
6     A.   Yeah.  I answered -- yeah, I'm answering, yes.
7 And it's --
8     Q.   Okay.  And I'm not saying it's the only
9 company that does that.  I'm just --
10     A.   Yeah.
11     Q.   I'm saying, in terms of what your subscription
12 service offers, because I don't know what your
13 subscription service looks like, your website has a
14 subscription service that's similar to Zillow.com in
15 terms of being able to go on and see recent house sales
16 and that sort of thing in a visual user-friendly format?
17     A.   Somewhat, yes.
18     Q.   And I'm not saying it's identical but --
19     A.   Yeah.  Yeah.
20     Q.   Same idea, though, is that, if you wanted to
21 find out:  Hey, what is happening in the Henry County
22 real estate market?  You have a product that allows
23 people to subscribe and get that kind of information,
24 right?
25     A.   Well, yes, and I also -- and that is more for

Page 112

1 the ownership data end, things of that -- the valuation
2 end, things of the, let's say, legal nature.  But I also
3 offer a free listing of sales on my website.  Like year
4 2020 sales, I've got, like, a PDF file.  It shows people
5 -- you know, I provide that information to my -- to my
6 property owners and citizens of Henry County to make
7 them aware of what the market is doing.  I definitely
8 don't want them to get shortchanged.
9     Q.   Yeah.  And you consider that, what you do
10 there, posting all the information on your website,
11 that's a public benefit, right?  You do that because
12 you're an elected official and you think that that
13 information is valuable to the citizens that you serve,
14 correct?
15     A.   That is, because I am funded through taxpayer
16 money.  Yes.
17     Q.   Okay.  And you think that that kind of
18 information, recent home sales, and that kind of thing,
19 that's useful to the people of Henry County?
20     A.   Verified sale data, yes.
21     Q.   You think it's less valuable than political
22 news?
23     A.   State that again.
24     Q.   Do you think that the information that you
25 publish about recent home sales in Henry County, do you

Page 113

1 think that's less valuable to the citizenry of Henry
2 County than political news about what's going on in
3 Frankfort, for example?
4         MR. BERTELSON:  Objection.  Calls for
5     conjecture.  But he can answer if he has an
6     opinion, I suppose.
7     A.   I'm not going to speculate on that.  It's pure
8 speculation.
9 BY MR. FORD:
10     Q.   I'm not asking you speculation.  I'm asking
11 you for your opinion, Mr. Scriber.  Mr. Bertelson asked
12 you about public benefit and politics and what was
13 beneficial about those things.  And I'm asking you, that
14 you publish home sales in Henry County on your website
15 as a public benefit, correct?
16     A.   Yes.
17     Q.   Is that information less useful or valuable to
18 the citizens of Henry County, than, say, the political
19 news that the -- is it the -- what's the name of the
20 newspaper, the Henry County?
21     A.   Local.
22     Q.   Local.
23     A.   It's circumstantial.  It depends on what
24 you're looking for.  If you're interested in the real
25 estate market, you're going to be interested in my

29 (Pages 110 - 113)

Page 114

1 information.
2    Q.   Yeah.
3    A.   If you're interested in a house bill that's
4 going through legislature, you're probably going to go
5 to the newspaper or some other website, information,
6 things of that nature.  So it's all circumstantial.
7    Q.   So it depends; is that fair to say?
8    A.   Yes, sir.
9    Q.   It depends on what the person's use for that
10 information might be and what they need to know, right?
11    A.   Yes.
12    Q.   And certainly you wouldn't -- sitting as PVA
13 of Henry County, you wouldn't purport to decide for your
14 citizens which is more important for them, right?  It's
15 up to them to decide which information is more valuable
16 to them at any given time?
17    A.   Yes.  I mean, that's -- I can't determine
18 someone else's priorities.  I -- okay.
19    Q.   As to the 10 cents per page regulation that
20 you were discussing with Mr. Bertelson, that's a copy
21 charge, is it not, Mr. Scriber?
22    A.   It's a charge for a record, I believe.
23    Q.   No, but where does the -- the 10 cent per a
24 page, I mean, that's not just an arbitrary amount,
25 right?  That's a number that's tied to the cost of your

Page 115

1 office of buying paper and making copies, right?
2    A.   I suppose, yes.  I don't know.
3    Q.   Because you buy paper for your office on an
4 annual basis, right?
5    A.   I don't buy it on a -- I buy it.  I don't know
6 if it's annual.
7    Q.   You buy it.  How ever often you buy it, but
8 you have a budget for office supplies that you -- and
9 part of that budget includes buying paper, right?
10    A.   Yes, if I have the money.
11    Q.   And that paper is not free; you have to pay
12 for it, right?
13    A.   That's correct.
14    Q.   And so, when someone comes in and wants a
15 hundred pages, physical pages, of some record that you
16 maintain, you have to give them that paper and you
17 charge them to get that paper, correct?
18    A.   Yes.
19    Q.   And there's some time, personnel cost involved
20 in physically sitting there and either printing out the
21 paper or, I guess, making a physical copy.  I don't know
22 if people do that anymore.  But, anyways, conceivably
23 you could make, you know, a copy on a copy machine.  So
24 there's personnel time embedded in that 10 cent per a
25 page, too, right?

Page 116

1    A.   Yes and no.  Basically, if it's an open
2 records request.  But if we're -- you know, if my
3 personnel has to do it.  You know, if someone steps in
4 my office and says, Hey, I need a copy of a card.  Well,
5 they're all available.  All they have to do is take it
6 over to my copier, make a copy for 10 cents.  If we're
7 having to compile a bunch of records for somebody, we're
8 going to charge them above the 10 cents.  Let's put it
9 that way.
10    Q.   Sure.  Let me ask you this, Mr. Scriber.  If
11 you get a call from a resident of Henry County, and they
12 say, Hey, could you e-mail me a copy of my property
13 card?  I'm trying to put together my taxes.  Would you
14 do that for them?
15    A.   Yes.
16    Q.   Okay.  Would you charge them 10 cents for
17 sending them the e-mail?
18    A.   No, because it's their property.
19    Q.   Okay.  But I think you said that if they came
20 to your office and wanted to make a copy of their own
21 property card --
22    A.   Hold on.  Hold on.  Hold on.  Not a property
23 owner.  I did not say a property owner.  A property
24 owner can come make a copy for free, or we'll provide it
25 or we'll make a copy for free.

Page 117

1    Q.   Okay.  So you don't charge 10 cents per page
2 to a property owner?
3    A.   No.
4    Q.   What was -- and maybe we need to get Mr.
5 Bertelson here to weigh in on here, what was the KAR
6 regulation cite that he gave you that you were
7 discussing?
8    A.   You might have to -- I can't --
9    Q.   If Rick needs to weigh in here, I'm fine with
10 that.
11       MR. BERTELSON:  It's 200 KAR 1:020 section
12    three, subsection one.
13    Q.   I'm just going to pull that up here, Mr.
14 Scriber.  I want to make sure I have the text in front
15 of me.  All right.  So section 200 KAR 1:020 has a header
16 of "Access to Public Records."  And it says, Released to
17 KRS chapter 20 -- 61, and the section that he was -- Mr.
18 Bertelson was discussing with you is section three.  And
19 that section reads, Any person may, on written
20 application to the official custodian, describing the
21 records, inspect and make abstracts and memoranda of the
22 contents of any of the public records, except those
23 listed in section four of this administrative regulation
24 of all state administrative agencies.  Copies of any
25 written material shall be furnished on request to any

Page 118

1 person requesting them on payment of fee of 10 cents per
2 a page or 10 cents a page for each record copies.
3 Copies of photographs, maps and other non-written
4 material and records stored in computer files or
5 libraries shall be furnished to any person requesting
6 them on payment of a fee equal to the actual cost to the
7 agency of producing the copies. Now, I don't know -- you
8 probably don't have that statute in front of you, Mr.
9 Scriber, but the second part of the statute that Mr.
10 Bertelson did not read to you says that, Copies of
11 photographs, maps and other non-written material and
12 records stored in computer files or libraries shall be
13 furnished to any person requesting them on payment of a
14 fee equal to the actual cost to the agency of producing
15 the copies. So the second part of that regulation that
16 Mr. Bertelson was discussing with you, Mr. Scriber,
17 refers to an actual cost for electronic copies of
18 records, not 10 cents per a page. Would you agree with
19 me that that's what that means?
20    A.  I would agree.
21    Q.  Okay.  So, if someone is requesting your
22 electronic database in a text file, that 10 cent per
23 page has no application, correct?
24    A.  I suppose, yes.
25       MR. BERTELSON:  Objection.  Calls for a legal

Page 119

1 conclusion.
2    Q.  And I'll just note Mr. Bertelson was asking
3 you for your legal interpretation of that regulation
4 earlier, so his objection in this case to your answering
5 that question seems somewhat strange to me, but I will
6 go ahead and move forward to my next question. In terms
7 of the charges that you have provide -- or have imposed
8 on requesters like CoreLogic, who have asked for your
9 tax roll file database, you haven't charged them that
10 10 cent per page as part of that cost, right?
11    A.  No, because that's -- it's in a -- it's
12 different in a fee schedule, it's not a -- you know,
13 it's not -- it's a commercial fee, so it -- no, it's not
14 a noncommercial fee.
15    Q.  Well, let's look at Exhibit 3 for a second,
16 because I think I just want to just straighten that out,
17 and look at page 34 of Exhibit 3, which is the open PVA
18 open records commercial fee guidelines.
19    A.  Okay.
20    Q.  And if you see at the top there, there's copy
21 charges. Do you see that?
22    A.  Uh-huh.
23    Q.  And that's 10 cents, right?
24    A.  Uh-huh.
25    Q.  When you charge bulk requesters for text file,

Page 120

1 you don't impose that charge, correct, you impose the
2 per parcel fees and those other charges, correct?
3    A.  Correct.
4    Q.  Okay.  And one other question he had asked
5 about your interrogatory responses and providing
6 information for those, if we could look at Exhibit 6 for
7 just a moment.
8    A.  Okay.
9    Q.  And your response to interrogatory number
10 eight, which I believe Mr. Bertelson referenced, which
11 starts on -- the question is on page 14.  And it says,
12 "Describe the actual cost your office would incur to
13 provide the records"?
14    A.  Yes.
15    Q.  Okay.  And then your actual response is on
16 page 18 under letter D.
17    A.  Yes.
18    Q.  And your response here includes things like
19 office salary expenses, annual budget for benefits,
20 creating assessment data, that -- all that sort of
21 information, correct?
22    A.  Yes.
23    Q.  And do you recall earlier, in my questions to
24 you, we talked about the actual process of copying the
25 information which started with the backing it up, then

Page 121

1 validation, and then converting it to a text file and
2 then transmitting it, how ever the requester had
3 requested it. Do you recall that?
4    A.  Yes.
5    Q.  Okay.  So this response here does not pertain
6 to that process specifically.  It's the overall process
7 of your office collecting the information that goes into
8 those records, correct?
9    A.  Correct.
10       MR. FORD:  All right.  I think that's it on my
11    end. I don't know if Mr. Bertelson has any more
12    questions.  But, Mr. Scriber, I do thank you for
13    your time as well.  I appreciate your patience.
14    And I don't know if Rick has more questions or not,
15    but if he does, I'll reserve my right to recross.
16       RECROSS-EXAMINATION
17 BY MR. BERTELSON:
18    Q.  Just a couple follow-ups based on what
19 Mr. Ford asked here.
20    With regard to that response to number eight,
21 you said that you agreed with Jason Neely's response
22 above; is that correct?
23    A.  Uh-huh.
24    Q.  Now, if you flip back up to page 50, Mr. Neely
25 does describe the fees being inclusive of the estimated

31 (Pages 118 - 121)

Page 122

1 cost for media, mechanical processing, staff, correct?

2    A. Yes.

3    Q. And do you agree with -- still agree with that

4 being reflected on the same type of costs to your

5 office, as well?

6    A. Yes. That's -- I mean that's part of my

7 response, as well.

8    Q. All right. And I'm going to ask you a

9 hypothetical based on Mr. -- not on this, but what

10 Mr. Ford was referring to with regard to, is it more

11 important -- like he asked you, is it -- is political

12 news or real estate news more important. Let me just ask

13 you, if the mayor of New Castle, Kentucky owned a

14 residential home that was objectively worth a million

15 dollars cash value, but your assessment of his property

16 was $50,000, do you think the public would have some

17 reason to be interested in that?

18    A. Sure.

19    Q. Why?

20    A. It shows -- it shows my performance, I guess,

21 or this office's performance or if there has been any

22 kind of conflict or coercion or anything of that nature,

23 you know, between government offices or -- or he's

24 benefiting unfairly, according to the taxpayers, you

25 know.

Page 123

1    Q. Do you think that would make taxpayers mad?

2    A. Yeah, I'm pretty sure. Yeah, yeah. Mine

3 would be one of the first ones they would get.

4    MR. BERTELSON: That's all the questions I

5 have.

6    THE WITNESS: Okay.

7      FURTHER REDIRECT EXAMINATION

8 BY MR. FORD:

9    Q. And I just have one follow-up on that last

10 question, Mr. Bertelson asked you, Mr. Scriber, and I

11 promise I'll be done after this. If Zillow were to

12 publish the tax assessment data for Henry County on its

13 website, and you could go on and click on the houses and

14 see what the most recent assessment was, someone who

15 maybe wanted to find out if your office was engaging in

16 sort of either lowballing or highballing of tax

17 assessments, they would be able to potentially get that

18 type of information from Zillow.com and uncover

19 wrongdoing; would they not?

20    A. Yes.

21    MR. FORD: Nothing more for me.

22    MR. BERTELSON: One last follow-up on that.

23      FURTHER RECROSS-EXAMINATION

24 BY MR. BERTELSON:

25    Q. With a -- if the information talked about in

Page 124

1 that hypothetical where the mayor's house was valued at

2 $50,000, when it was really a million dollars value, is

3 that the kind of information that would subsequently

4 appear in a newspaper story?

5    MR. FORD: Objection.

6    A. Very possible, I guess, yeah.

7    MR. FORD: Calls for speculation.

8    MR. BERTELSON: That's all.

9    MR. FORD: Okay. Mr. Scriber, you have the

10 opportunity to read and sign. I know Mr. Bertelson

11 has reserved that right with past depositions. So,

12 I assume, same here?

13    MR. BERTELSON: Please.

14      (DEPOSITION CONCLUDED AT 12:06 P.M.)

Page 125

1      CERTIFICATE OF REPORTER

2      COMMONWEALTH OF KENTUCKY AT LARGE

3

4 I do hereby certify that the foregoing transcript was

5 taken on the date, and at the time and place set out on

6 the Title page hereof by me, and that the said matter

7 was recorded stenographically and mechanically by me and

8 then reduced to typewritten form under my direction, and

9 constitutes a true record of the transcript as taken,

10 all to the best of my skill and ability. I certify that

11 I am not a relative or employee of either counsel, and

12 that I am in no way interested financially, directly or

13 indirectly, in this action.

