UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

*Electronically Filed*

| | |
|---|---|
| ZILLOW, INC.<br><br>    *PLAINTIFF*,<br><br>v.<br><br>DANIEL P. BORK, Commissioner of the Kentucky Department of Revenue, et al.,<br><br>    *DEFENDANTS*. | Case No. 3:19-cv-00049-GFVT-EBA |

**INTERVENING COMPLAINT OF KENTUCKY PRESS ASSOCIATION AND AMERICAN CITY BUSINESS JOURNALS, D/B/A LOUISVILLE BUSINESS FIRST SEEKING DECLARATORY RELIEF**

**I.    PRELIMINARY STATEMENT**

1.    The Kentucky Press Association ("KPA") and American City Business Journals, Inc., d/b/a/ Louisville Business First ( collectively, "Intervenors") seek to intervene as of right pursuant to Fed. R. Civ. P. 24(a), or in the alternative, request the Court's permission to intervene pursuant to Fed. R. Civ. P. 24(b), to seek a judgment that the "newspaper exception" to the Kentucky Open Records Act's commercial requester fee provision is constitutional. In addition, Intervenors seek to appeal this Court's contrary ruling in *Zillow, Inc. v. Bork*, No. 3:19-CV-00049-GFVT, __ F. Supp. 3d. __, 2022 WL 883849 (E.D. Ky. Mar. 24, 2022).

2.    That decision, issued without notice to or the knowledge of Intervenors, materially impaired their longstanding rights under Kentucky law and the U.S. Constitution by declaring the

1

"newspaper exception" unconstitutional and thereby exposing newspapers (and potentially other media outlets) to the often-excessive fees that state and local agencies may assess on those who use the Act to request records that are to be used for a "commercial" purpose. *See Zillow, Inc.*, 2022 WL 883849, at *7 (declaring newspaper exclusion from the "commercial purpose" exception to be facially unconstitutional).

3.  None of the parties to the present action are positioned to safeguard the media's interest. Zillow has proven that by arguing that the media's exemption from the commercial fee request is itself unconstitutional. And the Defendants have, on information and belief, recently elected not to appeal the adverse aspects of the ruling (which will, in fact, lead to them obtaining more revenue). Thus, Intervenors are the only party positioned to ask the Sixth Circuit to consider—and vindicate—the press' constitutional and statutory rights.

4.  The Kentucky General Assembly has declared that "free and open examination of public records is in the public interest." KRS 61.871. And in order to allow the press to readily access public records for the benefit of the public, it has made clear that the definition of "commercial purpose" does not include "[p]ublication or related use of a public record by a newspaper or periodical" or "[u]se of a public record by a radio or television station in its news or other informational programs." KRS 61.870(4). The General Assembly has further declared that "[a] newspaper, periodical, radio or television station shall not be held to have used or knowingly allowed the use of the public record for a commercial purpose merely because of its publication or broadcast, unless it has also given its express permission for that commercial use." KRS 61.874(5)(c).

5.  Carving media organizations out of the definition of "commercial" requesters makes perfect sense. After all, the Supreme Court has long recognized that news stories are not

2

considered "commercial" speech and "the degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away." *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 n.5 (1988); *see also Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 647 (1981) (First Amendment protections are not "lost because the written materials sought to be distributed are sold rather than given away"); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."); *Murdock v. Pennsylvania*, 319 U.S. 105, 111 (1943) ("But the mere fact that the religious literature is 'sold' by itinerant preachers rather than 'donated' does not transform evangelism into a commercial enterprise").

6. The commercial/non-commercial distinction matters greatly to members of the press, and to the public they serve. Agencies responding to commercial requests are allowed to—and typically do—demand that requesters agree to contractual limitations on the distribution of records they obtain under the Act. *See* KRS 61.874(b). This directly infringes on the media's First Amendment right to publish news about state agencies that are of interest to its readers.