14

15

16

17

18

19 *Sandra Ventura*

20

21

22 SANDRA VENTURA

23 COURT REPORTER/NOTARY

24 MY COMMISSION EXPIRES ON: 08/15/2021

25 SUBMITTED ON: 03/25/2021

32 (Pages 122 - 125)

Page 126

```
1          Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
            Cleveland, Ohio 44114
3           Phone: 216-523-1313
4   March 25, 2021
5
    To: Mr. Bertelson
6
    Case Name: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
7
    Veritext Reference Number: 4458288
8
    Witness: Jason  Scriber      Deposition Date:  3/5/2021
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
19  If the errata is not returned within thirty days of your receipt of
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 127

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4458288
3      CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/5/2021
4      WITNESS' NAME: Jason  Scriber
       In accordance with the Rules of Civil
5      Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____
9   Date           Jason  Scriber
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
            Statement; and
14     Their execution of this Statement is of
          their free act and deed.
15
       I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
18  _____
       Notary Public
19
    _____
       Commission Expiration Date
20
21
22
23
24
25
```

Page 128

```
1          DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 4458288
3      CASE NAME: Zillow, Inc. v. Hon. Thomas B. Miller, Et Al.
       DATE OF DEPOSITION: 3/5/2021
4      WITNESS' NAME: Jason  Scriber
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9      I request that these changes be entered
    as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date           Jason  Scriber
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  at and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18       in the appended Errata Sheet;
       They signed the foregoing Sworn
19       Statement; and
       Their execution of this Statement is of
20       their free act and deed.
21     I have affixed my name and official seal
22  this _____ day of_____, 20____.
23  _____
       Notary Public
24
    _____
25     Commission Expiration Date
```

Page 129

```
1          ERRATA SHEET
       VERITEXT LEGAL SOLUTIONS MIDWEST
2      ASSIGNMENT NO: 4458288
3   PAGE/LINE(S) /        CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
    _____     _____
20  Date             Jason  Scriber
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
       Notary Public
24
    _____
25     Commission Expiration Date
```

33 (Pages 126 - 129)

[& - 61.8704]                                                          Page 1

**&**

**&**   2:5

**0**

**000115**   71:14
**000125**   71:15
**000127**   21:9 46:13
   98:4
**000128**   21:12
**000129**   22:5
**000406**   89:16
**000407**   89:22
**000409**   91:24
**000417**   89:16
**00049**   1:5
**03/25/2021**   125:25
**08/12**   34:3 92:14
**08/15/2021**   125:24

**1**

**1**   3:12 9:22 10:1,2
   11:7 23:18 46:13
   54:12 73:7,11
   85:8,9 86:5
**10**   42:12 51:20
   55:1,23 56:9
   85:25 86:6,23
   89:1 103:1,2,4,13
   105:6,9 114:19,23
   115:24 116:6,8,16
   117:1 118:1,2,18
   118:22 119:10,23
**100**   64:18 82:23
**101**   4:4
**109**   3:5
**11**   3:16 10:20 11:6
   11:14 30:22 95:12
   95:16
**1100**   126:1
**12**   93:10 100:12
**12,000**   78:22 81:2

**121**   3:6
**123**   3:7,8
**127**   21:20
**12:06**   124:14
**13**   86:13 87:1
**13,000**   100:16
**132**   21:9
**133.047**   30:13
**133.047.**   17:12
**13a**   87:10
**14**   120:11
**14,000**   100:16
**15**   55:25 65:11
**16**   3:13 101:2
**16,000**   55:25
**18**   3:17 71:10,12
   71:14 120:16
**18,000**   101:2
**1820**   126:2
**19**   3:18 72:17,19
   85:5 95:19
**199a**   85:6
**1:020**   103:11
   117:11,15
**1:33**   89:23
**1st**   98:6

**2**

**2**   27:21 100:4
**2,040**   103:1
**20**   3:20 21:3,4
   27:19 46:13 65:11
   73:12 97:23,24,25
   117:17 127:16
   128:22 129:22
**20,000**   103:19,24
**20,400**   103:24
**20,401**   102:13,23
**200**   103:10 117:11
   117:15
**2012**   89:23 92:2,12
   92:25 93:5,19

**95:7** 96:3,11,12
**2017**   54:3
**2018**   23:8 58:22
   95:19
**2019**   20:6,14 21:15
   22:11 23:1,16
   27:22 46:13 47:21
   54:8 98:6 100:4
   102:10
**2020**   3:18 72:21
   73:6,11 74:19
   75:4 112:4
**2021**   1:24 3:19 4:7
   72:21 73:6,6,6
   74:19 75:5 126:4
**21**   3:20 30:19
**216-523-1313**
   126:3
**22**   13:17
**24**   13:9 14:4 84:17
**2400**   2:6
**2408**   125:19
**25**   20:6,13 21:15
   22:11 23:1,16
   47:21 54:8 126:4
**26**   86:11,14
**27**   89:23
**29**   21:21 55:24
**2nd**   22:21

**3**

**3**   3:13 16:20 19:18
   20:9 25:25 33:22
   36:11 43:18 46:24
   58:18 97:19
   119:15,17
**3,200**   56:1
**3/5/2021**   126:8
   127:3 128:3
**30**   9:12 73:8,12
**300**   2:7

**33**   3:21 89:12,13
   91:23
**34**   33:23 119:17
**397**   83:14
**3:19**   1:5

**4**

**4**   105:21 106:1
**40202**   4:5
**40601**   2:21
**41017**   2:8
**423.455**   4:12
**44114**   126:2
**4458288**   126:7
   127:2 128:2 129:2
**45,000**   83:14
**46**   20:1 43:17,17
   58:19 97:20
**47**   20:9 43:19,25
**4a**   107:20
**4b**   108:1
**4c**   107:16

**5**

**5**   1:24
**50**   121:24
**50,000**   122:16
   124:2
**501**   2:20
**502**   2:22
**564-4581**   2:22
**578-7263**   2:9
**5th**   4:6

**6**

**6**   3:3,14 9:12
   85:21,22,23,24
   86:1,10 100:17
   101:7 120:6
**61**   117:17
**61.870**   37:5
**61.8704**   22:22 23:2

**[61.874 - answer]**

**61.874**  17:12
**61.8743.**  54:20
**61.8745**  17:12
**61874**  107:13,22
**61874a**  107:23
**62fo15**  34:2

**7**

**71**  3:17
**72**  3:19
**730**  4:4
**7:11**  98:7

**8**

**8**  92:2
**8,000**  75:5,7,10,11
  75:14,18 76:12,15
  76:17 77:7,17
  78:5,9 79:1,12,16
  79:17 80:5
**8,716**  101:16,21,22
**8,985**  101:18,21
**85**  3:15
**859**  2:9
**89**  3:21

**9**

**9**  3:12
**91**  12:23
**95**  3:16 13:6
**97**  3:4 14:1
**98**  14:2
**9:01**  4:7

**a**

**a.m.**  4:7
**ability**  8:6 83:22
  91:6,11 125:10
**able**  12:9 57:5
  63:4 77:17 78:16
  78:17 80:10 81:22
  82:4 111:15
  123:17

**absorbed**  84:21
**abstracts**  117:21
**accepted**  49:9 50:3
  50:10
**access**  62:25
  117:16
**accomplish**  62:6
**account**  85:6
  102:20 104:6
**accurate**  45:9,13
  46:7 72:7 75:1
  91:2 93:16 94:18
  109:20,22
**acknowledge**
  127:11 128:16
**acquired**  53:1
**acronym**  15:3
**act**  4:9 16:13
  19:13,16 20:18
  44:17,24 45:6
  52:15 55:8,9
  127:14 128:20
**acting**  108:20
**action**  1:5 6:15
  10:4 11:4 16:22
  125:13
**activities**  11:5
  75:19 77:16
**activity**  76:19 78:3
**actual**  62:10 90:6
  118:6,14,17
  120:12,15,24
**ad**  40:23
**add**  88:14
**added**  64:11
**addition**  44:14
**additional**  70:13
  84:25 85:4 94:21
**address**  8:20
  126:15

**addressed**  20:6
**addressing**  96:5
**adequacy**  85:13
**adequate**  49:19
**adhering**  90:23
**adjustable**  84:7
**administration**
  13:4 32:5 103:8
**administrative**
  15:13 16:4 117:23
  117:24
**administratively**
  80:12
**administrator**
  9:12,16,19 10:10
  13:9,15,20 14:5,13
  17:1 18:7 20:7
  71:17
**administrators**
  6:17 90:14,20
**ads**  36:4 39:7,9
**advance**  88:17,21
**advanced**  87:5
**advances**  87:5
**advertise**  40:10,15
**advertisements**
  23:5 41:15
**advertising**  39:3
  39:14,15,16,24
  40:1,19 51:2
**advice**  45:12
  106:18 107:6
**aerial**  78:10,17,20
  80:9,13,18,20 81:5
  81:9,11,14 85:2
**affect**  8:6
**affirm**  6:6
**affixed**  127:15
  128:21
**agencies**  99:22
  117:24

**agency**  43:4 118:7
  118:14
**agent**  50:25
**agents**  39:21 50:24
**ago**  94:4 95:1
**agree**  5:23 118:18
  118:20 122:3,3
**agreed**  4:15 88:10
  121:21
**agreement**  94:7
  102:2
**ahead**  6:19 9:21
  44:22 50:7 83:8
  119:6
**al**  1:15 2:15 126:6
  127:3 128:3
**allegations**  18:8
**allocate**  85:16
**allocation**  82:18
  82:21 83:2,23
**allows**  55:9 111:22
**amend**  96:19,22
**amount**  42:25
  54:17 57:20,23,24
  65:12 66:17 74:16
  74:24 75:23 77:18
  80:2 83:24 84:24
  114:24
**analogous**  35:12
**analysis**  3:16
  95:19 96:13,16
**annual**  3:18 72:22
  73:2 75:15,18
  78:21,22 81:15
  82:11 115:4,6
  120:19
**annually**  79:9
**answer**  6:25 7:4
  7:11 8:3,17,19,23
  9:1,3,5,6 18:12
  41:10 42:20 44:19

44:20 45:17 50:9
52:20,21 55:10
88:6,10,14 113:5
**answered** 42:21
50:6 111:6
**answering** 47:2
97:15 111:6 119:4
**anticipate** 74:24
76:10,17
**anticipated** 74:3,4
74:14,17,23 76:12
82:17 83:18 85:15
**anybody** 11:3,16
11:17
**anymore** 105:21
115:22
**anyways** 115:22
**apologies** 21:1
32:1 107:19
**apologize** 32:10,16
**apparent** 23:3
39:4
**appeals** 107:2
**appear** 124:4
127:11 128:15
**appearance** 5:4
**appearances** 2:1
**appeared** 2:11,25
4:11
**appearing** 5:18
**appended** 128:11
128:18
**applicable** 90:24
**application** 49:18
104:19 117:20
118:23
**apply** 45:2 46:7,9
**applying** 43:8 47:1
**appointed** 13:21
13:22,23 14:1
93:21

**appreciate** 97:14
121:13
**appropriate** 95:3
**appropriated** 85:9
**approve** 82:12,15
88:10
**approximately** 4:7
63:24 76:12 77:7
**april** 20:6,13
21:15,21 22:11
23:1,16 47:21
54:8
**arbitrary** 114:24
**argue** 88:21
**arnold** 5:21 6:20
**array** 65:20
**ars** 21:16
**articles** 23:7
**aside** 72:16
**asked** 8:23 37:11
37:11,19 45:25
46:14 50:5 51:5,6
87:2 97:17 98:16
99:25 100:7,9
102:10 106:7
107:7 109:6
113:11 119:8
120:4 121:19
122:11 123:10
**asking** 12:3 22:9
30:15 48:5 49:12
49:16 51:9 52:14
53:20 56:11 61:1
80:8 108:10
113:10,10,13
119:2
**asks** 23:18 61:21
108:14
**asserted** 19:2
**assertion** 52:24

**assessment** 15:12
15:23 16:2,9
21:16 58:22 107:2
120:20 122:15
123:12,14
**assessments** 16:1
123:17
**assignment** 127:2
128:2 129:2
**assist** 33:6
**assistant** 13:16
15:13 16:4
**assisting** 107:5
**association** 95:1
**assume** 14:20 16:5
16:13 39:11 40:12
40:18,20,24 41:17
62:10 66:8 88:2
124:12
**assumption** 41:6
**attached** 21:16,24
128:7
**attend** 12:24
**attended** 4:6
**attending** 5:5
**attorney** 5:15 6:14
8:11 17:25 32:3
45:10,16,22
106:14,17,25
107:4
**attorneys** 18:17
45:11
**auditing** 64:23,23
78:12,15
**auditors** 91:1
**august** 89:23 92:2
92:12,25 93:10,19
96:11,12
**authority** 91:17,20
**authorize** 128:11

**automated** 64:21
**available** 21:22
29:1 33:5 41:12
49:5 50:18 51:21
52:12,13 53:7,21
53:24,25 58:14
77:25 116:5
**ave** 126:1
**aware** 35:13 88:18
93:6 96:25 100:5
112:7
**awkward** 7:8
**awry** 65:20

**b**

**b** 1:13 2:13 9:12
36:13 126:6 127:3
128:3
**back** 10:18 22:14
22:20 23:8 25:23
25:24 27:18 36:10
42:12 49:20 52:24
54:3,12 57:18
58:18 62:13 75:25
76:22 89:8 92:19
96:3,11 97:16,20
121:24 126:15
**backed** 63:21
**background** 12:18
**backing** 120:25
**backside** 55:25
**backup** 63:17,25
65:16,17 68:18
70:3 71:2
**bad** 107:18
**baiting** 48:9 98:20
98:20
**balanced** 74:8
**based** 18:10,25
22:15 26:23 41:15
70:20 71:5 96:24
98:10 109:18

**[based - cents]**

110:14 121:18
122:9
**basically**   11:8
13:17,25 15:20
46:19 48:9 59:8
60:2 62:12 63:14
63:22 64:7,8,16
67:11 76:4 83:3
83:16 84:21 90:9
92:9 93:23 95:7
116:1
**basis**   8:16 35:16
38:5,23 45:19
64:22 73:2 75:15
75:18 78:21,22
81:15 82:11
106:10 115:4
**bates**   21:6 71:14
89:15
**bear**   95:14
**beat**   7:11
**becoming**   13:14
13:18
**beg**   32:2
**beginning**   10:18
31:24 32:13
**behalf**   2:3,13 9:11
**belief**   40:22
**believe**   15:12 23:8
26:23 30:9 42:16
48:12 50:13 52:15
61:24 66:22 72:10
74:6 83:20 103:6
114:22 120:10
**believed**   49:8
**beneficial**   113:13
**benefit**   38:6,7,13
38:14,19 109:9
112:11 113:12,15
**benefiting**   122:24