7. Moreover, under the Act, agencies may only assess non-commercial users a nominal fee that "shall not exceed the actual cost of reproduction, including the costs of the media and any mechanical processing cost incurred by the public agency, *but not including the cost of staff required*." KRS 61.874(3) (emphasis added). Courts have recognized that, in processing Open Records requests, the burden of separating exempt from non-exempt information is part of an agency's burden under the law and cannot be passed on to a non-commercial requester. *See Dep't of Kentucky State Police v. Courier Journal*, 601 S.W.3d 501, 508 (Ky. Ct. App. 2020) (collecting authorities). For commercial requesters, by contrast, an agency may assess a fee that includes the

"[c]ost to the public agency of media, mechanical processing, *and staff required to produce a copy of the public record or records*" or the "[c]ost to the public agency of the creation, purchase, or other acquisition of the public records." *Id.* § 61.874(4)(c) (emphasis added). That distinction makes all the difference, as the ability of agencies to charge any expense related to compliance—including staff time—will discourage the media from even making public records requests.

8. Although the financial stakes are high for the intervenors, this is *not* simply a matter of newspapers' bottom lines. Kentucky Courts have long recognized that "[n]ews outlets occupy 'a unique position as the eyes and ears of the public.'" *Cincinnati Enquirer v. Dixon*, 638 S.W.3d 379, 383 (Ky. 2022) (quoting *Courier-Journal & Louisville Times Co. v. Peers*, 747 S.W.2d 125, 127 (Ky. 1988)). If those eyes and ears are closed because of prohibitive fees in an environment of shrinking local news budgets, or the news outlets are muzzled by contracts that limit the way they can use public records, the public will suffer. It will no longer have watchdogs able to assess "whether the public servants are indeed serving the public," which, in turn, "provides impetus for an agency steadfastly to pursue the public good." *Kentucky Bd. of Exam. v. Courier-Journal*, 826 S.W.2d 324, 328 (Ky. 1992).

## II.   PARTIES

9. Intervenor-Plaintiff Kentucky Press Association ("KPA") is a Kentucky non-profit corporation with a principal place of business at 101 Consumer Ln., Frankfort, KY 40601-2835. KPA is the leading trade association for print and online journalists in Kentucky. KPA's membership includes 174 different newspapers across the state. KPA's members are committed to excellence in the gathering, dissemination, and facilitation of news and information through multiple platforms. KPA's members regularly submit non-commercial records requests under the Kentucky Open Records Act.

4

10. Intervenor-Plaintiff American City Business Journals, Inc. d/b/a Louisville Business First ("LBF") is a Delaware Corporation with its principal place of business in Kentucky at 462 S. Fourth St., Louisville, KY 40205. LBF publishes a weekly print newspaper covering news of interest to Louisville's business community, as well as the website www.bizjournals.com/louisville. Among other topics, LBF regularly covers the health care, banking, technology, food and lifestyle, and commercial/residential real estate sectors.

11. Plaintiff/Intervenor-Defendant Zillow is a Washington for-profit corporation, with its principal place of business in Seattle, Washington.

12. Defendant/Intervenor-Defendant Daniel P. Bork ("Commissioner Bork") is the Commissioner of the Kentucky Department of Revenue ("DOR") and is charged with directing, instructing, and supervising each Kentucky property valuation administrator ("PVA") throughout the Commonwealth of Kentucky, including their enforcement of the Commercial Purpose Fee Statutes.

13. Defendant/Intervenor-Defendant Brad McDowell ("PVA McDowell") is the Property Valuation Administrator for Shelby County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Shelby County, Kentucky.

14. Defendant/Intervenor-Defendant Kellie Lang ("PVA Lang") is the Property Valuation Administrator for Franklin County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Franklin County, Kentucky.

15. Defendant/Intervenor-Defendant Jason Scriber ("PVA Scriber") is the Property Valuation Administrator for Henry County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Henry County, Kentucky.

16. Defendant/Intervenor-Defendant Blake Robertson ("PVA Robertson") is the Property Valuation Administrator for Owen County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Owen County, Kentucky.

17. Defendant/Intervenor-Defendant Jill M. Mahoney ("PVA Mahoney") is the Property Valuation Administrator for Trimble County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Trimble County, Kentucky.

18. Defendant/Intervenor-Defendant Jason Neely ("PVA Neely") is the Property Valuation Administrator for Clark County, Kentucky, and the public official charged with enforcing the Commercial Purpose Fee Statutes for Clark County, Kentucky. (PVAs McDowell, Lang, Scriber, Robertson, Mahoney, and Neely are collectively referred to as the "Defendant PVAs.")