**benefits**   120:19
**bertelson**   2:16 3:4
3:6,8 5:9,10 6:1
8:10,13 9:1 11:3
18:3,10 41:8
44:18 45:11,14
50:5 65:21 89:5
96:23 97:3,5,10
108:25 109:6
113:4,11 114:20
117:5,11,18
118:10,16,25
119:2 120:10
121:11,17 123:4
123:10,22,24
124:8,10,13 126:5
**best**   91:11 125:10
**bethany**   2:18
31:20,23
**better**   82:13
103:20
**big**   54:4 65:10
82:18 97:12
**bigger**   108:23
**bill**   30:6 101:18
114:3
**billings**   85:6
**bills**   59:17
**bit**   7:11 8:25 12:17
86:2 102:17
103:20
**black**   102:8
**blue**   19:19
**board**   107:2
**body**   20:8 21:13
**bottom**   21:7,14
26:3 60:8 74:23
92:1
**break**   8:1 27:5
65:23 89:9

**bring**   57:18
**broker**   23:14
50:25
**budget**   3:18 11:12
72:21 73:11,16,25
74:1,8,18 75:2
77:8,13 82:8,14
83:23 84:15,19
85:7,9,14,15 115:8
115:9 120:19
**budgets**   82:10,12
**buildings**   101:1
**bulk**   29:5,15 33:12
33:15 34:22,25
35:2,2 52:3
119:25
**bunch**   92:3 116:7
**burden**   96:16
**business**   13:4 23:4
23:7 41:18 47:25
50:22,23 51:2
52:25 53:10,13
**businesses**   35:5
50:14
**busy**   97:13
**buy**   47:17,22 48:3
53:5,23 54:5
68:22 69:11 80:21
110:21 115:3,5,5,7
115:7
**buying**   52:25 53:7
54:2 109:18 110:1
115:1,9

**c**

**c**   30:22
**ca**   126:25
**cabinet**   5:15 32:5
**calculated**   55:22
56:14
**calculator**   77:6

**call**   32:9 45:9,22
59:24 99:18
104:15 116:11
**called**   35:20 91:15
**calls**   18:11 44:18
44:20 45:15 113:4
118:25 124:7
**capabilities**   15:19
**capability**   69:17
69:9
**capable**   64:15
**capacity**   1:13 2:14
17:1 25:3,16
41:25 42:6,9
**caption**   10:11
16:23 17:3
**card**   25:8 30:1
104:8 116:4,13,21
**cards**   55:25
**case**   5:13,17 6:7
7:22 18:16 45:25
63:21 71:24 73:19
74:18 119:4 126:6
127:3 128:3
**cash**   122:15
**castle**   122:13
**category**   74:22
**caution**   18:7
**cautionary**   18:14
**caveat**   91:12
**cd**   105:15
**cent**   114:23
115:24 118:22
119:10
**center**   2:6
**central**   1:3
**cents**   51:20 55:1
55:23 56:9 103:1
103:2,4,13 105:6,9
114:19 116:6,8,16
117:1 118:1,2,18

[cents - company]

Page 5

119:23
certain  80:2 84:24
certainly  77:6
  114:12
certificate  125:1
  128:11
certification  127:1
  128:1
certify  125:4,10
chair  93:21,22
challenged  107:1
chamber  2:6
chance  8:15 9:1
  10:24 44:10 87:16
  87:23 88:5,9
change  44:15 84:4
  126:13,14 128:8
  129:3
changed  101:23
  102:4
changes  101:16
  102:3 126:12
  127:7 128:7,9
chapter  117:17
characteristics
  16:2
characterization
  29:6 92:4
characterize  22:8
charge  15:20 31:8
  31:14 33:16,16
  34:15 48:10 49:6
  49:14 50:2,19
  51:6,12,19,23 52:7
  52:16 53:24 54:7
  54:10 55:20 56:6
  56:13,20 57:13
  69:2 71:3 78:6
  94:12,16,20
  102:24 105:6,25
  106:3 114:21,22

115:17 116:8,16
117:1 119:25
120:1
charged  30:17
  31:3 42:3 54:17
  57:20 110:15
  119:9
charges  34:17
  76:3,3 100:7
  119:7,21 120:2
chart  98:18
check  91:1
checking  64:15
chief  15:11,11,16
  15:20,23 16:9
choose  91:8
chunk  97:12
circumstantial
  37:1 38:5 113:23
  114:6
cite  117:6
cities  84:10,13
citizenry  113:1
citizens  112:6,13
  113:18 114:14
civil  1:5 4:9 127:5
  128:5
claim  19:6,10
claiming  19:4,8
claims  19:1
clarification  14:24
clarify  7:20 49:16
  61:7 97:16
classification  50:3
  50:4,10
classified  36:4
  42:5
classifieds  25:12
classify  49:12
classifying  53:1

clause  103:13
clear  7:12 14:9,18
  18:3 28:15 57:17
  58:17 59:25 88:19
clerical  64:10,17
clerk  15:12,23
  16:7,9 63:7
cleveland  126:2
click  110:11
  123:13
clicked  24:18
client  45:16
coercion  122:22
coincidentally
  92:12
collect  28:18 81:21
  82:2
collected  71:23
collecting  77:3
  82:4 121:7
collection  16:1
  76:3
collects  81:21
college  12:24 13:1
  13:2,11,14
color  19:20
come  29:25 30:8
  33:6 40:14 51:17
  54:25 85:8 91:1
  103:18 106:20
  110:3 116:24
comes  52:1 55:15
  115:14
coming  74:4,10,11
  83:6 88:11 94:7
comment  50:8
  56:17
commercial  17:16
  19:15 22:17 23:2
  23:19 24:4 26:4,6
  26:9,12,19 27:3,3

27:4,23 28:3,6,11
31:9,15 33:18,22
33:24 34:6,10
36:12,13 38:16,19
42:13,23,25 43:3
46:15,22 47:2
48:6,10,16,21
49:13 51:7,12
52:1,8,17 53:2
57:9 70:21 71:6
72:14 75:13 86:20
87:3 88:16,21
92:13,24 93:19
94:13,16 95:3,10
96:3,10,13 98:12
107:11 108:4,24
119:13,18
commericial  22:22
  23:15 28:7 49:14
  98:19
commission  23:14
  26:16 125:24
  127:19 128:25
  129:25
commissioner
  1:14 2:14 6:18
  90:6 91:5
committee  93:21
  93:22
commonwealth
  125:2
communication
  4:10
communications
  11:2,18
companies  35:5,8
  35:8,9,10
company  35:14
  37:17 108:21
  111:9

compensation 70:13

compilation 3:12 10:2

compile 116:7

compiled 95:24

complaint 3:13 16:21 17:3,16 18:9,18,20,25 25:25 26:2 36:11 42:12 43:18 87:5 92:21 97:20

complete 21:24 34:21 48:4,23 68:11 70:18

completed 4:17 27:16 48:8 49:1 126:15

complied 4:12

complying 46:2

computer 62:16 62:23 68:12 69:22 69:24 76:2 104:18 118:4,12

conceivably 67:18 115:22

concentrated 95:9

concern 55:9

concerned 39:16

concluded 124:14

conclusion 18:11 119:1

conduct 81:10 95:2

confirm 43:24

conflict 122:22

confused 61:14 86:2

confusion 14:22 58:18

conjecture 113:5

connection 24:7 24:21 96:2

consequences 7:1

consider 22:16 28:7,10,22,25 29:14,23 32:18 36:21,25 37:4,19 38:10 43:9 44:5 46:14 47:10 51:15 52:17 59:5,21 72:4,12 98:11,19 112:9

considered 22:21 23:18 27:22,25 28:2 48:6,6 54:8

considering 109:17,25

consist 102:13 105:3

constant 65:7

constitutes 125:9

consult 97:6 106:17

consulting 94:7

consults 45:18

consuming 104:10 104:11

contain 36:4 99:6

contained 49:4 50:17 88:22

contains 59:19

contend 87:3 88:16

contents 117:22

context 38:19 66:16

continue 8:19 96:23

continues 20:8

contract 81:15

contracted 80:22 80:22

conversation 9:5 11:24 14:11 48:8

conversations 11:19

conversion 67:5

convert 60:23 63:21 68:12 69:3

converting 67:1,2 121:1

converts 61:25 62:1

coordinated 93:25

copier 116:6

copies 9:23,23,25 51:18 52:18 55:10 56:1,9,12 72:8 115:1 117:24 118:2,3,7,10,15,17

copy 19:20 30:1 51:20 55:1,1,2,18 55:24 56:13,21 58:13 62:2,25 63:1,4 64:2 67:23 89:16 95:12 102:24 104:23 114:20 115:21,23 115:23 116:4,6,12 116:20,24,25 119:20

copying 63:13 120:24

corelogic 35:14 60:25 71:19 101:12 102:1 119:8

correct 8:11,12 9:16 14:6 16:8,10 16:13 18:1 20:21

20:22,24 28:6,24 29:16,17 30:10 31:5,7,11 32:20 33:15,18,19 34:14 39:12 40:19 42:1 42:2,3,4,11 45:4 46:4,5,25 47:4,5 48:17 49:15 51:23 56:4 57:2,6,23 61:9 63:23 66:7 66:11,13,15,18,18 67:16 68:23 69:7 69:12,25 72:2,8 73:3,9,12 74:12 78:18 79:10,13,18 79:25 81:1,17 82:15 91:3,21 92:21 93:10 94:22 96:20,22 98:7 102:11 107:11,16 108:6,12,13 112:14 113:15 115:13,17 118:23 120:1,2,3,21 121:8 121:9,22 122:1

corrections 126:12 128:17

corruption 65:15

cost 3:16 22:1 49:19 54:23 56:13 78:20 94:6 95:5 95:19 105:18 114:25 115:19 118:6,14,17 119:10 120:12 122:1

costs 40:14 58:1,5 58:7,8,9,11 68:11 68:15,20,22 81:2 94:21 101:3 122:4

[counsel - deposition]

counsel 11:3 44:10
45:18 46:4 88:7
97:6 125:11
counties 10:3 40:3
county 9:16,19
10:11 13:9,20
14:16,18,19 17:2
24:14,23,25 33:2
35:18,21,23,24,25
36:3,8,21 37:3,12
38:1 39:6,14,23,25
40:23 41:14 42:1
42:1,6,9 45:10
51:4,15,22 71:16
80:24 81:8 82:3
84:9,13 87:9
88:23 91:15
101:21 106:14,15
106:17,25 107:4
109:13,13,18
110:1 111:21
112:6,19,25 113:2
113:14,18,20
114:13 116:11
123:12 127:10
128:15
couple 14:17
65:23 73:24 109:4
121:18
course 9:2 11:12
44:11
court 1:1 4:11,16
5:3,19,22 6:2,5,10
6:16 7:5 19:22
31:23 84:9 125:23
127:7
covered 85:19
89:2
covid 73:14
create 58:18 68:25
81:5 104:8,12

created 46:11
61:23
creates 58:9
creating 76:5 96:2
104:4 120:20
creation 58:8
credit 25:8
cross 3:4 96:23
97:9
current 21:16 34:6
58:22 59:17 93:9
93:13,20 110:7,24
currently 8:3 78:8
82:2 93:10
custodian 117:20
cut 85:3,8
cuts 84:20
cutting 85:10
cv 1:5

**d**

d 87:8 101:12
120:16
daily 90:22
darren 2:4 5:6
6:14 65:21
data 16:2 21:17
25:17,19 35:2
62:12,13 63:18,20
64:5 65:8 66:5,20
66:22,25 68:18
72:11 75:8 76:3
85:13 103:21,22
103:24 104:13,14
104:25 112:1,20
120:20 123:12
database 28:12,16
28:23 29:16,19
32:23,25 34:21
35:3 51:5,13 52:2
52:7,12 55:3 56:6
56:13,15,16 58:10

59:8,9,12,13,19,22
59:24 60:1,7,13,17
61:5,9,16,20 62:1
62:3,7 63:11 64:3
64:15 65:15 66:7
66:9 67:2 70:20
76:5 77:4 100:25
101:15 102:3,10
108:11,15 118:22
119:9
date 1:24 20:6
125:5 126:8 127:3
127:9,19 128:3,13
128:25 129:20,25
dated 89:22 92:2
92:12
david 89:22 90:1
day 4:6 11:25 12:6
25:13,13 45:2,3
46:8 70:14 76:4,4
77:2,2 97:13
106:10,10 127:16
128:22 129:22
days 126:18
deal 106:20,21
dealing 38:22
deals 38:20,21
dear 21:15 126:10
decide 82:3 114:13
114:15
decision 22:18
98:14
declaratory 17:3
dedicated 78:8
deed 127:14
128:20
deem 31:13 72:13
deemed 126:19
def 21:8,12,20
22:5 46:13 71:14
71:15 89:16,16,22

91:24 98:3
defendant 10:4
defendants 1:16
2:13 3:14 5:17 6:1
16:24
define 31:7 37:10
44:25 45:1 46:10
47:24
defined 17:15 26:4
30:9,11,25 87:4
defines 36:12
57:13
defining 109:7
definitely 112:7
definition 26:6,9
26:17,21 42:13
43:10 107:11
degree 13:3
delay 85:12
delimited 60:14
denoted 98:3
department 1:14
2:15 5:10,13,16
6:18 15:5 32:4
45:10 76:23 90:10
90:19,21 106:8,9
126:22
depend 80:15
dependent 75:23
depending 85:7
depends 80:11
109:20 113:23
114:7,9
deponent 1:23
deposed 6:21
deposition 4:3,8
8:14 9:8 10:3,9,23
11:7 16:16,18
17:20 31:20 54:13
54:22 57:2 85:20
124:14 126:8,11

[deposition - enforcement]

127:1,3 128:1,3
**depositions** 8:9
 124:11
**deputy** 15:11,17
 15:20 16:7 63:7
 84:13
**describe** 89:21
 120:12 121:25
**described** 21:13
 26:24 47:9 70:25
**describes** 58:21
**describing** 69:9
 117:20
**desktop** 62:16,23
 67:11
**detail** 96:4
**determination**
 26:18 27:1 28:5
 46:1,21
**determinative**
 27:1
**determine** 37:13
 38:2 47:3 54:23
 57:1 58:4 68:10
 95:2 114:17
**determined** 46:1
**determining** 23:1
 86:20
**dford** 2:10
**differ** 65:6
**difference** 39:13
 70:16,17 73:18
**different** 29:7 71:5
 73:15 76:9 80:8
 101:10 103:19
 119:12
**difficulty** 7:23
**direct** 3:3,7 6:11
 26:12 27:8 87:7
 106:9

**direction** 125:8
**directives** 91:7,10
 91:20
**directly** 84:8
 125:12
**director** 90:7,7,11
**disclosing** 45:15
**discover** 66:6
**discovered** 66:16
**discovery** 57:19
**discretion** 94:16
**discuss** 9:6
**discussed** 68:17
**discussing** 114:20
 117:7,18 118:16
**displayed** 103:19
**disseminated** 50:2
**distinction** 19:16
**distinguish** 28:14
 38:17 39:1 51:25
**distinguished** 47:8
**distinguishes**
 47:14,17
**distinguishing**
 109:7
**district** 1:1,2 6:15
 6:16 13:17 16:23
**division** 1:3
**docs** 89:2
**document** 10:15
 17:3 18:21 21:6
 21:12,20 22:5
 34:17 71:13,20,22
 71:23 72:24 73:1
 87:21 89:15,17
 95:22 96:2 104:1
 104:3,24
**document's** 95:11
**documents** 12:13
 72:1 99:22