## III. JURISDICTION AND VENUE

19. This Court has jurisdiction over this dispute by virtue of 28 U.S.C. §§ 1331, 2201, 2202.

20. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), because a substantial part of the events giving rise to Zillow's claims occurred in this district, and because the defendants are public officials who perform their duties in, and are located within, this judicial district.

## IV. FACTUAL ALLEGATIONS

### A. PRIOR LITIGATION

21. Zillow filed suit in this Court on July 9, 2019, arguing that charging it fees as a commercial requester violated its First and Fourteenth Amendment Rights. *See* Doc.1, PageID.22-31.

22. On March 24, 2022, this Court granted in part and denied in part Zillow's motion for summary judgment.

23. It first declared that the Open Records Act's "commercial/non-commercial purpose distinction is content-neutral, so the First Amendment is not implicated." Doc.68, PageID.3116-17.

24. Next, however, the Court found that exempting newspapers from the definition of commercial requesters violates both the First and Fourteenth Amendment to the Constitution. Doc.68, PageID.3117-25. It concluded that it must sever the exemption for newspapers (but not other entities) from the Open Records Act. *Id.*, PageID.3126.

25. The Court then entered judgment in favor of Zillow. Doc.69, PageID.3131–3132.

**B.    LBF'S Request**

26. On February 22, 2022, Allison Stines, a reporter at Louisville Business First, made a request to the Jefferson County Property Value Administrator for records showing (1) all deed transfers valued at more than $500,000 for calendar year 2021; (2) valid home sales over $500,000 for calendar year 2021; and (3) new construction sales over $500,000 for calendar year 2021.

27. LBF requests this information annually to produce two annual rankings that are part of its widely read "Book of Lists": the highest residential real estate transactions – existing homes and highest residential real estate transactions – new homes. LBF also requests similar information on a regular basis from PVAs to write a monthly feature on the most expensive real estate transactions in Jefferson County; these articles are consistently among the most widely read features on LBF's website.

28. On March 1, 2022, the Jefferson County PVA contacted LBF to inform it that it was working on the records requests and would send the records as soon as it was finished compiling them.

29. Several weeks passed, and no records were produced. So LBF followed up with the PVA on March 29, 2022. The agency replied the same day, informing LBF that it would have to pay commercial requester fees—for the first time—if it wanted to access these records. The PVA's email relied on guidance issued to all PVAs across the Commonwealth telling them that they must charge commercial user fees to newspaper requesters, like LBF. That email specifically stated that this Court's ruling required LBF to pay commercial requester fees even though it was a newspaper.

30. The PVA's quoted costs were far higher than the nominal costs of reproduction that LBF otherwise would have had to pay for these same records, as it had done in past years.

31. In view of the increased expense, LBF opted not to purchase the records under the commercial fee schedule. Instead, it was forced to use a manual, more time-intensive process to identify largest sales in the Louisville market for its annual coverage of this story. Moreover, because of the nature of the data derived from that alternative process, LBF could not segregate the data in the way that its readers have become accustomed to seeing: separate lists for existing and new home sales.

32. LBF intends to continue requesting these, and similar, records from public agencies in the future.

    **C.**    **Other KPA Members' Requests**

33. Other KPA members across the Commonwealth frequently request public records from state and local agencies.

34. Since the inception of the Open Records Act in the 1970s, these KPA members have been exempt from commercial request fees under the Act.

35. In addition, KPA members have been free to use records obtained under the Act for any journalistic purpose.

36. KPA's members intend to continue requesting records from state and local agencies across the Commonwealth.

37. Under this Court's ruling, which treats those KPA members as "commercial" requesters, public agencies may attempt to control the media's use of these records through contracts they can ask commercial requesters to sign.

38. Additionally, under this Court's ruling, public agencies can charge newspapers far more for requesting the very same records they have always been able to obtain under the Act.

39. These new restrictions on use of public records and fees for accessing them will dramatically reduce KPA members' ability to use public records in their reporting.