**doing** 7:15 8:17
 9:24 14:7 22:8
 63:13 99:14 112:7
**dollar** 84:12
**dollars** 122:15
 124:2
**dor** 15:4 73:2 82:8
 82:10,14 90:13
 91:1,5 92:3,24
 93:23 94:1,6 95:1
**download** 103:17
**draft** 92:7,10,18
**drafter** 44:23
**drive** 2:6 62:11,15
 67:15 105:14,14
 105:15
**driver's** 5:24
**due** 64:17
**duties** 24:25 82:2
**duty** 79:17,20

**e**

**e** 2:10,23 3:20,21
 21:13 22:4,13
 23:17 27:18,21
 46:12 67:19,23
 68:1,5,18 71:2,18
 89:19,20,21 92:1,2
 92:4,6,12 98:1,6,9
 116:12,17
**earlier** 32:14
 40:21 54:13 61:6
 92:13 119:4
 120:23
**early** 23:8
**ease** 14:11
**eastern** 1:2 6:16
 16:23
**easy** 24:6 87:13
**effect** 99:10
**effort** 56:25 93:5,8
 95:8,9

**eight** 70:14 101:6
 120:10 121:20
**either** 26:16 41:2
 68:4 76:18,24
 115:20 123:16
 125:11
**elected** 13:21 99:8
 112:12
**election** 13:24
**electricity** 68:11
 68:15
**electronic** 51:13
 55:2,10,18 56:21
 58:13,14 60:9,13
 61:19,21 105:14
 118:17,22
**eleven** 95:17
**eliminate** 78:5,9
**eliminated** 78:6
**else's** 114:18
**email** 126:17
**embedded** 115:24
**eminence** 12:19,21
**employee** 41:3,5
 41:11,18 76:13,15
 76:25 77:1 78:8
 80:11 125:11
**employees** 11:20
 11:25 12:6 15:8,9
 15:14 76:23 77:14
 77:19,20 79:5
 80:15 83:3 84:14
 84:24
**employment** 75:23
**enclosed** 126:11
**endeavor** 57:4
 58:4
**endeavored** 68:9
 68:10
**enforcement** 33:9

enforces 90:22
engage 80:19
engaged 25:6
engaging 123:15
ensure 7:12 63:20
entered 128:9
entire 13:7 27:2
  32:25 61:9,15
  101:15 102:2,10
  108:11,15 127:5
  128:5
entity 27:4 39:17
  82:10
equal 118:6,14
errata 126:13,18
  128:7,10,18 129:1
error 64:10,17
  65:11 66:6,6,18
errors 64:16 65:10
essence 23:15
essentially 7:4
est 4:7
estate 23:4,12,13
  25:4 35:10 38:22
  38:23,25 44:14
  47:15,16,23 48:3
  50:24,25 52:25
  53:5,8,23 108:20
  109:14 111:22
  113:25 122:12
estimate 74:18,19
  75:14 78:22
  103:24
estimated 121:25
estimating 74:9
et 1:15 2:15 126:6
  127:3 128:3
events 8:7
everyday 58:8
exact 73:22 90:12

exactly 35:16 90:9
examination 3:3,4
  3:5,6,7,8 6:11
  97:9 109:2 121:16
  123:7,23
example 32:21
  113:3
excel 55:19 56:3
  56:12 60:14
exception 108:2
exclusive 70:6
exclusively 38:22
  69:21
excuse 65:20
executed 128:10
execution 127:14
  128:19
executive 91:15
exhibit 3:12,13,14
  3:16,17,18,20 9:22
  9:22 10:1,2 11:7
  16:18,20 19:18
  20:9 21:3,4 25:25
  27:19 33:22 36:11
  43:18 46:13,24
  54:12 58:18 71:10
  71:12,14 72:17,19
  85:5,21,22,23,24
  86:1,5,10 89:12,13
  91:23 95:12,16
  97:19,23,24
  100:17 101:7
  119:15,17 120:6
exhibits 3:10,11
exhibti 3:21
exist 40:10
existence 24:9
  40:7
expanding 57:15
expects 26:15

expended 99:16
expense 68:16
  85:16
expenses 74:3,15
  74:17 82:24 85:15
  120:19
expensive 105:21
experience 57:3
expiration 127:19
  128:25 129:25
expires 125:24
explain 47:13
  103:20
explaining 8:16
explanatory 16:5
export 61:23
exported 103:21
extensive 58:10
extent 11:15 28:12
  31:18 34:20 43:7
  53:16 56:15 60:8
  63:9
extract 62:12,14
  66:22,25
extremely 64:12

**f**

fact 5:23 24:17
  38:24 47:16 53:21
  66:11 100:2
factors 22:25
  26:22
failed 48:7
fair 22:7 24:8
  25:19,20 29:6
  37:20 41:2 47:18
  48:14 65:3,4 77:8
  91:4 92:4,16
  114:7
familiar 16:12
  23:19 24:9 26:8
  84:18 103:7

far 9:8 23:6 34:20
  39:16 43:4 45:14
  54:3 58:10 64:11
  65:15
fault 10:5
feasible 95:10
feature 8:9
features 37:2,7
federal 4:8
fee 3:16 11:13
  17:16 20:23 21:22
  21:22 26:16 31:9
  31:15 33:18,22,24
  34:6,10,11 49:14
  51:7 52:8,18 62:8
  62:8 69:2 70:5
  75:13 81:25 83:22
  87:4 88:16,21
  90:1 92:7,10,13,24
  93:19,23 94:2
  95:3,6,18 96:3,10
  108:22 118:1,6,14
  119:12,13,14,18
feel 7:8
fees 31:14 39:2,9
  48:10 51:2 85:11
  95:9 120:2 121:25
fell 43:10
felt 48:9
figures 99:7
file 30:7 52:2,19
  55:19 56:21 58:13
  58:16,22 59:5,15
  59:15,16 60:18,22
  60:23 61:4,22
  62:2,2 65:15
  67:10,14,19,24
  68:12 69:3 70:4
  70:19 71:3 79:9
  79:22 82:5 101:18
  103:18 104:14

112:4 118:22
119:9,25 121:1
**filed** 6:15 16:21
**files** 28:17 58:22
60:20 61:24 62:14
68:25 118:4,12
**filings** 86:19,22
**fill** 22:9 48:4 49:18
**filled** 48:13,16
**final** 7:25 92:7,10
92:17
**finalized** 96:11
**finance** 5:15 32:5
103:7
**financially** 125:12
**financials** 40:12
41:19
**find** 19:25 24:24
30:5 54:3 57:7,10
111:21 123:15
126:11
**fine** 32:11 117:9
**finish** 7:10 8:15
41:9,10 63:13
**finished** 87:18
**firm** 23:14
**first** 3:15 7:8 9:22
13:19,21 16:22
21:14,20 58:24
59:1 63:16 71:15
73:25 81:4 86:17
87:7 89:21 98:3
102:8 123:3
**firsthand** 110:3
**fiscal** 73:5,7 74:18
75:4 84:9
**five** 10:7 97:5
**fixed** 64:20
**flights** 85:11
**flip** 10:6 19:25
54:5 121:24

**flow** 65:22
**fluent** 85:7
**fly** 80:23
**folks** 92:3,3
**follow** 48:1 91:10
109:4 121:18
123:9,22
**followed** 48:11,13
**following** 10:16
56:8 59:20 73:8
**follows** 26:5
**forced** 84:23
**ford** 2:4 3:3,5,7
5:6,6,25 6:12,14
18:13 31:19,25
32:7,11,15 44:21
45:20 65:24 66:2
88:25 89:7 96:18
97:2,7,17 99:4,25
100:6 106:7 109:3
113:9 121:10,19
122:10 123:8,21
124:5,7,9
**foregoing** 125:4
127:13 128:18
**forgive** 90:5
**form** 21:24,25
22:3,4,9,9 26:13
27:16 42:19 48:4
48:8,13,16,24 49:2
49:2,7,25 50:12
55:11 125:8
**format** 7:5 55:19
56:3,12 58:14
60:10,24,24 61:6
61:19,21 67:2,3
68:5 104:2 105:14
111:1,16
**formats** 58:14
60:13,13,16

**formatted** 103:22
**fort** 5:7 91:14
**forth** 92:20
**fortunately** 84:21
**forward** 81:25
119:6 126:15
**four** 9:20 57:25
61:23 65:14 66:15
77:3 79:21 80:3
117:23
**frame** 90:1
**frankfort** 1:4 2:21
113:3
**free** 8:18 49:6 50:2
50:19 51:19 53:24
112:3 115:11
116:24,25 127:14
128:20
**frequently** 79:24
**friday** 4:6
**friendly** 111:16
**front** 55:25 86:6
89:17 117:14
118:8
**ft** 2:8
**ftp** 68:1
**fulfill** 20:21
**fulfilling** 66:21
68:7 70:3,6,25
78:4
**full** 5:20 15:9
**function** 90:22
**funded** 112:15
**funds** 77:19 83:17
83:24
**furlough** 84:24
**furloughs** 84:22
**furnished** 117:25
118:5,13
**further** 3:7,8 50:8
123:7,23

**fy** 3:18 72:21

**g**

**gap** 8:25
**gaps** 14:3
**general** 17:23 18:8
19:1 24:16 45:17
99:13 100:2
**generalized** 11:24
**generally** 11:1,5
15:17,24 17:23
82:7 94:3,5,24
**generate** 41:13
83:22
**generated** 76:1
**generates** 41:15
**generating** 40:5
**getting** 7:12 23:22
23:25 31:4 48:12
74:25 75:13 76:14
90:1
**gfvt** 1:5
**gis** 35:2 81:9 96:5
**give** 6:6,23 7:10
8:15 9:1 18:15
32:21 44:10 49:18
80:9 88:25 96:19
105:15 108:23
115:16
**given** 28:18 84:10
96:20 114:16
**gives** 26:5 99:14
**giving** 108:21
**go** 6:19 9:21 10:18
12:6,18 13:1,7
27:18 33:23 42:12
44:22 50:7 54:12
57:5 65:17,20
77:19 80:23 83:8
97:16,20,23 104:5
110:2,5,10 111:15
114:4 119:6

123:13
**goal** 74:12
**god** 6:8
**goes** 21:8 36:16
68:4 76:6 121:7
**going** 6:23 8:22
9:21 12:17 14:15
18:4 25:23 27:11
27:13,15,17 42:16
42:18 48:10,24
49:14,20 50:1
52:24 59:16 65:23
74:2,2,3 79:4
80:12,13,14,14
81:25 83:9,11,20
83:21 85:8 86:12
87:13,14,17 89:1
98:18 113:2,7,25
114:4,4 116:8
117:13 122:8
**good** 6:13 10:19
12:16 15:7 16:11
65:24
**gordon** 89:22,25
90:4
**gosh** 78:22
**gotcha** 61:13 83:1
**gotten** 98:22,25
108:10
**government** 31:17
34:18 84:19,23
85:3 99:7,11,14,16
122:23
**governmental**
87:3 88:15,20
**graduate** 12:22
**graduated** 13:10
**graduating** 13:14
**graduation** 13:18
**graydon** 2:5

**graydon.com** 2:10
**group** 20:5
**guess** 23:16 35:7
38:17 75:22 76:8
90:8 98:20 101:2
105:2 115:21
122:20 124:6
**guessing** 105:24
**guideline** 49:14
**guidelines** 31:9,15
33:18,22,24 34:7
34:10,11 51:7
52:8,18 92:13,24
93:9,15,20,20 94:8
94:10,17 95:3
96:3,10 119:18

**h**

**half** 77:7,13
**hand** 6:2,4 19:23
34:2
**happened** 108:11
**happening** 109:13
111:21
**hardware** 68:19
68:21,23,24 70:4
78:8
**head** 2:5
**header** 20:5 71:16
117:15
**hear** 7:16
**helicopter** 80:24
**help** 6:8 30:17
**helpful** 41:24
**helping** 107:5
**henry** 9:16,19
10:10 13:9,20
17:2 24:14,22,25
35:18,21,23,24,25
36:3,8,21 37:3,12
38:1 39:6,14,23,25
40:23 41:14 42:1

42:1,6,9 51:4,15
51:22 71:16 81:8
82:2 87:8 88:23
101:21 106:14
109:13,18 110:1
111:21 112:6,19
112:25 113:1,14
113:18,20 114:13
116:11 123:12
**hereof** 125:6
**hesitate** 7:23
14:23
**hey** 12:7 91:16
111:21 116:4,12
**hi** 22:14 98:10
**high** 2:20 12:18,19
**highballing**
123:16
**hire** 76:14,15,18
80:23
**hiring** 84:14
**history** 13:8 28:19
28:20
**hold** 73:22 90:12
116:22,22,22
**home** 24:1,1,2,13
24:13 110:25
112:18,25 113:14
122:14
**homes** 23:9,10
47:17,17 54:2,5
**hon** 1:13 2:13
126:6 127:3 128:3
**honest** 39:25
**honestly** 27:15
**hopefully** 7:9,21
10:11,17 95:12
**hour** 65:13
**hours** 65:14 66:15
70:14 76:25

**house** 109:18
110:1 111:1,15
114:3 124:1
**houses** 110:5,11
123:13
**huh** 16:19 26:1
27:20 28:4 30:20
36:20 43:20 45:7
46:16 54:15,21
55:17 58:20 63:19
77:9 79:14 89:14
91:25 100:20
101:11,17,19
102:9 104:16
119:22,24 121:23
**hundred** 115:15
**hustle** 108:19
**hypothetical** 38:4
44:9 62:10 70:17
99:25 108:9 122:9
124:1

**i**

**idea** 111:20
**identical** 71:7,8
92:18 111:18
**identification** 10:1
16:20 21:4 71:12
72:19 85:23 89:12
95:16
**identified** 11:6
16:25 17:11 57:10
87:6
**identify** 31:21
76:16
**impact** 78:14
96:13
**important** 7:5,7
97:13 109:12
114:14 122:11,12
**impose** 120:1,1

**imposed**  119:7
**inclination**  43:13
**include**  36:14
  44:12 108:5
**included**  49:2,6,22
  69:15,18 74:16,25
  75:9 126:13
**includes**  81:8
  115:9 120:18
**including**  100:14
**inclusive**  121:25
**income**  40:5 75:1
  75:9,21,22,24 76:1
  76:10,12,24 81:25
  83:22 84:3,6,7,8
**incorporated**
  128:12
**increase**  83:24
**incur**  58:1,5 94:21
  120:12
**incurs**  68:16
**index**  3:1
**indicate**  53:18
**indicated**  49:7,21
  49:25 50:11 53:3
  73:5 100:13
**indicates**  47:21
**indicating**  126:13
**indirect**  26:12
  27:8
**indirectly**  125:13
**individual**  29:11
  29:22,23 32:23
  33:13 36:7 100:22
  100:24 104:5
  110:11
**inevitably**  79:22
**information**  21:21
  21:24 22:1,15
  24:21,24 25:11
  28:17 29:8,11,22