## CLAIMS FOR RELIEF

### COUNT I
### (Declaratory Judgment—Newspaper Exception)

40. Intervenors incorporate by reference all allegations in the preceding paragraphs as if set forth herein.

41. The Court correctly held that the Act's "commercial/non-commercial" distinction is a content-neutral rule that does not violate the Constitution. Doc.68, PageID.3116-17.

42. The Court erred, however, in holding that the statutory classification of newspapers as non-commercial requesters violates the First and Fourteenth Amendment rights of Plaintiff Zillow. *Id.*, PageID.3117-25. That distinction turns not on the content or viewpoint of the media's speech, but rather on the purpose for which the requester intends to use the documents: something the Court said was a valid, content-neutral distinction.

43. Moreover, even if the newspaper exception were content-based, "it is well established that the government can make content-based distinctions when it subsidizes speech." *Davenport v. Washington Educ. Assn.*, 551 U.S. 177, 188–89 (2007) (citing *Regan v. Taxation*

9

*With Representation of Wash.*, 461 U.S. 540, 548–550 (1983)). Thus, the Commonwealth is free to pay for staff time needed to process requests for media organizations that use them for newsgathering purposes, but not commercial requesters who plan to use the documents for their own gain.

44. In addition, the remedy that the Court imposed in its order—requiring the Commonwealth to treat newspapers as commercial requesters—violates the First Amendment in multiple respects. First, it allows the state to control the purposes for which public records may be used, including the conditions under which they may be published. *See* KRS 61.874(4)(b). That amounts to an unconstitutional form of prior restraint. *See, e.g.*, *Plain Dealer Publishing Co.*, 486 U.S. at 757 ("At the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."). Such restrictions are presumed unconstitutional. *See Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019).

45. Second, the Court's remedy now requires PVAs—and, arguably, other state agencies—to charge newspapers (but not TV or radio broadcasters) for access to information that would be provided, for only a nominal fee, to other requesters. That violates decades of Supreme Court caselaw holding that news reporting is entitled to full First Amendment protection even though it is sold rather than given away. *See, e.g.*, *Plain Dealer Publishing Co.*, 486 U.S. at 757 n.5; *Joseph Burstyn, Inc.*, 343 U.S. at 501.

46. Moreover, the Court's remedy creates the very problem it purports to cure: differential treatment based on the identity of the requester. Individuals who want to broadcast public records on a TV show, radio program, podcast, or just their own blog, remain exempt from commercial request fees (for now), whereas newspapers must pay them. The appropriate way for

the Court to have resolved this First Amendment problem—even if there were one—was to treat Zillow like those other requesters, and not to uniquely disfavor newspapers over all other requesters.

47. Intervenors, including KPA member newspapers, intend to keep requesting access to public records, including those held by the Defendant PVAs.

48. The Court's erroneous holding will impede Intervenors' ability to obtain public records and violate their First Amendment right to gather and disseminate news.

49. Intervenors are entitled to a judgment declaring that the newspaper (and other) exceptions in KRS 61.870 and 61.874 do not violate the Constitution and are enforceable.

50. Intervenors also are entitled to a judgment declaring that even if these statutes do violate the Constitution, the Court's chosen remedy inappropriately punishes newspapers without granting Plaintiff Zillow the relief it sought—an exemption from commercial requester fees.

## REQUEST FOR RELIEF

Intervenors respectfully request that this Court:

A. Grant their motion to Intervene;

B. Declare that provisions of the Kentucky Open Records Act exempting newspapers from commercial requester fees, KRS 61.870 and 61.874, are constitutional;

C. Declare that even if those provisions of the Act are unconstitutional, the appropriate remedy would be to exempt Zillow from the commercial fee provisions rather than to treat newspapers as commercial requesters; and

D. Grant such other and further relief as the Court may deem just, proper, and equitable.

Dated: May 2, 2022

                          */s/ Michael P. Abate*
                          Jon L. Fleischaker
                          Michael Abate
                          Rick Adams
                          Chuck Stinson
                          Kaplan, Johnson, Abate & Bird LLP
                          710 West Main Street
                          Fourth Floor
                          Louisville KY 40202
                          Telephone: (502) 416-1630
                          mabate@kplouisville.com
                          radams@kplouisville.com
                          cstinson@kplouisville.com

                          *Counsel for Intervenors*