30:7,9,16,23 31:2
  33:3,5,6,9 35:4,11
  35:15 38:1,2,11,25
  39:20 41:11 42:10
  43:11,21,23 44:3
  44:15,24 45:16
  48:12,25 49:2,4,19
  49:22,24 50:17
  51:1,5,11 52:3,9
  52:11 53:1,3,4,7
  53:20,25 54:4
  56:3 57:5,8 59:19
  59:20 62:1,25
  63:5 64:24 75:11
  80:16 81:20 82:1
  98:10 99:11 102:1
  103:18 108:15,21
  109:17,21,21,24
  110:3,17,24
  111:23 112:5,10
  112:13,18,24
  113:17 114:1,5,10
  114:15 120:6,21
  120:25 121:7
  123:18,25 124:3
**injunctive**  17:4
**inner**  99:15
**insight**  99:15
**inspect**  77:19,24
  78:1,2 79:23 80:1
  117:21
**inspecting**  77:21
  79:4,21
**inspection**  78:15
**inspections**  80:14
**instance**  33:2
  55:19 76:13 85:1
**instant**  39:21 54:1
**instantaneous**
  67:6

**instruct**  9:3 18:12
**instructed**  8:17
**instruction**  18:14
**instructs**  9:4,7
**intend**  53:22
**intended**  22:16,21
  27:22 28:1,3
  38:11 42:14 43:11
  43:22 44:6 46:15
  47:9,22 48:2
  49:23 52:9 53:19
  86:20 98:12
**intending**  98:18
**intends**  49:3 50:16
**intent**  48:12 49:23
  53:11
**intention**  14:25
**interest**  25:3 87:6
  88:15
**interested**  113:24
  113:25 114:3
  122:17 125:12
**interesting**  24:18
**interests**  87:3
  88:20
**intergovernmental**
  31:17 32:18,22,24
  33:17 34:16 43:3
**interject**  8:14 9:2
**internet**  76:3
**interpretation**
  119:3
**interrogatories**
  3:15 88:11 100:13
**interrogatory**
  86:12 87:1 88:3
  100:12 120:5,9
**interrupt**  65:22
**invoices**  3:17
  71:17 72:10,12,13

**involved**  4:10
  65:19 68:20
  100:14,15 107:5
  115:19
**irrespective**  66:11
**issue**  17:10 91:7
  91:20
**issues**  65:14
**item**  74:16 78:5
  85:18
**items**  11:14 83:25

**j**

**jason**  1:23 4:3
  5:21 6:20 87:8
  88:16 97:11
  121:21 126:8
  127:4,9 128:4,13
  129:20
**job**  13:7 15:16
  45:3 97:13
**jobs**  13:13
**joined**  31:20
**judge**  91:15
**july**  73:7,11
**jump**  105:13,14,15
**june**  73:8,12

**k**

**k**  86:23
**kar**  103:10 117:5
  117:11,15
**kenton**  91:15
**kentuckiana**  4:3
**kentucky**  1:2,14
  2:8,15,21 4:5 5:7
  5:10,18 6:16
  12:21 13:2 16:13
  16:23 19:13 20:18
  23:13 24:15 45:5
  51:1 74:8 84:18
  90:15,20 122:13

125:2
**kind** 11:10 24:5
  25:21 33:13 34:25
  64:20 85:4 93:25
  98:19 99:15,20
  108:8 111:23
  112:17,18 122:22
  124:3
**kinds** 35:5 38:21
**knew** 32:8 98:18
**knight** 102:8
**know** 7:9,10,14,20
  8:2,21 9:23 10:12
  12:5,7 14:12,15,20
  18:17 19:20 20:1
  25:8 26:22,25,25
  27:15 29:4,6,12
  30:6,11,14,16
  31:21 33:25 34:16
  34:20 36:1 37:22
  37:24 38:20,23
  39:9 40:12 41:1,2
  41:14 43:25 44:13
  45:22 46:6 47:7
  48:11,23 52:23
  54:6,10 55:13,23
  55:24 56:7,14,17
  56:19 57:12,24
  58:7 63:8 64:1,9
  65:5,8,13,16,18
  67:7,8 68:19 74:1
  74:6 76:4 77:21
  78:5,7 82:6 85:10
  85:11 87:18 90:6
  90:22,23 91:13,14
  94:5 97:12 98:19
  98:21 99:13 100:2
  100:21,22 105:21
  109:13 110:7,12
  110:20 111:12
  112:5 114:10

115:2,5,21,23
  116:2,3 118:7
  119:12 121:11,14
  122:23,25 124:10
**knowledge** 26:23
  39:15 63:4 93:8
**known** 23:4
**knows** 44:19
**krs** 4:12 22:22
  23:2 37:5 54:20
  107:13 117:17
**ky.gov** 2:23

**l**

**language** 46:23
**large** 67:19 105:20
  125:2
**larger** 83:23
**largest** 83:11,13
**law** 18:6 33:8
  44:25 46:2,10,11
  74:8 79:13 80:5
  81:10,18 82:4
  87:5 103:5
**lawful** 52:6
**lawmakers** 46:11
**laws** 90:24
**lawyers** 11:18
**lay** 77:14
**layman's** 90:17
**layoff** 84:22
**layoffs** 84:21
**layperson** 17:24
  18:5 37:8
**lease** 26:14
**left** 34:2 68:6
**legal** 2:19 5:11,16
  18:11 32:4 45:12
  46:4 91:17,19
  106:18 107:6
  112:2 118:25
  119:3 126:1 129:1

**legislature** 114:4
**letter** 20:8,12,17
  20:24 22:10,13
  43:16 47:9,20
  49:3,22 53:18
  58:19 87:8 97:21
  120:16 126:19
**lettering** 19:20
**lexington** 5:18
**libraries** 118:5,12
**license** 5:24
**line** 74:16 75:1
  78:5 82:17 83:24
  85:18 92:6 109:10
  126:13 128:7
  129:3
**lines** 7:18
**link** 24:5
**list** 10:20 54:14
  59:16
**listed** 11:14 34:17
  44:25 45:2 64:17
  75:5 117:23 128:7
  128:17
**listening** 31:22
**listing** 24:16 112:3
  128:7
**listings** 24:2,13
  35:11 110:7,25
**lists** 110:7
**literally** 42:24
**litigation** 17:10
**little** 6:24 7:8,11
  8:25 12:17 73:15
  86:2 102:17
  103:20
**llp** 2:5
**local** 35:17,21,25
  36:3,8,21 37:3,3
  37:12 39:7,24
  40:1,23 41:15

42:1,6,9 51:4,16
  51:23 83:17 99:14
  107:2 109:14
  110:2 113:21,22
**local's** 39:14
**locate** 65:14
**location** 5:5
**long** 9:18 63:24
  64:1 65:5,7 67:5
**longer** 75:20,20
  77:22 78:14
**look** 16:17 17:8
  19:18 24:13 26:8
  30:18,21 33:22
  34:5 36:10 38:2
  43:16 58:18 74:14
  85:5,20,21 86:9,12
  86:19 87:1,16
  92:3 94:8 97:19
  100:17 101:6,6
  102:7 104:17,18
  107:9 119:15,17
  120:6
**looked** 24:18
  26:22 30:14 86:23
  92:13,20 103:10
  107:10
**looking** 33:9 46:23
  46:24 56:1 61:4
  65:1 91:23 107:25
  113:24
**looks** 65:2 71:17
  77:6 89:19 93:15
  101:20 111:13
**lose** 77:1 80:11
**lost** 77:12 81:25
**lot** 35:7,15 65:19
  99:3 102:21
**lots** 29:7
**louisville** 4:4

**lowballing** 123:16
**lower** 95:8

**m**

**machine** 115:23
**mad** 123:1
**madam** 126:10
**mail** 2:10,23 21:13
23:17
27:18,21 46:12
67:19 68:1,5
71:18 89:20,21
92:1,2,4,6,12 98:1
98:6,9 116:12,17
**mailed** 67:23
**mailing** 68:18 71:2
106:5
**mails** 3:20,21
89:20
**main** 4:4
**maintain** 29:22
60:12,16 64:15
72:1 76:2 78:11
81:7 115:16
**maintaining** 76:5
77:3 81:13
**maintains** 60:9
**maintenance** 16:1
58:9
**major** 75:11
**making** 19:5 20:18
27:1,7 34:11
52:11,11 54:18
56:22 94:5 115:1
115:21
**management** 35:8
**manager** 13:16
**mandated** 81:5,7
82:4
**mandatory** 94:11
**manipulate**
110:11

**manipulated** 56:6
103:22
**manipulation**
64:23
**map** 110:6,11,25
**mapping** 78:11
80:13 81:8,13
**maps** 118:3,11
**march** 1:24 4:7
126:4
**mark** 9:22 16:17
89:13 95:24
**marked** 10:1
16:20 21:4 54:13
71:12 72:19 85:23
89:12 91:24 95:16
**market** 80:21
109:14 111:22
112:7 113:25
**marking** 71:13
**match** 74:10
**material** 58:8
117:25 118:4,11
**matter** 24:17 67:7
125:6
**mayor** 122:13
**mayor's** 124:1
**mbd** 67:1,2
**mdb** 60:18,23 69:3
69:6
**mean** 11:23 16:4
24:3,15,23 27:2,2
37:9,16 40:5,24
41:2,17 43:2 45:2
48:14,23 52:4
53:25 55:25 64:4
64:22 65:12 67:1
68:19 69:17 82:24
92:18 95:6,23
105:19 114:17,24
122:6

**meaning** 36:22
37:5,15 54:20
**means** 14:13 26:12
40:5 85:10 104:4
118:19
**meant** 107:21
**mechanical** 122:1
**mechanically**
125:7
**mechanism** 41:12
51:3
**media** 24:5,16
67:15,25 122:1
**medications** 8:6
**meeting** 93:25
94:1
**meetings** 106:21
**memoranda**
117:21
**memory** 94:4,25
**mentioned** 32:13
78:24 80:18
**microsoft** 60:14
**middle** 71:18
73:14 92:1
**midwest** 126:17
129:1
**mileage** 77:25
**miles** 77:21
**miller** 1:13 2:13
91:6,19 126:6
127:3 128:3
**million** 64:18
122:14 124:2
**mind** 14:22 47:7
**mine** 123:2
**minimal** 105:19
**minimums** 94:12
**minute** 87:7
**minutes** 64:2
65:11,23 67:7,8

89:1 97:6
**miscellaneous**
75:1
**misleading** 50:14
50:20,21
**misled** 107:19
**missed** 31:25
32:12
**mitchell** 2:8 5:7
91:14
**mls** 25:12,14,15
**model** 39:14,15,16
41:18
**moment** 87:15
120:7
**money** 25:8 39:5
40:19 41:3 42:9
74:2,2,3,4,10,11
75:7 76:2 77:25
79:5 82:21 83:5
83:11 84:8 85:4,9
99:16 112:16
115:10
**moneys** 84:10,25
85:2
**months** 13:17
**morning** 6:13,25
9:24
**mortgage** 35:7
108:21
**move** 57:17 119:6
**moves** 30:21
**moving** 32:16
57:25
**multicounty** 35:22
**multiple** 29:4 85:1

**n**

**name** 5:20 6:14,19
32:12 113:19
126:6 127:3,4,15
128:3,4,21

**named** 10:4
**national** 44:13
**nature** 7:1 16:3
 23:6,10 24:2,6,19
 33:4 35:9 54:2
 65:11,17 68:2
 78:1,13 80:10
 104:22 112:2
 114:6 122:22
**necessarily** 11:21
 11:22 46:3 103:18
 106:13
**necessary** 62:6
**necessities** 85:7
**need** 8:1 14:16
 33:3 57:15,18
 62:9 70:5 71:4
 77:5 86:6 106:19
 114:10 116:4
 117:4
**needed** 63:1
**needs** 64:19 117:9
**neely** 121:24
**neely's** 121:21
**neighborhood**
 110:6
**never** 25:18,21
 27:16 28:8,9
 32:24 34:19 43:7
 48:7 51:8 52:22
 55:22 56:14,15
 61:8 63:7 86:22
 86:23 108:9,10,11
**new** 68:22 90:1
 122:13
**news** 37:25 44:13
 100:2,3 109:9
 112:22 113:2,19
 122:12,12
**newsletter** 37:18

**newspaper** 35:17
 36:8,18,22 37:4,4
 37:6,8,10,14,14,16
 37:20 38:3,18,20
 39:1,7 43:10,12,14
 43:23 44:7,16
 47:4,8,10,12,14,18
 51:11,16 52:7,10
 52:16,17 99:6,6
 108:6,10,14,16,19
 109:7 113:20
 114:5 124:4
**newspapers** 99:5
 99:21 108:1
**nicole** 2:17 5:14
**nine** 26:2 85:19
 102:7
**non** 118:3,11
**noncommercial**
 19:4,6,9,14 29:24
 30:10,12 31:1,6,8
 31:14 32:18 48:22
 49:8 50:1,11 52:1
 54:9,19,24 55:3,15
 55:20 56:22 57:22
 70:22 71:6 96:14
 100:7 102:22
 119:14
**notarial** 4:9
**notarized** 126:14
**notary** 4:15
 125:23 126:25
 127:10,18 128:15
 128:23 129:23
**notations** 19:21
**note** 19:19 20:4
 104:20 119:2
 126:12
**notepad** 104:19,20
**notice** 10:9,15,16
 11:7 54:14 57:2

 62:18,22 85:20
 87:8
**notices** 3:12 10:3
 41:21,25
**noto** 20:10,13,17
 20:17,23 21:14,21
 22:9,14 27:21,25
 42:22 46:12 48:15
 50:11 58:19 60:1
 97:21 98:7
**noto's** 23:17 25:24
 47:20 98:15
**november** 95:19
**number** 16:24
 21:6 54:16 57:1
 57:20 64:11 65:6
 71:14 75:10 82:18
 83:16 85:6 86:6
 86:12 87:1 97:19
 97:20 100:12,18
 100:19,19 101:6
 101:13,20 105:4
 114:25 120:9
 121:20 126:7,13
**numbered** 10:5,20
**numbering** 21:7
**numbers** 64:16
 73:22 84:4 89:15
 128:7
**numerous** 23:7
 84:20

**o**

**oath** 6:25 7:1
 89:10
**object** 18:4,10
 44:10 45:14
**objection** 8:15,16
 8:20 9:2 41:8
 44:18 50:5 113:4
 118:25 119:4
 124:5

**objectively** 122:14
**obligate** 80:1
**obligated** 74:8
 79:8,13 81:10
**observation** 32:6
**obtain** 22:10
**obvious** 47:19
**obviously** 7:14 8:1
 8:23 9:4,6 12:5
 29:15 64:19 73:16
 74:11
**occasionally** 90:25
 99:21 106:18,19
**occur** 52:22
**odd** 98:17
**offer** 110:4 111:13
 112:3
**offers** 23:9 39:21
 54:1 110:16
 111:12
**office** 2:19 3:18
 5:11,15 9:11
 10:10 11:9,12,16
 14:2,21,25 15:8,18
 16:6 18:9 19:2,9
 20:20 22:16 27:10
 28:10 29:11 31:17
 32:3 33:5 34:7,23
 36:7 37:13 38:12
 41:21 46:14 52:13
 54:6,8 55:16 58:5
 58:12 60:3,8,12,16
 62:9,19,20 63:3
 68:16 69:6 72:21
 74:20 75:19,25
 76:18 77:3,12
 80:19 81:21 82:22
 91:1,7,20 94:20
 98:11 106:10
 107:6 110:3,4,21
 115:1,3,8 116:4,20

120:12,19 121:7
122:5 123:15
**office's**  59:5 71:16
72:2 122:21
**offices**  15:1 33:2
75:24 122:23
**official**  1:13 2:14
16:25 24:25 25:16
41:25 42:8 90:13
93:9 112:12
117:20 127:15
128:21
**officials**  99:8,11
**offset**  84:13
**oh**  61:13 86:3
97:23 98:2 101:8
**ohio**  126:2
**okay**  5:22 6:23 7:4
8:3 9:15,18,21
10:2,14,23 11:1,10
12:3,12,20 13:1,3
13:13,19,23 14:3,7
15:1,2,23 17:6,22
18:2,25 19:11,18
19:25 20:4,12,16
20:20 21:1,5,11,19
22:7,13,20,25
23:16,21,24 24:8
24:12 25:2,6,11,15
26:11,21,23 27:5
27:18 28:9,14
29:4,10,14 30:2,13
30:25 31:12,19,25
31:25 32:7,21
33:8,12,16,20 34:9
34:22,25 35:17,25
36:6,16,24 37:2,7
37:17 38:7,15,17
38:24 39:18,23
40:4,18 41:10,24
42:5,8 43:1,6

44:22 45:1,8,25
46:6,12,19,21 47:6
47:13,16,20 48:1
48:14,19 49:1,11
49:20 50:15 51:4
51:9,15,25 54:6,12
56:11 57:14,25
58:4,16,21 59:4,11
59:14,18,21,24
60:5,12,16,19,23
61:13,13,19 62:5
62:18,22 63:3,7,10
63:20,24 64:4,14
65:5 66:14,25
67:14,18 68:3,9,15
69:1,5,14 70:9,12
71:22 72:7,18
73:5,11,14,19,24
74:14,22 75:4,17
77:5,12,16 78:16
78:20,24 79:15,23
80:4,16 81:4,10,14
81:20 82:7,17,20
83:1,15,18 84:15
85:19,25 86:4,8
87:1,13,19,20,22
88:5,13,19 89:4,5
89:13,19,25 90:12
90:17 91:4,10,22
92:6,16 93:2,12,18
93:24 94:10,15
96:1,7,18 97:2,18
98:15,22,25 99:3
99:10,20,25 100:6
100:11,18 101:6,8
101:24,25 102:5,7
102:13,16,18,19
102:22 103:7,10
103:13,16 104:1,7
104:13,21 105:1
105:11,18,23

106:3,7,12,14,25
107:4,9 108:8,14
108:19,25 109:4
109:23 110:4,9,15
110:19 111:8
112:17 114:18
116:16,19 117:1
118:21 119:19
120:4,8,15 121:5
123:6 124:9
**once**  8:16 14:8
21:25 36:2 67:9
68:4 77:23 79:21
80:3
**ones**  123:3
**online**  37:18 39:20
65:17
**open**  16:13 19:13
20:18 33:24 34:6
44:17,24 45:5,19
52:15 55:9 80:21
98:23 99:1,23
101:10 102:23
103:8 106:21,22
116:1 119:17,18
**operation**  58:8
**operational**  40:14
**operations**  106:10
**opinion**  35:12
113:6,11
**opportunity**  96:19
124:10
**ora**  26:4
**order**  10:8 12:14
83:25 99:20
**organization**
106:8
**organize**  89:2
**original**  44:23
**outliers**  64:9

**overall**  53:10,13
121:6
**oversaw**  90:14
**oversees**  90:22
**oversight**  90:21
**overtime**  70:13
78:8
**overview**  6:24
**owned**  23:11
122:13
**owner**  30:4,12
107:1 116:23,23
116:24 117:2
**owners**  29:25 33:4
112:6
**ownership**  112:1
**owns**  30:5

**p**

**p.m.**  89:23 98:7
124:14
**pad**  104:20
**page**  3:2,11 10:5,9
10:15,15,16,17
16:22,25 17:2,6,7
19:23 20:1,9,9
21:12,14,20 26:2,5
26:5 30:18,22
33:23 36:10 42:12
43:17,17,18 58:19
58:24 71:15 86:11
86:14 91:24 97:20
98:3 100:18 101:6
102:7 103:2,4,13
103:22 105:6
114:19,24 115:25
117:1 118:2,2,18
118:23 119:10,17
120:11,16 121:24
125:6 126:13,15
128:7 129:3

**pages** 10:7 103:19
105:4,9 115:15,15
**paid** 25:7 41:20
42:9
**paper** 9:23,25
35:22 37:3,25
39:7 40:2,8,15
41:22 42:10 51:5
56:9,11,13 95:12
115:1,3,9,11,16,17
115:21
**paragraph** 17:8
17:11 26:3,11
30:18 43:24 44:3
59:1 102:8
**parcel** 29:11,22
36:7 102:23,25
120:2
**parcels** 28:17
29:23 32:23 33:13
96:6 101:16,20
102:14
**pardon** 32:2
**part** 15:14 22:5
26:13 29:19 39:17
47:1,1 50:22
53:10,12 76:22,25
82:2 115:9 118:9
118:15 119:10
122:6 128:9
**partial** 3:16 95:19
**partially** 64:25
**participants** 4:6
**participating** 5:8
**particular** 30:5
76:13 94:18
**parties** 5:3,22
**parts** 26:25
**pass** 96:22 97:2
**paste** 104:23

**patience** 121:13
**pay** 40:22 41:22
62:8 69:3 70:5
77:19,25 83:11
115:11
**paying** 40:15
**payment** 118:1,6
118:13
**pays** 83:3,7
**pdf** 9:23 104:2,4,4
104:8,12 112:4
**pending** 8:3
**people** 40:15
50:23 109:17
111:23 112:4,19
115:22
**percent** 77:7,13
82:23 85:8,9
**perfect** 10:2 32:7
**perform** 68:17
71:4 75:20 76:19
77:17 79:20 81:16
**performance**
122:20,21
**performing** 24:22
24:24 79:17
**performs** 41:12
**period** 38:22
**periodical** 36:18
36:24,25 43:12,14
44:7 47:4,8,10,12
47:14 108:2,6
**periodicals** 99:21
**permitted** 52:15
**person** 30:22 91:6
105:25 117:19
118:1,5,13
**person's** 114:9
**personal** 25:3 42:6
64:23 109:19

**personally** 109:24
110:2 127:11
128:15
**personnel** 31:3
82:23,24 115:19
115:24 116:3
**pertain** 121:5
**pertinent** 57:7,11
57:12 94:1
**phone** 77:6 126:3
**photographs**
118:3,11
**photography**
78:11,18,20 80:9
80:18,20 81:6,9,11
81:14 85:2
**physical** 62:5
102:24 105:13
115:15,21
**physically** 37:16
37:25 77:21
115:20
**pictures** 80:24
111:1
**piece** 29:12 30:5,8
33:9 70:4 79:21
81:20 82:1
**place** 41:21 95:7
125:5
**placed** 41:25 42:5
90:2
**plaintiff** 1:8 2:3
5:6,25 16:24
**plaintiff's** 3:14
**plane** 80:23
**planned** 53:4
**planning** 33:2
**please** 5:4,19 6:2
6:19 7:20,23
14:23 21:15,24
41:9 70:23 124:13

**126:11,11
**plenty** 23:5 53:6
**plus** 65:14 101:21
104:20
**pocket** 58:1,5
**point** 7:19 8:1,21
18:19,23 86:17
88:2 91:6 97:1
**political** 112:21
113:2,18 122:11
**politics** 44:14 99:7
109:8 113:12
**pop** 104:17
**portion** 40:14 61:1
61:2 74:15,17
75:9,25 83:8,10,11
83:13,14 85:15
**position** 77:1
88:22
**positive** 14:10
**possible** 67:18
77:15 124:6
**possibly** 77:18
80:6,7
**postage** 106:3
**posting** 112:10
**potentially** 45:15
123:17
**practice** 50:23
**practices** 50:22
**prefix** 21:8
**preparation** 12:12
16:15 17:9,20
19:12 54:22
**prepare** 11:6 79:9
82:5
**prepared** 72:24
96:2,11
**prescribe** 94:17
**presumably** 66:17
69:5,23

**pretty** 16:5 23:3,3
  24:6,6 39:4 47:19
  48:5 57:13 67:6
  73:19,23 94:9
  123:2
**previous** 65:18
**previously** 8:23
  101:25
**printing** 115:20
**prior** 10:23 23:16
  23:17,22,25 56:25
  73:15,20 88:1,2,6
  88:10 106:8
  109:24
**priorities** 114:18
**prisoner** 7:25
**privilege** 45:16
**probably** 14:8
  15:3 16:5 40:1,2
  56:1 65:7,11
  78:25 83:14 101:3
  103:1 114:4 118:8
**procedure** 4:9
  49:17 127:5 128:5
**procedures** 77:2
**proceedings** 5:1
**process** 9:8 63:17
  64:21 65:16 66:4
  66:21 68:3,11
  70:2,18,25 71:1,5
  71:7 76:4 78:15
  80:22 81:12,13
  82:8 93:14,18
  94:5 120:24 121:6
  121:6
**processing** 122:1
**produce** 37:6,16
  62:3 79:19,22
**produces** 40:2
**producing** 62:3
  118:7,14

**product** 110:16,20
  111:22
**production** 126:15
  126:17,22
**profit** 26:15 40:6
**profitable** 40:10
**program** 110:5
**promise** 123:11
**properties** 29:5
  35:11 77:20,22
  78:15 79:23 80:2
**property** 6:17
  9:12,15,18 10:10
  13:8,14,20 14:4,12
  17:1 18:6 20:7
  24:22 28:16,20
  29:7,12,25 30:1,4
  30:5,6,7,12,16
  31:2 33:4,10
  34:17 35:3,3,8
  39:4 49:4 50:17
  51:18 52:2,18
  55:19 56:21 58:13
  64:17 70:19 71:16
  77:24 78:12 79:4
  79:9,21 80:25
  82:5 90:7,10,14,19
  100:13,24 101:3
  107:1,1 110:21
  112:6 116:12,18
  116:21,22,23,23
  117:2 122:15
**propose** 83:23
**proposed** 82:14
**provide** 21:25
  22:18 30:3 39:20
  55:2,10 56:3
  58:15 61:5,20
  98:13 112:5
  116:24 119:7
  120:13

**provided** 22:15
  44:3 61:15 84:9
  98:11
**provides** 109:16
  110:24
**providing** 120:5
**public** 4:15 19:8
  19:13 26:13 28:9
  29:1,2,18 36:17
  38:5,7,12,14,19
  44:17 45:12,22,23
  46:3 55:8,10 62:7
  63:5,8 66:5,12,21
  67:22 68:7,23
  69:10,12,25 70:6
  70:20 71:1 72:5
  74:20,25 76:11
  78:4 81:17,22,24
  83:21 85:16 86:18
  94:21 99:7,11,12
  99:13,18,22 108:5
  108:16 109:9,12
  112:11 113:12,15
  117:16,22 122:16
  127:10,18 128:15
  128:23 129:23
**publication** 36:17
  37:20 44:7 108:5
  108:16
**publications** 111:4
**publish** 35:10
  37:25 43:11 51:11
  52:9 99:20 112:25
  113:14 123:12
**published** 36:1
  37:18,25 108:15
**publishes** 38:24
**publishing** 99:10
  109:9
**pull** 21:2,2,2 85:21
  86:6 117:13

**purchase** 39:4
  78:10,14,17,25
  79:2 85:2 107:11
**purchased** 102:3
**purchases** 80:19
**purchasing** 23:9
  84:11 102:2
**pure** 113:7
**purport** 114:13
**purpose** 17:16
  19:6,9,15,15 22:17
  22:22 23:2,19
  26:4,6,9,12,19
  27:3,3,23 28:2,3,6
  28:8,11 30:10
  36:13,13 42:13,23
  43:3 46:15,22
  47:3 48:16 49:13
  50:1,11 51:10,12
  52:9 53:2,19 54:9
  54:18,24 55:3,20
  56:23 57:22 69:20
  70:22 71:6 72:14
  75:13 86:21 87:4
  88:16,21 94:13,16
  96:14,15 98:12
  99:18 100:8
  102:23 108:4,22
**purposes** 17:15
  23:24 27:8 42:25
  44:16 54:19 66:5
  68:9 71:23
**pursuant** 4:8,12
  22:22
**put** 13:10 15:19
  40:22 49:3 72:16
  104:1,3,14 116:8
  116:13
**puts** 19:22
**putting** 42:10
  93:14,19

**pva**   3:18 13:18
  14:12,18,19,20,23
  24:25 25:13,16
  33:24 34:6 41:25
  54:17 58:1 72:21
  75:24 82:3 87:8
  88:23 90:2 95:1
  110:3 114:12
  119:17
**pvas**   5:12 11:17,20
  14:16 73:7 92:4
  92:23 93:22,23
  94:1,7 95:4 96:14
  106:9

**q**

**qualified**   44:5,6
**question**   7:4,10,19
  8:3,15,18,19,21,23
  8:25 9:3,5,7 40:9
  40:13 41:9 44:20
  45:15,17 47:2,6
  49:21 50:9 52:14
  57:4,18 66:3
  74:15 76:7 81:4
  85:25 86:11,17
  87:2,17 88:13
  89:25 91:16 98:16
  98:22,25 100:1,19
  119:5,6 120:4,11
  123:10
**questioning**
  109:10
**questions**   6:25
  7:24 9:8 11:11
  18:2,5 89:3 96:24
  97:3,15,16 99:4
  106:20 109:1
  120:23 121:12,14
  123:4
**quick**   107:9

**quite**   76:7
**quote**   22:1 23:2
  49:19 62:8
**quoted**   20:23

**r**

**raise**   6:2
**raises**   6:4
**ran**   13:24 14:1
**rates**   49:14
**raw**   104:13
**read**   18:23,25 86:9
  87:16,23 88:9
  98:9 99:12 118:10
  124:10 127:5,6,12
  128:5,6,17
**readily**   33:5 41:12
  51:20 52:12,12
  53:25
**reading**   4:17 44:2
  87:19 108:16
  126:19
**reads**   108:4
  117:19
**real**   23:4,11,13
  25:3 35:10 38:21
  38:22,25 44:14
  47:15,16,22 48:3
  49:4 50:17,24,25
  52:25 53:5,8,23
  87:13 107:9
  108:20 109:14
  111:22 113:24
  122:12
**realize**   65:6
**really**   13:10 21:13
  21:13 30:25 49:11
  55:22 56:17 92:1
  104:3 124:2
**realtor**   110:2
**reason**   50:23,23
  50:24 83:20

122:17 126:14
  128:8 129:3
**reasons**   8:24 22:18
  98:13
**recall**   8:7 20:12
  96:1,8,12 100:9,11
  109:8,9 120:23
  121:3
**receipt**   126:18
**receipts**   74:4,23
  82:17 83:19
**receive**   21:25
  29:10 31:13 32:22
  34:22 35:1,2 39:2
  43:4 45:12 51:1
  58:12 70:12 75:17
  81:24 82:21 83:21
  84:12
**received**   20:17
  28:9 29:21 32:24
  36:6 61:8,10,11
  86:18 97:21
**receives**   39:9
**receiving**   20:12
  76:10
**recognize**   71:19
  91:19 95:22
**recommendations**
  94:6
**record**   5:20 7:13
  14:9 26:13 29:1
  29:18 34:17 36:7
  36:17 51:18 55:1
  66:1 88:19 89:6,9
  94:18 97:8 98:23
  101:10 102:21
  104:9 108:6,17
  114:22 115:15
  118:2 125:9 128:9
**recorded**   125:7

**records**   16:13 19:8
  19:13,14 20:18,23
  22:10 26:13 27:9
  27:11,14 28:10
  33:24 34:6 37:19
  42:16,17,18 44:17
  44:24 45:6,12,19
  45:23 46:3 47:22
  48:2 49:5 50:17
  52:15 53:19,22
  54:7,17 55:8,9,10
  55:11 57:21 58:21
  60:9 62:7,10 63:5
  63:8 65:6 66:5,12
  66:22 67:23 68:7
  68:23 69:7,10,12
  69:25 70:6,20
  71:1 72:2,5,8
  74:20,25 76:11,11
  78:4,6 81:17,22,24
  83:21 85:16 86:18
  94:21 99:1,23
  100:8,13,24 101:1
  101:22 102:23,24
  102:25 103:8,25
  106:22 116:2,7
  117:16,21,22
  118:4,12,18
  119:18 120:13
  121:8
**recross**   3:6,8 97:4
  121:15,16 123:23
**redirect**   3:5 109:2
  123:7
**reduce**   76:25
**reduced**   125:8
**refer**   14:19 15:4
  21:7 59:8,11
  100:17
**reference**   14:16,18
  34:10,11 126:7

127:2 128:2
**referenced**  4:9
  120:10 127:11
  128:15
**referring**  14:19,20
  14:22,25 15:1
  22:4 28:16 33:1
  34:13 86:5 122:10
**refers**  19:13
  118:17
**reflect**  102:19
**reflected**  103:14
  108:17 122:4
**regard**  45:18
  97:17 107:10
  121:20 122:10
**regarding**  11:11
  15:25
**regards**  103:8
**registered**  23:13
  23:14 50:25
**regular**  45:19
  106:10
**regulation**  103:14
  114:19 117:6,23
  118:15 119:3
**regulations**  103:8
**reimburse**  77:20
  79:5
**related**  16:6 36:17
  43:12 108:5,17
**relationship**  90:18
**relative**  125:11
**relatively**  65:7
**relators**  108:21
**released**  117:16
**relief**  17:4
**rely**  22:25 25:21
**remember**  92:14
**remotely**  4:6

**rent**  26:14
**repeat**  7:22
**repeated**  49:21
**rephrase**  7:20,22
  8:22 76:8
**rephrasing**  8:20
**report**  64:25
**reporter**  1:25 4:11
  4:16 5:3,19,22 6:2
  6:5,10 7:6 31:23
  125:1,23 127:7
**reporters**  4:4
**represent**  5:17
  106:25
**representing**  5:12
  11:4
**represents**  77:7
  103:24
**request**  8:2 19:8
  20:18,21 21:16,23
  22:16 23:1,18,22
  23:25 24:10 25:24
  26:18 27:7 28:2,5
  28:10 29:5,15,15
  29:21,24 30:10,12
  31:18 32:17,25
  34:18,19,20 35:3
  36:6 37:12 42:15
  42:22 43:7 44:6
  45:13,23 46:3,4
  48:13,15,24 49:5,8
  49:13,16,17,23
  50:18 51:8,10,12
  52:5 53:2 54:8,9
  54:18 55:12,21
  56:15,22 57:21
  58:2,6,12 59:21,22
  61:8 62:6 63:8,12
  65:9 66:6,12,15,22
  67:23 68:7,23
  69:10 70:3,21

71:1,6 83:21
  86:19 98:11 99:23
  100:8 102:6,23
  106:21,22 108:10
  108:23 116:2
  117:25 128:9,11
**requested**  20:24
  21:22 22:10 27:9
  29:7 38:12 42:25
  54:7 60:14 67:16
  121:3
**requester**  34:16
  37:24 55:3,11,15
  56:22 58:15 61:1
  61:21 62:7,9 63:5
  70:20 71:3 94:16
  98:23 99:1 121:2
**requesters**  33:17
  34:23 52:1 74:25
  75:14 94:13
  101:10 119:8,25
**requesting**  42:18
  48:3 49:24 52:2
  53:5,22 59:20
  60:2 105:25 118:1
  118:5,13,21
**requests**  19:14
  28:7 29:10 31:13
  31:16 32:19,22
  33:1,8,13,15 34:22
  34:25 35:2,6 43:2
  45:19 54:19 55:18
  69:12,25 70:7
  71:24 72:11,13
  74:20 75:13 76:11
  78:4 81:17,22,25
  85:17 94:22 96:14
  96:15
**require**  47:3
**required**  76:21
  81:18 126:25

**requirement**
  103:4
**requirements**  4:13
**requisite**  63:4
**resale**  26:14
**research**  11:8,10
  12:13 23:6 24:1
  26:24 35:8
**resell**  27:14 42:17
**reserve**  121:15
**reserved**  124:11
**reserving**  96:23
**resident**  116:11
**residential**  122:14
**respect**  43:9,22
  47:9 66:3 68:6
  69:7 78:3 88:15
**respond**  58:1,5
  81:22
**responding**  66:5
  66:12 71:23 94:21
  101:10
**response**  21:19
  37:12 57:1 87:8,9
  87:9,10 88:22
  100:11,12,14,19
  101:12 120:9,15
  120:18 121:5,20
  121:21 122:7
**responses**  3:14
  88:3 120:5
**responsibilities**
  15:16,19,21,24
**responsibility**
  15:25 83:10
**responsive**  99:23
**restate**  55:13
  70:23
**result**  75:20 92:19
**retain**  41:19

**retrieve** 65:18
**return** 21:25
**returned** 126:18
**reveal** 11:2 18:16
**revenue** 1:14 2:15
  2:19 5:11,11,13,16
  6:18 15:5 32:4,5
  39:19,21,24 40:1,4
  41:13,15 45:10
  75:25 76:18,23
  90:19,21 91:5
  92:11 106:8,9
**revenues** 39:3
  76:22
**review** 10:24
  12:13 18:22 44:4
  60:2 88:5 126:12
  127:1 128:1
**reviewed** 11:12,13
  11:13 16:16 17:9
  17:20 18:18 19:12
  57:2
**reviews** 87:21
**revise** 93:5 94:2
  95:8
**revised** 92:24
**revising** 93:23
**rhythm** 7:9
**rice** 2:18 31:20,23
  32:2,10
**richard.bertelson**
  2:23
**rick** 2:16 5:9 117:9
  121:14
**right** 5:9 6:2,13
  8:5,9,13 9:7,10
  12:16 13:11 15:7
  16:11,15 17:25
  18:21 19:23 22:3
  25:23 26:8 28:3
  28:20,23,25 29:19

30:4 31:4,7,10
32:1 33:14 34:5
34:15,18 36:10
37:23 38:10 39:11
40:5,9,11,16,21
41:4 42:23 43:16
45:3,6 46:8,15,19
46:24 53:13 62:19
62:20 63:16,18
64:19 66:12 69:16
69:19,22 70:9
71:1,9 74:3,4,5
75:5 79:14,16
80:25 81:18 82:18
82:22 86:16 88:25
89:8 92:9 95:12
96:18,23 97:4
99:3 103:2 105:8
106:7 107:14
111:2,24 112:11
114:10,14,25
115:1,4,9,12,25
117:15 119:10,23
121:10,15 122:8
124:11
**ritchey** 2:5
**robertson** 87:14
**robertson's** 87:10
  88:6,9,14,22
**role** 24:22 25:13
  32:6 93:15,18
**roll** 28:16 35:3
  52:2,18 55:19
  56:21 58:13,16,22
  59:5,15,15,16,19
  59:22,24 60:1,12
  60:17 61:4,4,9,16
  61:20 62:3,7
  70:19 79:9,22
  82:5 84:12 119:9

**rom** 105:15
**rough** 78:22
**roughly** 75:18
  78:21 81:2
**rule** 9:12
**rules** 4:8 127:5
  128:5
**run** 9:4 64:7,8
  65:1 82:22
**runs** 73:7

**s**

**s** 126:15 128:8,8
  129:3
**salaried** 70:9
**salaries** 76:1 83:3
  83:7
**salary** 26:16 76:24
  83:12 120:19
**sale** 23:11 26:14
  27:10 112:20
**sales** 24:2,13 25:17
  25:19,21 39:3
  75:12 110:7,25
  111:15 112:3,4,18
  112:25 113:14
**sandra** 1:25 4:15
  125:22
**satisfy** 63:7 68:23
  69:10,11 81:17
**satisfying** 68:4
  74:20 85:16
**save** 62:14 67:10
  67:14
**saved** 85:1,2
  100:18
**saw** 23:10,12 88:2
**saying** 7:13 48:20
  53:12,12,14,15
  55:4,6 77:13
  79:16,24 80:4
  98:20 111:8,11,18

**says** 19:23 21:15
  22:14 26:3,12
  29:7 30:22 31:1,8
  33:24 34:2 36:13
  54:16 57:25 59:20
  60:8 95:19 116:4
  117:16 118:10
  120:11
**schedule** 3:16
  11:13 21:23 90:2
  92:7,10 93:23
  94:2 95:6,18
  119:12
**school** 12:18,19
**scope** 100:8
**scores** 44:13
**scriber** 1:23 4:3
  5:12,19,21,23 6:13
  6:20,21 8:5 9:10
  12:17 15:7 16:12
  17:22,25 18:15
  20:4 21:3,15
  22:15 30:18 32:16
  44:9,22 46:8
  48:14 50:7,9 51:4
  56:2 66:3 70:10
  71:9 72:17 75:17
  87:8,24 88:16
  89:8,17 96:18
  98:10 109:5
  113:11 114:21
  116:10 117:14
  118:9,16 121:12
  123:10 124:9
  126:8 127:4,9
  128:4,13 129:20
**seal** 127:15 128:21
**searches** 24:1
**sec** 86:19,22
**second** 10:14,15
  10:16 16:25 20:8

21:11 43:18 59:16
74:22 95:14 118:9
118:15 119:15
**secret**  54:4
**section**  103:11
117:11,15,17,18
117:19,23
**see**  10:7,12,21
16:22 17:4,12,13
17:17 19:23 20:10
21:9,16,17 22:1,18
22:23 24:16 26:3
26:6 27:23 30:23
31:20 34:3 35:7
36:12,14,19 38:14
43:14 48:9 54:16
54:20 55:25 56:18
58:2,21,23 60:7,10
64:18 65:2 70:18
72:22 85:5,8
87:10 89:23 90:2
92:7 95:20 98:3
100:18,19 110:5
110:11 111:15
119:20,21 123:14
**seeing**  24:4 96:15
**seek**  46:3
**seeking**  30:23 31:2
**seen**  95:23,24
109:21 111:3
**self**  16:5 49:12
50:3,10
**sell**  27:11 39:4
42:16 47:15,16,17
47:22 48:3 53:5
53:23 110:21
**selling**  52:25 53:8
54:2 75:8 76:11
108:20 109:18
110:1,12

**sells**  41:16
**send**  60:21,25
84:12,25 85:4
92:19
**sending**  22:8
68:18 70:3,19
116:17
**sense**  7:17
**sent**  48:4,17 49:7
**separate**  67:25
**sergeant**  2:17 5:14
5:14 96:25
**series**  3:20,21
89:19
**serve**  112:13
**served**  88:7
**servers**  62:25
**service**  26:15
111:12,13,14
**services**  2:19 5:11
5:16 32:4
**set**  3:15 125:5
**sets**  82:10
**sheet**  126:13 128:7
128:10,18 129:1
**short**  89:9
**shortchanged**
112:8
**shortfall**  83:25
84:14,15,19 85:6
**shortly**  20:13
**showing**  5:24
**shown**  126:16
**shows**  112:4
122:20,20
**side**  19:23 34:2
108:19
**sides**  74:1
**sign**  124:10
**signature**  125:19
126:14

**signed**  20:9 127:13
128:18
**significant**  75:25
78:14
**significantly**  77:2
**signing**  4:17
126:19
**similar**  15:19,21
66:17 73:19,23
96:1 110:16,20
111:14
**simply**  31:8 77:1
**sincerely**  126:21
**sir**  6:3 9:9 10:22
11:21 13:12 14:14
16:14 63:9 70:11
70:15 71:11 87:25
89:11 91:11 92:15
93:17 95:17,21
114:8 126:10
**site**  68:1
**sitting**  62:18,20
69:23 97:14
114:12 115:20
**situation**  52:22
57:8
**six**  100:19
**size**  15:18
**skill**  125:10
**skills**  63:4
**social**  24:5,16
**software**  58:9
61:23,25 62:14
64:8,14,25 67:7,9
68:20,22,22,25
69:6,9,11,15,17
76:2 103:23
**sold**  61:17 101:25
110:6,12
**sole**  69:20

**solemnly**  6:5
**solicitation**  26:14
42:19
**solutions**  126:1
129:1
**somebody**  71:19
76:18 80:19,23
109:25 116:7
**someone's**  56:11
**somewhat**  39:2
103:9 111:17
119:5
**soon**  8:18
**sorry**  10:16 31:23
49:13 70:23 73:6
82:19 83:8 86:3
88:8 97:23,24
98:2 107:18,24,25
**sort**  16:6 25:4 36:7
67:24 69:2 70:4
70:12 93:4 94:7
95:2 96:15 110:4
110:15 111:1,16
120:20 123:16
**sought**  49:5 50:18
54:17 57:21
**sounds**  16:5 38:4
**source**  25:22 84:3
84:6,7
**sources**  25:11
**speak**  7:7 12:5
32:2
**speaking**  11:1
94:5
**specific**  14:24
76:19 85:18
**specifically**  4:11
12:1 14:17,21
23:17 30:15 69:11
86:10 96:4,5 99:5
107:16 121:6

**specified** 31:15
**specify** 48:5,24
**speculate** 113:7
**speculation** 44:19
  44:20 113:8,10
  124:7
**spend** 74:20
**spits** 67:10
**sport** 100:1
**sports** 44:13 100:3
**staff** 94:1 122:1
**stamp** 19:22
**standard** 49:17
  60:9
**start** 63:13 85:10
**started** 120:25
**starts** 43:25 89:22
  120:11
**state** 5:4,20 6:19
  24:18 31:5 82:18
  82:21,22 83:2,3,7
  83:11,23 84:13,18
  84:23 85:3,7 87:2
  112:23 117:24
  127:10 128:15
**stated** 53:17
**statement** 50:14
  50:15,19 127:13
  127:14 128:19,19
**states** 1:1 6:15
**statewide** 84:21
**statute** 26:25 27:2
  27:6 30:10,14,15
  31:1 36:22 37:5
  37:15 43:8 46:7,9
  46:23 57:13,16
  71:7 74:7 79:9
  80:1 90:23 107:10
  108:4 118:8,9
**statutes** 11:14
  16:17 17:9,11,16

17:19 18:6 19:11
  45:2,5 87:4 88:17
  88:21 90:24
**statutorily** 81:4,7
**statutory** 4:13
  79:17,20 84:10
**stay** 17:7 19:18
**stays** 65:7
**stenographically**
  125:7
**step** 63:17 66:21
  71:4
**steps** 62:5 68:17
  116:3
**stipulation** 4:1
**stop** 79:16 82:3
**stored** 118:4,12
**stories** 99:7,21
  100:1
**story** 124:4
**straight** 14:4
**straighten** 119:16
**strange** 119:5
**street** 2:20 4:4
**strictly** 25:3 81:16
  105:13
**strike** 19:7 24:20
  28:1 80:17 82:9
  93:7 100:22
**string** 22:4
**strings** 89:20
**structure** 102:20
**structure's** 104:8
**structures** 78:12
  101:3
**studies** 95:2
**study** 96:12
**stuff** 40:15 43:4
  107:9
**subject** 92:6 97:3

**submit** 73:2 75:24
  76:21 82:14 92:11
**submitted** 125:25
**subparagraph**
  26:11
**subscribe** 39:22
  111:23
**subscribed** 127:10
  128:14 129:21
**subscription** 69:1
  70:5 85:11 110:14
  111:11,13,14
**subsection** 30:22
  117:12
**subsequent** 93:4
**subsequently**
  124:3
**subsidize** 76:1,23
  83:16
**subsidized** 40:2
**subsidized** 40:2
**substance** 45:9,21
**substantial** 65:12
  73:17 76:22 77:18
  77:22
**substantiates** 40:7
**sue** 21:14
**suffer** 80:12
**sufficient** 75:23
**suggested** 44:4
**suite** 2:7 4:4 126:2
**superior** 126:1
**supplies** 115:8
**support** 16:6
**suppose** 113:6
  115:2 118:24
**supposed** 12:7
  77:23
**sure** 5:6 7:24 8:4
  8:24 14:9 17:7
  18:3 23:20,23
  29:25 32:8,8

33:11,11,20 34:12
  37:9,10 55:14
  56:5,10 60:4,6
  62:13 64:9 65:2
  65:24 66:19 70:24
  77:11 78:10 87:15
  88:19 89:2 90:5,9
  90:23 92:11 95:15
  97:7 106:2,4,6
  116:10 117:14
  122:18 123:2
**surrounding** 33:3
**susan** 20:9 97:21
  98:7
**sustain** 80:10
**swear** 4:16 6:5
**sworn** 127:10,13
  128:14,18 129:21
**system** 25:14,15
  78:11 81:8,9,13
**systems** 76:2

**t**

**tackett** 95:24
**take** 8:1 16:17
  19:3 63:25 65:8
  65:12 66:14,17
  67:5 77:22 80:24
  87:1,6,15 116:5
**taken** 4:3,8 66:16
  125:5,9
**talk** 11:16 12:17
**talked** 100:6
  103:14,17 120:24
  123:25
**talking** 28:15
  33:20,21 42:14
  51:22 64:2 92:17
  101:9
**talks** 108:1
**tax** 21:16 28:16
  30:6 35:3,8 52:2

52:18 55:19 56:21
58:13,16,22 59:5
59:15,15,16,16,19
59:22,24,25 60:12
60:17 61:4,4,9,15
61:20 62:3,7
70:19 79:9,22
82:5 84:11 99:16
101:18 119:9
123:12,16
**taxable** 60:7
**taxes** 116:13
**taxpayer** 112:15
**taxpayers** 122:24
123:1
**technical** 7:23
**technology** 4:10
**telephone** 2:9,22
76:3
**television** 24:4
**tell** 11:4 12:8
41:19,20,23 48:7
48:21 56:20 57:22
**telling** 56:23
**ten** 26:5 30:18
36:10 85:21
**term** 13:21,24
14:12 26:4 29:5
40:4 59:7,25 87:4
**terminology** 7:17
**terms** 14:10 17:8
19:11,16 25:23
27:6 53:10 64:5
68:4,12 80:16
83:18 92:18 93:14
94:10 96:10 109:8
110:16 111:11,15
119:6
**test** 94:4,25
**testified** 17:8

**testify** 8:7 9:11
11:6 12:7,9,14
57:5
**testifying** 68:10
**testimony** 6:6 7:6
48:19 96:20 127:6
127:7 128:6,9,12
**text** 17:19 60:14
60:22,24 61:5,22
61:23 62:1,2 67:3
67:14,19,24 69:3
70:4,19 103:18
104:14 117:14
118:22 119:25
121:1
**thank** 6:10 97:11
98:14 121:12
**theirs** 41:19
**thereabouts** 75:18
**thing** 7:14,25 16:6
25:4 33:21 64:20
79:1 111:2,16
112:18
**things** 14:17 16:2
23:5,9,12 24:2,5
24:18 33:4,14
35:9 54:1 65:10
65:16,18,19 68:2
69:25 73:24 77:25
78:12 80:9,9
85:10 91:2 94:6
97:17 99:5,5
107:25 112:1,2
113:13 114:6
120:18
**think** 7:9 31:19
38:7 39:23 40:21
42:14,15 45:16
48:20 52:6 56:6
61:6 62:18 63:16
65:22 66:20 67:1

67:8 71:18 73:17
78:16 83:9,13,13
89:4 90:7,8,10
94:8 95:4 96:5
98:15 108:17,22
109:12,16,24
112:12,17,21,24
113:1 116:19
119:16 121:10
122:11,16 123:1
**third** 10:6,8 17:2
**thirty** 126:18
**thomas** 1:13 2:13
91:6 126:6 127:3
128:3
**threads** 89:20
**three** 15:9 16:18
17:7,11,19 54:16
57:1,6,20 64:2
65:13 103:11
105:21 106:1
117:12,18
**thumb** 62:11,15
67:15
**tied** 76:12 78:9
114:25
**time** 7:19 8:2 15:9
15:14 29:25 31:3
42:21 44:2 45:12
45:23 46:4 47:7
51:17 52:13 53:3
65:12,25 66:17
68:16 76:25 77:22
78:8 80:2 84:24
86:18 90:1 92:23
97:12,12,14
104:10,11 114:16
115:19,24 121:13
125:5
**times** 7:15 8:14,19
15:4 18:4 105:9

**title** 90:9,13 125:6
**titled** 72:20
**titles** 15:10
**today** 8:6 9:11
11:7 12:14 14:11
16:16 17:20 18:2
19:12 54:22 56:25
68:10 88:3 92:11
96:21 97:12
**today's** 10:23
**told** 23:15 27:17
27:25 42:22,24
48:15 51:10 52:8
**top** 16:22 19:19,21
20:5 33:23 36:11
43:25 72:20 73:5
95:18 119:20
**topic** 57:1,6,10,19
57:25 85:19,21
**topics** 10:24 11:6
11:20 12:1,8
38:21 54:14
**total** 47:24 77:8
101:20
**totally** 64:21
**totals** 64:7,8,12
**track** 64:13
**traditional** 39:1
**transactional** 69:2
70:5
**transactions** 23:12
25:7
**transcribed** 127:7
**transcript** 4:17
125:4,9 126:11,12
127:5,12 128:5,11
128:17
**transmit** 71:3
**transmitting**
121:2

**travel** 76:2 79:6
**traveled** 77:21
**true** 72:7 125:9
**truth** 6:7,7,8
**truthfully** 8:7
**try** 7:7,22
**trying** 116:13
**turn** 10:8,14 17:6
  21:11 24:3 25:24
  43:18 71:9 72:16
  91:22,23
**twenty** 9:20
**twice** 14:8
**two** 19:16 64:2,12
  67:8 74:1 89:3
  101:13
**type** 32:17 37:19
  60:25 63:12 96:1
  110:10 122:4
  123:18
**types** 11:5 31:12
  32:21
**typewritten** 125:8
**typically** 33:1
  34:19 35:1 55:5,6
  55:23 60:21 61:20
  99:9

**u**

**uh** 16:19 26:1
  27:20 28:4 30:20
  36:20 43:20 45:7
  46:16 54:15,21
  55:17 58:20 63:19
  77:9 79:14 89:14
  91:25 100:20
  101:11,17,19
  102:9 104:16
  119:22,24 121:23
**ultimate** 92:19
**ultimately** 20:20

**uncover** 123:18
**understand** 7:1,18
  7:21,24 9:10
  14:13 15:4 19:12
  19:15 20:16 27:7
  27:13 40:4 41:1
  42:17 53:9,9,14,15
  55:8 60:1 73:1,7
  74:1,24 82:7 89:9
  90:25 91:13 93:3
  94:3,11 110:23,23
**understanding**
  17:23 18:5,8,16
  19:1,5,7 37:8 39:6
  74:7 79:8 88:6
  90:13,18,18
**understood** 17:10
  27:10 48:19
**undertake** 54:23
**unfair** 40:13
**unfairly** 122:24
**unfortunately**
  10:4
**unheard** 56:16
**uninitiated** 8:10
**united** 1:1 6:15
**unusual** 108:12
**upcoming** 74:9
**upload** 68:1
**ups** 109:4 121:18
**usb** 105:14
**use** 4:10 14:11
  15:3 22:16,21
  23:15 24:20,20,23
  25:2,11 26:13,15
  27:8,22 28:1,3
  29:5 36:17 38:11
  38:16,19 42:14
  43:11,12,22,24
  44:6 46:15 47:9
  47:22,25 48:2,6,22

48:24 49:23 50:2
  53:4,19,22 57:9
  59:25 62:13,16,24
  64:14 67:2 68:24
  69:5,10,22,24 70:2
  76:1 77:5 84:11
  84:11 86:20 93:10
  98:12 108:5,17,24
  109:19,25 114:9
**useful** 24:24
  109:17,25 112:19
  113:17
**user** 19:4 26:15
  95:10 111:16
**users** 49:5 50:18
**utilize** 25:14,15
  35:15
**utilized** 26:17 34:7

**v**

**v** 1:10 126:6 127:3
  128:3
**valid** 62:13
**validate** 63:17
  64:4,6 65:8
**validating** 64:5
  66:4,20
**validation** 66:4
  121:1
**valuable** 112:13
  112:21 113:1,17
  114:15
**valuation** 6:17
  9:12,15,19 10:10
  13:8,15,20 14:4,12
  17:1 18:6 20:7
  24:22 71:16 90:8
  90:10,14,20 107:1
  112:1
**value** 122:15
  124:2

**valued** 124:1
**variables** 65:19
**varies** 64:1
**various** 6:17 8:14
  38:21 72:11
**ventura** 1:25 4:15
  7:12 125:22
**verbiage** 46:10
**verification** 25:17
  25:19,22
**verified** 112:20
**verify** 40:17,24
  41:23
**veritext** 126:1,7
  129:1
**veritext.com.**
  126:17
**version** 10:6 34:6
  56:12 65:18 92:17
  92:20,25 93:9,13
  105:14
**versus** 96:14
**video** 69:24
**videoconference**
  2:11,25 4:5,12
**view** 37:2 38:18,25
  44:2,15 49:25
  50:15,20 91:5
  94:15
**viewed** 86:22
**violate** 80:4
**visual** 110:6 111:1
  111:16
**visually** 65:1
**vital** 51:2
**voluntarily** 82:3

**w**

**waiting** 48:20
**waived** 4:18
  126:19

**walk** 62:5
**want** 8:24 11:2,17
    13:7 14:8,21
    18:15,17 29:12
    30:1 31:21 34:12
    43:23 45:8,21,22
    56:12 58:17 62:11
    65:21 66:11 73:24
    81:22 82:7 86:9
    87:6,15 89:20
    94:25 112:8
    117:14 119:16
**wanted** 32:7,8
    51:13 89:13 97:11
    103:16 104:17
    111:20 116:20
    123:15
**wanting** 56:16
**wants** 30:5 105:13
    115:14
**water** 13:16
**way** 7:11 15:20
    24:21 35:16 74:12
    76:9 103:20 107:5
    116:9 125:12
**we've** 84:19
**website** 23:5,21,25
    24:13 44:12 49:6
    50:18 53:24 90:2
    100:2,3 109:16,19
    110:10,22 112:3
    112:10 113:14
    114:5 123:13
**week** 36:2
**weigh** 117:5,9
**weird** 64:16
**welcome** 51:17
**went** 63:22
**wesleyan** 13:2
**west** 4:4

**wise** 64:11
**witness** 4:16,18
    5:4,21,23 6:4,9
    9:13 87:21 123:6
    126:8,11 127:1,4
    127:11 128:1,4,15
**witnesses** 96:19
**witness'** 126:14
**word** 82:13 104:1
    104:3,24
**words** 26:22 49:11
    76:14 78:7 96:15
**work** 70:14
**workings** 99:15
**works** 6:24 67:12
**worry** 83:5
**worth** 64:18
    122:14
**wow** 9:21
**wrap** 89:4
**write** 21:20
**writes** 22:14
**written** 18:22
    57:19 117:19,25
    118:3,11
**wrong** 63:22 64:10
**wrongdoing**
    123:19
**wrote** 22:20

**y**

**yeah** 18:14,23
    25:20 43:17 57:3
    58:25 65:24 66:8
    66:10 73:21,23
    76:16 85:24 94:9
    96:8 97:7 99:9
    102:15,17 105:10
    105:10,12 111:6,6
    111:10,19,19
    112:9 114:2 123:2
    123:2,2 124:6

**year** 12:22 13:5,10
    28:18 59:17 65:6
    65:7 73:7,8,8,12
    74:9,19 75:4
    78:23 81:2 83:14
    83:19 85:2 112:3
**years** 9:20 13:9
    14:4 24:10 73:15
    73:20 77:23 79:21
    80:3 84:17,20,23
    85:1
**yep** 86:15

**z**

**zero** 64:11
**zeros** 64:12
**zillow** 1:7 2:3 5:7
    5:25 6:14 16:24
    19:3,5,7 20:5 23:4
    23:8,9,10,11,13,19
    24:4,5 25:7,7,18
    25:21 26:24 27:3
    27:7 35:12 38:18
    38:21,24 39:17
    41:2,4,5,6,11 43:9
    43:13 44:5,12,16
    47:4,7,13 49:1
    50:16,24 51:6
    53:4,21 54:7,18
    58:2 86:19 100:8
    100:14 110:16
    123:11 126:6
    127:3 128:3
**zillow's** 22:16 23:1
    24:9 26:18 34:20
    38:11 39:13 41:12
    42:14 44:6 46:14
    52:24 53:1 54:18
    57:21 58:6 86:18
    88:7 98:12 109:16
**zillow.com** 25:2
    49:6 50:19 99:4

100:1,3 109:23
    110:10,24 111:14
    123:18
**zillow.com's** 24:21
**zoning** 33:3
**zoom** 5:8,18 7:15

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.